Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>       Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>       Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey (collectively, "Singularism"), by and through their counsel, hereby file this Motion for Temporary Restraining Order and Preliminary Injunction to preserve the status quo and protect against Defendants' violation of Plaintiffs' constitutional and statutory rights to free exercise of religion.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** …………………………………………………………… ii

**TABLE OF AUTHORITIES** …………………………………………………… iii

**INTRODUCTION** ………………………………………………………….. 1

**RELIEF SOUGHT AND GROUNDS FOR RELIEF** ………………………… 2

**STATEMENT OF FACTS** ………………………………………………… 2

**ARGUMENT** …………………………………………………………….. 9

    I.      **PLAINTIFFS MEET EACH REQUIREMENT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.** ……. 9

        a.  **Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.** ………………………………………………………………... 10

            i.  *The First Amendment to the U.S. Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……. 10

           ii.  *Article I, Section 4 of the Utah Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……… 14

          iii.  *Utah's Religious Freedom Restoration Act Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……… 17

           iv.  *The Utah Code Contains Various Exemptions Which Undermine the Government's Interest and Indicate There are Less Restrictive Means.* …………………………………………………… 22

           v.  *Courts and Agencies Permit Sincere Religious Adherents to Conduct Religious Ceremonies with Entheogenic Substances.* ….. 25

           vi.  *Strict Scrutiny Requires Plaintiffs' Religious Exemption from the Utah Controlled Substances Act.* ………………………………… 26

        b.  **Plaintiffs Have Suffered and Will Suffer Irreparable Harm.** ……….. 30

        c.  **The Injury to Plaintiffs Greatly Outweighs Any Potential Damage to Defendants.** ……………………………………………………… 30

        d.  **A Temporary Restraining Order and Preliminary Injunction Advance the Public Interest.** ………………………………………… 31

**CONCLUSION** ………………………………………………………… 31

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Attorney General v. Desilets*,
636 N.E.2d 233 (Mass. 1994)............................................................................. 16

*Bostock v. Clayton Cnty., Georgia*,
140 S. Ct. 1731 (2020)......................................................................................... 11

*Braunfeld v. Brown*,
366 U.S. 599 (1961) ...................................................................................... 18, 19

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ......................................................................... 17, 18, 19, 20

*Church of Christ v. Metropolitan Board of Zoning Appeals*,
371 N.E.2d 1331 (Ind. Ct. App. 1978) ................................................................ 16

*Church of Holy Light of Queen v. Holder*,
443 F. App'x 302 (9th Cir. 2011)......................................................................... 26

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) ............................................................................................ 12

*Church of the Holy Light of the Queen v. Holder*,
584 F. App'x 457 (9th Cir. 2014)................................................................... 26, 29

*City Chapel Evangelical Free Inc. v. City of South Bend*,
744 N.E.2d 443 (Ind. 2001)................................................................................. 16

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ............................................................................................ 18

*City of Woodlinville v. Northshore United Church of Christ*,
211 P.3d 406 (Wash. 2009) ................................................................................. 16

*Core Progression Franchise LLC v. O'Hare*,
2022 WL 1741836 (10th Cir. May 31, 2022)...................................................... 30

*Coulee Catholic Schs. v. Labor & Indus. Review Comm'n*,
768 N.W.2d 868 (Wis. 2009) .............................................................................. 16

*Davis v. The Church of Jesus Christ of Latter-day Saints*,
852 P.2d 640 (Mont. 1993)................................................................................. 16

*Dedman v. Board*,
740 P.2d 28 (Haw. 1987) ..................................................................................... 16

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990) ................................................................................. 12, 13, 24

*Foltin v. Roman Catholic Bishop*,
871 A.2d 1208 (Me. 2005) .................................................................................. 16

*Fulton v. City of Philadelphia, Pennsylvania*,
141 S. Ct. 1868 (2021)....................................................................... 11, 12, 13

*Gipson v. Brown*,
749 S.W.2d 297 (Ark. 1988) ............................................................................... 16

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
  546 U.S. 418 (2006) ...................................................................... 13, 19, 25
*Harmon v. City of Norman, Oklahoma,*
  981 F.3d 1141 (10th Cir. 2020) ................................................................ 10
*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ................................................................ 30
*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ................................................................ 10
*Holt v. Hobbs,*
  574 U.S. 352 (2015) ................................................................................. 17
*Humphrey v. Lane,*
  728 N.E.2d 1039 (Ohio 2000) .................................................................. 16
*In re Brown,*
  478 So. 2d 1033 (Miss. 1985) ................................................................... 16
*Janny v. Gamez,*
  8 F.4th 883 (10th Cir. 2021) .............................................................. 11, 12
*Jeffs v. Stubbs,*
  970 P.2d 1234 (Utah 1998) ................................................................. 14, 15
*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) .......................................................................... 10, 11, 12
*Larson v. Cooper,*
  90 P.3d 125 (Alaska 2004) ....................................................................... 16
*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  140 S. Ct. 2367 (2020) .............................................................................. 17
*Lower v. Bd. of Dirs. of the Haskell Cnty. Cemetery Dist.,*
  56 P.3d 235 (Kan. 2002) ........................................................................... 16
*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018) .............................................................................. 12
*Matter of Browning,*
  476 S.E.2d 465 (N.C. Ct. App. 1996) ...................................................... 16
*McCready v. Hoffius,*
  586 N.W.2d 723 (Mich. 1998) ................................................................. 16
*Hill-Murray Federation of Teachers v. Hill- Murray High School,*
  487 N.W.2d 857 (Minn. 1992) ................................................................. 16
*Munns v. Martin,*
  930 P.2d 318 (Wash. 1997) ...................................................................... 16
*Catholic Charities v. Serio,*
  859 N.E.2d 459 (N.Y. 2006) .................................................................... 16
*Porth v. Roman Catholic Diocese,*
  532 N.W.2d 195 (Mich. Ct. App. 1995) .................................................. 16
*Rasheed v. Comm'r of Corr.,*
  845 N.E.2d 296 (Mass. 2006) .................................................................. 16
*Rocky Mountain Gun Owners v. Polis,*
  121 F.4th 96 (10th Cir. 2024) ................................................................... 10

iv

*Rupert v. Portland,*
  605 A.2d 63 (Me. 1992) ............................................................................ 16
*Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n,*
  2006 UT App 47 ........................................................................................ 26
*Sherbert v. Verner,*
  374 U.S. 398 (1963) .................................................................................. 13
*Sierra Club, Inc. v. Bostick,*
  539 F. App'x 885 (10th Cir. 2013) ............................................................ 30
*Snyder v. Murray City Corp.,*
  124 F.3d 1349 (10th Cir. 1997) ................................................................ 14
*Snyder v. Murray City Corp.,*
  2003 UT 13, 73 P.3d 325 .......................................................................... 14
*Soc'y of Separationists, Inc. v. Whitehead,*
  870 P.2d 916 (Utah 1993) ........................................................................ 14
*St. John's Lutheran Church v. State Comp. Ins. Fund,*
  830 P.2d 1271 (Mont. 1992) ...................................................................... 16
*State ex rel. Swann v. Pack,*
  527 S.W.2d 99 (Tenn. 1975) ..................................................................... 16
*State v. Evans,*
  796 P.2d 178 (Kan. Ct. App. 1990) .......................................................... 16
*State v. Everly,*
  146 S.E.2d 705 (W.Va. 1966) ................................................................... 16
*State v. Green,*
  2004 UT 76 ................................................................................................ 15
*State v. Hershberger,*
  462 N.W.2d 393 (Minn. 1990) .................................................................. 16
*State v. Holm,*
  2006 UT 31, 137 P.3d 726 ........................................................................ 15
*State v. Loudon,*
  857 S.W.2d 878 (Tenn. Crim. App. 1993) ................................................ 16
*State v. Mack,*
  173 N.H. 793, 249 A.3d 423 (2020) ................................................... 16, 26
*State v. Miller,*
  549 N.W.2d 235 (Wis. 1996) .................................................................... 16
*State v. Mooney,*
  2004 UT 49, 98 P.3d 420 .......................................................................... 26
*State v. Victor,*
  15–339 (La. App. 5 Cir. 5/26/16), 195 So. 3d 128 ................................... 16
*Summum v. Pleasant Grove City,*
  2015 UT 31, 345 P.3d 1188 ...................................................................... 14
*Swanner v. Anchorage Equal Rights Comm'n,*
  868 P.2d. (Alaska 1994) ............................................................................ 16
*Tanzin v. Tanvir,*
  592 U.S. 43 (2020) .............................................................................. 17, 18

