Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Email: mstephens@jdrslaw.com
         jjames@jdrslaw.com
         dolson@jdrslaw.com

*Counsel for Utah County and Jeffrey Gray*

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, JACKSON JULIAN, JOHN DOES 1-4,<br><br>Defendants. | **JOINT MEMORANDUM OPPOSING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

Defendants Utah County and Jeffrey Gray (collectively, "Utah County") and Provo City, Troy Beebe, Brian Wolken, and Jackson Julian (collectively, "Provo") (collectively, "Defendants"), submit this Memorandum in Opposition to the Plaintiffs' (collectively, "Singularism" or "Plaintiffs") Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"). [*See* Motion (Dkt. 9)].

# Table of Contents

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 4

I.    Bridger Lee Jensen's Admitted History of Drug Use Predates His New "Religion.". 4

II.   Jensen Markets "Psychedelic Therapy" Separate From Singularism. ....................... 4

III.  Jensen Admitted To The Provo Police That Singularism Was Formed to Avoid Criminal Prosecution. ................................................................................. 9

IV.  The Search Warrant. ..................................................................................... 10

ARGUMENT .................................................................................................... 11

I.    Plaintiffs Cannot Succeed on the Merits. ................................................... 12

   A.   Utah's Controlled Substances Act Does Not Violate the U.S. Constitution. ......... 13

   B.   The Utah Constitution Does Not Legalize Hallucinogenic Drugs. ...................... 15

   C.   The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claim, Which Also Fails on the Merits. ............................................................................ 18

      1.   The Court lacks jurisdiction over Plaintiffs' claims because they failed to provide notice under the GIAU. ......................................................... 18

      2.   Plaintiffs have not established that they satisfy the provisions of the Utah RFRA. ................................................................................ 21

         A.   Compliance with Utah law does not substantially burden singularism. ............. 21

         B.   Plaintiffs cannot establish that their psilocybin use is "substantially motivated by a sincerely held religious belief." ................................................... 23

         C.   Meyers Factors. .............................................................................. 28

            i.    Ultimate Ideas. ......................................................................... 28

            ii.   Metaphysical Beliefs. ................................................................. 29

            iii.  Moral and Ethical System. ........................................................... 30

            iv.  Comprehensiveness. ................................................................... 31

            v.   Accoutrements ........................................................................... 33

         D.   Other Considerations Weigh Against a Finding of a Sincerely Held Religious Belief. ...................................................................................... 34

      3.   Regardless, the State has a compelling interest in regulating controlled substances. ................................................................................ 35

II.   Plaintiffs Have Not Established Irreparable Injury. ......................................... 38

III.  Plaintiffs Have Not Established That the Threatened Injury Outweighs the Public Interests. ............................................................................................ 39

IV.  If the Motion is Granted, Plaintiffs Should Post Security. ................................ 40

CONCLUSION ................................................................................................. 40

## Table of Authorities

**Cases**

*Africa v. Com. of Pa.*,
  662 F.2d 1025 (3d Cir. 1981) ................................................................................... 24

*Am. Bush v. City of S. Salt Lake*,
  2006 UT 40, 140 P.3d 1235 ..................................................................................... 18

*Carson v. Makin*,
  596 U.S. 767 (2022) ................................................................................................. 16

*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ................................................................. 11, 13, 14, 39

*Dee v. United States*,
  241 F. Supp. 2d 50 (D. Me. 2003) ........................................................................... 15

*Douglas v. City of Jeannette (Pennsylvania)*,
  319 U.S. 157 (1943) ................................................................................................. 12

*DTC Energy Grp., Inc. v. Hirschfeld*,
  912 F.3d 1263 (10th Cir. 2018) ............................................................................... 11

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
  494 U.S. 872 (1990) ....................................................................................... 13, 14, 15

*Founding Church of Scientology of Washington, D.C. v. United States*,
  409 F.2d 1146 (D.C. Cir. 1969) ............................................................................... 23

*Gallagher v. Dhillion*,
  No. 3:18-cv-2801, 2020 WL 2737246 (N.D. Tex. May 7, 2020) ............................. 14

*Harmon v. City of Norman, Oklahoma*,
  981 F.3d 1141 (10th Cir. 2020) ............................................................................... 13

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ......................................................................... 38, 39

*Hobby Lobby Stores, Inc, v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ............................................................................... 21

*Jeffs v. Stubbs*,
    970 P.2d 1234 (Utah 1998) ......................................................................... 17, 18

*Madruga v. Utah High Sch. Activities Ass'n Inc.*,
    No. 4:21-CV-00089, 2021 WL 4748493 (D. Utah Oct. 12, 2021) ......................................... 38

*Mecham v. Frazier*,
    2008 UT 60, 193 P.3d 630 ......................................................................... 20

*Mendoza v. Thompson*,
    No. 1:15-cv-00090, 2015 WL 5693705 (D. Utah Sept. 28, 2015) ................................... 38, 39

*Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*,
    755 F.3d 372 (6th Cir. 2014) ......................................................................... 15

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*,
    474 F. Supp. 2d 1133 (N.D. Cal. 2007) ......................................................................... 39

*Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*,
    365 F. App'x 817 (9th Cir. 2010) ......................................................................... 14

*Olsen v. Drug Enf't Admin.*,
    878 F.2d 1458 (D.C. Cir. 1989 ......................................................................... 3, 14

*Olsen v. Mukasey*,
    541 F.3d 827 (8th Cir. 2008) ......................................................................... 15

*Patterson v. Am. Fork City*,
    2003 UT 7, 67 P.3d 466 ......................................................................... 19

*Peyote Way Church of God v. Thornburgh*,
    922 F.2d 1210 (5th Cir. 1991) ......................................................................... 14

*Provo City v. Shurtliff*,
    4 Utah 15, 5 P. 302 (Utah 1885) ......................................................................... 17

*S. Salt Lake City v. Maese*,
    2019 UT 58, 450 P.3d 1092 ......................................................................... 17

*Schrier v. Univ. of Co.*,
    427 F.3d 1253 (10th Cir. 2005) ......................................................................... 11, 12

*Soc'y of Separationists, Inc. v. Whitehead*,
    870 P.2d 916 (Utah 1993) ......................................................................... 15, 16, 17

*State v. Balzer,*
    954 P.2d 931 (Wash. Ct. App. 1998) .......................................................................... 28

*State v. Brashear,*
    593 P.2d 63 (N.M. Ct. App. 1979) ............................................................................. 27

*State v. Cook,*
    2020-Ohio-432, 2020 WL 615076 (Ohio Ct. App. 2020) ........................................... 3

*State v. Green,*
    2004 UT 76, 99 P.3d 820 ........................................................................................... 14

*State v. Hardesty,*
    214 P.3d 1004 (Ariz. 2009) ........................................................................................ 27

*State v. Sobel,*
    221 N.E.3d 44 (Ohio Ct. App. 2023) ........................................................... 2, 27, 29, 30

*State v. White,*
    271 P.3d 1217 (Idaho Ct. App. 2011) ................................................................... 22, 27

*Strope v. Cummings,*
    381 F. App'x 878 (10th Cir. 2010) ............................................................................. 23

*Summum v. Pleasant Grove City,*
    2015 UT 31, 345 P.3d 1188 ....................................................................................... 16

*Summum v. Pleasant Grove City,*
    No. 2:05-cv-638, 2010 WL 2330336 (D. Utah June 3, 2010) .................................... 15

*United States v. Greene,*
    892 F.2d 453 (6th Cir. 1989) ..................................................................................... 14

*United States v. Meyers,*
    906 F. Supp. 1494 (D. Wyo. 1995) ........................................................ 3, 23, 24, 25, 30, 31

*United States v. Jeffs,*
    No. 2:16-cr-82, 2016 WL 6745951 (D. Utah Nov. 15, 2016) ...................................... 21, 22, 38

*United States v. Kuch,*
    288 F. Supp. 439 (D.C. Cir. 1968) ......................................................................... 26, 27, 30

*United States v. Meyers,*
    95 F.3d 1475 (10th Cir. 1996) .......................................... 23, 24, 25, 28, 29, 30, 31, 32, 33

*United States v. Quaintance*,
   315 F. App'x 711 (10th Cir. 2009) ........................................................ 25

*United States v. Quaintance*,
   471 F. Supp. 2d 1153 (D.N.M. 2006) ....................................... 3, 25, 26, 31, 32, 33, 34, 35

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .............................................................. 38

**Statutes**
21 U.S.C. § 812 .......................................................................................... 1, 36
28 U.S.C. § 1367 ............................................................................................ 15
28 U.S.C. § 2283 ............................................................................................ 12
28 U.S.C. § 1446 ............................................................................................ 15
42 U.S.C. § 2000bb ........................................................................................ 23
Uniform Controlled Substances Act (1994) .................................................. 36
Utah Code § 17-18a-202 ................................................................................ 20
Utah Code § 58-37-3.5 ......................................................................... 2, 22, 37
Utah Code § 58-37-4 ................................................................................... 1, 4
Utah Code § 63G-33-101 ................................................................. 18, 21, 23, 35
Utah Code § 63G-33-201 ................................................................. 19, 21, 23, 35
Utah Code § 63G-7-401 ............................................................................. 18, 20
Utah Code Ann. § 58-37-4 (West 2004) ........................................................ 17

