Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>       Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>      Defendants. | **REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to Utah Federal Rules of Civil Procedure 7(b), Plaintiffs Bridger Lee Jensen,

Singularism, and Psyche Healing and Bridging, LLC ("Plaintiffs") hereby file their Reply Brief

in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Reply").

i

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ……………………………………………………… ii

**TABLE OF AUTHORITIES** ……………………………………………………. iii

**INTRODUCTION** …………………………………………………………... 1

**RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**……………………. 1

**ADDITIONAL STATEMENT OF FACTS** ……………………………………… 10

**ARGUMENT** ………………………………………………………………... 11

    I.     **PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL.** ……… 11

          a.  **Defendants Fail Strict Scrutiny Under Utah's Religious Freedom Restoration Act.**……………………………………………………... 12

          b.  **Defendants Fail Strict Scrutiny Under Article I, Section 4 of the Utah Constitution and the First Amendment to the U.S. Constitution.** …….. 18

          c.  **Defendants' Attempts to Avoid Strict Scrutiny Fail.** …...……..…….. 20

               i.  *The Court Has Jurisdiction Over Plaintiffs' Utah Religious Freedom Restoration Act Claim.*……. …….…….…….…….…… 20

              ii.  *Plaintiffs' Religious Free Exercise Has Been Substantially Burdened..* ……. …….…….…….…….…….…….…….…… 22

             iii.  *Plaintiffs Have Demonstrated Religious Sincerity.*……………..… 25

             iv.  *Singularism's Religious Practices Are Protected.*…………………………………………………… 27

    II.    **PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM.** ……………………………………………………. 31

    III.  **THE INJURY TO PLAINTIFFS GREATLY OUTWEIGHS ANY POTENTIAL DAMAGE TO DEFENDANTS.** ……………..……………… 33

    IV.  **A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ADVANCE THE PUBLIC INTEREST.** ……………..…….. 34

    V.   **DEFENDANTS' REQUEST FOR A $100,000 SECURITY IS UNREASONABLE.** ……………..…….…….…….…….……..………… 34

**CONCLUSION** ………………………………………………………. 36

**PAGE LIMIT CERTIFICATION** ……………………………………………… 37

**CERTIFICATE OF SERVICE** ……………………………………………….... 38

# TABLE OF AUTHORITIES

Page(s)

Cases

*United States v. Christie*, No. CR 10-00384 01 LEK,
2013 WL 6860818 (D. Haw. Dec. 30, 2013) ......................................................... 28

*Am. Bush v. City of S. Salt Lake*,
2006 UT 40, 140 P.3d 1235............................................................................... 18

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ......................................................................................... 26

*Centro Espírita Beneficente União Do Vegetal v. Ashcroft*,
282 F. Supp. 2d 1236 (D.N.M. 2002)................................................................ 31

*Fulton v. City of Philadelphia, Pennsylvania*,
593 U.S. 522 (2021) ......................................................................................... 17

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006) ......................................................................................... 13

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003)............................................................... 12, 31, 34

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ....................................................................... 33

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ......................................................................................... 19

*Kikumura v. Hurley*,
242 F.3d 950 (10th Cir. 2001) ......................................................................... 32

*Mendoza v. Thompson*,
2015 WL 5693705 (D. Utah Sept. 28, 2015)................................................ 32, 34

*Moore-King v. Cnty. of Chesterfield, Va.*,
708 F.3d 560 (4th Cir. 2013)........................................................................... 28

*O Centro Espírita Beneficente União Do Vegetal v. Ashcroft*,
342 F.3d 1170 (10th Cir. 2003)....................................................................... 34

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) ....................................................................... 35

*Starsurgical, Inc. v. Aperta, LLC*,
832 F. Supp. 2d 1000 (E.D. Wis. 2011) ........................................................... 36

*United States v. Hoffman*,
436 F. Supp. 3d 1272 (D. Ariz. 2020) ............................................................. 28

*United States v. Jeffs*,
2016 WL 6745951 (D. Utah Nov. 15, 2016)................................................ 22, 32

*United States v. Lepp*,
2008 WL 3843283 (N.D. Cal. Aug. 14, 2008) .................................................. 28

*United States v. Meyers*,
95 F.3d 1475 (10th Cir. 1996) ......................................................................... 28

*Voter Reference Found., LLC v. Balderas,*
   616 F. Supp. 3d 1132 (D.N.M. 2022) ........................................................................ 35

Statutes

Article I, Section 4 of the Utah Constitution ...................................................... Passim
Utah Code § 63G-33-201 ............................................................................... 12, 20
Utah Code § 63G-33-101 ...................................................................... 13, 23, 24, 27

Rules

Federal Rule of Civil Procedure 65 ............................................................................ 35
Federal Rules of Civil Procedure 7 .............................................................................. 1

Other Authorities

11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) ............................................................. 35
DUCivR 7-1(a)(4) ...................................................................................................... 37

## <u>INTRODUCTION</u>

Defendants' opposition brief perpetuates a reductive and harmful religious stereotype. Disregarding entheogenic religious practices rooted centuries back, Defendants open their brief with slur, calling Plaintiffs "for-profit drug deal[ers]," slandering their ceremonies as drug deals, and mocking them for practicing an "alleged 'religion.'" This intolerance drives Defendants to fabricate claims of religious insincerity and to turn a blind eye to the explicit language of statute and caselaw which protects Plaintiffs' religious free exercise. Imagine if Defendants had made these arguments about Native American religious usage of peyote. It would be unthinkably offensive.

But beyond offense, Defendants are just wrong. Their First Amendment analysis fails to address significant updates in the law by the U.S. Supreme Court, their Article I, Section 4 of the Utah Constitution analysis relates to issues of religious establishment, not free exercise, and their Utah Religious Freedom Restoration Act analysis plainly misinterprets the words of that potent statute. And in every case, Defendants have failed to articulate a compelling government interest of the highest order in denying *Plaintiffs specifically* a religious exemption from the Utah Controlled Substances Act. Further, Defendants have made *no attempt* to show the Court that their complete prohibition of psilocybin usage for sincere religious adherents is the only way they can accomplish that interest. Thus, regardless of what route this Court arrives at strict scrutiny, Defendants have failed to overcome it.

## <u>RESPONSE TO DEFENDANTS' STATEMENT OF FACTS</u>

**Defendants' Statements of Fact ("DSOF") ¶¶ 1-4:** Defendants' open their statements of fact by placing Mr. Jensen's statements out of context in order to paint him as a devious drug dealer with

no religious connection to psilocybin. The Court should disregard these efforts and evaluate the full context of Mr. Jensen's statements, as shown by the Verified Complaint, Mr. Jensen's declaration attached to Plaintiffs' opening brief, *see* Pls.' Ex. A, and Mr. Jensen's supplemental declaration filed together with this reply brief, *see* Pls.' Ex. V. Those documents plainly demonstrate Mr. Jensen's sincere faith journey, beginning with his ancestor's Lutheran roots, to his Mormon upbringing, to his search for spiritual enlightenment, to a period of agnosticism, to a period where he utilized spiritual concepts in professional mental health therapy, to his first transformative religious experience with psychedelics, to other profound religious experiences with psilocybin that changed and enhanced his connection with God and shaped a new religious system for him, to his decision in 2019 to pursue that connection further, and eventually, to found Singularism in 2023. *See* Pls.' Ex. A. Mr. Jensen has explained this even further in a supplemental declaration. *see* Pls.' Ex. V.

Defendants have not meaningfully engaged with any of this content and have misrepresented that small portion with which they have engaged. DSOF ¶¶ 1-4 should be disregarded entirely. Following Defendants' logic would lead to the conclusion that if any individual had a period of agnosticism or a faith transition in their life, they could never demonstrate to a court that they had later sincerely converted to a different religion.

**DSOF ¶¶ 5-12:** Defendants next try to introduce facts to discredit the religious sincerity of Mr. Jensen and Singularism, including by pointing to sources from the internet to say that because Mr. Jensen did not mention his spirituality in every context in which he appears on the internet, past and present, that he cannot be religiously sincere now. Such flawed logic would prevent, for

example, a Latter-day Saint bishop from asserting his religious sincerity even though he maintains a day job and does not mention his religious role on his company bio.