v

*Thomas v. Review Bd. of Ind. Employment Security Div.*,
    450 U.S. 707 (1981) ..................................................................................... 11
*Toledo v. Nobel-Sysco, Inc.*,
    892 F.2d 1481 (10th Cir. 1989) ................................................................ 26
*United States v. Boyll*,
    968 F.2d 21 (10th Cir. 1992) ..................................................................... 26
*Verlo v. Martinez*,
    820 F.3d 1113 ............................................................................... 10, 31
*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ..................................................... 11, 13, 31
*Wolf v. Sundquist*,
    955 S.W.2d 626 (Tenn. App. 1997) ........................................................ 16

**Statutes**

42 U.S.C. § 1996a ....................................................................................... 24
42 U.S.C. § 2000bb-1 ................................................................................. 17
775 Ill. Comp. Stat. 35/1 to 35/99 ............................................................ 16
Ala. Const. art. I § 3.01 .............................................................................. 16
Ariz. Rev. Stat. §§ 41-1493 to 41-1493.02 .............................................. 16
Ark. Code §§ 16-123-401 to 16-123-407 ................................................. 16
Article I, Section 4 of the Utah Constitution ......................... 2, 14, 15, 27
Article III, Section 1 of the Utah Constitution ......................................... 15
Conn. Gen. Stat. § 52-571b ........................................................................ 16
Fla. Stat. §§ 761.01 to 761.05 .................................................................... 16
Kan. Stat. § 60-5301 to 60-5305 ............................................................... 16
Ky. Rev. Stat. § 446.350 ............................................................................ 16
La. Rev. Stat. §§ 13:5231 to 13:5242 ....................................................... 16
Miss. Code § 11-61-1 ................................................................................. 16
Mo. Stat. §§ 1.302-1.307 ........................................................................... 16
Mont. Code §§ 27-33-101 to 27-33-105 ................................................... 16
N.D. Cent. Code § 14-02.4-08.1 ................................................................ 16
N.M. Stat. §§ 28-22-1 to 28-22-5 ............................................................. 16
Okla. Stat. tit. 51, §§251-258 .................................................................... 16
PL 103–344 .................................................................................................. 24
R.I. Gen. Laws §§ 42-80.1-1 to 42-80.1-4 ............................................... 16
S.C. Code §§ 1-32-10 to 1-32-60 .............................................................. 16
S.D. Codified Laws § 1-1A-4 .................................................................... 16
Tenn. Code § 4-1-407 ................................................................................. 16
Tex. Civ. Prac. & Rem. Code §§ 110.001 to 110.012 ............................. 16
Title 58 of the Utah Code ........................................................................... 28
U.S. Const. amend. I ................................................................................... 11
Utah Code § 34A-5-115 .............................................................................. 23
Utah Code § 58-37-2(1)(w) ........................................................................ 24

Utah Code § 58-37-3.5 ................................................................................................ 22, 28
Utah Code § 58-37-3.6(2)-(3) ............................................................................................ 23
Utah Code § 58-37-3.7(2)-(5) ............................................................................................ 23
Utah Code § 58-37-3.8 ....................................................................................................... 23
Utah Code § 58-37-8(12) .................................................................................................... 24
Utah Code § 58-60-102(7) .................................................................................................. 24
Utah Code § 58-60-103(1)(a) ............................................................................................. 24
Utah Code § 58-60-107(2) .................................................................................................. 25
Utah Code § 63G-33-101 .................................................................................................... 20
Utah Code § 63G-33-201(1) ............................................................................................... 21
Va. Code § 57-1 .................................................................................................................. 16
W. Va. Code § 35-1A-1 ...................................................................................................... 16

Regulations

21 C.F.R. § 1307.31 ........................................................................................................... 24

Other Authorities

*S.B. 150* ............................................................................................................................. 20
S.B. 266 .............................................................................................................................. 22
SB0150 ............................................................................................................................... 20
SB0266 ............................................................................................................................... 22
*Senate – 2024* .................................................................................................................... 21
*Smith* decision.,
   *What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*
   ”38 Val. U. L. Rev. 353 (2004) ...................................................................................... 15

## INTRODUCTION

With full knowledge of Singularism's sincere religious belief that sacramental psilocybin usage is essential to accessing the divine, Defendants detained Singularism's founder, searched its spiritual center, seized its sacramental psilocybin and other items, and threatened Singularism's landlord to evict Singularism from its spiritual center. These unconstitutional acts were intentional. Utah County Attorney Jeffrey Gray, with knowing and reckless disregard for the law and Plaintiffs' rights, instructed Provo City Detective Julian and other officers that no exemption from the Utah Controlled Substances Act for psilocybin is *ever* proper, even for sincere religious believers who pose no harm to the public.

Defendants' position is plainly wrong. It is ignorant of the long history of clearly established law regarding religious free exercise in this country. The First Amendment protects Plaintiffs' religious worship, the Utah Constitution protects it in greater force, and the newly passed Utah Religious Freedom Restoration Act's protections are greater still. Defendants grievously erred when they refused to even begin the nuanced analysis which is focused on Plaintiffs' specific religious needs.

The Court should immediately grant a temporary restraining order and thereafter a preliminary injunction enjoining Defendants' constitutional and statutory violations of Plaintiffs' free exercise. Plaintiffs' unquestionable religious sincerity and their record of conducting religious ceremonies without *any* effect on public safety, paired with the constitutional and statutory authorities described below, demonstrate Plaintiffs will prevail in this matter. They have already been irreparably harmed. Allowing Defendants' egregious conduct to continue will wipe Singularism off the map, devastate its adherents, and destroy the livelihoods of its clergy who run

1

Singularism's non- and for-profit organizations. In contrast, no damage comes to Defendants by an injunction. Thus, an injunction is in the public interest, protecting what the Utah Legislature said, only months ago, was a "fundamental right," and what the U.S. Supreme Court has called "indispensable to life in a free and diverse Republic."

## RELIEF SOUGHT AND GROUNDS FOR RELIEF

The Court should enjoin Defendants from burdening Plaintiffs' religious free exercise. The injunction should expressly permit Plaintiffs to practice their entheogenic religion and perform psilocybin ceremonies. The injunction should prohibit Defendants from taking any action to limit Plaintiffs' free exercise of religion.

## STATEMENT OF FACTS

1.     Singularism is a small, minority faith which views the ingestion of sacramental psilocybin tea as central to accessing the divine. Verified Compl., ECF 2-2, at ¶¶ 2-3, 16, 24; Decl. of Bridger Jensen, attached as Exhibit A, at ¶¶ 18-27.

2.     Singularism was founded by Plaintiff Bridger Lee Jensen, who, following years of various transcendent and spiritual experiences facilitated through psilocybin, felt compelled to share his spiritual enlightenment with the community. Mr. Jensen founded Singularism first as a community of believers, and then, second, as a non-profit organization, together with an associated for-profit organization, Psyche Healing and Bridging, LLC. Verified Compl. at ¶¶ 1-3, 16-21; *see generally* Ex. A.

3.     Singularism has openly and publicly operated its religious community since November 2023. Verified Compl. at ¶¶ 18-24, 31-32; Ex. A, at ¶ 18. Singularism even invited the

Provo City Mayor, the Provo City Council, and the Utah County Attorney's Office to tour its spiritual center in Provo shortly after opening. *See* letters attached together as <u>Exhibit B</u>.