**Other Authorities**
11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) ........................................... 21, 38
11A Fed. Prac. & Proc. Civ. § 2946 (3d ed.) .............................................. 20
1898 Revised Statutes of Utah §§ 1711-27, 38, 41 (Title 51) .................... 17
Immanuel Kant, *Critique of Pure Reason* (1971) ...................................... 32
Laws & Ordinances of the State of Deseret, Compilation 1851 (Shepard Book 1919) .............. 35
Max M. Houck, Jay A. Siegel, *Fundamentals of Forensic Science* (3rd) (2015) ......................... 11
T.K. Seung, *Kant's Conception of the Categories*, THE REVIEW OF METAPHYSICS 43 No. 1 (1989) ........................................................................ 32
Uniform CSA at § 203 .................................................................................... 36
Uniform Law Commission, Controlled Substances Act ................................ 35
Utah Constitutional Convention Day 25, p. 437 ........................................... 18
Utah Department of Environmental Quality, *Our Mission, Vision, and Values*, available at
   https://deq.utah.gov/general/mission-vision-values .................................. 31
Utah Senate 2024 General Session – Day 45 (Sen. Cullimore, Sponsor) ....... 37
Utah State Treasurer, *Mission & Core Values*, available at
   https://treasurer.utah.gov/about/mission-and-core-values/ ....................... 31

**Rules**
Fed. R. Civ. P. 65 ........................................................................................... 40

## INTRODUCTION

Singularism's Motion seeks judicial permission to sell illegal drugs for a profit. As Singularism's Complaint openly concedes, a search warrant – authorized by Judge Sean Petersen – resulted in the seizure of both psilocybin and THC. [*See* Complaint at ¶ 41; *see also* Ex. C to Complaint]. Both are Schedule I substances under state and federal law, and Plaintiffs' Motion does not even attempt to rationalize their possession of THC. *See, e.g.*, 21 U.S.C. § 812 (listing "Psilocybin" and "Tetrahydrocannabinols" as "Schedule I" controlled substances); Utah Code § 58-37-4 (same). "[I]ndividuals pay a fee" that is thousands of dollars to "Singularism's for-profit organization" in exchange for Plaintiffs' "therapeutic" drug "ceremonies." [Complaint at ¶ 30; *see also* Jackson Julian Aff. (Ex. A) (testifying fees range from $3,900 to $6,400)].

Plaintiffs nevertheless seek to excuse their for-profit drug dealing by alleging their "religious conviction is unquestionable." [*Id.* at p. 2]. "Undecipherable" more aptly describes their alleged "religion." Indeed, the following comes from the liability waiver (Plaintiffs call it an "attestation") that Plaintiffs have their customers sign before a deal:

> **Acknowledgment of Religious Inclusivity:**
> I further acknowledge and respect that Singularism does not require "religious exclusivity" from its adherents. I understand that participation in Singularism's ceremonies does not necessitate forgoing or abandoning my affiliations, beliefs, or practices in other religions. Rather, Singulaism teaches religious inclusivity. I recognize that Singularism respects the coexistence of multiple spiritual paths and that my involvement in these ceremonies is a personal choice, made in accordance with my own spiritual and mental well-being needs. My participation in Singularism's ceremonies is a testament to my sincere commitment to exploring diverse spiritual experiences as I deem necessary for my personal growth and development.

[Dkt. 9-3 at p. 3 (emphasis added); *see generally id.* at 7 ("Participants agree to waive and release Singularism . . . from any liability or claims . . . .")]. Plaintiffs' website confirms that their "facilitators" guide "participants through experiences that aim to unlock and affirm their highest

1

selves . . . ***without seeking to change their foundational beliefs***."[1]  Put simply, Singularism's "core belief appears to be allowing people to believe whatever he or she wants to believe."  *See State v. Sobel*, 221 N.E.3d 44, 50 (Ohio Ct. App. 2023) (affirming criminal restriction of psilocybin).  That falls short of constitutional protection.  In addition, Plaintiffs cannot establish that the longstanding criminalization of one hallucinogenic drug substantially interferes with a "religion" that incorporates all other "spiritual paths."  [Dkt. 9-3].

Similarly, Plaintiffs' liability waiver demonstrates the compelling distinction between FDA-approved investigational psilocybin treatment conducted by "the largest healthcare systems in the state" and Plaintiffs' non-licensed drug dealing.  [*See* Motion at 28].  *See also* Utah Code § 58-37-3.5.  Plaintiffs advise all "voyagers" that ***"advice from Singularism***'s staff . . . ***is not a substitute for licensed and qualified medical advice***, and we acknowledge their ***clinical advice supersedes our spiritual advice*** in medical and physical matters."  [Dkt. 9-3 at p. 3 (emphasis added)].  "Singularism always advises that you seek your own medical council [sic]."  [*Id.*].  In short, medical oversight of controlled substances is consistent with compelling government interests and Singularism itself.  The State has ensured Singularism's followers can obtain "qualified medical advice," including potential prescriptions for psilocybin under the care of licensed professionals.  *See* Utah Code § 58-37-3.5.  Plaintiffs' only injury is that they are "not a substitute for licensed and qualified medical advice."  [Dkt. 9-3 at p. 3].

But even if Plaintiffs could establish a religious right to possess and sell hallucinogenic mushrooms (they cannot), their current Motion still fails.  Plaintiffs have not even attempted to defend their undisputed possession of ***THC***.  [*See* Complaint at ¶ 41 (admitting "law enforcement

---

[1] *See* https://psychedelictherapyjourney.com/frequently_asked_questions.

removed . . . THC . . . from Singularism's religious center")].  There is zero basis for the Court to enjoin a criminal investigation and prosecution when Plaintiffs have not even attempted to justify half of their criminal conduct.  [*See, e.g.*, Proposed Order (Dkt. 9-18)].  Their possession of multiple illegal drugs suggests a scheme to use and sell drugs, not a solemn sacrament.

Finally, even if Plaintiffs could establish their "religion" is impinged by longstanding criminal codes, they still lose.  Each of Plaintiffs' claims is subject to dismissal for multiple reasons.  And their claims all fail for the common reason that "there is certainly a compelling state interest in regulating the use of Schedule I controlled substances."  *State v. Cook*, 2020-Ohio-432, 2020 WL 615076, at *6 (Ohio Ct. App. 2020); *see also Olsen v. Drug Enf't Admin.*, 878 F.2d 1458, 1462 (D.C. Cir. 1989) ("[E]very federal court that has considered the matter, so far as we are aware, has accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare.").

Hallucinogenic drugs might cause a user to "feel as though the boundaries between myself and the universe dissolved," begin "laughing uncontrollably," or visualize "the very air molecules that surrounded me."  [*See* Dkts. 9-1; 9-4 – 9-8].  That is not enough to establish a constitutional right to get high or distribute drugs.  *See, e.g.*, *United States v. Quaintance*, 471 F. Supp. 2d 1153, 1159 (D.N.M. 2006) ("If marijuana use results in expanded mental capabilities, such as increased focus or awareness, this result occurs simply because of the physical (and not spiritual or religious) interaction between the mind-altering substance and the user.").  The First Amendment would "easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying 'religion.'"  *United States v. Meyers*, 906 F. Supp. 1494, 1498 (D. Wyo. 1995).  Plaintiffs'

civil efforts to avoid criminal accountability for the laws they knowingly violated should be rejected.

## STATEMENT OF FACTS

### I.    BRIDGER LEE JENSEN'S ADMITTED HISTORY OF DRUG USE PREDATES HIS NEW "RELIGION."

1.    Bridger Lee Jensen ("Jensen") was using drugs before he founded Singularism in the fall of 2023.

2.    For example, during his "mid-twenties during a hiking trip in Peru," Jensen consumed what he believes was ayahuasca.  [*See* Jensen Dec. (Dkt. 9-1) ¶ 11].  The active ingredient in ayahuasca is a Schedule I drug.    *See* Utah Code § 58-37-4 (listing "dimethyltryptamine" or "DMT").  Notably, Jensen disclaims any religious affiliation that supported his drug use.  He was in "a period of agnosticism."  [Jensen Dec. (Dkt. 9-1) ¶ 9].

3.    A decade later, Jensen got high "on a beach in Hawaii."  [*Id.* at ¶ 13].  Again, Jensen had not yet started Singularism.  Nor does he identify any religious affiliation or ceremony.  He was "alone on a beach," celebrating his "32nd birthday."  [*Id.*].

4.    In 2019, Jensen decided not to "continu[e] as a licensed therapist" because that "might conflict with his" continued "use of psychedelics."  [*Id.* at ¶ 5].  That was four years ***before*** Jensen "founded . . . Singularism in the fall of 2023."  [*See id.* at ¶ 18].

### II.    JENSEN MARKETS "PSYCHEDELIC THERAPY" SEPARATE FROM SINGULARISM.

5.    Singularism's operation as a religious entity – as opposed a facility for "psychedelic therapy" – is contradicted by the reviews of its own customers.  For example, Singularism has a 5.0 Google review rating.  However, the reviews refer to Singularism as a "clinic," substitute for

"medication," and "much safer than having to find it on the street from illegal sources."  [*See* Google Reviews, Ex. B].

6.      Moreover, Plaintiffs ***do not*** assert that their use of illicit drugs is limited to Singularism's churches or worship services (if those exist).  Nor could they.  Singularism has not identified any "religious" use of THC.  And Singularism's founder, Jensen, actively markets "Psychedelic Therapy" without referencing Singularism.

7.      For example, "bridgerleejsensen.com" offers viewers a chance to "schedule a 30 minute consultation" without any disclaimer (or suggestion) that Jensen's invitation to "experience another breakthrough! 🙂" is religious:



[*See* bridgerleejsensen.com, Ex. C].  Notably, Jensen's email address is ***not*** associated with Singularism.  Instead, it is "bridger@**utahmushroomtherapy**.org."  [*Id.* (emphasis added)].

8.      Jensen's website includes an "About Bridger" section.  In addition to "psychedelic[s]," Jensen references everything from "suicide" to "dance" and his "four children."