These documents do nothing to undermine Plaintiffs' religious sincerity, including as addressed in Mr. Jensen's statements mentioned above, or the other demonstrations of religious sincerity that Plaintiffs have adduced, including comprehensive statements of doctrine, even more of which are included with this brief, *see* Pls.' Exs. P, Q, R, and S; the declarations of those within Singularism's faith community, Pls.' Ex. D-H. Moreover, Defendants' internet finds are further problematic because Defendants misrepresent their content. Plaintiffs address each document in the following table:

| Document | Defendants' Representation | Plaintiffs' Response |
|---|---|---|
| Defs.' Ex. B – Google Reviews | Singularism's operation as a religious entity – as opposed a facility for "psychedelic therapy" – is contradicted by the reviews of its own customers. For example, Singularism has a 5.0 Google review rating. However, the reviews refer to Singularism as a "clinic," substitute for "medication," and "much safer than having to find it on the street from illegal sources."<br><br>DSOF ¶ 5 | The fact that one individual left a review on Google, a third-party website, stating, in full, "Best clinic in Utah" does nothing to undermine Singularism's religious sincerity. As explained further below, even if Singularism were solely a for-profit religious clinic, it would not lose its free exercise protections.<br><br>However, the only other individual to leave a review with Google (from which Defendants cherry pick phrases) *does* confirm Singularism is a religious entity. Specifically, the individual stated that "I'm grateful that there is finally a safe location in our state that provides *a spiritual setting and approach for this type of soul therapy. It's so much safer than having to find it on the street from illegal sources with no* |

| | | *responsible supervision or safe spiritual guidance.*" |
|---|---|---|
| Defs.' Ex. C – bridgerleejensen.com | And Singularism's founder, Jensen, actively markets "Psychedelic Therapy" without referencing Singularism.<br><br>DSOF ¶ **6**<br><br>For example, "bridgerleejensen.com" offers viewers a chance to "schedule a 30 minute consultation" without any disclaimer (or suggestion) that Jensen's invitation to "experience another breakthrough! 🤪" is religious . . . [photo]<br><br>DSOF ¶ **7**<br><br>Jensen's website includes an "About Bridger" section. In addition to "psychedelic[s]," Jensen references everything from "suicide" to "dance" and his "four children." [*See id.*]. Tellingly, he does not reference religion, spirituality, or Singularism. Instead, he describes his psychedelic therapy as "clinical": [photo with alterations]<br><br>DSOF ¶ **8** | Because Defendants' print of this website is ill-formatted, Plaintiffs recommend the Court view the website though a web browser.<br><br>First, as discussed in Mr. Jensen's supplemental declaration, this website is an old website that Mr. Jensen does not actively use, but has not wholly discarded because it may serve as a means for individuals to find Singularism. *See* Pls.' Ex V. Because of that, it is unsurprising that *some* of its content is not explicitly religious. However, a simple scroll down the page demonstrates that there *is religious content*.<br><br>Second, Defendants include a photo of Mr. Jensen in an enthusiastic pose for no clear reason.<br><br>Third, Singularism is prominently displayed. To the right of its logo, it states that "It is the mission of Singularism to provide *a sacred space where science and spirituality unite*, offering a holistic path to healing, growth, and self-discovery. At the heart of our approach is the integration of evidence-based psychotherapy *with the profound wisdom of entheogenic spiritual practices*. Through this unique synergy, we guide individuals toward profound insights, authentic connections, and lasting change. |

| | | Utah Psychedelic Therapy is the next listing. To the right of its logo, it states that that entity is "dedicated to advocating for the safe and legal use of psychedelic-assisted therapy *and sincere religious use.* |
| | | Thereafter, the website contains listings for now-defunct companies and endeavors in which Mr. Jensen was involved, including Mental Gurus and Reveal Myself. *See* Pls.' Ex. V. It then mentions a conference regarding psychedelics. |
| | | Fourth, the website then contains a bio for Mr. Jensen which he never updated to describe his role with Singularism. *See* Pls.' Ex. V. Thus, it is unsurprising that it does not contain content regarding Singularism's religious mission. |
| Defs.' Ex. D – Mr. Jensen's LinkedIn Profile | Jensen's LinkedIn profile provides yet another example. [*See* LinkedIn Profile, Ex. D]. Jensen's background image advertises a non-party to this lawsuit – "Psychedelic Therapy Academy." Jensen's commitment to psychedelics, or perhaps psychedelic therapy, is evident Again, however, that commitment has no connection to religion. Jensen focuses on "therapy": [photo with alterations] [*See id.*]. Jensen's LinkedIn profile also includes another "About" section. In that section, Jensen refers to himself as a "therapist," "visionary," "innovator," and "entrepreneur." [*Id.*]. He does not | Because Defendants' print of this profile is ill-formatted and does not capture the content of various drop-down options, Plaintiffs recommend the Court view it though a web browser. |
| | | Mr. Jensen's LinkedIn bio is similar to that provided at bridgerleejensen.com. Mr. Jensen also never updated this portion of his LinkedIn profile to describe his role with Singularism. *See* Pls.' Ex. V. Thus, it is unsurprising that it does not contain content regarding Singularism's religious mission. |

| | | |
|---|---|---|
| | reference religion, spirituality, or Singularism. [*Id.*].<br><br>DSOF ¶ 9 | However, Defendants simply ignore the most relevant entry for "Psychedelic Therapy Academy" under which Mr. Jensen states that "At Utah Mushroom Therapy, we provide a unique approach to mental health, *addressing spiritual and existential issues* alongside mental wellness." Later, it continues to say that "Through Singularism, we integrate *spiritual and existential healing*, offering a holistic approach to mental wellness." Plainly, Mr. Jensen *does* "reference religion, spirituality, [and] Singularism."<br><br>As would be expected of anyone with a professional career before becoming a full time clergy member, Mr. Jensen's LinkedIn profile lists other of his endeavors prior to Singularism. |
| Defs.' Ex. E – psychedelictherapy academy.com<br><br>Defs.' Ex. F – psychedelictherapy academy.com (Facilitator Course Application form) | As another example, Jensen is the "Founder and Lead Instructor" at "Psychedelic Therapy Academy." [*See* PsychedelicTherapy Academy.com, Ex. E]. That entity markets an "immersive course" and promises enrollees the chance to join the "expanding field of psychedelic assisted therapy." It promises enrollees will become "a True Practitioner" of "psychedelic therapy" – not a "true believer" in Singularism: [photo with alterations] [*Id.*].<br><br>DSOF ¶ 10<br><br>Clicking "Apply Now" produces another screen that describes the | As described in Mr. Jensen's supplemental declaration, over the course of Singularism's existence, he has made changes to how Singularism is presented to the public, as well as changes to previous websites he maintained, sometimes in order for individuals to be directed to Singularism. This website is another example of that, and, in particular, an example of Singularism's missionary efforts to share and educate others in its religious truths and practices.<br><br>Additionally, this website *does* mention Singularism's religious purpose. It states that those educated under Singularism's |

| | | |
|---|---|---|
| | therapy program. It aptly summarizes the "common goal" behind Jensen's personal drug use and his various enterprises – "exploring the incredible world of psychedelics": [photo with alterations] [Facilitator Course Application (Ex. F)]. The application form does not require commitment to any religious precepts. It does require a financial commitment: "I understand that tuition is $1,800, and I can pay in full . . . ." [*Id.*].<br><br>DSOF ¶ 11 | program will review "the amazing *spiritual practices* from other cultures" and that the program "emphasiz[es] the integration of mystical insights with practical applications" and that by doing so "we provide an extremely powerful framework that combines the *spiritual* and scientific aspects of psychedelic therapy, offering a holistic approach to facilitating transformative experiences."<br><br>Regarding the application form for interested individuals, interested individuals will be informed by the above content of the website regarding the religious nature of their application. Further, as Mr. Jensen's supplemental declaration states, each of the applicants that fills out this form is screened for religious sincerity before being allowed to participate in any sort of Singularism program. *See* Pls.' Ex. V. |
| Defs.' Ex. G – *Mental Gurus: An Artificial Intelligence Solutions for Our Mental Health Crisis,* Newsroom, Silicon Slopes (Sept. 17, 2019)<br><br>Defs.' Ex. H – Mr. Jensen's Facebook Profile<br><br>Defs.' Ex. I – Appears Defendants intended this to be | Jensen is known to be involved with the following businesses or websites that market "training," "therapy," and/or psychedelics:<br><br>- Psychedelic Therapy Academy [*see* Exs. E-F];<br>- Mental Gurus [Ex. G];<br>- UtahMushroomTherapy.org [*see* Ex. C];<br>- RevealMyself.com [*see* Facebook profile (Ex. H); Ex. J];<br>- UtahPsychedelicTherapy.org [*see* Instagram profile (Ex. I)];<br>- Psyche Healing and Bridging, LLC [*see* Utah Dept. of Corp. (Ex. | As described in Mr. Jensen's supplemental declaration, DSOF ¶ 12 includes websites and references to now-defunct companies and endeavors in which Mr. Jensen was involved, including Mental Gurus and Reveal Myself. *See* Pls.' Ex. V.<br><br>As described in Mr. Jensen's supplemental declaration, over the course of Singularism's existence, he has made changes to how Singularism is presented to the public, as well as changes to previous websites he maintained |