4.      One of Singularism's principal beliefs is that psilocybin ceremonies permit a "voyager" to access the divine and thereby "write their own scripture" by interpreting and recording their experiences. Verified Compl. at ¶¶ 20, 24; Ex. A, at ¶ 20. Singularism has set forth extensive statements regarding its beliefs and doctrine. *See, e.g.,* <u>Exhibits P, Q, and R</u>.

5.      Singularism also believes that the American cultural line drawn between religion and science is illusory and that the two fields are complementary and interwoven. As such, Singularism takes full advantage, for religious purposes, of the benefits and wisdoms of clinical practices used in mental health therapy, integrating a broad collection of scientific and medical research. Verified Compl. at ¶ 25; Ex. A, at ¶¶ 17, 19, 24; *see, e.g.,* research utilized by Plaintiffs, attached as <u>Exhibit O</u>.

6.      Before administering its ceremonial and sacramental psilocybin to its voyagers, Singularism puts interested individuals through a screening process. During this multi-stage screening process, Singularism evaluates each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony. As part of this multi-stage screening process, Singularism also evaluates the voyager's religious sincerity and prohibits individuals attempting to ingest psilocybin solely for secular or recreational purposes from participating in its ceremonies. Verified Compl. at ¶ 26; Ex. A, at ¶ 19.

7.      Singularism requires the individual to sign an attestation of their religious sincerity before participating in a psilocybin ceremony. The document requires the voyagers to to protect their well-being following a voyage. Verified Compl. at ¶ 27; *See* <u>Exhibit C</u>.

3

8.    Singularism turns away individuals that it deems religiously insincere, as well as individuals for which a psilocybin ceremony could potentially be harmful. Verified Compl. at ¶ 28; Ex. A, at ¶ 19.

9.    Singularism's voyagers have reported significant and varied religious experiences. As a few examples:

    a.    One voyager described his experience as "profoundly transformative," that he "experienced an overwhelming sense of unity with all things," which was a "deeply religious encounter with the sacredness of existence." *See* Decl. of Allan Johnson, attached as <u>Exhibit D</u>, at ¶ 7.

    b.    Another voyager described her experience walking "alongside Jesus," encountering deceased relatives, embracing "Heavenly Mother and Father [and] feeling their unconditional love and reassurance." *See* Decl. of Brandi Lee, attached as <u>Exhibit E</u>, at ¶ 9.

    c.    Another voyager described that she "experienced an overwhelming sense of joy, inner peace, and enlightenment," which was "nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself." *See* Decl. of Marjorie Johnson, attached as <u>Exhibit F</u>, at ¶ 7.

    d.    Others have had similar experiences. *See* Decl. of Jennifer Eden, attached as <u>Exhibit G</u>; Decl. of Jake Wood, attached as <u>Exhibit H</u>.

10.    Because of Singularism's convictions, it openly shares about its mission and invites others to learn more about its beliefs. As part of Singularism's missionary efforts, it has begun to develop processes and procedures whereby others can become certified spiritual guides in its

doctrines to expand the reach of its spiritual movement. Presently, only a handful of these guides have received Singularism's religious training. They are taught to abide by and conduct the same screening procedures discussed above. Verified Compl. at ¶ 31.

11.     Singularism has operated peacefully and without any private or public incident or complaint related to it or any of its voyagers since it opened the doors of its spiritual center. Verified Compl. at ¶ 32; Ex. A, at ¶ 16, 19, 21.

12.     However, on November 11, 2024, law enforcement from the Provo City Police Department—Detective Julian and Officer Does 1-4—presented at Singularism's spiritual center with a warrant to search the premises and seize certain items. Verified Compl. at ¶ 33; *see* search warrant attached as <u>Exhibit I</u>.

13.     For roughly two hours, law enforcement searched Singularism's spiritual center, detained Mr. Jensen, and interrogated him regarding his and Singularism's religious practices. Verified Compl. at ¶ 34.

14.     From the outset, Detective Julian explained that he and Officers Does had been instructed to obtain the search warrant by Utah County Attorney, Defendant Gray. Detective Julian told Mr. Jensen that he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had instructed him that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin. Verified Compl. at ¶ 35.

15.     Detective Julian explained that he had, undercover, posed as an individual interested in Singularism, going through some of the initial stages of Singularism's screening process. Verified Compl. at ¶ 36.

16.     At no point during law enforcement's search and seizure did Detective Julian or Officers Does 1-4 appear to doubt Mr. Jensen or Singularism's religious sincerity that psilocybin ceremonies are a vital and core part of their religious practice. Verified Compl. at ¶ 37.

17.     Rather, Mr. Jensen explained in detail the integral nature of psilocybin to Singularism's religious practices, outlining Singularism's screening mechanisms, the other procedures it uses to ensure safety for its voyagers, and that psilocybin tea or any other form of psilocybin is never administered or distributed to anyone outside one of Singularism's ceremonies. Verified Compl. at ¶ 38.

18.     At one point, Detective Julian and/or Officers Does indicated they would be seizing certain records kept by Singularism. When Mr. Jensen saw which records they were referring to, it caused him immense grief, as these were the records in which Mr. Jensen and other of Singularism's spiritual guides recorded the personalized scripture for Singularism's voyagers. Mr. Jensen expressed that although the seizure of Singularism's sacramental psilocybin was devastating, seizure of this sacred scripture would be even more devastating. Verified Compl. at ¶ 40.

19.     In total, law enforcement removed psilocybin, a black grinder, a black scale, and a gold scale used in preparing Singularism's sacramental psilocybin tea, THC, and "Bridging Model Paperwork" from Singularism's religious center. *See* Exhibit J. Although not recorded on the officers' seizure receipt, law enforcement also seized additional Psyche Bridging and Healing's business records, as well as some of Singularism's voyager's attestations to their religious sincerity. Verified Compl. at ¶ 41.

20.     At the end of the encounter, Detective Julian told Mr. Jensen that he recommended Singularism cease all its religious practices. Verified Compl. at ¶ 42.

21.     The officers released Mr. Jensen without arrest. However, they told him to expect criminal charges. Verified Compl. at ¶ 43.

22.     Upon law enforcement's departure, Mr. Jensen was left in an immense state of distress, facing the reality that Defendants were placing before him an impossible choice: (1) practice his religion and continue the religious practices of Singularism under the prospect of escalated threats from law enforcement and promised prosecution or (2) give up his sincerely held religious beliefs, disband Singularism, give up his and other clergy's livelihoods through Psyche Healing and Bridging, and turn away voyagers expecting to access the divine under Singularism's spiritual care. Verified Compl. at ¶ 44.

23.     This distress continues to the present and increased when, the next day, on November 12, 2024, Defendant Wolken served Singularism's landlord with a letter, threatening that if he did not evict Singularism from their rented space, that law enforcement would pursue the landlord for civil abatement. Verified Compl. at ¶ 45; *See* Exhibit K.

24.     The letter, written with a header containing Defendant Beebe's name, asserted that Singularism was performing "illegal and dangerous activity" and that "residents in that neighborhood . . . are living in unnecessary fear and danger . . . ." Verified Compl. at ¶ 46; Ex. K.

25.     As stated above, no incidents of any kind have ever occurred at or around Singularism's religious center related to Singularism's religious practices. Neither Singularism, nor its landlord, are aware of any complaint regarding Singularism's spiritual practices. Verified Compl. at ¶ 47.

26.     Further, others in the Singularism community have observed only the sincere religious practice of religion at Singularism's spiritual center. *See* Exs. E-H.

27.     Singularism's landlord responded to Defendant Wolken and the Provo City Police Department. In his letter, he asserted that he understood that Singularism was taking legal action to protect their religious rights. Because of that, he asserted that if he evicted Singularism as law enforcement desired, he would expose himself to potential liability for religious discrimination in his renting practices. Verified Compl. at ¶ 48; *see* eviction letter, attached as Exhibit K.