[*See id.*].  Tellingly, he does not reference religion, spirituality, or Singularism.  Instead, he describes his psychedelic therapy as "clinical":

## About Bridger

Bridger's <u>career in mental health</u> began in 2002, when he worked as a guide for a prominent outdoor behavioral healthcare clinic for youth. Bridger facilitated over 400 seminars and presented in dozens of conferences before earning his undergraduate degree in therapeutic recreation and his master's degree in counseling psychology.

Having gained a national <u>reputation as a therapist,</u> Bridger conceptualized Mental Gurus in response to losing several youthful clients to suicide. His dedication to his work and his passion for human consciousness led him to see the potential for artificial intelligence to improve psychotherapy and psychometrics.

Bridger's passion for alleviating human suffering led him to utilize technology in creating a powerful psychometrics engine, which is now widely used for personality and mental wellness.

<u>Today Bridger is an active advisor and consultant to well known companies and high profile individuals. Specializing in clinical psycedelic integration,</u> Bridger embodies leadership and passion, which has brought his multiple teams together.

When not working, Bridger enjoys spending time with his family, including four children in the outdoors. Bridger is also an accomplished artist with a love for sculpting, poetry, dance, and photography, having received several grants and awards for his work, which has been displayed nationally in various exhibitions.

[*Id.* (emphasis added)].

9.  Jensen's LinkedIn profile provides yet another example.  [*See* LinkedIn Profile, Ex. D].  Jensen's background image advertises a non-party to this lawsuit – "Psychedelic Therapy Academy."  Jensen's commitment to psychedelics, or perhaps psychedelic therapy, is evident. Again, however, that commitment has no connection to religion.  Jensen focuses on "therapy":



[*See id.*].  Jensen's LinkedIn profile also includes another "About" section.  In that section, Jensen

refers to himself as a "therapist," "visionary," "innovator," and "entrepreneur."  [*Id.*].  He does not

reference religion, spirituality, or Singularism.  [*Id.*].

　　　　10.　　As another example, Jensen is the "Founder and Lead Instructor" at "Psychedelic

Therapy Academy."  [*See* PsychedelicTherapyAcademy.com, Ex. E].  That entity markets an

"immersive course" and promises enrollees the chance to join the "expanding field of psychedelic-

assisted therapy."  It promises enrollees will become "a True Practitioner" of "psychedelic

therapy" – not a "true believer" in Singularism:

### Are you ready to be at the forefront of a revolutionary approach to healing?

# Skills of a True Practitioner

Embrace a transformative journey of learning and personal growth as you delve into the art of facilitating psychedelic therapy. Gain comprehensive knowledge and practical skills to guide individuals safely through profound healing experiences. Join us on this immersive course and become a trusted facilitator in the expanding field of psychedelic-assisted therapy.

[*Id.*].

11.    Clicking "Apply Now" produces another screen that describes the therapy program. It aptly summarizes the "common goal" behind Jensen's personal drug use and his various enterprises – "exploring the incredible world of psychedelics":



## Facilitator Course Application form

Welcome to a transformative journey that sets the benchmark in the world of psychedelic facilitation. We're thrilled that you're applying to join our exclusive course and training program, designed for those who aspire to be the best in this field.

Our course isn't just another training; it's a pathway to excellence, curated for individuals who are passionate about guiding others through profound experiences and facilitating personal growth.

You're invited to be part of a select group of individuals who share a common goal: to create a safer, more supportive, and more enlightening space for those exploring the incredible world of psychedelics. While we maintain high standards, we are committed to fostering a warm and welcoming community. Your journey begins here, and we're eager to have you on board.

Please be aware that we place little emphasis on perfect spelling, punctuation, or formal qualifications. No need to spend hours filling out this form. We prioritize individuals who are dedicated to safety, authenticity, and the creation of a nurturing and enriching experience for their clients.

We are also NOT exclusively looking for people with lots of experience as a psychedelic guide. We are open and receptive to all experience levels.

[Facilitator Course Application (Ex. F)].  The application form does not require commitment to any religious precepts.  It does require a financial commitment: "I understand that tuition is $1,800, and I can pay in full . . . ."  [*Id.*].

12.    Jensen is known to be involved with the following businesses or websites that market "training," "therapy," and/or psychedelics:

- Psychedelic Therapy Academy [*see* Exs. E-F];

- Mental Gurus [Ex. G];

- UtahMushroomTherapy.org [*see* Ex. C];

- RevealMyself.com [*see* Facebook profile (Ex. H); Ex. J];

- UtahPsychedelicTherapy.org [*see* Instagram profile (Ex. I)];

- Psyche Healing and Bridging, LLC [*see* Utah Dept. of Corp. (Ex. K); Provo Business License (Ex. L)];

- Psychedeliccon.org [*see* Ex. M]; and

- PsychedelicTherapyJourney.com.  [*See* Ex. N].

## III.    JENSEN ADMITTED TO THE PROVO POLICE THAT SINGULARISM WAS FORMED TO AVOID CRIMINAL PROSECUTION.

13.    In connection with Defendants' criminal investigation, Detective Jackson Julian of the Provo Police Department met with Jensen undercover "to obtain information regarding" his "usage of psilocybin."  [*See* Complaint at ¶ 36].

14.    After applying to become a "Certified Psychedelic Practitioner," Detective Julian received a call from Jensen.  [Julian Aff. (Ex. A) at p. 3].  During that call, Jensen explained that they have "therapy session . . . packages that cost between $3900 -$6400."  [*Id.* at 4].

15.     Jensen further informed Detective Julian that "Singularism is supportive of other religions." [*Id.*]. "[Y]ou need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist." [*Id.*].

16.     On October 22, 2024, Detective Julian "attended a webinar that was hosted by Bridger" and two of his staff members. [*Id.*].

17.     During that webinar, Jensen "explained the pricing and the process of how the therapy sessions work." [*Id.*]. "He sells packages in 'rounds' and the minimum package is a two round package." [*Id.*]. "The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400." [*Id.*].

18.     Jensen also confirmed that "the way that **he founded the religion** was **by talking with his lawyer** to review prior cases in which people claimed religious exemption; where those claimants won or lost." [*Id.* at 5 (emphasis added)].

## IV.     THE SEARCH WARRANT.

19.     On November 4, 2024, Defendants asked the Fourth District Court, State of Utah to authorize a search warrant on "Bridger Lee Jensen." [*See* Search Warrant (Ex. O)].

20.     That same day, District Court Judge Sean Petersen issued the search warrant. [*See id.*]. Judge Petersen determined "that there is probable cause" supporting the search. [*See id.*].

21.     On November 11, 2024, police officers executed the search warrant as authorized by Judge Petersen and the Utah Courts. [*See* Return to Search Warrant (Ex. P)]. The search warrant resulted in the seizure of "**459.8 grams** psilocybin mushrooms" and "2 fluid ounces of THC liquid syrup," among other things. [*See id.*].

22.    "The most effective dose seems to be about 5 mg [of mushrooms], with higher doses causing some unpleasant effects."  Max M. Houck, Jay A. Siegel, *Fundamentals of Forensic Science* (3rd) (2015) (recognizing "psilocybe mushrooms" also "resemble highly toxic" mushrooms and "poisonings are reported every year").  Using that number, Plaintiffs possessed enough psilocybin mushrooms to distribute 92 doses.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Chiles v. Salazar*, 116 F.4th 1178, 1199 (10th Cir. 2024) (affirming denial of preliminary injunction to prevent Colorado prohibition on "conversion therapy" despite alleged First Amendment violations).  "It is an extraordinary remedy never awarded as of right.  A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018) (cleaned up); *accord Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

"To prevail on a preliminary injunction motion," a Plaintiff typically must prove: (1) they are "substantially likely to succeed on the merits"; (2) they will "suffer irreparable injury if the court denies the injunction"; (3) the "threatened injury (without the injunction) outweighs the opposing party's" interests; and (4) the "injunction isn't adverse to the public interest."  *Chiles*, 116 F.4th at 1199 (cleaned up).  That said, "[t]he final two factors merge when the Government is the opposing party."  *Id.* (cleaned up).

The injunctive relief Plaintiffs demand from this case is additionally and more "specifically disfavored."  *See Schrier*, 427 F.3d at 1259.  Plaintiffs demand that this Court – via a civil

injunction – should effectively determine the outcome of a criminal proceeding that began with the search warrant in the Utah State Courts.  Their proposed order includes the following demands:

-    "Defendants are ordered to **return all items they seized**" pursuant to the Search Warrant;

-    "Defendants are **prohibited from prosecuting Plaintiffs'** sincere free exercise of religion." [*See* Proposed Order (Dkt. 9-18) (emphasis added)].  Plaintiffs want this Court to preemptively paralyze the criminal process and destroy the evidence so that subsequent prosecution becomes impossible.  A "preliminary injunction[] that" effectively grants Jensen "all the relief that [he] could recover at the conclusion of a full [criminal] trial on the merits" is "specifically disfavored." *See Schrier*, 427 F.3d at 1259.  The Court should "be slow to act where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court."  *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 162 (1943); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

I.    **PLAINTIFFS CANNOT SUCCEED ON THE MERITS.**

Plaintiffs' Motion argues likelihood of success with only vague reference to the actual claims for relief alleged in the Complaint.  As Defendants' forthcoming Motion to Dismiss will detail, each of Plaintiffs' claims fails as a matter of law.  Without any claims, there is no basis for Plaintiffs to seek or obtain any relief from the Court.  Accordingly, the Court should postpone ruling on the instant Motion until the Motion to Dismiss has been resolved.

Even if the Court were inclined to tackle the merits of two different constitutions on an expedited basis and without a full record, Plaintiffs' Motion still fails.  Plaintiffs must "make a

prima facie case showing a reasonable probability that they will ultimately be entitled to the relief sought." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1146 (10th Cir. 2020) (cleaned up). Plaintiffs cannot make that showing.