7

| | | |
|---|---|---|
| Mr. Jensen's Instagram profile, but Defendants did not attach an Exhibit I to their opposition brief.<br><br>Defs.' Ex. J – revealmyself.com/ resilience-campaign<br><br>Defs.' Ex. K – Certificate of Organization of Psyche Healing and Bridging, LLC<br><br>Defs.' Ex. L – Business License Application Status form for Pshyche Healing and Bridging, LLC<br><br>Defs.' Ex. M – psychedleiccon.org/ agenda<br><br>Defs.' Ex. N – psychedelictherapy journey.com | K); Provo Business License (Ex. L)];<br>- Psychedeliccon.org [*see* Ex. M]; and<br>-PsychedelicTherapyJourney.com. [*See* Ex. N].<br><br>DSOF ¶ 12 | in other capacities, sometimes in order for individuals to be directed to Singularism. *See* Pls.' Ex. V.<br><br>Additional notes regarding Defendants' exhibits:<br><br>Ex. H: Mr. Jensen's Facebook profile links directly to Singularism.org<br><br>Exs. K and L: Psyche Healing and Bridging, LLC is a named plaintiff in this action. The Complaint explains its relationship to Singularism. |

**DSOF ¶¶ 13-18:** Defendants' next set of statements of fact relate to Defendant Julian's investigation of Singularism. However, Plaintiffs omit significant content that Defendant Julian included in his search warrant affidavit which demonstrate Plaintiffs' religious sincerity and Defendant Julian's understanding of that claim to sincerity, from the outset of his investigation, including:

- That his review of a media article included a statement that Singularism "is protected by the Religious Freedom Restoration Act" and the "United States Constitution." Defs.' Ex. A, at 2-3.
- That his review of Singularism's website showed Singularism's statements regarding the religious nature of the organization and its practices. *Id.* at 3.
- That he "spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing, or cultivating psilocybin, that person is subject to prosecution in the state of Utah." *Id.*
- That when he had a phone call with Mr. Jensen posing as an individual interested in Singularism, that "Bridger explained that the use of psilocybin is legal in his practice due to the religion of Singularism." *Id.* at 4.
- That when he went on a tour of Singularism's spiritual center, Mr. Jensen stated that "the drinking of the [psilocybin] tea was considered a 'ceremony' . . . *Id.*
- That when he attended a webinar, Mr. Jensen "discussed how he is the founder of Singularism and discussed the basis of the religion," that "the use of psilocybin is the central point upon which Singularism is based," and that "psilocybin is a 'mystical' and 'religious' experience." *Id.* at 5.
- That during the seminar, Mr. Jensen explained the multi-step screening process Singularism engages with people. *Id.* at 5.

Additionally, Defendants point to Defendant Julian's statement that "the way that [Mr. Jensen] founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost." Mr. Jensen, as stated in his supplemental declaration, refutes this description, stating that he founded the religion of Singularism of his own accord, but that he sought out and consulted with legal counsel, among other things, because of his perception that there were risks associated with others' misunderstanding of Singularism's religious practices and the religious freedom protections to which Singularism is entitled. *See* Pls.' Ex. V. Regardless of how Mr. Jensen phrased it to Defendant Julian, Plaintiffs, like any other individual and organization, are entitled to seek and receive legal counsel, including to protect their rights to religious free exercise.

**DSOF ¶¶ 19-21:** Similarly, Defendants' next set of statements of fact omit substantial facts which occurred during Defendants' search of Singularism's spiritual center, including those described in SOF ¶¶ 12-21. Notably, Defendants omit that Detective Julian told Mr. Jensen that he recommended he cease Singularism's practices and that he should expect criminal charges. Defendants omit Detective Julian's statements acknowledging Plaintiffs' claim to religious sincerity and religious freedom. Defendants omit that Defendant Wolken served a letter on Singularism's landlord threatening to forcibly evict Singularism if the landlord did not. Additionally, when questioned about THC, Bridger told Defendant Julian that it was limited to his personal religious use, that was locked in his personal safe, and that it had never been used in any Singularism context. Pls.' Ex. V.

**DSOF ¶ 22:** Defendants' citation to this article does not constitutes a statement of fact for the purposes of this case. Defendants do not introduce any facts about whether Singularism has particular practices regarding dosing, so their conclusion that "Plaintiffs possessed enough psilocybin mushrooms to distribute 92 doses" is speculation.

## ADDITIONAL STATEMENT OF FACTS[1]

**SOF ¶ 34:** Since the filing of their motion, Plaintiffs have been able to assess further, beyond the description contained in SOF ¶ 29 of their opening brief, the damaging impact of Defendants' actions. Plaintiffs have already seen Singularism's religious community dimmish and shrink through fear. Mr. Jensen transparently lets individuals know that Plaintiffs are seeking to protect

---

[1]     Plaintiffs continue the numbering of their statements of fact, referred to as "SOF," from their opening brief.
        Plaintiffs also note that during the filing of their opening brief, its Exhibit R was inadvertently not filed. That exhibit is attached to this reply.

their religious free exercise in court, but this has led to some individuals distancing from Singularism. As a result, Singularism is performing less ceremonies for voyagers, engaging in less religiously infused therapeutic tasks, and, as a result, Singularism has already, in fact, sustained financial losses. These losses are so significant that some of Singularism's clergy have forgone their pay for the past two months. *See* Pls.' Ex. V.

**SOF ¶ 35:** Since the filing of their motion, Plaintiffs have received a response to a GRAMA request made to Provo City Police requesting copies of records indicating any complaints made to Provo City Police regarding Singularism. *See* Pls.' Ex. V. The response included only a highly redacted version of Defendant Julian's affidavit, leaving unredacted this paragraph:

> Later in November 2023 a concerned citizen, who did not want to be named, came forward wanting to speak with detectives about Bridger and his business. I met with the citizen and they advised me that Bridger has a website promoting the business and identified where the business was located. The website is Singularism.org and the business location is 1969 N State St, Provo, UT.

*See* Pls.' Ex. U. Notably, this paragraph does not contain any actual complaint made, just a concern. The results of Plaintiffs' GRAMA request demonstrate that Provo City Police Department has no other record of any concern or complaint being made regarding Singularism for any reason.

<u>**ARGUMENT**</u>

## I.    **PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL.**

Defendants agree that Plaintiffs need only demonstrate a prima facie case of their claims to establish the first prong of the temporary restraining order/preliminary injunction framework. *Compare* ECF 9, at 10 *with* ECF 13, at 12-13. Further, Defendants do not dispute that for religious freedom claims, this factor is the determinative factor of the test because of the seminal interests at stake. *See* ECF 9, at 10. This is so because the "loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003), which Defendants also do not dispute.

### a. Defendants Fail Strict Scrutiny Under Utah's Religious Freedom Restoration Act.

Plaintiffs are substantially likely to succeed on their Utah's Religious Freedom Restoration Act ("Utah's RFRA) claim. Defendants do not, and cannot, argue that Utah's RFRA does not require strict scrutiny review of the burden Defendants imposed upon Plaintiffs' religious free exercise. Strict scrutiny review is plain from the face of the statute: the "free exercise of religion is a fundamental right and applies to all government action, *including action that is facially neutral*" and "a government entity may not substantially burden the free exercise of religion of a person, *regardless of whether the burden results from a rule of general applicability . . .*" Utah Code § 63G-33-201(1) (emphasis added). Utah's RFRA then goes on to require the two prongs of strict scrutiny: (1) compelling governmental interest and (2) least restrictive means of furthering that compelling governmental interest. Utah Code § 63G-33-201(3). *Defendants* carry the burden of proving these two prongs. *See* Utah Code § 63G-33-201(3).