28.     The landlord also stated that he had not observed any behavior that would prompt any concern. He stated that his employees present in the same building have not reported feeling unsafe or threatened by Singularism's presence. Additionally, he stated that he had not seen any questionable activity nor any unsavory people coming or going from Singularism's spiritual center. He stated that, if anything, "they have been exemplary tenants." Verified Compl. at ¶ 49; Ex. L.

29.     As a result of Defendants' actions, Mr. Jensen was detained and Plaintiffs have been deprived of the possession and usage of their sacramental psilocybin, have been deprived of precious records regarding Singularism's voyagers, have been placed under threat of eviction, have been placed under threat of criminal prosecution and forfeiture, have had their livelihoods threatened, and have endured substantial emotional and mental distress. It is anticipated that the continued course of Defendants' conduct will only deepen the present and future harms to Plaintiffs' statutory and constitutional religious rights. For example, Plaintiffs expect that Singularism's religious community will be irreparably diminished, voyagers will no longer feel safe participating in a Singularism ceremony, and Psyche Bridging and Healing, as a result, will sustain substantial financial losses to the point of closure. Verified Compl. at ¶ 63.

30.     Defendants appear to have decided not to prosecute very similarly situated religious groups, including the Divine Assembly and Psychedelics in the Beehive, which utilize psilocybin, and others which utilize other entheogenic substances, such as Oklevueha Native American Church and Temple of Hermes. *See* Verified Compl., at ¶¶ 52-55.

31.     On November 19, 2024, the Utah Department of Commerce's Division of Professional Licensing ("DOPL") concluded that Mr. Jensen is entitled to practice mental health therapy under the clergy exemption to the Utah Mental Health Professional Practice Act and according to the dictates of Singularism's sacramental ceremonies. *See* Verified Compl., at ¶¶ 56; *see* email correspondence attached as <u>Exhibit M</u>.

32.     On November 19, 2024, Singularism filed its Complaint against Defendants in state court, along with a motion for temporary restraining order and preliminary injunction. *See* ECF 2-2, 2-3.

33.     On November 27, 2024, before the state court judge could hear Singularism's motion for temporary restraining order and preliminary injunction, Defendants removed the case to this Court. Defendants' notice of removal did not include a copy of Singularism's motion for temporary restraining order and preliminary injunction, *see* ECF 2, so the Court set a briefing schedule for it to be refiled incorporating federal injunctive frameworks on December 4, 2024, as well as a hearing date for the motion on December 13, 2024, *see* ECF 5.

## **ARGUMENT**

## I.     **PLAINTIFFS MEET EACH REQUIREMENT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.**

Plaintiffs demonstrate each of the four elements required for the Court to grant their motion for a temporary restraining order and preliminary injunction:

(1) a substantial likelihood that they will ultimately succeed on the merits of their suit;
(2) that they are likely to suffer irreparable harm in the absence of preliminary relief;
(3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and,
(4) if issued, the injunction will not adversely affect the public interest.

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) (quotation omitted).

"The likelihood-of-success and irreparable-harm factors are the most critical in the analysis." *Id.* (quotation omitted). Additionally, "the third and fourth factors merge when, like here, the government is the opposing party." *Id.* (quotation omitted).

### a. Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.

To demonstrate this factor, Plaintiffs must "make a prima facie case showing a reasonable probability that they will ultimately be entitled to the relief sought." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1146 (10th Cir. 2020). In "the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Id.* (cleaned up) (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016 and *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd*, 573 U.S. 682 (2014)). Plaintiffs allege a prima facie case of each of their causes of action and that they are likely to ultimately prevail on each of them according to the authorities below.

#### i. The First Amendment to the U.S. Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.

"Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543

10

(2022). Indeed, "preserving the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1754 (2020).

The First Amendment, applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022); *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021). Singularism's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton*, 141 S. Ct. at 1876 (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972).

The First Amendment "protects not only the right to harbor religious beliefs inwardly and secretly," but also "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (quotation omitted). It "guarantees the right of every person to freely choose his own course in the matter of religion, free of any compulsion from the state," so the "government may neither compel affirmation of religious beliefs, nor punish the expression of religious doctrines it believes to be false." *Janny v. Gamez*, 8 F.4th 883, 911 (10th Cir. 2021) (cleaned up).

To demonstrate a violation of the Free Exercise Clause, a plaintiff must first show "that a government entity has burdened his sincere religious practice." *Kennedy*, 597 U.S. at 525. "A plaintiff states a claim [his or] her exercise of religion is burdened if the challenged action is

11

coercive or compulsory in nature." *Janny*, 8 F.4th at 911. Such is "not limited to acts motivated by overt religious hostility or prejudice" as the Free Exercise Clause has "been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons." *Id.* at 912 (cleaned up).

Even so, the U.S. Supreme Court held in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990), that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876. However, laws intentionally burdening religion, laws that are not neutral, and laws that are not generally applicable *are* subject to strict scrutiny under the First Amendment. "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy*, 597 U.S. at 526.

For example, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1730–1732 (2018); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–532 (1993)). "A government policy will not qualify as neutral if it is specifically directed at religious practice," "discriminates on its face," or "if a religious exercise is otherwise its object." *Kennedy*, 597 U.S. at 526 (cleaned up).

Further, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). In particular, where "the government [may] grant exemptions [from a law] based on the circumstances" of each case before it, the law is not

generally applicable. *Id.* (pointing to *Smith*'s explanation of the lack of general applicability demonstrated in *Sherbert v. Verner*, 374 U.S. 398 (1963)). In such instances "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* (quoting *Smith*). "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude . . . ." *Id.* at 1879. In other words, the "creation of a system of exemptions" undermines governmental contentions that its laws "can brook no departures." *Id.* at 1882. "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 1877.

"A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881; *see, e.g., generally Yoder*, 406 U.S. 205. A government may not advance its interests "at a high level of generality" because "the First Amendment demands a more precise analysis." *Fulton*, 141 S. Ct. at 1881. "Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (cleaned up) (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). The question before this Court, then, is not whether the government "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Singularism specifically. *Id.*

> ii. *Article I, Section 4 of the Utah Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.*

Utah's constitutional protection for the free exercise of religion exceeds that of the First Amendment. Although Utah Constitution, Article I, Section 4 contains the same language as the First Amendment—that the State "shall make no law . . . prohibiting the free exercise" of religion—the Utah Supreme Court has indicated the two are not to be equated in terms of rigor, breadth, or interpretation.

Since 1993, the Utah Supreme Court has stated that a free exercise analysis conducted under the First Amendment "does not control [the] analysis under the Utah Constitution . . . ." *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 930 (Utah 1993); *see also Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354 (10th Cir. 1997); *Snyder v. Murray City Corp.*, 2003 UT 13, 73 P.3d 325; *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188. Although it has yet to conduct a free exercise analysis under Article I, Section 4, this Court, or the Utah Supreme Court by certification of the question, is poised to do so in a case like Singularism's.

For example, in *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998) the Utah Supreme Court stated that although it had not previously "determined whether the free exercise clause of article I, section 4 of the Utah Constitution provides protection over and above that provided by the First Amendment," and that it would "not decide that question" in the *Jeffs* case, the Utah Supreme Court proceeded to analyze the case as if it had done precisely that. For its articulation of strict scrutiny, the Utah Supreme Court cited to foundational strict scrutiny cases under pre-*Smith* First Amendment caselaw: *Yoder* and *Sherbert*. *Id.* at 1249-50. The Utah Supreme Court thereafter found the government's interest in that case was compelling and that its means of accomplishing

14

that interest was the least restrictive possible, thereby stating the government had met its burden of proof. *Id.* at 1250-51.