### A.    Utah's Controlled Substances Act Does Not Violate the U.S. Constitution.

Three months ago, the Tenth Circuit reaffirmed that "[l]aws incidentally burdening religion . . . are ordinarily not subject to strict scrutiny under the Free Exercise Clause [of the First Amendment] so long as they are neutral and generally applicable." *Chiles*, 116 F.4th at 1221. That court then refused to enjoin a Colorado statute that prohibited the plaintiff from offering "conversion therapy," even though she was "a practicing Christian" and treated clients who "believe their faith and their relationships with God supersede romantic attractions." *See generally id.* at 1193, 1221-25. The plaintiff lost because she could not show that Colorado's law "lacks neutrality and general applicability." *Id.* at 1225.

The Tenth Circuit's ruling was consistent with established law. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up). The Supreme Court offered an explanatory example before it rejected an argument that the First Amendment superseded Oregon's criminalization of peyote:

> It is no more necessary to regard the collection of a general tax, for example, as "prohibiting the free exercise [of religion]" by those citizens who believe support of organized government to be sinful, than it is to regard the same tax as "abridging the freedom . . . of the press" of those publishing companies that must pay the tax as a condition of staying in business. . . . [I]f prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended.

*Id.* at 878.  "[W]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law . . . ."  *Id.* at 878-79.

"[A]s the party seeking a preliminary injunction, [Plaintiffs] must show the" Utah Controlled Substances Act ("Utah CSA") "is not neutral or generally applicable."  *Chiles*, 116 F.4th at 1221; *accord State v. Green*, 2004 UT 76, ¶¶ 20-22, 99 P.3d 820 (applying same standard and finding bigamy statute constitutional).  Plaintiffs cannot meet that burden.

Courts repeatedly have ruled that controlled substance laws do not violate the First Amendment.  *See, e.g.*, *Smith*, 494 U.S. at 875; *Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*, 365 F. App'x 817, 819 (9th Cir. 2010) ("Because drug laws are both neutral and generally applicable, they may be enforced even if doing so substantially burdens one's religion." (cleaned up)); *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991) (ruling drug law "does not offend the First Amendment's free exercise clause"); *Olsen*, 878 F.2d at 1463 (D.C. Cir. 1989) (J. Bader Ginsburg) ("[F]ree exercise clause does not compel the DEA to grant [plainitff] an exemption immunizing his church from prosecution for illegal use of marijuana."); *United States v. Greene*, 892 F.2d 453, 456 (6th Cir. 1989) ("Congress may control the use of drugs that it determines to be dangerous, even if those drugs are used for religious purposes.").  The law is so well-established that courts have deemed ongoing challenges "frivolous."  *See, e.g.*, *Gallagher v. Dhillion*, No. 3:18-cv-2801, 2020 WL 2737246, at *2 (N.D. Tex. May 7, 2020) (ruling plaintiff's challenges were "futile and should be dismissed as legally

frivolous"); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Me. 2003) ("Dee's constitutional challenge is frivolous.").[2]

Utah's controlled substances laws are narrowly tailored, facially religion-neutral, and do not target any specific sect of religion.  Utah's neutral drug laws with general applicability do not violate Plaintiffs' First Amendment rights.

**B.    The Utah Constitution Does Not Legalize Hallucinogenic Drugs.[3]**

Article I, section 4 of the Utah Constitution "rests on the concept of governmental neutrality."  *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 937 (Utah 1993).  Both the language of that text and the history of its adoption "identify three complementary themes: (i) a distancing of government from involvement with religion, (ii) nonsectarianism to the extent there is government involvement with religion, and (iii) government neutrality—the maintenance of a level playing field in civil matters—as between religious and nonreligious sentiments."  *Id.* at 936.

---

[2] To the extent Plaintiffs intended the argument on page 22-25 of their Motion about "Various Exemptions" to the Utah CSA to apply here, that argument is equally meritless.  In fact, the Supreme Court began its opinion in *Smith* by recognizing controlled substances were illegal "unless the substance has been prescribed by a medical practitioner."  *Smith*, 494 U.S. at 874; *see also Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (rejecting argument that CSA was "not generally applicable" because it allows "certain research and medical uses of marijuana"); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law need not apply to every person or business in America to be generally applicable.  A law is generally applicable if it does not make distinctions based on religion.").

[3] Defendants removed this action to federal court because Plaintiffs asserted multiple federal claims.  Pursuant to 28 U.S.C. § 1446, that removal applied to the "civil action" that was pending in the Utah State Court.  *See* 28 U.S.C. § 1446(a).  The Court has supplemental jurisdiction over the additional claims involving state law.  *See* 28 U.S.C. § 1367.  However, Defendants recognize that the Court "may decline to exercise supplemental jurisdiction" over those claims if they "raise a novel or complex issue of State law."  *Id.* at § 1367(c); *cf. Summum v. Pleasant Grove City*, No. 2:05-cv-638, 2010 WL 2330336, at *4 (D. Utah June 3, 2010) (declining to exercise supplemental jurisdiction for claims involving the Utah Constitution).

Utah's Constitution ensures "neutrality toward conscientious sentiments, religious or irreligious." *Id.* at 937.

When the government acts "in an impartial manner," any burdens and benefit "'flowing to religious worship, exercise, or instruction can be fairly characterized as indirect because the benefit flows to all those who are beneficiaries of the use of government money or property, which may include, but is not limited to, those engaged in religious worship, exercise, or instruction.'" *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 8, 345 P.3d 1188 (quoting *Soc'y of Separationists, Inc.*, 870 P.2d at 937). For example, "[i]f a city permits groups to use city-owned facilities, that use must be permitted without regard to the belief system of the user." *Soc'y of Separationists, Inc.*, 870 P.2d at 938; *see also Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). However, the Utah Constitution does not require (or allow) the alteration of an existing standard for the benefit of one religious sect. For example, in *Summum v Pleasant Grove City*, the Utah Supreme Court refused "an injunction requiring Pleasant Grove to display" the plaintiff's religious text in a park. *Summum*, 2015 UT 31, ¶ 11. It was not enough for the plaintiff to establish the city had a "display of the Ten Commandments" in a public park. *Id.* at ¶ 9. Even "[a]ssuming that the Ten Commandments monument amounts to religious exercise or instruction, requiring Pleasant Grove to erect a second religious monument would not" result in the type of broad religious neutrality the Utah Constitution requires. *Id.* at ¶ 11. It would instead elevate Summum's beliefs while ignoring "multiple religious denominations, agnosticism, or atheism." *Id.* Total neutrality is the test under Utah's article 1, section 4.

The Utah CSA complies with the constitutional standard of neutrality. It is a uniform law that applies to everyone in the State of Utah. The Utah CSA certainly was not enacted to impair Singularism's alleged beliefs. Singularism was not formed until decades after the Utah CSA classified psilocybin as a Schedule I drug. *See, e.g.*, Utah Code Ann. § 58-37-4 (West 2004). [*See also* Jensen Dec. (Dkt. 9-1) at ¶ 18 (Singularism founded in "fall of 2023")]. Plaintiffs cannot establish that a longstanding law enacted and enforced for non-religious reasons violates the constitutional "concept of governmental neutrality." *Soc'y of Separationists, Inc.*, 870 P.2d at 937.

Utah law at the time of statehood further rebuffs Plaintiffs' constitutional arguments. *See S. Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 450 P.3d 1092 (evaluating "the meaning of the text as understood when it was adopted"). Ten years before the Utah Constitution was finalized, the Supreme Court of the Territory of Utah affirmed a city ordinance that allowed only "druggists" to "sell such liquors as a medicine." *Provo City v. Shurtliff*, 4 Utah 15, 5 P. 302, 302-03 (Utah 1885). Three years after the constitution was adopted, the Utah Legislature dedicated an entire Title of the Utah Code to "Pharmacy." *See* 1898 Revised Statutes of Utah §§ 1711-27 (Title 51). Among other things, the 1898 code declared, "it shall not be lawful for any person other than a registered pharmacist to compound or dispense drugs." *Id.* § 1711; *see also id.* § 42 (authorizing cities to "punish and prohibit" opium); *id.* § 38 (allowing cities to "license, tax, and regulate" "druggists").

Plaintiffs' Motion fails to seriously engage with the Utah Constitution or its history. Instead, it leaps to the conclusion that "strict scrutiny . . . applies under Article I, Section 4 of the Utah Constitution." [Motion at 27]. "This proposed test does not come from the language of the [Utah] constitution or from our case law . . . ." *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *see also id.* ("We have never determined whether the free exercise clause of article 1, section 4 of

the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution."); *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 11, 140 P.3d 1235 ("In light of the fact that the Utah Constitution was adopted against the background of over a century of experience under the United States Constitution, an understanding of the First Amendment contemporary to its adoption is also instructive." (cleaned up)); Utah Constitutional Convention Day 25, p. 437 ("A constitutional convention, such as we are now holding, has its sphere largely determined by the overshadowing Constitution of the United States, which we have already adopted as a condition precedent to framing a Constitution for the prospective State of Utah.").

The Court should refuse Plaintiffs' efforts to adopt a new meaning of the Utah Constitution.

### C.    The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claim, Which Also Fails on the Merits.

Plaintiffs' affirmative claim under Utah Code Chapter 33, ("Utah RFRA") also must be rejected.  *See* Utah Code § 63G-33-101.  Initially, the Court lacks jurisdiction to adjudicate that claim because Plaintiffs failed to provide notice as required by the Utah RFRA and the Governmental Immunity Act of Utah ("GIAU").  Even if that failure were overlooked, Plaintiffs' arguments fail as a matter of fact and law.