*Compelling Governmental Interest.* Defendants have failed to articulate a compelling governmental interest specific to Plaintiffs. Their brief appears to posit that Defendants, generally, have an interest in regulating controlled substances for the purposes of public health, public safety, and the prevention of drug trafficking. *See* ECF 13, at 2-3, 35-37. But these generalized interests don't cut it. Utah's RFRA, just like the federal RFRA and the First Amendment, requires Defendants to show the Court that they have a compelling governmental interest in specifically denying a religious exemption *to Singularism* from the Utah Controlled Substance Act. Plaintiff's opening brief explained this requirement in depth, and Defendants made no attempt to argue

12

otherwise. *See* ECF 9, at 13, 19, 27; *compare also Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006) (explaining this specificity requirement is sourced from the federal RFRA's "to the person" language) *with* Utah Code §§ 63G-33-101, 63G-33-101 (also containing "to the person's," "the person," and "the person's" phrases); *see also id.* at 431-33 (stating that "the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day" and analogizing peyote exemption in the Act with *hoasca*).[2]

Even if the Court were to evaluate Defendants' overly generalized assertions of compelling governmental interest, Defendants' own sources do not support the generalized dangers to public safety, public health, and drug trafficking they claim psilocybin poses. On pages 36-37 of Defendants' brief, they make several claims regarding the harms of psilocybin, citing to a variety of sources to do so. *See* ECF 13, at 36-37. Defendants' assertions drawn from those sources are seriously misleading.

Defendants quote statistics related to drug overdoses, impaired driving fatalities, homicide victims testing positive for drugs, prisoners serving time for drug offenses, and drug trafficking

---

[2]     Defendants cite to several cases for the assertion that enforcing a controlled substances act is a compelling governmental interest. Many of these cases fail to comply with the U.S. Supreme Court's mandate that governmental interests be specific to the religious adherent at issue in the case. Others contains significant different factual scenarios which are distinguishable from the facts presented here. Because of the religious-adherent specific and fact-specific nature of religious freedom inquiries, each case must be evaluated on its facts. That some individuals or organizations have, in other cases, failed to demonstrate religious sincerity, religiosity, or another component of the analysis in the context of religion and controlled substances does not control here.

The Court should look to the cases where religious individuals and organizations have successfully obtained religious exemptions from controlled substances acts, like *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 438 (2006) and others provided in Plaintiffs' opening brief.

areas in Utah. However, Defendants' cited sources in footnotes 11, 12, 13, 14, and 16 generally fail to clarify the types of drugs contributing to these statistics, and when it is clear, these sources indicate that the primary contributors to the problems discussed are recreational use of opioids, fentanyl, methamphetamines, or a combination of drugs and alcohol, *not* psilocybin. Even assuming all drugs contributed equally to the problems discussed, one report explicitly notes that "[d]rug presence does not necessarily imply impairment . . . whereas the impairment effects for various concentration levels of alcohol is well understood, little evidence is available to link concentrations of other drug types to impairment." ECF 13, at 36 n. 13.[3]

Defendants also misrepresent findings from a report cited in their footnote 15 which summarizes the findings of three clinical studies involving psilocybin. They assert that these studies show serious adverse effects, including hospitalization, self-injury, and suicidal behavior. However, such adverse effects occurred in very few participants and only among those who "were non-responders to psilocybin-assisted therapy. Additionally, investigators pointed out that . . . the group mean scores for suicidality . . . did not change from baseline." ECF 13, at 36 n. 15.[4] Importantly, these adverse effects were observed in only one of the three studies, while the other two studies, which used similar doses, reported no serious suicidality. The report ultimately concluded, despite what Defendants would lead the Court to believe, that results from the three

---

[3]    Memorandum from Janae Duncan, Division Director, Population Health to Health and Human Services Interim Committee, *Violent Incidents and Fatalities Involving Substance Abuse*, UT Dept. Health & Hum. Servs. (Oct. 1, 2023), at 2, available at https://le.utah.gov/interim/2023/pdf/00004015.pdf.

[4]    Lauren Heath, et al., *Psilocybin-Assisted Therapy for Major Depression or Treatment-Resistant Depression: Phase 2 Evidence Synthesis*, at 15 (Oct. 17, 2022), available at, https://www.utah.gov/pmn/files/903929.pdf.

clinical trials "offer preliminary positive support for psilocybin-assisted therapy . . . the trends of these studies . . . suggest positive effects by psilocybin for depression." ECF 13, at 36 n. 15.[5]

Finally, Defendants claim that "Plaintiffs ignore that the FDA has issued detailed 'Considerations for Clinical Investigations' involving psychedelics." ECF 13, at 37. Even assuming this statement were true, the source Defendants cite to in their footnote 18 is only a guidance document published by the FDA which explicitly states that, "FDA's guidance documents do not establish legally enforceable responsibilities," and goes on to clarify that this guidance "applies to clinical trials . . . conducted under an investigational new drug application (IND)." )." ECF 13, at 37 n. 18.[6] Plaintiffs' activities do not fall within this scope. In short, Defendants cannot rely on misrepresentation of these sources as a basis to support their supposed compelling governmental interest.

Moreover, even taking Defendants' claimed governmental interests at face value, Defendants' own actions since Singularism made contact with them demonstrate a lack of concern on those interests. In fall of 2023, Singularism opened a conversation with Defendants by sending them letters for the purpose of operating a sincere religious organization with utmost transparency and under the constitutional and statutory protections to which Plaintiffs are entitled. If the public safety, public health, and drug trafficking concerns Defendants express were truly of the highest order, one would expect Defendants to have acted immediately to enforce the Controlled Substances Act against Defendants. Around the same time, Detective Julian's search warrant affidavit reveals that an anonymous individual raised an unspecified "concern" regarding

---

[5]    *Id.* at 28.
[6]    US FDA, *Psychedelic Drugs: Considerations for Clinical Investigations* (June 2023), at 1, available at, https://www.fda.gov/media/169694/download.

Singularism to the Provo Police. *See* Defs.' Ex. A. Again, no immediate action was taken by Defendants, even after the concern was addressed with the individual. Instead, Defendants waited for over a year, during which Singularism began flourishing as a religious community, to take action against Defendants to enforce the Controlled Substances Act. Defendants' inaction undermines their claim of compelling governmental interest as well as Defendants' claims elsewhere in their brief that Plaintiffs sat on their hands before seeking relief from the Court.

Additionally, Defendants have failed to meaningfully respond to Plaintiffs' arguments that further undermine Defendants' claim to the legitimacy of their governmental interest. They cannot argue that psilocybin, or other Schedule I controlled substances like cannabis or peyote, are so dangerous that no one can use them, given the substantial secular and religious exemptions for those drugs' usages in the Utah Controlled Substances Act. *See* ECF 9, at 22-25, 27-29. They cannot credibly argue that psilocybin can only be safely used under the direction of a licensed medical professional, as the Utah Psilocybin Act's definition of licensed "health care provider" includes a religious clergyman like Mr. Jensen by reference to the clergy exemption in the Utah Mental Health Professional Practice Act, and where Singularism follows virtually all the requirements of the Utah Psilocybin Act. *Id.* Defendants say nothing at all regarding the Utah Department of Commerce's Division of Professional Licensing approving of Mr. Jensen's religious mental health therapy practice. *Id.* at 28-29; SOF ¶ 31. And Defendants make no comment whatsoever on their apparent decision not to prosecute similarly situated religious groups which perform entheogenic ceremonies in their jurisdictions, including the Divine Assembly, Psychedelics in the Beehive, Oklevueha Native American Church, and Temple of Hermes. *Id.* at

16

28; SOF ¶ 30. All considered, Defendants cannot legitimately advance their stated governmental interests, even at the impermissibly high level of generality which they articulate them.