Years later, in *State v. Green*, 2004 UT 76, ¶ 70 n. 1, 99 P.3d 820 (Durrant, J., concurring), a concurring opinion indicated two justices of the Utah Supreme Court fully supported the strict scrutiny analysis in *Jeffs*. The opinion cited Justice Durham's law review article "*What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*" of the same year, which analyzed state constitutional free exercise interpretation in the wake of the *Smith* decision. 38 VAL. U. L. REV. 353 (2004). It concluded that these broader interpretations of religious liberty "when given effect in today's pluralistic society, may turn out to be instrumental in allowing those with beliefs outside the mainstream to honor their own consciences in the way the founders of this nation sought to honor theirs." *Id.* at 371.

*Green* led the Utah Supreme Court two years later to state that "our constitution may well provide greater protection of the free exercise of religion in some respects than the federal constitution," citing to the view expressed by "[a]t least two justices" that "pursuant to the guarantees contained in our state constitution, religiously motivated conduct should not be burdened by the State unless the burden furthers a compelling state interest and is narrowly tailored to serve that interest." *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726. However, because the case was resolved on the unambiguous prohibition of polygamy contained in Article III, Section 1 of the Utah Constitution, the Utah Supreme Court did not expound further on strict scrutiny. *Id.* at ¶¶ 36-48.

By confirming strict scrutiny to be the official interpretive framework for Article I, Section 4, this Court or the Utah Supreme Court would break no new ground. In fact, in the wake

of *Smith* reducing strict scrutiny's application within the First Amendment framework, twenty-five states inserted it back into their legal systems by statute or constitutional provision through state-level Religious Freedom Restoration Acts, including several acts passed after 2020.[1] And independent of state statutory protections, an additional eleven states interpret their state constitution's free exercise clause to require strict or heightened scrutiny.[2] In other words, Utah

---

[1]    *See* Ala. Const. art. I § 3.01; Ariz. Rev. Stat. §§ 41-1493 to 41-1493.02; Ark. Code §§ 16-123-401 to 16-123-407; Conn. Gen. Stat. § 52-571b; Fla. Stat. §§ 761.01 to 761.05; Idaho Code §§ 73-401 to 73-404; 775 Ill. Comp. Stat. 35/1 to 35/99; Ind. Code § 1.IC34-13-9;  Kan. Stat. § 60-5301 to 60-5305; Ky. Rev. Stat. § 446.350; La. Rev. Stat. §§ 13:5231 to 13:5242; Miss. Code § 11-61-1; Mo. Stat. §§ 1.302-1.307; Mont. Code §§ 27-33-101 to 27-33-105; N.M. Stat. §§ 28-22-1 to 28-22-5; N.D. Cent. Code § 14-02.4-08.1; Okla. Stat. tit. 51, §§251-258; Pa. Const. Stat. tit. 71, §§ 2401 to 2407; R.I. Gen. Laws §§ 42-80.1-1 to 42-80.1-4; S.C. Code §§ 1-32-10 to 1-32-60; S.D. Codified Laws § 1-1A-4; Tenn. Code § 4-1-407; Tex. Civ. Prac. & Rem. Code §§ 110.001 to 110.012; Va. Code § 57-1 to 2.02; W. Va. Code § 35-1A-1.

[2]    *See* Alaska (*Larson v. Cooper*, 90 P.3d 125, 131–32, n.31 (Alaska 2004); *Swanner v. Anchorage Equal Rights Comm'n*, 868 P.2d. 274 (Alaska 1994)); Maine (*Foltin v. Roman Catholic Bishop*, 871 A.2d 1208, 1227–30 (Me. 2005); *Rupert v. Portland*, 605 A.2d 63 (Me. 1992)); Massachusetts (*Rasheed v. Comm'r of Corr.*, 845 N.E.2d 296, 302–03, 308 (Mass. 2006); *Attorney General v. Desilets*, 636 N.E.2d 233 (Mass. 1994)); Michigan (*McCready v. Hoffius*, 586 N.W.2d 723, 729 (Mich. 1998), vacated on other grounds, 593 N.W. 2d 545 (Mich. 1999); *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195 (Mich. Ct. App. 1995)); Minnesota (*Hill-Murray Federation of Teachers v. Hill- Murray High School*, 487 N.W.2d 857 (Minn. 1992); *State v. Hershberger*, 462 N.W.2d 393, 396–99 (Minn. 1990)); New Hampshire (*State v. Mack*, 173 N.H. 793, 249 A.3d 423 (2020)); New York (*Catholic Charities v. Serio*, 859 N.E.2d 459, 465–68 (N.Y. 2006)); North Carolina (*Matter of Browning*, 476 S.E.2d 465 (N.C. Ct. App. 1996)); Ohio (*Humphrey v. Lane*, 728 N.E.2d 1039 (Ohio 2000)); Washington (*City of Woodlinville v. Northshore United Church of Christ*, 211 P.3d 406, 410 (Wash. 2009); *Munns v. Martin*, 930 P.2d 318 (Wash. 1997)); Wisconsin (*Coulee Catholic Schs. v. Labor & Indus. Review Comm'n*, 768 N.W.2d 868, 884–87 (Wis. 2009); *State v. Miller*, 549 N.W.2d 235 (Wis. 1996)).

Additionally, 9 states that have passed state-level RFRA acts also interpret their state constitutional protections of free exercise of religion to require strict or heightened scrutiny. *See* Arkansas (*Gipson v. Brown*, 749 S.W.2d 297 (Ark. 1988)); Hawaii (*Dedman v. Board*, 740 P.2d 28 (Haw. 1987)); Indiana (*City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 445–51 (Ind. 2001); *Church of Christ v. Metropolitan Board of Zoning Appeals*, 371 N.E.2d 1331 (Ind. Ct. App. 1978); Kansas (*Lower v. Bd. of Dirs. of the Haskell Cnty. Cemetery Dist.*, 56 P.3d 235, 244–46 (Kan. 2002); *State v. Evans*, 796 P.2d 178 (Kan. Ct. App. 1990)); Louisiana (*State v. Victor*, 15–339 (La. App. 5 Cir. 5/26/16), 195 So. 3d 128); Mississippi (*In re Brown*, 478

would join thirty-six other states which regard strict or heightened scrutiny to be the proper analysis for free exercise violations.

### iii.    *Utah's Religious Freedom Restoration Act Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.*

This year, the Utah Legislature confirmed by statute that strict scrutiny is the proper analysis for free exercise claims by passing the Utah Religious Freedom Restoration Act. That Act has its genesis in the U.S. Supreme Court's 1993 decision in *Smith*. Shortly afterward, Congress rejected the Supreme Court's determination in *Smith* that free exercise claims are only subject to strict scrutiny absent a neutral and generally applicable law, as described above. To remedy the problem, Congress passed the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1 *et seq.*, which, as its name suggests, restores the strict scrutiny analysis for free exercise burdens imposed by federal actors. *Tanzin v. Tanvir*, 592 U.S. 43, 45-46 (2020).

RFRA "provides very broad protection for religious liberty" given that religious exercise is an "unalienable" right, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (cleaned up) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)), and provides "greater protection for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). The U.S. Supreme Court has instructed that RFRA be "construed in favor of broad protection of religious exercise, to the maximum extent permitted . . . ." *Burwell*, 573 U.S. at 696, 714 (2014). Religious individuals and organizations that

---

So. 2d 1033 (Miss. 1985)); Montana (*Davis v. The Church of Jesus Christ of Latter-day Saints*, 852 P.2d 640 (Mont. 1993); *St. John's Lutheran Church v. State Comp. Ins. Fund*, 830 P.2d 1271, 1276–77 (Mont. 1992)); Tennessee (*State ex rel. Swann v. Pack*, 527 S.W.2d 99, 107 (Tenn. 1975); *Wolf v. Sundquist*, 955 S.W.2d 626 (Tenn. App. 1997); *State v. Loudon*, 857 S.W.2d 878 (Tenn. Crim. App. 1993)); West Virginia (*State v. Everly*, 146 S.E.2d 705 (W.Va. 1966)).

prevail under RFRA are entitled to damages in addition to injunctive relief. *Tanzin*, 592 U.S. at
50-52. However, the U.S. Supreme Court limited RFRA's application to free exercise violations
committed by federal government actors. *See City of Boerne v. Flores*, 521 U.S. 507, 532-36
(1997).