#### 1.    *The Court lacks jurisdiction over Plaintiffs' claims because they failed to provide notice under the GIAU.*

"Any person having a claim against a governmental entity, or against the governmental entity's employee . . . shall file a written notice of claim with the entity before maintaining an action . . . ."  Utah Code § 63G-7-401(2).  "A plaintiff's failure to comply with the [GIAU's] notice of claim provisions deprives the trial court of subject matter jurisdiction."  *Patterson v. Am. Fork*

*City*, 2003 UT 7, ¶ 10, 67 P.3d 466.  The Legislature incorporated this notice requirement within the Utah RFRA.  "[A] person may not bring an action . . . unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity, in accordance with" the GIAU.  Utah Code § 63G-33-201(5)(a).

Plaintiffs did not provide the notice required by the GIAU and the Utah RFRA.  Instead, they rely on an exception that does not apply.  The Utah RFRA excepts the requirement of a GIAU notice only if the "government action alleged in the action": (a) "is ongoing" and providing GIAU notice "will place an undue hardship on the person" or (b) "is likely to occur or reoccur before the end of the 60-day period."  Utah Code § 63G-33-201(5)(b).  Plaintiffs' Motion does not establish that exception.  Instead, merely quotes it without further analysis.  [Motion at 22].

The statutory notice exception might not apply if this Court were presiding over a criminal case and Plaintiffs were asserting a "defense" in response to pending criminal charges.  *See id.* at § 63G-33-201(4) (confirming Utah RFRA may be asserted "as a claim or defense").  At least under those circumstances, the government's prosecution would be "ongoing."  That is not the circumstance before this Court.  Nor does the notice exception justify Plaintiffs' rushed initiation of an affirmative civil case.  Plaintiffs cannot show "ongoing" government action.  The search warrant issued November 4, 2024.  [*See* Dkt. 9-9].  Plaintiffs have not alleged any ongoing warrants or searches, or that additional searches are "likely to occur" within 60 days.[4]  Finally, any alleged threat of criminal prosecution cannot form the basis for expedited resolution because that threat has been apparent for more than 12 months.  [*See* Complaint at ¶ 23].

_____

[4] The hearing on Plaintiffs' Motion is scheduled to occur 39 days after the warrant issued.

Recognizing the criminal nature of Plaintiffs' conduct, "letters were sent to . . . the Provo Police Department, as well as the Utah County Attorney's Office" when Singularism opened in September 2023.  [Complaint (Dkt. 2-2) ¶ 22].  Plaintiffs' litigation counsel sent those letters.  [*See* Dkt. 9-2].  The letters argued Plaintiffs' "practices are conducted consistent with the protections granted by the First Amendment . . . [and] the Utah Constitution."  [*Id.*].  Plaintiffs, and their lawyers, could have drafted those letters to comply with the GIAU notice provisions.  They did not.  *See* Utah Code § 63G-7-401(2).  Nor do Plaintiffs allege otherwise.

After Singularism opened, "there was media coverage" concerning its illegal practices.  [*See* Complaint (Dkt. 2-2) ¶ 23].  That coverage "included a statement from the Utah County Attorney's Office."  By November 3, 2023, the "public prosecutor for the county," *see* Utah Code § 17-18a-202, had declared "it does not appear that Singularism has Constitutional protections to either use [or] administer psilocybin."  [*Id.*].  Again, Plaintiffs did not respond with a timely GIAU notice that set forth Plaintiffs' arguments.

The purpose of a GIAU notice is to allow the government to evaluate a party's position and, where appropriate, take corrective action to avoid a lawsuit.  *See Mecham v. Frazier*, 2008 UT 60, ¶ 17, 193 P.3d 630.  That purpose is eviscerated if Plaintiffs' approach is accepted; a private party could sit in wait, confident that the exception would swallow the rule.

At the very minimum, Plaintiffs' decision to sit still is enough to deny their demand for an emergency injunction.  "[E]quity aids the vigilant, not those who slumber on their rights . . . ."  11A Fed. Prac. & Proc. Civ. § 2946 (3d ed.).  Additionally, because Plaintiffs' alleged injuries all stem from another judicial process (the criminal process that began with the search warrant), they could seek to dismiss any future criminal prosecution on essentially the same bases they assert

here.  "[I]f the party seeking the injunction could raise the same issues in the other proceeding, the court typically will take the position that the party has an adequate alternative remedy and does not need injunctive relief."  11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.).

> **2.    Plaintiffs have not established that they satisfy the provisions of the Utah RFRA.**

Even if Plaintiffs provided timely notice of their Utah RFRA claim, that claim still fails.

> A.    <u>Compliance with Utah law does not substantially burden singularism.</u>

To prevail on a claim under the Utah RFRA, Plaintiffs must establish government action that "substantially burdens" their religious beliefs.  *See* Utah Code § 63G-33-201.  "A government act imposes a 'substantial burden' on religious exercise if it . . . prevents participation in conduct motivated by a sincerely held religious belief, or . . . places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief."  *United States v. Jeffs*, No. 2:16-cr-82, 2016 WL 6745951, at *6 (D. Utah Nov. 15, 2016) (quoting *Hobby Lobby Stores, Inc, v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013)); *see* Utah Code § 63G-33-101.

Jensen claims he must choose between "giv[ing] up his sincerely held religious beliefs" or facing "the prospect of escalated threats from law enforcement and promised prosecution."  [Motion at 14].  However, Plaintiffs have failed to establish that complying with the Utah CSA substantially burdens their ability to practice Singularism.  On the contrary, members who violate the law expressly ***do not*** act in accordance with Singularism's values.  [Dkt. 9-16 at 4 (expressing "compliance with governmental laws" as a value)].

Additionally, Plaintiffs have not demonstrated that the use of psilocybin mushrooms is mandatory or critical to Singularism.  [Dkt. 9-16 (indicating the experience is available only to

"adults who feel naturally called to it"); Dkt. 9-3 (restricting minors from using psilocybin)]. There is nothing in the record that indicates the total number of Singularism's members, nor the frequency with which they ingest psychedelic drugs. There is nothing that restricts Singularism's beliefs to those who pay Jensen to supply them with psilocybin, nor is there anything that prevents its members from experiencing "oneness of all existence" through other means. [Dkt. 9-16 at 3 (encouraging members to "discover and define their own beliefs" and "[w]rite [their] own scripture")]. Indeed, Singularism's materials suggest that it can be experienced "by merely [sic] meditation in our ceremonies." [*Id.* at 2]. Thus, Plaintiffs have failed to establish a substantial burden. *See Jeffs*, 2016 WL 6745951, at *6–*10 (concluding no substantial burden was present where prosecution still permitted members to believe in and practice their religion); *see also State v. White*, 271 P.3d 1217, 1225-26 (Idaho Ct. App. 2011) (finding no burden where member could obtain spiritual experiences through tai chi and yoga).

Moreover, Singularism expressly defers to medical providers. "Singularism always advises that you seek your own medical council . . . ." [Dkt. 9-2 at 3]. That medical advice "***supersedes [Singularism's] spiritual advice*** in medical and physical matters." [*Id.* (emphasis added)]. Singularism ***does not*** mandate or limit who can administer psilocybin to its members. And Plaintiffs argue that Utah's Psilocybin Act now allows medical providers to "determine how, when, where, to whom, and for what reason psilocybin is administered to their patients." [Motion at 30 (citing Utah Code § 58-37-3.5 *et seq.*)]. If medical providers offer psilocybin treatment to Singularism's followers, there is no religious impingement; psilocybin remains available. If medical providers determine a Singularism adherent ***does not*** qualify for psilocybin therapy, that medical determination "supersedes spiritual advice." [Dkt. 9-2 at 3]. This alone defeats

Singularism's Free Exercise Claim.  *See Strope v. Cummings*, 381 F. App'x 878, 882 (10th Cir. 2010) ("At a minimum the substantial burden test requires more than an inconvenience to one's religious practice." (cleaned up)).

Because Singularism does not mandate the use of psilocybin, and because its members apparently can obtain psilocybin through supervised regulatory channels, Singularism has failed to establish a substantial burden on its self-declared religion.

> B.    <u>Plaintiffs cannot establish that their psilocybin use is "substantially motivated by a sincerely held religious belief."</u>

Utah's RFRA states, "a government entity may not substantially burden the free exercise of religion."  Utah Code § 63G-33-201(2)(a).  "Free exercise of religion" is defined as acting "in a manner ***substantially motivated by a sincerely held religious belief***."  *Id.* at § 63G-33-101(2) (emphasis added).  That definition further assumes or requires "a larger system of religious belief," not merely a belief in one otherwise illegal act.  *Id.*

Although Utah courts have not yet interpreted the Utah RFRA, the statute is modeled after the federal Religious Freedom Restoration Act.  *See* 42 U.S.C. § 2000bb, *et seq.*  Courts have restricted RFRA protections to situations where a party demonstrates the existence of "a bona fide religion."  *See, e.g.*, *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) ("*Meyers I*"), *aff'd in* 95 F.3d 1475 (10th Cir. 1996) ("*Meyers II*").  Unless this threshold is met, Utah's RFRA "could easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying 'religion.'"  *Meyers I*, 906 F. Supp. at 1498; *see also Founding Church of Scientology of Washington, D.C. v. United States*, 409 F.2d 1146, 1161 (D.C. Cir. 1969) ("When otherwise proscribed substances are permitted to be used for purposes of worship, worship must be defined.").

"Though the sensitivity of this task has caused courts to tread lightly on the waters of religion, they have not feared to tread there" because "when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, [courts] are required to make such uneasy differentiations." *Meyers I*, 906 F. Supp. at 1501 (quoting *Africa v. Com. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981)).