Thus, Defendants carry the burden of showing this Court that unless Singularism is prohibited from practicing its faith, Singularism's religious practices will negatively impact public health, public safety, and drug trafficking. This is a burden they cannot shoulder. Indeed, they have not even tried. They have introduced no evidence whatsoever that any adherent of the faith has ever, even privately, had adverse health reactions. Defendants have introduced no evidence whatsoever that Singularism has had any impact upon public safety. And Defendants have introduced no evidence whatsoever that Singularism has contributed to drug trafficking. The only evidence this Court has before it regarding these topics is the declarations and evidence advanced by Plaintiffs which indicate Singularism has a perfect record on each accounts. *See* SOF ¶¶ 11; Ex. U. Because Defendants have failed to demonstrate they have a governmental interest of the highest order in prohibiting Singularism, *specifically*, from practicing its faith, Defendants fail strict scrutiny and Plaintiffs are substantially likely to prevail on their Utah RFRA claim. The Court need not continue to evaluate the least-restrictive-means prong of strict scrutiny.

*Least Restrictive Means.* Defendants also fail to demonstrate the second prong of strict scrutiny for Plaintiffs' Utah RFRA claim, should the Court proceed to evaluate it. Critically, *Defendants' brief advances <u>no argument at all</u> as to why refusing a religious exemption to Singularism is the least restrictive means by which it can accomplish its stated interests.* Defendants exert no effort to show they "can[not] achieve its interests in a manner that does not burden [Singularism's] religion . . ." *See Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 540 (2021). Defendants' failure to even attempt to shoulder their burden on this prong of strict

17

scrutiny leads to the conclusion that they have failed strict scrutiny. And even if Defendants had tried to argue this prong, they would have been unsuccessful. Defendants leave untouched Plaintiffs' arguments of other plainly less restrictive means, including that demonstrated by the secular exemption in the Utah Psilocybin Act, the results of other cases in which courts have upheld religious exemptions to controlled substances acts, and a public settlement agreement entered with the DEA which pens a religious exemption into contract. *See* ECF 9, at 25-26, 29. Defendants' failure to shoulder their burdens under the Utah RFRA's strict scrutiny review is fatal to Defendants' arguments. Thus, Plaintiffs are likely to prevail on their Utah RFRA claim.

### b. Defendants Fail Strict Scrutiny Under Article I, Section 4 of the Utah Constitution and the First Amendment to the U.S. Constitution.

The Court can reach the same conclusion by reaching the strict scrutiny analysis via Article I, Section 4 of the Utah Constitution or via the First Amendment to the U.S. Constitution. Although these authorities provide different routes to strict scrutiny, the governmental interest and least restrictive means analysis above applies in equal measure.

Regarding the Utah Constitution, Defendants' brief fails to address Plaintiffs' analysis that the Utah Supreme Court would interpret Article I, Section 4 to require strict scrutiny review of all governmental burdens on religious free exercise. *Compare* ECF 9, at 14, *with* ECF 13, at 17-18. Defendants cite *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 11, 140 P.3d 1235, for the proposition that the Utah Constitution should be interpreted against the background of the First Amendment, which was in place when the Utah Constitution was adopted. However, that case relates to free speech, not religious free exercise. It does nothing to contradict the authorities Plaintiffs have set forth regarding strict scrutiny analysis for religious exercise claims under Article I, Section 4.

Defendants also try to convince the Court that a "neutrality" standard, not strict scrutiny, applies under Article I, Section 4. However, an analysis of Defendants' cited authorities for their "neutrality" standard reveal that if this standard exists at all (and has not been overturned by *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022)), it governs concerns of whether the government has *established* a religion, not whether individuals or organizations can freely exercise their religion. Defendants try to warp this religious establishment standard to argue that allowing Plaintiffs a religious exemption would somehow amount to an establishment of religion, or, alternatively, that the religious establishment standard itself indicates that the Utah Controlled Substances Act is neutral and generally applicable. Neither are helpful. The Court should disregard this wayward analysis and follow the unrebutted authorities Plaintiff set forth demonstrating the Utah Supreme Court would interpret Article I, Section 4 under the strict scrutiny rubric.

Regarding the First Amendment to the U.S. Constitution, Defendants argue that strict scrutiny does not apply to religious free exercise claims where the burden to religion is incidental, neutral, and generally applicable. *See* ECF 13, at 13-15. That is true. But, as Defendants fail to address, where the government action is *not* incidental and not pursuant to a neutral and generally applicable law, strict scrutiny *does* apply. Defendants leave unrebutted Plaintiffs' explanations of those paths to strict scrutiny under the First Amendment. *See* ECF 9, at 12-13. For example, Defendants do nothing to counter the U.S. Supreme Court's pronouncement that "a system of exemptions" may lead to strict scrutiny, nor do they counter that a law which prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. *Id.* at 13. As Plaintiffs have argued, the Utah Controlled Substances Act contains the system of exemptions and prohibitions of religious conduct while permitting secular conduct, such

that strict scrutiny is the correct analytical framework for this case. *Id.* at 22-27. Because there are three routes to strict scrutiny review, and, as stated above, Defendants cannot shoulder their burden under strict scrutiny, Plaintiffs are substantially likely to prevail on their claims.

### c. Defendants' Attempts to Avoid Strict Scrutiny Fail.

Because application of strict scrutiny is fatal to Defendants' arguments, Defendants do everything they can to avoid it in addition to their attempts above. But each additional attempt fails. Strict scrutiny applies.

#### i. *The Court Has Jurisdiction Over Plaintiffs' Utah Religious Freedom Restoration Act Claim.*

Defendants try to avoid the plainest path to strict scrutiny by asserting the Court lacks jurisdiction over Plaintiffs' Utah RFRA claim. Defendants argue that the exception from the notice-of-claim requirement in Utah's RFRA does not apply, so Plaintiffs need to wait another 30 days from the date of the hearing on the present motion (60 days from the November 12, 2024, service of Plaintiffs' notice of claim on Defendants, ECF 2-2, at 5) before they can bring this claim.

The notice-of-claim requirement under Utah's RFRA

> does not apply if the government action alleged in the action:
> (i) is ongoing, and complying with [the notice-of-claim provision] will place an undue hardship on the person or increase the harm suffered by the person; or
> (ii) is likely to occur or reoccur before the end of the 60-day period described in Subsection (5)(a).

Utah Code § 63G-33-201(5)(b). Defendants argue these terms have not been met because they have not yet filed criminal charges against Mr. Jensen, so their action cannot be viewed as "ongoing," that they do not plan on conducting addition searches or seizures within the 60-day

notice-of-claim period, and that a threat of prosecution cannot meet the terms of the exception. *See* ECF 13, at 19. Each is wrong.

First, Defendants' threat of criminal prosecution *and* the threat of eviction from Singularism's sacred space (which Defendants fail to mention in their brief) are both ongoing actions that place undue hardship on Defendants and increase the harm suffered by Defendants. As stated above, Defendants' acts of holding Plaintiffs in limbo between promised and actual prosecution and eviction has caused Singularism's religious adherents to distance themselves from the religion, and, as a result, the monies derived from Singularism's religious services have had a noticeable downturn to the point where some of Singularism's clergy forwent pay for the past two months. *See* Plfs.' Ex. V. Second, subsection (ii) of the exception contemplates fending off precisely this sort of anticipated wrongful act, using the phrase "is likely *to occur* or reoccur." Defendants could follow through on their promised prosecution and eviction tomorrow, well within the 60-day notice-of-claim period. Thus, the exception applies and Plaintiffs' Utah RFRA claim is properly before the Court. Third, even if the Court were inclined to agree with Defendants regarding their application of the notice-of-claim exception, the question of whether Plaintiffs are substantially likely to prevail on their Utah RFRA claim will be back to the Court for decision in 30 days from the hearing on the present motion.

Despite the language of the exception, Defendants appear keen to convince the Court that Defendants' notice of claim could never be proper, no matter when filed. They argue that Defendants should have filed a notice of claim back when (1) Plaintiffs sent letters to Provo City and the Utah County Attorney's Office and then (2) once again when the Utah County Attorney's Office commented to a news outlet that in its view Singularism was not entitled to religious

freedom. *See* ECF 13, at 20. However, Defendants, lines away, fault Plaintiffs for a "rushed initiation of an affirmative civil case," ECF 13, at 19, and then, in another turn, fault Plaintiffs' "decision to sit still," ECF 23, at 20. But the Court need not bother with these inconsistencies, as the facts presented here qualify for the notice-of-claim exception under Utah's RFRA. Thus, Defendants fail to avoid strict scrutiny by this line of argument.