The leading case regarding RFRA's application to a religious business is *Hobby Lobby
Stores*. In that case, three faith-infused businesses—a wood-working shop, an arts-and-crafts store,
and a Christian bookstore—sued, seeking an exemption under RFRA from a federal mandate
requiring businesses to provide health insurance coverage for contraception under threat of
massive financial penalties. 573 U.S. at 688, 700-04.

The U.S. Supreme Court first concluded that these businesses were entitled to RFRA's
protection just like an individual would be. *Id.* at 706-09. The Court made clear that regardless of
whether the businesses were "closely held corporations," "nonprofit corporations," "for-profit
corporations," some other corporations, or "natural persons," they would be within RFRA's ambit.
*Id.* at 708-09. Further, the U.S. Supreme Court determined that "[b]usiness practices that are
compelled or limited by the tenets of a religious doctrine fall comfortably within" RFRA's
definition of "exercise of religion." *Id.* at 710. This is true even if the religious business seeks "to
make a profit as [a] retail merchant[]." *Id.* (referencing the Court's decision in *Braunfeld v. Brown*,
366 U.S. 599 (1961)). Faith-infused businesses do not lose their RFRA protections just because
"the purpose of such corporations is simply to make money." *Id.* at 710-13.

Because the religious businesses qualified for RFRA's protection, the U.S. Supreme Court
continued the RFRA analysis, beginning with the threshold finding that the businesses were
substantially burdened by the government's contraceptive mandate because failure to comply

would result in steep fines. *Id.* at 726. The Court then proceeded to evaluate whether the government had a "compelling governmental interest." *Id.* In the Court's earlier description of the contraceptive mandate, it explained that the mandate applied only to employers with fifty or more full time employees, but that there were several exemptions, including for religious nonprofits, as well as for grandfathered health plans that existed before March 23, 2010, meaning the contraceptive mandate did "not apply to tens of millions of people." *Id.* at 696-700. Describing the mandate in this way underscored the Court's subsequent conclusions of the government's lack of a compelling interest and least restrictive means.

In the U.S. Supreme Court's compelling interest analysis, it rejected the government's broadly asserted interests such as promoting public health or gender equality, and explained that RFRA requires

> a more focused inquiry: It requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened. This requires us to look beyond broadly formulated interests and scrutinize the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing [a particular governmental policy] in [the instant case].

*Id.* at 726-27 (cleaned up) (quoting *Gonzales*, 546 U.S. at 430-31). However, for the purposes of argument, the Court assumed that an "interest in guaranteeing cost-free access to the four challenged contraceptive methods [was] compelling" and proceeded to the last prong of RFRA: least restrictive means. *Id.* at 728.

The U.S. Supreme Court explained that the "least-restrictive-means standard is exceptionally demanding." *Id.* It then described other alternatives for the government to achieve its interest in guaranteeing cost-free access to contraception which the government had not taken,

including the existing exemption set up for non-profit religious organizations. *Id.* at 729-32. The Court brushed away an argument that expanding this exemption under RFRA to for-profit religious businesses would "lead to a flood of religious objections" that would undermine the government's contraceptive mandate, as the government was unable to provide any evidence of that claim. *Id.* at 732-36. Because the Court concluded the government had other, less restrictive means available to it to accomplish its interest, the Court held the government had failed to satisfy strict scrutiny as expressed under RFRA, thereby granting the three religious businesses an exemption from compliance with the government's contraceptive mandate. *Id.* at 736.

Utah's RFRA builds upon the federal RFRA, providing additional clarity and protections to religious individuals and organizations under the strict scrutiny framework, and for free exercise violations committed by Utah government actors. Utah's RFRA was passed *unanimously* by the Utah Legislature in 2024[3] and is now codified at Utah Code § 63G-33-101 *et seq.*

Testifying in favor of Utah's RFRA, Senator Todd Weiler expressed that the bill was

designed to make sure that religious rights, and *especially minority religious rights*, are protected 20 years from now, 30 years from now, and so this bill would protect, in Utah, it would protect the rights of Muslims to worship as they choose, it would protect the rights of Jews, and Seventh-day Adventists, and other religions. *This is not a bill for any one church or any one religion.* It is to codify in our code that if the government is impeding on someone's sincerely held religious beliefs that [the government is] going to have to show and meet the highest constitutional standard in order to do so. . . . This sets the highest constitutional standard that a government would have to jump over if its laws were impeding on someone's religious rights.

---

[3]     *S.B. 150 Exercise of Religion Amendments*, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/~2024/bills/static/SB0150.html.

(emphasis added).[4]

    The text of Utah's RFRA provides:

> (2) Except as provided in Subsection (3):
>     (a) a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability; and
>     (b) a person other than a government entity may not seek to apply or enforce government action against another person that substantially burdens the free exercise of religion of the other person, regardless of whether the burden results from a rule of general applicability.
> (3) A government entity or government action may substantially burden a person's free exercise of religion only if the government entity, or any other person seeking to enforce government action, demonstrates that the burden on the person's free exercise of religion is:
>     (a) essential to furthering a compelling governmental interest; and
>     (b) the least restrictive means of furthering the compelling governmental interest.

UTAH CODE § 63G-33-201(2)-(3).

    Utah's RFRA includes several clarifications and definitions: (1) that the "free exercise of religion is a fundamental right and applies to all government action, including action that is facially neutral," UTAH CODE § 63G-33-201(1); (2) that "'Free exercise of religion' means the right to act or refuse to act in a manner substantially motivated by a sincerely held religious belief, regardless of whether the exercise is compulsory or central to a larger system of religious belief," UTAH CODE § 63G-33-101(2); (3) that "Government action" includes statutes and rules, application of those statutes and rules, and actions taken by government entities, UTAH CODE § 63G-33-101(3), (6)(b); (4) that "'Substantially burden' means that government action, directly or indirectly: (i) constrains, limits, or denies the free exercise of religion by a person; or (ii) compels a person to act, or fail to

---

[4]     *Senate – 2024 General Session – Day 29*, at 2SB150 Exercise of Religion Amendments, Weiler, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/av/floorArchive.jsp?markerID=125928.

act, in a manner that is contrary to the person's free exercise of religion," including by "assessing criminal, civil, or administrative penalties or damages," UTAH CODE § 63G-33-101(6).

Utah's RFRA empowers religious individuals and organizations to assert the statute's protections "as a claim or defense in a judicial or administrative proceeding to obtain relief," UTAH CODE § 63G-33-201(4)(1), and awards them attorney fees if they prevail, UTAH CODE § 63G-33-201(6). Uniquely, Utah's RFRA contains a notice of claim provision, but it does not apply where the government action burdening religious exercise "is ongoing, and complying with [the notice of claim provision] will place an undue hardship on the person or increase the harm suffered by the person," or the burdensome action "is likely to occur or reoccur before the end of the 60-day [notice of claim] period . . ." UTAH CODE § 63G-33-201(5).

> iv. *The Utah Code Contains Various Exemptions Which Undermine the Government's Interest and Indicate There are Less Restrictive Means.*

_Utah Psilocybin Act_. In 2024, in the same legislative session in which the Utah Legislature enacted Utah's RFRA, the legislature passed S.B. 266 Medical Amendments,[5] now codified within the Utah Controlled Substances Act at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"). The Utah Psilocybin Act grants broad permission to the largest healthcare systems in the state, UTAH CODE § 58-37-3.5(1)(b), to "develop a behavioral health treatment program that includes a treatment based on a drug that the healthcare system determines is supported by a broad collection of scientific and medical research." UTAH CODE § 58-37-3.5(2). The word "drug" is defined to mean "*any form of psilocybin* . . . that is in federal Food and Drug Administration Phase 3 testing for an investigational drug . . . ." UTAH CODE § 58-37-3.5(1)(a) (emphasis added).