In *Meyers II*, the Tenth Circuit adopted five factors to consider in the search for a "sincerely held religious belief." *See Meyers II*, 95 F.3d at 1484. These "indicia of religion" consist of the following: (1) ultimate ideas, (2) metaphysical beliefs, (3) moral or ethical systems, (4) comprehensiveness of beliefs, and (5) accouterments of religion, which includes ten separate subfactors. *Id.* at 1483–84. The subfactors under the fifth factor consider whether the religion has: (a) a founder, prophet, or teacher, (b) important writings, (c) gathering places, (d) keepers of knowledge, (e) ceremonies and rituals, (f) structure or organization, (g) holidays, (h) diet or fasting, and (j) propagation or missionary work. *See id.*

The *Meyers I* and *Meyers II* cases involve two charges from the United States against Meyers relating to marijuana possession and distribution. *See id.* at 1479. Meyers sought dismissal of the charges "based on religious freedom under the First Amendment and the Religious Freedom Restoration Act." *Id.* Meyers "founded the 'Church of Marijuana,'" a church with "800 members and one designated meeting spot." *Meyers I*, 906 F. Supp. at 1504. According to Meyers, the church's religion was "to grow, possess, and distribute marijuana." *Id.* "The church's only ceremony revolves around one act: the smoking and passing of joints," which "apparently results in a sort of 'peaceful awareness'" and "plays a role in social bonding." *Id.* The Tenth Circuit agreed that Meyers' beliefs did not "rise to the level of a 'religion.'" *Id.* at 1508; *Meyers II*, 95

24

F.3d at 1484. Although the court noted that smoking marijuana "can engender or induce different mental states of being, this does not mean that deliberately altered physical states of being are themselves 'religious.'" *Id.*; *accord id.* ("Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a slippery slope where anyone who was cured of an ailment by a 'medicine' that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial 'medicine.'"). The Tenth Circuit declined to extend RFRA to "professed beliefs" that had "an ad hoc quality that neatly justif[ied] [Meyers'] desire to smoke marijuana." *Meyers II*, 95 F.3d at 1484.

In another similar case, the Tenth Circuit evaluated the drug-related views of the "Church of Cognizance." *United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006) ("*Quaintance I*"), *aff'd in* 315 F. App'x 711 (10th Cir. 2009) ("*Quaintance II*"). Like *Meyers*, the defendants in *Quaintance* were charged with possession of marijuana with intent to distribute. *Quaintance I*, 471 F. Supp. 2d at 1154. Quaintance was "the founder of the Church of Cognizance," which maintains "that marijuana is a sacrament and deity and that the consumption of marijuana is a means of worship." *Id.* at 1155. The defendants cited RFRA and sought dismissal of the criminal charges. *Id.* Applying the *Meyers* factors, the Tenth Circuit "determined that the Quaintances' beliefs did not qualify as a religion" and that "the Quaintances' beliefs were not sincere." *Quaintance II*, 315 F. App'x at 713.

In addition to the *Meyers* factors, other considerations demonstrated the Church of Cognizance's beliefs were not religious. For example, beliefs about the "medical, physical, and social" benefits of marijuana were "secular and not religious." *Quaintance I*, 417 F. Supp. 2d at 1171. The court recognized the "Church of Cognizance excludes minors from participating in the

25

sacrament of marijuana (unlike other religions which allow minors to consume sacramental wine)." *Id.* at 1171 n.18.  The court found the defendants "adopted their 'religious' belief in cannabis as a sacrament and deity in order to justify their lifestyle choice to use marijuana." *Id.* at 1171. The court further concluded that "[e]vidence of Defendants' commercial involvement with marijuana" demonstrated a "monetary, as opposed to religious" motive. *Id.* at 1173.  Finally, the Court found that the possession of other controlled substances (cocaine) undermined "Defendants' assertion that they consume marijuana for religious, as opposed to secular, purposes." *Id.* at 1174.

In *United States v. Kuch*, 288 F. Supp. 439 (D.C. Cir. 1968), the court considered whether the New-American Church's use of psychedelic drugs (LSD) was protectable as a religious exercise. *Kuch*, 288 F. Supp. at 442.  Kuch was an ordained minister of the Neo-American Church, which had a "nationwide membership of about 20,000." *Id.* at 442–43.  Members of the church subscribed to several principles, including that "[e]veryone has the right to expand his consciousness" and that "psychedelic substances, such as LSD, are the true Host of the Church, . . . are sacramental foods, manifestations of the Grace of God, of the infinite imagination of the Self, and therefore belong to everyone." *Id.* at 443.  Kuch contended that "ingestion of psychedelic drugs brings about a religious awareness and sharpens religious instincts." *Id.* at 444.

Although the D.C. Circuit recognized that the "dividing line between what is, and what is not, a religion is difficult to draw," the court concluded that the church's members were not "motivated by or associated because of any common religious concern." *Id.*  There was no evidence "of a belief in a supreme being, a religious discipline, a ritual, or tenets to guide one's daily existence." *Id.*  Rather, the court found that "the desire to use drugs and to enjoy drugs for their own sake, regardless of religious experience, is the coagulant of this organization and the

reason for its existence." *Id.*  It was not enough "that some . . . persons using LSD . . . may have what some users report to be religious or mystical experiences." *Id.*

Recently, the Ohio Court of Appeals reached the same conclusion concerning psilocybin mushrooms.  *Sobel*, 221 N.E.3d 44.  After being arrested, Sobel maintained "that he used psilocybin mushrooms for 'religious and spiritual purposes'" as part of the Church of Freewater. *Id.* at 47.  The church used psilocybin as "a holy sacrament . . . that helps . . . tap into the divine knowledge that is only accessible with the aid of these divine teachers." *Id.* at 47–48.  According to the Church of Freewater, there was "not a one size fits all approach" to religion; "[e]very being deserves to be free and make the best decision for their mind, body and spirit." *Id.* at 48.

The court determined that "Sobel failed to establish that he uses psilocybin mushrooms in connection with a sincerely held religious belief." *Id.* at 50.  The court found that Sobel did "not describe any particular religious beliefs or tenets of the organization, other than to help people 'be themselves, through mind, body, and spirit.'" *Id.*  Essentially, the "core belief" of the Church of Freewater was to allow "people to believe whatever he or she wants to believe." *Id.*  Under these circumstances, Sobel's belief was more "accurately characterized as a personal preference, rather than as a deeply held religious conviction." *Id.*  Sobel's beliefs did not fill "a place in the life of its possessor parallel to that filled by the orthodox belief in god." *Id.*

Courts throughout the country have reached similar conclusions.  *See, e.g.*, *State v. Hardesty*, 214 P.3d 1004 (Ariz. 2009) (en banc) (rejecting argument based on "sacrament[al]" use of marijuana); *State v. White*, 271 P.3d 1217, 1222 (Idaho Ct. App. 2011) (rejecting defense because White "borrowed the ideology of many different religions . . . to meld into a justification for his use of marijuana"); *State v. Brashear*, 593 P.2d 63 (N.M. Ct. App. 1979) (ruling defendant's

drug use was not excused by "a principle, tenet, or dogma of any organization of which he was a member," considering factors such as the length and nature of defendant's beliefs); *State v. Balzer*, 954 P.2d 931 (Wash. Ct. App. 1998) (rejecting defense and recognizing that a contrary ruling would result in drug users "seek[ing] membership in these religions to invoke protection for their use that would otherwise be unlawful").

As these cases show, Plaintiffs are not the first parties to try and justify illegal drug use through the guise of religion. This Court should reject Plaintiffs' arguments because: (1) Singularism does not satisfy the *Meyers* factors, and (2) other considerations establish a lack of action substantially motivated by a sincerely held religious belief.[5]

C.    *Meyers Factors.*

Plaintiffs fail the five *Meyers* factors. *See* They cannot establish that their illegal drug use is substantially motivated by a sincerely held religious belief because Singularism: (i) lacks any non-secular ultimate ideas, (ii) does not express any non-secular metaphysical beliefs, (iii) prescribes no system of morals or ethics, (iv) does not represent a comprehensive system of beliefs, and (v) lacks many of the accoutrements that typically accompany bona fide religions.

i.    Ultimate Ideas.

"[A] religion addresses fundamental and ultimate questions having to do with deep and imponderable matters." *Meyers II*, 95 F.3d at 1483. These matters often extend to "existential

---

[5] At minimum, the sincerity of Plaintiffs' religious beliefs and the classification of Singularism as a bona fide religion involve factual questions that would be prematurely resolved absent an evidentiary hearing or discovery. *See United States v. Jeffs*, No. 2:16-cv-82, 2016 WL 6745951, at *3 (D. Utah Nov. 15, 2016) ("The issue of sincerity is a factual matter.").

matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe."  *Id.*

Singularism does not answer "fundamental and unique questions."  According to Jensen's declaration, Singularism "does not claim special access to divine truths or elevate itself above others."  [Dkt. 9-1 at ¶ 20].  Instead, individuals are encouraged "to find their own spiritual revelations and solutions."  [*Id.*; *see also* Dkt. 9-16 at 3 ("[I]ndividuals . . . define their own beliefs.")].  A doctrine of allowing "people to believe whatever he or she wants to believe" or to help people "be themselves, through mind, body, and spirit" are personal opinions, not "a deeply held religious conviction."  *Sobel*, 221 N.E.3d at 47.