> ### ii.  *Plaintiffs' Religious Free Exercise Has Been Substantially Burdened.*

Defendants' next bid for the Court to avoid strict scrutiny is their argument that Defendants have not "*substantially* burdened" Plaintiffs' religious free exercise under Utah's RFRA. But to make this argument, Defendants depart from the language of Utah's RFRA. First, Defendants cite to *United States v. Jeffs*, No. 2:16-cr-82, 2016 WL 6745951, at *6 (D. Utah Nov. 15, 2016) for a definition of "substantial burden."[7] *See* ECF 13, at 21. But there's no need for that. Utah's RFRA includes a detailed and controlling definition:

> (6)    (a) "Substantially burden" means that government action, *directly or indirectly*:
>> (i) *constrains, limits*, or denies the free exercise of religion by a person; or
>> (ii) *compels a person to act, or fail to act*, in a manner that is contrary to the person's free exercise of religion.
>
> (b) "Substantially burden" includes:
>> (i) any of the following in response to, or as a consequence of, the person's free exercise of religion:
>>> (A) withholding a government benefit;

---

[7]    Even if the definition of "substantial burden" from *United States v. Jeffs* were the correct one for Utah's RFRA (or if Defendants had argued Plaintiffs' rights were not substantially burdened for the purposes of analysis under the First Amendment or Article I, Section 4 of the Utah Constitution), Plaintiffs have demonstrated they meet that definition, as Defendants' actions have both prevented "participation in conduct motivated by a sincerely held religious belief" and placed "substantial pressure on [Plaintiffs] to engage in conduct contrary to a sincerely held religious belief." *United States v. Jeffs*, No. 2:16-cr-82, 2016 WL 6745951, at *6 (D. Utah Nov. 15, 2016).

        (B) assessing criminal, civil, or administrative penalties or damages; or

        (C) excluding a person from a government program or from access to a government facility or service; and

(ii) a burden described in Subsections (6)(a) and (b)(i), regardless of whether the burden is:

        (A) imposed by:

                (I) law, statute, ordinance, rule, *policy, order, or other assertion of governmental authority*;

                (II) *the application of law, statute, rule, policy, order, or other assertion of governmental authority*; or

                (III) *any other means*;

        (B) *applied or enforced by, or on behalf of, a government entity*; or

        (C) applied or enforced by, or on behalf of, a person other than a government entity to:

                (I) enforce a law, statute, ordinance, rule, policy, order, or other assertion of governmental authority;

                (II) compel a government entity to act;

                (III) prohibit a government entity from acting; or

                (IV) utilize an administrative or judicial proceeding of a government entity, or an instrumentality or function of a government entity, to exert government power, authority, or influence.

Utah Code § 63G-33-101(6) (emphasis added).

      Under this definition, a substantial burden is met by *direct or indirect* government action (which can be manifested through *statute, rule, policy, order, or other assertion of governmental authority*, or the *application* or *enforcement* of any of those authorities) that merely *constrains or limits* religious free exercise or which *compels a person to fail to act*. Defendants' actions substantially burdened Plaintiffs' religion under this definition. Defendants took direct action to enforce the Utah Controlled Substances Act against Plaintiffs, including by detaining Mr. Jensen,

searching Singularism's spiritual center, seizing its sacramental psilocybin and religious records, telling Singularism to shut down, promising criminal charges, and threatening Singularism's landlord to evict Singularism. Even if Defendants would only characterize the filing of criminal charges, prosecution, or a finding of guilt as *direct* action, Utah's RFRA does not require direct action. *Indirect* action, too, suffices. And here, however characterized, Defendants' actions deprived Plaintiffs of their rights to be secure in their persons, free from unlawful search and seizure, and to exercise their constitutional and statutory rights to religious free exercise. These acts, and the promised threats of prosecution and eviction, have substantially chilled Plaintiffs' religious free exercise. Out of fear of government retribution, Singularism's adherents have begun to distance themselves from the faith, leading to a decline in monies to support Plaintiffs' religious mission. At least two of Singularism's clergy have forgone their pay because of the financial straits in which Defendants' actions have placed them. *See* Plfs.' Ex. V.

Second, Defendants assert that in order for Plaintiffs' religious free exercise to be burdened, sacramental psilocybin ceremonies must be "mandatory or critical to Singularism." *See* ECF 13, at 21-22. But the language of Utah's RFRA says precisely the opposite. It defines the "free exercise of religion" to mean "the right to act or refuse to act in a manner *substantially* motivated by a sincerely held religious belief, *regardless of whether the exercise is compulsory or central to a larger system of religious belief.*" Utah Code § 63G-33-101(2). Utah's RFRA does not only protect core religious beliefs; it protects them all.

Regardless, Plaintiffs *have* demonstrated that sacramental psilocybin usage *is* a core part of their religious practice and that partaking it under the auspices of Singularism's religious doctrines and guides is a unique religious experience that cannot be replicated alone or by a secular

medical provider, *see* Plfs.' Ex. A, V. Thus, given the definitions in Utah's RFRA, and the facts presented, Defendants' actions amount to a substantial burden upon Plaintiffs' religious freedom. Defendants cannot avoid the application of strict scrutiny which Utah's RFRA imposes by these means.

### iii.   Plaintiffs Have Demonstrated Religious Sincerity.

Defendants' primary argument against Plaintiffs' motion is that Plaintiffs are lying: they are not religious, but drug lords. Beyond the highly offensive nature of this argument, it is just wrong. Defendants have disregarded, wholesale, the evidentiary assertions of Plaintiffs' sincerity, and have attempted to manufacture insincerity by stitching together cherry-picked statements and authority. The Court should reject this unserious argument, credit Plaintiffs' religious sincerity, and continue to strict scrutiny review.

First, Defendants' argument regarding Plaintiff's religious sincerity is newly advanced only for the purposes of the litigation. Prior to this litigation, as shown in Detective Julian's search warrant indicated he saw and experiences multiple assertions of religious sincerity from Singularism, even if he thought it was misguided. *See* response to DSOF ¶¶ 13-18. And during the search and seizure of Singularism's spiritual center, Defendant Julian told Mr. Jensen that he did not doubt his religious sincerity—a factual statement that Defendants have not attempted to controvert in their opposition brief. *See* SOF ¶ 35-38. Importantly, Defendant Julian and the Officers Does were following Defendant's Gray's direction that, regardless of Plaintiffs' sincerity, there could be no religious exemption for Plaintiffs' free exercise of religion, yet another fact Defendants have not attempted to contradict. *See* SOF ¶ 35; *see also* Defs.' Ex. A.

Second, Defendants pull out-of-context quotes from different sources associated with Mr. Jensen to assert he's been a drug dealer all along. As addressed above in Plaintiffs' responses to Defendants' statements of fact, those quotes are cherry picked and misrepresent the nature of those documents. *See* Responses to DSOF ¶¶ 5-12. When viewed in their entirety, they do not demonstrate any religious insincerity. Rather, they complement the different sources explaining Plaintiffs' religious sincerity: Plaintiffs and Singularism followers' declarations, Singularism's attestation document, Singularism's various doctrinal statements, and more.

Third, Defendants imply that Plaintiffs cannot be religiously sincere because they are collecting money in relation to their psilocybin ceremonies. *See* ECF 13, at 1, 9-10, 22, 35, 40. But the fact that Plaintiffs receive money—either as voluntary contributions or as payment for religious ceremonial services—does nothing to counter Plaintiffs' religious sincerity. As stated in Plaintiffs' opening brief, the U.S. Supreme Court in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 708-13 (2014), explained that faith-infused businesses do not lose religious liberty protections just because they seek "to make a profit as [a] retail merchant[]" or because "the purpose of such corporations is simply to make money." Plaintiffs are not out of the ordinary in operating a religious for-profit entity. Many such entities exist. Indeed, there are similar entities run by Christian religious organizations which offer religious mental health therapy in exchange for pay.[8]

---

[8]    *See, e.g.,* Center for Christian Therapy, available at, https://www.centerforchristiantherapy.com/; *Counseling and Wellness Services*, Counseling Center of Park City, Christian Center of Park City, available at, https://ccofpc.org/counseling-services/; *About Us*, Lifeline Christian Counseling Center, available at, https://lifelineccc.com/about; *Cost, Insurance Reimbursement, Financing & Fundraising*, Sanctuary Clinics, available at, https://sanctuaryclinics.com/cost-insurance-reimbursement-financing-fundraising/.