---

[5]    *Medical    Amendments*,    UTAH    STATE    LEGISLATURE,    available    at, https://le.utah.gov/~2024/bills/static/SB0266.html.

The Utah Psilocybin Act's only limitations on these healthcare systems' development and administration of psilocybin programs are that (a) psilocybin be administered "under the direct supervision and control of the healthcare system," (b) psilocybin not be administered to individuals under eighteen years old, (c) that the program, in the healthcare system's own determination, "is supported by a broad collection of scientific and medical research," and (d) before July 1, 2026, the healthcare systems "provide a written report to the Health and Human Services Interim Committee" regarding the drugs they used, the health outcomes of their patients, any side effects, and other information for the Legislature "to evaluate the medicinal value of any drugs." UTAH CODE § 58-37-3.5(3)-(4). Otherwise, these healthcare systems have broad leeway to determine how, when, where, to whom, and for what reason psilocybin is administered to their patients. The Act insulates individuals administering or participating in the psilocybin program from a violation of Utah's Controlled Substances Act. UTAH CODE § 58-37-3.5(5).

*Medical Cannabis.* In addition to the Utah Psilocybin Act, the Utah Controlled Substances Act exempts the usage of medical cannabis from prosecution. All that individuals need to do to be insulated from prosecution and guilt is to become a medical cannabis cardholder and abide by dosage limits. UTAH CODE § 58-37-3.7(2)-(5); *see also* UTAH CODE § 58-37-3.6(2)-(3); UTAH CODE § 58-37-3.8 (limiting law enforcement, government agencies, and political subdivisions from expending resources to enforce or take adverse action against individuals and organizations regarding medical cannabis). Accordingly, the Utah Code also treats cannabis usage as a protected class status in the context of public employment. *See* UTAH CODE § 34A-5-115.

*Peyote.* The Utah Controlled Substances Act also exempts individuals from civil and criminal liability for the usage of peyote "in connection with the practice of a traditional Indian

23

religion . . ." UTAH CODE § 58-37-8(12). The Act defines "Indian religion" to mean "any religion: (i) the origin and interpretation of which is from within a traditional Indian culture or community; and (ii) which is practiced by Indians." UTAH CODE § 58-37-2(1)(w).

This exemption has its roots in religious freedom. Indeed, as a result of the U.S. Supreme Court's *Smith* decision described above, Congress not only enacted RFRA, but also amended the federal Controlled Substances Act to insert an exemption for peyote usage for Native Americans. 42 U.S.C. § 1996a; 21 C.F.R. § 1307.31; American Indian Religious Freedom Act Amendments of 1994, PL 103–344, October 6, 1994, 108 Stat 3125. That was in direct response to *Smith*, in which case the U.S. Supreme Court denied a religious exemption for peyote for native religious purposes. *See Smith*, 494 U.S. at 874. The Utah Controlled Substances Act's inclusion of substantially the same exemption carries with it the recognition that religious groups for which sacramental usage of a controlled substance is a sincerely held part of their religion should be exempted from the burdens imposed by the Controlled Substances Act.

*Clergy Exemption*. The Utah Mental Health Professional Practice Act also contains an exemption for clergy which permits Singularism's religious guides to practice mental health therapy without a license and according to Singularism's religious beliefs.

By statute, the practice of mental health therapy includes conducting professional evaluations of mental health, mental illness, or emotional disorders; diagnosing such conditions; prescribing treatment or prevention plans; and performing psychotherapy. UTAH CODE § 58-60-102(7). Unless exempted, the Act requires individuals to be licensed to practice mental health therapy. UTAH CODE § 58-60-103(1)(a). Exempt individuals include "a recognized member of the clergy while functioning in a ministerial capacity as long as the member of the clergy does not

represent that the member of the clergy is, or use the title of, a license classification in Subsection 58-60-102(5)." UTAH CODE § 58-60-107(2)(b). If clergy do not use these license classifications and are functioning in a ministerial capacity, they "may engage in acts included within the definition of practice as a mental health therapist . . ." UTAH CODE § 58-60-107(2).

*Hypnosis*. Additionally, the Utah Mental Health Professional Practice Act exempts individuals practicing hypnosis from licensure requirements as long as the individual performing the hypnosis: (1) "induces a hypnotic state in a client for the purpose of increasing motivation or altering lifestyles or habits, such as eating or smoking, through hypnosis;" (2) "consults with a client to determine current motivation and behavior patterns;" (3) "prepares the client to enter hypnotic states by explaining how hypnosis works and what the client will experience;" (4) "tests clients to determine degrees of suggestibility;" (5) "applies hypnotic techniques based on interpretation of consultation results and analysis of client's motivation and behavior patterns;" and (6) "trains clients in self-hypnosis conditioning." UTAH CODE § 58-60-107(2)(d)(i). Notably, this exemption is stricter than the clergy exemption. Where the clergy exemption permits clergy to practice mental health therapy, and even diagnose and treat health conditions, the hypnosis exemption does not. *Compare* UTAH CODE § 58-60-107(2)(b) *with* UTAH CODE § 58-60-107(2)(d)(ii).

> v. *Courts and Agencies Permit Sincere Religious Adherents to Conduct Religious Ceremonies with Entheogenic Substances.*

Where courts and agencies are presented with sincere religious individuals and organizations for which entheogenic substances are used as a sacramental and ceremonial portal to the divine, they have held religious free exercise rights require exemption from the Controlled Substances Act. For example, in *Gonzales*, 546 U.S. 418, the U.S. Supreme Court confirmed a

religious exemption from the Controlled Substances Act for a Christian Spiritist sect's communion through hoasca, a sacramental tea made from plants from the Amazon. Similarly, the Ninth Circuit confirmed an entheogenic church's religious exemption from the Controlled Substances Act for the religious use of Daime tea. *See Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457 (9th Cir. 2014).[6] And in April 2024, several federal agencies, including the Drug Enforcement Administration, entered into a public settlement agreement with an entheogenic church regarding the importation and religious use of ayahuasca, following a federal district court confirming the church's religious exemption. *See* <u>Exhibit N</u>.

> vi. *Strict Scrutiny Requires Plaintiffs' Religious Exemption from the Utah Controlled Substances Act.*

Three independent sources of law require this Court to review Defendants' actions burdening Plaintiffs' religious free exercise under strict scrutiny. First, although the First Amendment interprets free exercise claims under strict scrutiny only where the law or action burdening religion is not neutral or generally applicable, that is the case here. The Utah Controlled Substances Act is so riddled with exemptions for religious *and* secular purposes that it is not generally applicable. The Act, as of 2024, contains a gaping exemption for secular psilocybin usage, as well as significant exemptions for secular cannabis and religious peyote usage. Between these three exemptions, substantial portions of Utahns are not subject to the general rules of the

---

[6]     *See also Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481 (10th Cir. 1989); *United States v. Boyll*, 968 F.2d 21 (10th Cir. 1992) (unpublished); *State v. Mooney*, 2004 UT 49, 98 P.3d 420; *Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n*, 2006 UT App 47; *State v. Mack*, 173 N.H. 793, 817, 249 A.3d 423 (2020).

Act, and for both secular and religious reasons. Thus, under the First Amendment, strict scrutiny applies.

Second, strict scrutiny also applies under Article I, Section 4 of the Utah Constitution. According to the authorities above, Article I, Section 4's protections for religious free exercise are greater than the Supreme Court's interpretation of the First Amendment, meaning that strict scrutiny applies to all free exercise claims, regardless of whether the law or government action is neutral or generally applicable.

Third, Utah's RFRA explicitly states that strict scrutiny applies regardless of whether the law or action at issue is neutral or generally applicable. Accordingly, under all three sources of law, the government must justify its burden upon Singularism's free exercise of religion under strict scrutiny, the most exacting constitutional standard.