Additionally, Singularism does "not claim any special or unique access to God that is unavailable to others."  [Dkt. 9-3 at 4].  On the contrary, it holds "that all people are capable of connecting with the Divine and receiving equally valid and transformative revelations."  [*Id.*].  Finally, Singularism expressly acknowledges that it does not answer ultimate questions of teleological matters, *i.e.*, "a man's purpose in life" or the "origin of the universe," instead claiming that "the ultimate purpose of existence" and "origin of the universe before the Big Bang" is "beyond human comprehension."  [Dkt. 9-17 at 5; *see also* Dkt. 9-16 ("[N]o organization, including ours, has all the answers to life's most difficult questions.")].

ii.    <u>Metaphysical Beliefs.</u>

Singularism claims that "entheogenic experiences . . . connect directly to the divine and ultimate truths of existence."  [Dkt. 9-17 at 7; *id.* at 4 (indicating psilocybin allows voyagers "to see beyond the narrow constructs of our senses" and "awaken[] awareness")].  However, legal precedent confirms that poetic descriptions of drug-induced hallucinations are not the same as

sincere religious beliefs. "There is nothing metaphysical" about halogenic drugs causing "altered physical states of being"; that is a "psycho-pharmacological effect." *Meyers I*, 906 F. Supp. at 1505. Even though "certain physical states of being can engender or induce different mental states of being," including states of "peaceful awareness," "this does not mean that deliberately altered physical states of being are themselves 'religious.'" *Id.* Thus, the *Sobel* court rejected the contention that psilocybin mushrooms enabled the defendant to "tap into the divine knowledge that is only accessible with the aid of these divine teachers." *Sobel*, 221 N.E.3d at 48. In *Kuch*, the D.C. Circuit rejected the contention that LSD enabled users to "expand . . . consciousness," experience "the infinite imagination of the Self," and bring about "religious awareness and sharpens religious instincts." *Kuch*, 288 F. Supp. at 443–44.

### iii. Moral and Ethical System.

"Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'" *Meyers II*, 95 F.3d at 1483. These beliefs "often describe certain acts in normative terms, such as 'right and wrong,' 'good and evil,' or 'just and unjust.'" *Id.* "A moral or ethical belief structure also may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest." *Id.*

Singularism does not offer an objective moral or ethical system. *See id.* Singularism's members instead are free to "discover and define their own beliefs." [Dkt. 9-16 at 3]. While Singularism aims "to make the world a more enlightened place and to alleviate suffering," [Dkt. 9-16 at 2], there are no actual directives or framework for accomplishing either. Instead, Singularism

vaguely suggests that its members "strive to alleviate suffering whenever [they] encounter it, beginning with [themselves] and radiating outward to others."[6]  [*Id.*].

"A spiritual or ethical system is not comprised of simply one vague and unspecific motto." *Quaintance I*, 471 F. Supp. 2d at 1161.  Singularism's references to "empathy," "compassion," "growth," "integrity," "hope," and "humility" do not constitute a religion.  [*See* Dkts. 9-16 – 9-17].  In fact, the same types of buzzwords can be found, for example, in government mission and values statements.  *See, e.g.*, Utah State Treasurer, *Mission & Core Values* ("ethical," "honest," "responsibility," "empathy," "compassion")[7]; Utah Department of Environmental Quality, *Our Mission, Vision, and Values* ("integrity," "reliable," "professional," "prosperous," "fair").[8]

Nothing in the record establishes that this alleged "system" "has a religious, as opposed to secular or philosophical, connotation." *Quaintance I*, 471 F. Supp. 2d at 1161.  Nothing "require[s] believers to abandon base or elemental self-interest." *Meyers I*, 906 F. Supp. at 1505.  Nor is there any explication of "precisely what" actions would be considered "good" versus "bad." *Quaintance I*, 471 F. Supp. 2d at 1161.  Nothing "restrains members from doing that which they should not do, or binds them to do that which they should do." *Meyers I*, 906 F. Supp. at 1505.

### iv.   Comprehensiveness.

Religions "provide a *telos*, an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483.  "The Tenth Circuit's definition of comprehensiveness requires

---

[6] Singularism further touts one of its values to be "compliance with governmental laws."  [Dkt. 9-16 at 4].  This is ironic given Singularism's possession and distribution of illegal drugs.
[7] https://treasurer.utah.gov/about/mission-and-core-values/
[8] https://deq.utah.gov/general/mission-vision-values

multiple beliefs." *Quaintance I*, 471 F. Supp. 2d at 1162 (citing *Meyers II*, 95 F.3d at 1483); *see also id.* (concluding "Defendants' beliefs are not comprehensive because they are not uniform" where "[e]ach member of the Church of Cognizance is entitled to adopt his or her own individual beliefs").

Singularism does not offer "answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483. Instead, Singularism's members "discover and define their own beliefs." [Dkt. 9-16 at 3]. Singularism's members are free to believe in ***any*** comprehensive belief from ***any*** religion. [*See* Dkt. 9-3 at 4 ("Singularism does not require 'religious exclusivity' and permits members to maintain "affiliations, beliefs, [and] practices in other religions.")]. Seemingly, the only "common goal" shared by Singularism's followers is "the incredible world of psychedelics." [*See* SOF ¶ 11].

Singularism may argue that its "Octadrant functions as a comprehensive map of existence." [Dkt. 9-17 at 8]. However, the Octadrant "categorizes" knowledge and serves as a framework for "navigating human epistemology." [Dkt. 9-17 at 2–3]. For example, the Octadrant distinguishes between "provable" truths and beliefs "that cannot be empirically validated." [Dkt. 9-17 at 3–4]. Additionally, the Octadrant recognizes that some empirical truths are "not yet known" and that some truths are "beyond human comprehension." [*Id.* at 4–5]. Generalities about human knowledge do not "provide the believer with answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483. Nor are they religious. Philosophers have long recognized the limits of human perception independent of religious beliefs.[9]

---

[9] *See, e.g.*, Immanuel Kant, *Critique of Pure Reason*, 70–81 (1971); T.K. Seung, *Kant's Conception of the Categories*, THE REVIEW OF METAPHYSICS 43 No. 1 (1989).

Singularism cannot simply borrow longstanding secular, philosophical concepts and brand them as religious excuses for illegal drug use.

v.   <u>Accoutrements</u>

Finally, courts look to analogous traits of "established or recognized religions" to establish whether "a particular set of beliefs [are] 'religious.'" *Meyers II*, 95 F.3d at 1483. The corresponding subfactors demonstrate that the Court is not faced with sincerely held religious beliefs:

a.   Singularism has no prophet. [Dkt. 9-16 ("[N]o voyager, practitioner or leader is more of a prophet than another."); *see also* Dkt. 9-1 ¶ 23 ("I do not see myself as a prophet")];

b.   Singularism's "scripture" is a "conceptual framework," consisting of secular knowledge classifications. [*See supra*]. The scripture also is "constantly evolving," which undermines its place as scripture in Singularism. *Quaintance I*, 471 F. Supp. 2d at 1165. [Dkt. 9-16 at 2 (referring to "a living scripture"); *id.* (encouraging members to "Write your own scripture.")];

c.   The record does not indicate that Singularism has any "sacred, holy, or significant" gathering place. *Quaintance I*, 471 F. Supp. 2d at 1166. Instead, Singularism's street address is at a townhome, [*see supra*], and it appears to rent commercial space from Utah Valley Foot and Ankle. [Dkt. 9-11];

d.   Singularism does not have organized leadership or keepers of knowledge. [Dkt. 9-16 ("[N]o voyager, practitioner or leader is more of a prophet than another.")]. Indeed, there is "no uniform set of knowledge to keep." *Quaintance I*, 471 F. Supp. 2d at 1167;

e.   Despite claiming ingestion of psilocybin as a "sacrament," [*see* Dkt. 9-18]*,* there is no mandate to participate, [Dkt. 9-16 (applying only to "adults who feel naturally called to it")], no specified "services," "prayers," liturgies, or "blessings," and no dictate that the sacrament "be performed at a certain time or a certain day, or even a certain frequency." *Quaintance I*, 471 F. Supp. 2d at 1167–68 (cleaned up) ; and

f.   Nothing in the record suggests that Singularism has any holidays, specialized diet or restrictions, required clothing, or missionary work and proselytizing. *Id.* at 1169–1170.

D.    *Other Considerations Weigh Against a Finding of a Sincerely Held Religious Belief.*

In addition to the *Meyers* factors, courts have considered other criteria when assessing the sincerity of an alleged religious belief.  *See Quaintance I*, 471 F. Supp. 2d at 1170.  For example, the defendants in *Quaintance I* defended their drug use not only on religious grounds but also based on "their belief in marijuana's medicinal and therapeutic effects."  *Id.*  Similarly, the record before the Court confirms that Singularism's defense of psilocybin is not religious.  Instead, they cite "scientific and medical research" studying "clinical practices used in mental health therapy." [Motion at 10; *see also* Dkt. 9-15].

Health effects aside, Jensen also warns of "unethical behaviors within the underground psychedelic community" and the desire to find a "safer" way of using psychedelic drugs.  [Dkt. 9-1, ¶ 16].  Singularism's secular justification of psilocybin undermines its position that its actions are religiously motivated.  *Quaintance I*, 471 F. Supp. 2d at 1170–71.

The ad hoc nature of Plaintiffs' beliefs also indicates that they "adopted their 'religious' belief" to justify their prior decision to use psilocybin.  *Id.* at 1171.  Jensen's use of psychedelic drugs predates Singularism's "founding" by more than twenty years.   [Dkt. 9-1, ¶¶ 11, 13]. Jensen's use of psychedelic drugs "played a significant role in [his] marriage ending" before Singularism was formed.  [*Id.* at ¶ 14].  Jensen's use of psychedelic drugs caused him to abandon his professional career in 2019.  [*Id.* at ¶ 15].  Jensen did not claim to have establish the religion until years later, "in the fall of 2023," [*id.* at ¶ 18], when he worked with his lawyer to structure a religion based on "prior cases in which people claimed religious exemption; where those claimants won or lost."  [Julian Aff. (Ex. A) at p.4].  Singularism's conveniently-founded religion, which

34

just so happens to match Jensen's longstanding consumption of psychedelic drugs, undermines Plaintiffs' position. *Quaintance I*, 471 F. Supp. 2d at 1171–72.