None of Defendants' attempts to discredit Plaintiffs' religious sincerity hold any water. The Court should find the evidence presented demonstrates Plaintiffs' religious sincerity and continue to strict scrutiny review.

### iv. Singularism's Religious Practices Are Protected.

Last, Defendants argue that Singularism is not a religion, so it does not deserve protection under either the First Amendment, Article I, Section 4, or Utah's RFRA. Defendants' open their analysis on this point by misquoting the definition of "free exercise of religion" from Utah's RFRA. They assert that phrase is defined as acting "in a manner substantially motivated by a sincerely held religious belief," but that the definition "further assumes or requires 'a larger system of religious belief,' not merely a belief in one otherwise illegal act." ECF 13, at 23. However, Defendants omit the full definition: "'Free exercise of religion' means the right to act or refuse to act in a manner substantially motivated by a sincerely held religious belief, *regardless of whether the exercise is compulsory or central to* a larger system of religious belief. Utah Code § 63G-33-101(2) (emphasis added). Defendants' misquotation attempts to obscure that under Utah's RFRA, free exercise of religion extends to anything *substantially* motived by a religious belief, even if that belief is not connected to "larger system of religious belief." An individual does not lose protection under Utah's RFRA for not being affiliated with an organized religion. The converse is necessarily true, too: that an individual does not lose protection under Utah's RFRA for being affiliated with more than one religious organization, as is the case for many followers of Singularism. That Singularism does not ask its adherents to drop their religious priors before affiliating with its religious community does nothing to demonstrate that Singularism is not a religious organization.

Following Defendants' misrepresentation of the text of Utah's RFRA, Defendants rely largely upon *United States v. Meyers*, 95 F.3d 1475, 1482 n.2, 1482-83 (10th Cir. 1996) in which the Tenth Circuit adopted a district court's "glean[ing]" from other caselaw five factors (with the fifth factor containing ten subfactors) which supposedly indicate whether a belief is religious as opposed to a philosophy or way of life. Importantly, however, *Meyers* notes that "the threshold for establishing the religious nature of . . . beliefs is low . . ." *Id.* 1482-83.

The five *Meyers* factors have come under criticism, however, including by a dissenting judge from the decision, who stated that it was not the "proper role of the court to establish a factor-driven test to be used to define what religion is," that the "ability to define religion is the power to deny freedom of religion," and that it is an "unnecessarily invasive exercise for the courts to attempt to evaluate an individual's religious claims and practices against any set standard of preconceived notions of what types of religious beliefs are valid of being recognized by the courts." *Id.* at 1489-90. *See also United States v. Lepp*, No. CR 04-00317 MHP, 2008 WL 3843283, at *4 (N.D. Cal. Aug. 14, 2008), aff'd, 446 F. App'x 44 (9th Cir. 2011) ("This court declines any invitation to define religion because '[t]he ability to define religion is the power to deny freedom of religion.'" (quoting *Meyers* dissent)); *United States v. Hoffman*, 436 F. Supp. 3d 1272, 1281 (D. Ariz. 2020) (same); *United States v. Christie*, No. CR 10-00384 01 LEK, 2013 WL 6860818, at *5 (D. Haw. Dec. 30, 2013) (same). Indeed, other jurisdictions follow tests for "religion" far different from that in *Meyers*, including whether a belief is "religious in nature under [a party's] scheme of things" and "occup[ies] a place in [their] life parallel to that filled by the orthodox belief in God." *Moore-King v. Cnty. of Chesterfield, Va*., 708 F.3d 560, 571 (4th Cir. 2013) (quotations omitted). These alternative tests appear to avoid another criticism of the *Meyers* factors: that its

28

factors map far better onto large, organized Abrahamic religions than for minority faith groups, especially those under consideration nearly thirty years after *Meyers*' publication.

Nothing in Utah's RFRA requires application of the *Meyers* factors. Its definition of religious free exercise stands on its own. But even if the Court applies the *Meyers* factors, they indicate Singularism is a bona fide religious organization entitled to protection under Utah's RFRA, Article I, Section 4, and the First Amendment. Although Plaintiffs provide examples under each of the factors below, an analysis of Plaintiffs' comprehensive doctrinal statements, attached as Pls.' Exs. P, W, R, and S, demonstrate even more details of Singularism's religious nature.

*Ultimate Ideas.* Singularism teaches that every individual has equal ability to access the divine. "[T]he the universe can speak through any voyager. No single person group, religion, philosophy, or ideology holds all the truth." Singularism believes that individual is empowered to discover and define their own beliefs. "Consciousness is a spectrum, beginning with the basic replication of life forms and evolving into complex thought, empathy, and the capacity to perceive oneness. Understanding this hierarchy is vital for exploring our identity, as it shows how each level builds upon the previous, connecting us to the larger web of existence. By recognizing our place in this continuum, we see ourselves as both individual and collective, constantly evolving toward greater self awareness and harmony." *See* ECF 9-16.

*Metaphysical Beliefs.* Singularism's teachings emphasize the interconnectedness of all life and matter, recognizing the illusion of separateness as a temporary condition of the physical world. Singularism emphasizes "the oneness of all existence, cosmically and quantumly." ECF 9-16. Additional insight into the nature of the universe, reality, and truth is provided in the Octadrant. *Id.*; Pls.' Ex. V.

*Moral or Ethical System.* Singularism teaches its adherents to abide by three core tenants: alleviate  suffering starting with oneself and extending outward; non-offensiveness: engage in thoughtful dialogue while standing firm in a member's value while respecting others; "agency and responsibility: Through the practice of "Write Your Own Scripture," members are given the tools to define their moral compass within Singularism's framework. This unique approach combines individual agency with collective ethical principles." Pls.' Ex. V; *see also* Pls.' Ex. P.

*Comprehensiveness of Beliefs.* "Singularism is built upon aphorisms—the simple yet profound truths that emerge from individuals voyager's and collective experiences. These aphorisms form the foundation of our evolving scripture, uniting us in our shared belief in the singularity of all things. Members are free to contribute their insights, helping to create a dynamic and adaptable religion that reflects the oneness and wisdom we uncover together." Pls.' Ex. P. While Singularism emphasizes the oneness of all things it also teaches its members that each participant is empowered to discover their own metaphysical truths. *Id.*; Pls.' Ex. V.

*Accoutrements of Religion.* Singularism presents the traditional accoutrements of religion including a founder, Bridger Jensen, Pls.' Exs. A, V, and important writings, including the Octadrants and the scriptures of the individual voyagers. Pls.' Ex. P, V. The ceremonies are practiced at the wellness center which serves as Singularism's gathering place. Pls.' Ex. V. Like many small religions, Singularism is starting its practice with very little. However, the humbleness of its space does not make it any less sacred to its practitioners.

 Singularism has a governance structure which mirrors that of other religious organizations. Brider Jensen, as the founder, works alongside two counselors and a board of directors. Pls.' Ex.

V. Together, these individuals give spiritual guidance to Singularism and provide organizational oversight. *Id.*

After thorough screening, members participate in Singularisms tea ritual, which enables them to access the divine and write their own scripture. *See* ECF 9, at ¶¶ 4-9; Pls.' Exs. A, V. Singularism's members participate in a specialized diet on the day of their ceremony in that they consume the sacramental tea. *Id.* On the day of their ceremony, members are encouraged to dress modestly and comfortably. Pls.' Ex. V. Clergy observe the sanctity of the ceremony by fasting and meditating before each ceremony with a voyager. *Id.* Cards are issued to clergy which symbolize the clergy person's mastery of the Bridging Model and a commitment to the religion's sacred principles. *Id.* Practitioners also wear white shirts with gold buttons which carry symbolic significance. *Id.*

Additionally, Singularism observes four key holidays: the Darkness Ceremony, the Light Color Ceremony, the Lightness Ceremony, and the Dark Color Ceremony. *Id.* Singularism's missionary efforts reflect the modern era in which we live in that Singularism employs methods such as social media to spread awareness. *Id.*

All considered, even if the Court looks to the *Meyers* factors, Singularity's religiosity manifests in every factor. Thus, the Court should proceed to strict scrutiny review.