Defendants will fail to shoulder their first burden under strict scrutiny: that denying a religious accommodation for Singularism to practice its private psilocybin ceremonies is "essential to furthering a compelling governmental interest." Although Defendants have yet to articulate their interest, generalized interests, such as public health and safety or uniform application of the law, will not suffice. Defendants' interest must be specific to Singularism. Additionally, whatever interests Defendants attempt to articulate, they are significantly undercut by the secular and religious exemptions found in the Utah Controlled Substances Act, particularly the exemption permitting secular psilocybin usage.

Should Defendants argue that psilocybin poses a danger to public health or safety, that interest would be undermined by the Utah Legislature's determination that it does not, as this year the legislature passed the Utah Psilocybin Act permitting secular usage according to private

27

healthcare systems' discretion. Even the federal government appears to recognize psilocybin does not pose the threat to public health or safety once thought, placing it, as the Utah Legislature has said in the Utah Psilocybin Act, in the "Food and Drug Administration Phase 3 testing for an investigational drug."

Should Defendants argue that the Utah Psilocybin Act protects health and safety in a way Singularism lacks because of the healthcare system supervision required by the Utah Psilocybin Act, that argument, too, would fail. The supervision required by the Act is "the direct supervision and control of the healthcare system and the healthcare system's health care providers who are licensed *under this title* . . ." UTAH CODE § 58-37-3.5 (emphasis added). The Act does not specify what type of health care provider must supervise an individual ingesting psilocybin. Thus, any licensed mental health care providers licensed under Title 58 of the Utah Code suffice. But that requirement, too, is undermined by the fact that the Utah Mental Health Professional Practice Act, which *is also located in Title 58*, exempts clergy from licensure and allows clergy like Mr. Jensen to practice mental health therapy according to the dictates of their religion. Thus, Defendants lack the ability to articulate any legitimate interest in denying a religious exemption to Singularism.

Additionally, Defendants' articulation of government interests is significantly undermined by their apparent decision not to prosecute similarly situated religious groups, including the Divine Assembly and Psychedelics in the Beehive, which utilize psilocybin, and others which utilize other entheogenic substances, such as Oklevueha Native American Church and Temple of Hermes. Moreover, another governmental agency—the Utah Department of Commerce's Division of Professional Licensing—concluded, on November 19, 2024, that Mr. Jensen is entitled to practice mental health therapy under the clergy exemption to the Utah Mental Health Professional Practice

28

Act and according to the dictates of Singularism's sacramental ceremonies, dismissing a complaint made regarding his lack of licensure.

Even if Defendants could state a compelling governmental interest in denying Singularism a religious exemption, Defendants have an obviously less restrictive means of furthering their governmental interest. The Utah Psilocybin Act's secular exemption from the Utah Controlled Substances Act for psilocybin usage is the clearest example and is a model Singularism already follows: close supervision of individuals, administration only to individuals over eighteen years old, and administration which follows a broad collection of scientific and medical research, which, in Singularism's case, is enriched with spiritual wisdom. Defendants will be unable to articulate a reason why secular individuals may utilize psilocybin under these circumstances, but religious individuals cannot. And although Plaintiffs need not speculate on every other potential less restrictive means, the cases of *Gonzales*, *Church of Holy Light of Queen v. Holder*, and the DEA's recent settlement agreement all provide additional examples of less restrictive means Defendants might follow to advance their governmental interests.

Because Defendants do not have particularized compelling governmental interests in denying Singularism a religious exemption from the Utah Controlled Substances Act, and because Defendants have obviously less restrictive means available to accomplish their governmental interests, Defendants fail strict scrutiny. Their burden on Plaintiffs' religious free exercise is unlawful, must be enjoined, and Defendants must compensate Plaintiffs for their damages suffered and attorney fees incurred to defend their religious free exercise. Accordingly, Defendants lacked probable cause to obtain a search warrant, detain Mr. Jensen, search Singularism's spiritual center, or seize any items from Singularism. According to all the above authorities, Plaintiffs will prevail

in this action, thus establishing the first element for a temporary restraining order and preliminary injunction.

### b.  Plaintiffs Have Suffered and Will Suffer Irreparable Harm.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). Here, Plaintiffs have already suffered and will continue to suffer continued and increasing irreparable harm unless the Court enjoins Defendants' violations of Plaintiffs' free exercise of religion. Defendants' seizure of Plaintiffs' sacramental psilocybin imposes irreparable harm by prohibiting Singularism's central religious practice, thereby stripping Plaintiffs of their fundamental right to religious free exercise, a harm which cannot be adequately compensated by damages. Defendants' vows to both prosecute Plaintiffs and evict Singularism from its spiritual center will affect even greater violations of Plaintiffs' free exercise, with the potential to wholly wipe out a small minority religion by decimating its religious, physical, and financial assets and instilling fear in its adherents. This is precisely the type of harm Rule 65 exists to protect against.

### c.  The Injury to Plaintiffs Greatly Outweighs Any Potential Damage to Defendants.

"In balancing harms, a court looks at whether the moving party's threatened injury outweighs the injury the opposing party will suffer under the injunction." *Core Progression Franchise LLC v. O'Hare*, No. 21-1151, 2022 WL 1741836, at *3 (10th Cir. May 31, 2022) (cleaned up) (quoting, *Sierra Club, Inc. v. Bostick* 539 F. App'x 885, 889 (10th Cir. 2013)). The injuries to Plaintiffs are monumental violations of constitutional and statutory fundamental rights, with the potential to destroy an entire religious minority and the livelihoods of its clergy. This injury vastly outweighs any potential damage to Defendants. In fact, it is difficult to conceive of

*any* potential damage an injunction would impose upon Defendants. Where Singularism is acting according to its fundamental right of religious free exercise, and doing so has no impact whatsoever on public health, safety, or any other concern for the broader community, Defendants cannot articulate any damage. And even if they could, such damage would pale in comparison to that Plaintiffs are suffering.

### d. A Temporary Restraining Order and Preliminary Injunction Advance the Public Interest.

Enjoining Defendants' unconstitutional acts advances the public interest by protecting and validating the right to religious free exercise for all sincere religious individuals and organizations. While many might not share the beliefs, doctrines, or dogmas espoused by Singularism and its adherents, *all* citizens, especially religious minorities, benefit from a robust protection of the right to free exercise of religion. That is precisely what the Utah Legislature enacted Utah's RFRA to do: "to make sure that religious rights, and especially minority religious rights, are protected." It "is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127-28.

Entitlement to the fundamental right of religious free exercise is not predicated upon whether religious beliefs are "acceptable, logical, consistent, or comprehensible" to others. Again, a "way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Yoder*, 406 U.S. at 224. Protecting Singularism's free exercise ensures that others' religious beliefs, including those which presently are viewed as mainstream, will remain protected even when they are out of vogue.

## <u>CONCLUSION</u>

For the above reasons, the Court should grant the motion, grant Plaintiffs a temporary restraining order, and, thereafter, a preliminary injunction.

DATED this 4th day of December 2024.

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

## **PAGE LIMIT CERTIFICATION**

I, Tanner Bean, certify that the foregoing document contains 31 pages and complies with DUCivR 7-1(a)(4) and ECF 8 granting the parties stipulated motion for overlength briefing.

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of December 2024, a true and correct copy of the foregoing was served via the Court's electronic filing service and by email on the following:

Mitchell A. Stephens
Lara A. Swensen
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste 400
Salt Lake City, Utah 84101
(801) 363-6363
mstephens@jdrslaw.com
lswensen@jdrslaw.com
*Attorneys for Defendants Utah County and Jeffrey Gray*

J. Brian Jones
Gary D. Millward
Richard A. Roberts
PROVO CITY ATTORNEY'S OFFICE
445 West Center St.
Provo, Utah 84601
(801) 852-6140
bjones@provo.gov
gmillward@provo.gov
rroberts@provo.gov
*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

*/s/ Tanner J. Bean*