Further, Singularism's commercial enterprise confirms that they have a financial motive to shield the use of psilocybin mushrooms, which they sell to third parties for thousands of dollars. [*See supra* at SOF § III]. Moreover, Singularism's use of illegal drugs does not end at psilocybin— the police also seized THC. [*See supra* at SOF § 4]. In addition to the *Meyers* factors, these considerations weigh against finding that Plaintiffs' beliefs are sincerely held and that Singularism is a bona fide religion. *Quaintance I*, 471 F. Supp. 2d at 1173–74.

### 3.    *Regardless, the State has a compelling interest in regulating controlled substances.*

Even if Plaintiffs could establish the CSA would "substantially burden" an act "substantially motivated by a sincerely held religious belief," Plaintiffs still lose. *See* Utah Code § 63G-33-101. "A government entity . . . may substantially burden a person's free exercise of religion" if the government narrowly acts pursuant to a compelling governmental interest." *Id.* at § 63G-33-201(3).

Plaintiffs cannot seriously dispute the legitimacy of a government interest in defining and regulating the use of drugs. Drug laws have existed in Utah since at least 1851. *See* Laws & Ordinances of the State of Deseret, Compilation 1851 at p. 25-26 (Shepard Book 1919) (regulating "quicksilver, arsenic, antimony . . . night-shade, henbane, opium" and other "drugs, medicines, and other preparations"). In 1971, Utah adopted the Uniform Controlled Substances Act. *See* Uniform Law Commission, Controlled Substances Act.[10] The current prefatory note to the

---

[10] https://www.uniformlaws.org/committees/community-home?CommunityKey=9873a9bf-7335-4be7-855d-b17c9e8ff3dd#LegBillTrackingAnchor

Uniform Act recognizes that the "drug abuse problem has reached epidemic proportions." Uniform Controlled Substances Act (1994) at prefatory note. This remains true in Utah. The Center for Disease Control reported that Utah had 627 drug overdose deaths in 2022, the latest year reported.[11] That same year, "174 individuals died on Utah roads due to an impaired driver."[12] Approximately 68% of all homicide victims in Utah "tested positive for any drug."[13] The Department of Justice reports that there are "more federal prisoners . . . serving time for a drug offense than for any other type of offense."[14]

Plaintiffs incorrectly suggest that, unlike other Schedule I drugs, psilocybin and the illegal trafficking of psilocybin produce no "effect on public safety." [*See* Motion at 1]. That is wrong. Psilocybin is a Schedule I drug because it "has no currently accepted medical use" and "has high potential for abuse." *See* Uniform CSA at § 203; 21 U.S.C. § 812(b). Locally, clinical tests involving psilocybin have resulted in serious adverse effects, including "hospitalization, intentional self-injury," "suicidal ideation," "depression, drug withdrawal syndrome, intentional self-injury, suicidal behavior," and "self harm."[15] Moreover, the illegal trafficking of and market for magic mushrooms directly impacts public safety. Utah has several High-Intensity Drug Trafficking Areas, including Utah County.[16] The illicit trafficking of psilocybin is rapidly increasing, with the number of seizures and total weight tripling over the past five reported years.[17]

---

[11] https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm
[12] https://highwaysafety.utah.gov/drive-sober/impaired-driving/
[13] https://le.utah.gov/interim/2023/pdf/00004015.pdf
[14] https://bjs.ojp.gov/document/fjs22.pdf
[15] https://www.utah.gov/pmn/files/903929.pdf
[16] https://www.hidtaprogram.org/index.php
[17] https://www.nih.gov/news-events/news-releases/law-enforcement-seizures-psilocybin-mushrooms-rose-dramatically-between-2017-

Plaintiffs try to minimize these legitimate and substantial government interests by arguing the "Utah Psilocybin Act" allows for licensed medical facilities to participate in "[FDA] Phase 3 testing for an investigational drug." [Motion at 28]. Plaintiffs then discount the obvious distinctions between limited, medically supervised, and FDA-approved clinical treatment and their unsupervised mushroom voyages. First, Plaintiffs have made *zero* attempt to establish that their mushrooms are (a) the same material as the FDA-approved Phase 3 tests; (b) given in the same dose; or (c) obtained from clinical sources that ensure purity, efficacy, and precise dosage. Second, Plaintiffs ignore that the FDA has issued detailed "Considerations for Clinical Investigations" involving psychedelics.[18]

Utah Code section 58-37-3.5 does not create a free market for psilocybin. Instead, it is a "very controlled program" limited to "reputable hospital systems." *See* Utah Senate 2024 General Session – Day 45 (Sen. Cullimore, Sponsor). Each healthcare system must "develop a behavioral health treatment program" that remains "under the direct supervision and control of the healthcare system." Utah Code § 58-37-3.5(2)-(3). The drugs administered by these large, licensed medical facilities must also be approved by the FDA as Phase 3 investigational drugs. *See id.* at § 58-37-3.5(1)(a).

There is zero evidence that Plaintiffs' "psychedelic therapy" even approximates the type of highly-regulated, FDA-approved clinical treatment allowed by the Utah Code.

---

2022#:~:text=The%20number%20of%20law%20enforcement,(1%2C861%20lbs)%20in%20202 2

[18] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/psychedelic-drugs-considerations-clinical-investigations

## II.    Plaintiffs Have Not Established Irreparable Injury.

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs have not proven that irreparable harm will occur absent the issuance of extraordinary, injunctive relief.  Even if Plaintiffs could establish that prosecution will occur with a certainty, "the mere fact" of prosecution is not, by itself, sufficient to establish that "sincerely held religious beliefs [are] substantially burdened." *Jeffs*, 2016 WL 6745951, at *8.

More importantly, the proper operation of the judicial system is not irreparable harm.  If criminal charges are filed, Plaintiffs can present their Free Exercise arguments as a defense, where Singularism will "be represented by counsel during the state court trial" and will "have the right to appeal" any conviction. *See Mendoza v. Thompson*, No. 1:15-cv-00090, 2015 WL 5693705, at *2 (D. Utah Sept. 28, 2015) (holding no irreparable harm existed where party could present defense as part of separate, state court prosecution).  If Singularism prevails on that defense, then no harm, let alone irreparable harm, will ensue.  *See* 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) (recognizing that where a party can raise defenses in another proceeding, "the court typically will take the position that the party has an adequate alternative remedy and does not need injunctive relief").  There is no need for this Court to preemptively insert itself to any criminal proceedings.

Further, Plaintiffs' delay in seeking injunctive relief demonstrates the lack of irreparable harm.  *See Madruga v. Utah High Sch. Activities Ass'n Inc.*, No. 4:21-CV-00089, 2021 WL 4748493, at *8 (D. Utah Oct. 12, 2021) ("[E]quity aids the vigilant, not those who slumber on their rights.").  Plaintiffs are required to "complain of injuries promptly." *Id.* (holding a one-month

delay "seriously undermine[d]" request for injunctive relief) (cleaned up).  Here, Plaintiffs were on notice that Singularism did not have "Constitutional protections to either use o[r] administer psilocybin," [Complaint (Dkt. 2-2) ¶ 23], for more than a year before it sought injunctive relief. Rather than file an action for declaratory judgment, Singularism did nothing.  Singularism cannot manufacture an emergency through inaction.  *See, e.g.*, *Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1147 (N.D. Cal. 2007) (denying injunctive relief where "[n]othing before the court explain[ed] why the asserted sacraments of the Rastafari faith require complete immunity from the federal government's drug laws").

### III.    Plaintiffs Have Not Established That the Threatened Injury Outweighs the Public Interests.

Where "Government is the opposing party," the Court considers the parties' interests and the public's interests together.  *See Chiles*, 116 F.4th at 1199; *see also Heideman*, 348 F.3d at 1191.

As noted above, Singularism has not suffered, and will not suffer, any irreparable harm because it may present its Free Exercise defense should any criminal proceedings arise.  In contrast, Defendants have an interest in being "permitted to enforce . . . criminal laws," and the public has "an interest in seeing that its duly enacted legislation is enforced."  *Mendoza*, 2015 WL 5693705, at *3–*4; *see also Heideman*, 348 F.3d at 1191 (recognizing the interest "to enact and enforce measures [deemed] to be in the public interest").

If the Court inaccurately denies this Motion, Plaintiffs face the potential prospect of making the same arguments in connection with a criminal case in connection with a motion to dismiss. That change of forum is not a substantial harm.  Indeed, Plaintiffs may benefit from the different burdens that exist in a criminal proceeding.  In contrast, if the Court improperly grants this Motion,

the public faces the prospect of unlicensed, unsupervised, and unstoppable use of illegal, halogenic substances in the community.   As noted, the potential harms range from improper dosage, unintended poisonings, illegal trafficking, and impaired driving.

The public interest favors the continued enforcement of Utah's long-standing drug laws, at least so long as any unresolved question of law or fact remains.

## IV.     If the Motion is Granted, Plaintiffs Should Post Security.

Plaintiffs have not posted or offered to provide any security whatsoever for the requested injunction.   Under Rule 65, "the court may issue a preliminary injunction or a temporary restraining order ***only*** if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added).  At a minimum, Plaintiffs should be required to post a bond of $100,000.  Given the price of Plaintiffs' "psychedelic therapy" and the cost of litigation, that amount is both achievable and warranted.

## CONCLUSION

The definition of "Singularism" is "any philosophy that derives the universe from a single principle."   *See* https://www.merriam-webster.com/dictionary/singularism.   In this case, the "single principle" is Plaintiffs' desire to engage in unlicensed "psychedelic therapy."   That

principle is not enough to establish a constitutional or statutory basis to violate the Utah CSA. Plaintiffs' Motion should be denied.

DATED this 9th day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Mitchell A. Stephens*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

*/s/ Rich Roberts*
Rich Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*