## II.    PLAINTIFFS HAVE SUFFERED AND WILL SUFFER IRREPARABLE HARM.

Defendants do not disagree that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). *See* ECF 9, at 30. *See also O Centro Espírita Beneficente União Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1269-70 (D.N.M. 2002) ("Tenth Circuit law

indicates that the violations of the religious exercise rights protected under RFRA represent irreparable injuries. In *Kikumura,* the Tenth Circuit observed that 'courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA.'" (quoting *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (listing cases)). Even so, Defendants argue that in order for Plaintiffs to be irreparably harmed, Defendants must be subjected to criminal prosecution, but that even prosecution itself is not enough to create irreparable harm absent a conviction (or even failure on appeal of a conviction). *See* ECF 13, at 38.[9] If that were the case, Defendants could successfully wipe Singularism from existence pending such prosecution and even an appeal of a conviction, as the burdens imposed by Defendants' actions mount.

But, again, Defendants fault Plaintiffs not only for supposedly filing their motion too early, but also for filing it too late, asserting that Plaintiffs "delay[ed] in seeking injunctive relief" and are "manufactur[ing] an emergency through inaction" because Plaintiffs should have moved for a temporary restraining order and preliminary injunction when the Utah County Attorney's Office commented to the media that it thought Singularism was not entitled to religious freedom. *See* ECF 13, at 38.

This argument disregards the obvious. Parties cannot, and should not, move for injunctive relief before they have sustained an injury or the injury is likely to imminently occur. Here, there

---

[9]     Defendants cite to *United States v. Jeffs*, No. 2:16-CR-82, 2016 WL 6745951, at *8 (D. Utah Nov. 15, 2016) and *Mendoza v. Thompson*, No. 1:15-cv-00090, 2015 WL 5693705, at *2 (D. Utah Sept. 28, 2015) for this proposition. *See* ECF 13, at 38. But neither case stands for that proposition. In *Jeff*, the court's discussion was related to whether a "substantial burden" on religion was shown and whether RFRA can be raised as a defense. There is no discussion regarding irreparable harm, temporary restraining orders, or preliminary injunctions. In *Mendoza*, a case regarding a pretrial detainee awaiting trial on murder charges, the court's discussion of irreparable harm was related to the detainee's option to hire private counsel or proceed with a public defender, a fully distinguishable fact pattern from what is presented here.

was no reason for Defendants to move for injunctive relief when the Utah County Attorney's Office made its comment to the media. At that time, and until November 11, 2024, Defendants took no action and gave no indication that they would take action against Singularism. Without harm or imminent harm, Plaintiffs were limited to the actions they did take: communicating with Defendants to invite them to Singularism's spiritual center to learn more about why Singularism's spiritual practices are protected.

As stated above, when Defendants did take action on November 11-12, 2024, such amounted to a violation of Plaintiffs' religious free exercise rights, an irreparable injury. The effects of Defendants' threats of prosecution and eviction continue to haunt Plaintiffs, impacting them daily. *See also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ("Although mere allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm, plaintiffs may bring suits for prospective relief in First Amendment cases where they can demonstrate a credible threat of prosecution or other consequences flowing from the statute's enforcement." (cleaned up, quotations omitted)).

### III.    THE INJURY TO PLAINTIFFS GREATLY OUTWEIGHS ANY POTENTIAL DAMAGE TO DEFENDANTS.

Defendants fail to provide any evidence that they will be damaged by a temporary restraining order or preliminary injunction. The closest they come is pure speculation: "the public faces the *prospect* of unlicensed, unsupervised, and unstoppable use of illegal, halogenic substances in the community. As noted, the *potential* harms range from improper dosage, unintended poisonings, illegal trafficking, and impaired driving." ECF 13, at 39-40 (emphasis

added). Defendants have no evidence that any of these things would occur. Rather, the evidence is that Singularism's religious practices have caused *none* of these issues.

Defendants argue that Plaintiffs' only injury is moving the venue of their fight for the protection of their religious freedoms from this civil venue to a criminal venue. As stated above, Defendants' argument regarding a criminal venue and irreparable harm is not supported by the caselaw they cite. Additionally, Plaintiffs have incurred more significant harms, outweighing the non-existent, speculative harm Defendants advance here. *See* ECF 9, at 30-31.

## IV.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ADVANCE THE PUBLIC INTEREST.

Defendants argue that "the public has 'an interest in seeing that its duly enacted legislation is enforced," so enforcement of the Utah Controlled Substances Act against Plaintiffs is in the public interest. *See* ECF 13, at 39 (quoting *Mendoza v. Thompson*, No. 1:15-CV-00090-DN, 2015 WL 5693705, at *3-*4 (D. Utah Sept. 28, 2015) and citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003)). But this statement also operates as to Utah's RFRA—the public also has an interest in seeing Utah's RFRA enforced to preserve Plaintiffs' religious freedom. *See also O Centro Espírita Beneficente União Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1187 (10th Cir. 2003) ("as RFRA—a statute enacted by representatives of the people to protect religious freedom—acknowledges, harm ensues from the denial of free exercise and the public has a significant interest in unburdened legitimate religious expression."). On balance in this case, given the weighing of the harms above, the public interest in protecting free exercise prevails.

## V.    DEFENDANTS' REQUEST FOR A $100,000 SECURITY IS UNREASONABLE.

Perhaps only to perpetuate the inaccurate stereotype that Defendants are drug dealers swimming in illegal profits, Defendants request that if the Court grants the present motion, it impose a massive $100,000 security on Plaintiffs under Federal Rule of Civil Procedure 65(c). This is an unreasonable request the Court should deny outright.

"Courts in the Tenth Circuit have wide discretion under Rule 65(c) in determining whether to require security and may, therefore, impose no bond requirement." *Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1204 (D.N.M. 2022) (cleaned up) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009)). A "bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment." *Id.* (cleaned up) (quotation omitted) (holding the plaintiff was entitled a preliminary injunction and was "not required to secure a bond to ensure that the [state] complies with the Constitution.").

Even if a security were required, the Court should exercise its discretion to set the bond according to the value of the potential harm to Defendants. The purpose of Rule 65(c)'s security provision is "to enable a restrained party to secure indemnification for any costs, usually not including attorney's fees, and any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect." Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A FED. PRAC. & PROC. CIV. § 2954 (3d ed.). Where a wrongfully issued order would have no cost to the restrained party, trial courts have chosen not to require a plaintiff to pay a security bond at all. *See Voter Reference Found., LLC*, 616 F. Supp. at 1274 (finding no evidence in the record that compliance with an injunction not to prosecute plaintiff would cost anything to the defendant state of New Mexico); 11A Fed.

Prac. & Proc. Civ. § 2954, n. 48 ("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.") (citing *Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011) (Adelman, J.)). Here, even if the Court were to require a security, Defendants have provided no evidence of any sort of damages they might sustain during a period of enjoinder.

Even so, in good faith, Plaintiffs paid a bond upon filing their motion temporary restraining order and preliminary injunction with the state trial court. A $100,000 security is patently unreasonable. Plaintiffs have never had that level of financial resources, and they certainly do not have them now as they endure the financial burdens caused by Defendants' wrongful actions. Assessing such a security would end the faith.

## <u>CONCLUSION</u>

For the above reasons, those contained in Plaintiffs' opening brief, and the argument and evidence to be presented at the upcoming hearing, the Court should grant Plaintiffs' Motion and grant Plaintiffs a temporary restraining order and preliminary injunction.

DATED this 11th day of December 2024.

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

## <u>PAGE LIMIT CERTIFICATION</u>

I, Tanner Bean, certify that the foregoing document contains 36 pages and complies with DUCivR 7-1(a)(4) and the Court's order granting the parties' stipulated motion for overlength briefing.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 11, 2024, I caused the foregoing **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be served via the Court's electronic system upon the following:

> Gary DeMott Millward
> J. Brian Jones
> Provo City Attorneys Office
> 351 W Center St
> PO Box 1849
> Provo, UT 84603
> (801)852-6141
> gmillward@provo.org
> rroberts@provo.org
>
> Richard A. Roberts
> Provo City - Legal Department
> 445 W Center St Ste 300
> Provo, UT 84601
> 801-852-6140
> Email: rroberts@provo.org
>
> Mitchel A. Stephens
> Lara A. Swensen
> James Dodge Russell & Stephens PC
> 10 W Broadway Ste 400
> Salt Lake City, UT 84101
> mstephens@jdrslaw.com
> lswensen@jdrslaw.com

*/s/ Tanner J. Bean*

38