Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

   Pursuant to the Court's Order, *see* ECF 65, Plaintiffs Bridger Lee Jensen, Singularism, and

Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs" or

1

"Singularism") hereby file this Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## **INTRODUCTION**

Perhaps realizing that their efforts to prevent the Court from reaching strict scrutiny review have failed, Defendants provide supplemental briefing to the Court on the two issues upon which they carry the burden of proof in that analysis: (1) whether they have compelling governmental interests in specifically denying Singularism a religious exemption and (2), for this first time in this case, whether complete prohibition of psilocybin is the least restrictive means by which they can accomplish those interests.

Defendants' supplemental briefing fails to indicate Defendants can shoulder their burden on either of these prongs of strict scrutiny. First, Defendants fail to articulate anything beyond an improperly generalized governmental interest, arguing a rationale that was specifically rejected by the U.S. Supreme Court in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*. Second, Defendants fail to demonstrate that outright prohibition of psilocybin is the least restrictive means available to them to accomplish their interest. Singularism has proposed multiple less restrictive means and Defendants appear to have proposed one themselves. Thus, Defendants' supplemental briefing does nothing to excuse Defendants' constitutional violations.

Additional evidence obtained from Defendants indicates that Defendants' concerns regarding contaminated psilocybin are unfounded, that they have confirmed that Singularism is a religion, that Defendants knew Singularism was religiously sincere when it acted against Singularism, and that Defendants' actions caused harm even before the search and seizure, compromising Singularism's bank accounts at KeyBank. As a result of this and the other evidence

2

that has been presented to the Court, the Court should grant Singularism's motion for a preliminary injunction.

**ARGUMENT**

I. **DEFENDANTS LACK THE TAILORED GOVERNMENTAL INTEREST REQUIRED.**

Defendants bear the burden of demonstrating they have a *particularized* compelling governmental interest, not a *generalized* one. Defendants have made no argument, across multiple briefs and before this Court, that that standard does not apply. *See* ECF 9, at 13, 19 (setting forth standard and illustrating its use in *Burwell v. Hobby Lobby Stores, Inc.*); ECF 13, at 35-37 (failing to dispute standard); ECF 19, at 12-13 (noting Defendants' failure to dispute standard); ECF 64-1, at 3-9 (again failing to dispute standard); *see also* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 22:1-14; ECF 24, at 2 ("The court also finds that the government has not shown a compelling interest in prohibiting Singularism from using psylocibin outright and accordingly has not carried its burden."). Thus, as this Court has already recognized, the question before this Court is not whether the government "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Singularism specifically. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 541 (2021). The Court must "scrutinize the asserted harm of granting specific exemptions" to Singularism. *Id.*

Defendants may not "rely on broadly formulated interests." *Id.* Yet, that is precisely what they continue to do. Their supplemental brief argues that generally, psilocybin is dangerous, and, thus, Defendants have an interest in regulating it without exception. But even if all the sources

3

Defendants newly cite to make this argument supported Defendants' assertions (and they don't[1]) they have no effect upon the Court's analysis because these sources do nothing to demonstrate that allowing Singularism a religious exemption would contribute to any of the harms Defendants assert. It is impossible for these sources to do so, as none of them contain factual content regarding Singularism.

---

[1] The new sources Defendants cite to support their claim that psilocybin is dangerous fare no better than the last batch of sources to which Defendants pointed. *See* ECF 19, at 13-15; ECF 59, at 10. For example, Defendants rely on an article by the Utah Poison Control Center to claim a connection between psilocybin use and liver failure. *See* ECF 64-1, at 4. However, Defendants' representation of this source is misleading. While the article references a "possible case of amatoxin (mushroom) induced liver failure and death," it explicitly differentiates between amatoxin-containing mushrooms and psychedelic mushrooms, stating unequivocally that "Psychedelic mushrooms (magic mushrooms) do not cause liver damage" and that it "is highly unusual for hepatotoxic mushrooms to be mistaken for psychedelic mushrooms." ECF 64-1, at 4 n.1. Moreover, the reported instance of liver failure in the article is merely a "possible" case still under investigation, and the article notes that "the poison center is not aware of any confirmed cases of amatoxin induced liver failure ever occurring in Utah." *Id.*

Defendants further allege that "illicit drug purchases regularly support dangerous, far-reaching and widespread criminal enterprise." ECF 64-1, at 5. To support this claim, Defendants provide the Court with a lengthy string cite without particularized citations, other than to instruct the Court to dig through press releases from the U.S. Department of Justice ("DOJ"). *Id.* The first cited source, a "National Drug Threat Assessment" is a DOJ publication that, across its 100 pages, mentions psilocybin only once—and only in passing in a discussion of marijuana. *See* https://www.justice.gov/d9/pages/attachments/2021/08/18/2020_national_drug_threat_assessment_ndta.pdf. The publication focuses on fentanyl, methamphetamine, cocaine, and controlled prescription drugs. Moreover, the other sources cited in Defendants' string cite fail to address psilocybin as a primary concern, instead focusing predominantly on drugs such as fentanyl and methamphetamine. In many instances, the role of psilocybin, if mentioned at all, is peripheral and lacks clarity as to its context or purpose of use. That there have been seizures of psilocybin in other contexts does nothing to indicate that Singularism's sacramental usage is unlawful. Finally, Defendants cite, for the second time, a National Institutes of Health publication which Singularism has already shown Defendants have misrepresented. *See* ECF 59, at 10 n.2.

Singularism could cite to the Court a wealth of academic research indicating the benefits of psilocybin and how to administer it safely, *see, e.g.* ECF 9-15, but dueling articles will not aid the Court in analyzing whether Defendants have met their burden to demonstrate they have an interest of the highest order in denying *Singularism specifically* a religious exemption, as Singularism is not mentioned in any of those articles.

Again, the closest Defendants have come to attempting to engage with the particularized burden they carry is by asserting *speculative* harms. See ECF 19, at 33-34; ECF 64-1, at 8, n.8 (arguing that available evidence shows a "very substantial *risk*" that Singularism's beliefs "*risk* recreational diversion" (emphasis added)).[2] In Defendants' supplemental briefing, Defendants attempt to argue that because Singularism obtained psilocybin, possessed a particular amount of psilocybin,[3] and gave that psilocybin to its voyagers, such actions necessarily entail Singularism's participation in a "secular criminal enterprise[]," which "support[s] a dangerous yet thriving black market." ECF 64-1, at 5, 7.[4] Of course, this argument wrongfully assumes Singularism's conduct is unlawful. It is not. Plaintiffs have demonstrated they are entitled to take these actions pursuant

---

[2] In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 732-33, (2014) the U.S. Supreme Court indicated speculative risks do not enter the analysis, rejecting the government's argument that permitting a religious exemption would lead to a "flood of religious objections regarding a wide variety of medical procedures and drugs" given that the government made "no effort to substantiate [its] prediction" by providing evidence. "Such speculation is insufficient to satisfy strict scrutiny . . ." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 542 (2021); *see also Ramirez v. Collier*, 595 U.S. 411, 430 (2022) (rejecting government's "conjecture regarding what a hypothetical spiritual advisor might do in some future case").

[3] Regarding the amount of psilocybin that was seized by Defendants, Defendants' own statements appear to be contradictory. While Defendants argue the search warrant receipt indicate the seizure of "over 459 grams" of psilocybin, *see* ECF 64-1, at 8, Defendants' lab testing of the psilocybin indicated that the "total weight of the mushroom material" was, at most, 304 milligrams, comprising two tested items, one weighing "less than 100 milligrams" and the other 204 milligrams +/- 6 milligrams." *See* Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS, attached as Exhibit W. Notably, Defendants' lab testing of Singularism's sacramental psilocybin did not indicate that it contained anything other than pure psilocybin, refuting Defendants' speculative claims that Singularism could be endangering individuals by administering contaminated psilocybin. *Id.*

[4] Defendants assert that Singularism purchases psilocybin "on the street" and rumor that it purchases from a "kingpin for a dangerous drug cartel." ECF 64-1, at 4, 8 n.5. This factual assertion is directly contrary to the testimony provided to the Court during the TRO hearing. *See, e.g.,* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 68:16–71:11 (Singularism's psilocybin originates from a "lab in Oregon"). Defendants have provided no evidence indicating Singularism obtains psilocybin from any other sources, much less from off the street.

to the First Amendment, Article I, Section 4 of the Utah Constitution, and the Utah Religious Freedom Restoration Act.

Defendants further argue, in speculative fashion, that permitting Singularism an exemption from the Utah Controlled Substances Act compromises how that Act operates as a "closed system of drug distribution." ECF 64-1, at 3, 4, 7, 9. The U.S. Supreme Court rejected a strikingly similar argument in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). There, the Court opened its compelling interests analysis by stating that even though "Schedule I substances . . . are exceptionally dangerous," "the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day," and the fact that a substance is included in Schedule I "does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA." *Id.* at 432-33. Further, the Court recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [from the Controlled Substances Act]—that is how the law works." *Id.* at 434 (emphasis in original).[5]

The Court proceeded to then reject the government's contention that "the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* The Court found this argument to echo "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interests test, of exceptions to rules of

---

[5] Indeed, "RFRA operates as a kind of super statute, displacing the normal operation of other . . . laws . . ." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 682 (2020).

general applicability." *Id.* at 436 (cleaned up). The Court then rejected the government's "slippery-slope argument" and dismissed it as "no more than a possibility." *Id.* (cleaned up). The Court also noted that "congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them." *Id.* at 432-33.

The Court found that the government's argument that it had a compelling interest in a no-exception regulatory system was further undercut by the exceptions already present within the Controlled Substances Act. For example, the Controlled Substances Act contains a provision allowing the Attorney General to waive the Act's requirements where "consistent with the public health and safety." *Id.* at 432. Additionally, the Court noted that the Controlled Substances Act also contains an exception for religious use—the peyote exemption for the Native American Church. *Id.* at 433. The Court found this "well-established peyote exception [to] also fatally undermine[] the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* at 434.

Here, Defendants' invocation of the legislative findings behind the federal and state Controlled Substances Act, their assertion of the importance of administering a closed regulatory system without exception, and other speculative arguments all fail for the same reasons the U.S. Supreme Court pronounced in *O Centro*. Just like the federal Controlled Substances Act, the Utah Controlled Substances Act permits Utah authorities to waive "the licensure requirement [if] consistent with public health and safety." *Compare* Utah Code § 58-37-6(2)(d) *with* 21 U.S.C. §

822(d).[6] And just like the federal Controlled Substances Act, the Utah Controlled Substances Act also contains an exception for the religious use of peyote. *Compare* Utah Code § 58-37-8(12) *with* 42 U.S.C. § 1996a; 21 C.F.R. § 1307.31. Moreover, Utah Code § 58-37-3.5 (the "Utah Psilocybin Act") also permits secular use of psilocybin in a very similar fashion to how Singularism uses psilocybin.[7] Further, as clergy, Mr. Jensen is exempt from the licensure requirement to practice mental health therapy. *See* Utah Code § 58-60-107(2)(b); ECF 9, at 24-25, 28; ECF 59, at 9-10. Thus, just as in *O Centro*, the Court here should "determine that the Government failed to demonstrate, at the preliminary injunction stage, a compelling interest in barring [Singularism's] sacramental use of [psilocybin]." *O Centro*, 546 U.S. at 439.

---

[6] In addition to undermining Defendants' assertion of a compelling governmental interest, this provision of the Utah Controlled Substances Act also further indicates that the Act is *not* a neutral or generally applicable law which would be subject to rational basis review under the First Amendment. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (quotations omitted); *see also Chiles v. Salazar*, 116 F.4th 1178, 1224 (10th Cir. 2024) (quoting *Fulton*). In *Fulton*, the Court found that a provision which granted a municipality's commissioner the ability to provide "an exception . . . in his/her sole discretion," even where the commissioner had "no intention of granting an exception," indicated "a system of individual exemptions," such that the municipality could "not refuse to extend that exemption system to cases of religious hardship without compelling reason." 593 U.S. at 535 (cleaned up). The Utah Controlled Substances Act's discretionary waiver provision operates the same way. Thus, strict scrutiny review under the First Amendment applies, and Defendants' actions do not survive that scrutiny.

[7] Singularism incorporates its prior briefing which demonstrates how all the same dangers Defendants speculate will occur are also posed by healthcare systems operating under the Utah Psilocybin Act, *see* ECF 59, at 6-11, which further undermines Defendants' stated governmental interests and demonstrates that strict scrutiny review under the First Amendment applies. Singularism also incorporates its previous arguments regarding how Defendants' claimed governmental interests, even at a general level, are otherwise undermined. *See* ECF 9, at 22-29; ECF 19, at 12-17.

At the preliminary injunction hearing, it is likely that Defendants will raise an incident which occurred on January 16, 2025 with one of Singularism's voyagers. It is likely Defendants will raise the incident as evidence that Singularism's religious practices harm public health or safety. However, the full picture of the incident demonstrates that Singularism remains committed to public health and safety, even in unanticipated situations.

As one of Singularism's voyagers was completing their second successful psilocybin ceremony with Singularism, they began to exhibit symptoms of a paranoia, mistrust, and anxiety and wanted to leave Singularism's spiritual center, indicating the voyager was experiencing a rare an unanticipated adverse reaction to psilocybin. Second Supp. Decl. of Bridger Jensen, attached as Exhibit X. Singularism activated its emergency protocol that it had, fortunately, never needed to follow until that day, and called the voyager's emergency contacts, including the voyager's mother. *Id.* Another of those emergency contacts, the voyager's ex-husband, came to Singularism's spiritual center and picked up the voyager. *Id.* The voyager was then taken to the hospital, was treated, and was released a few hours later. *Id.*

While the voyager was in the hospital, Singularism discovered that the voyager had likely not disclosed all known mental health issues to Singularism during Singularism's screening process. *Id.* Had the voyager disclosed those issues, Singularism likely would not have proceeded to include the individual in one of its psilocybin ceremonies. *Id.* Nonetheless, Singularism remained committed to its emergency protocol which allowed the voyager to be taken as soon as possible to the hospital to receive treatment. *Id.*

The day after the incident, the voyager called Singularism and affirmed they were okay and thanked Singularism for its efforts in coordinating the voyager's care with her emergency

contact. *Id.* What the voyager indicated to Singularism is consistent with what the voyager told law enforcement when they came to check in at the voyager's home that same day. In a written statement to law enforcement, the voyager said that she "went [to Singularism] of my own free will & took the treatment willingly." *See* Voluntary Statement Form, attached as Exhibit Y. Additionally, the body camera footage of law enforcement's visit to the voyager's home confirms that "all that happened was [she] had a bad reaction to [psilocybin]," leading to a "hysterical panic attack"; that after receiving treatment at the hospital, she was "able to think reasonably"; that she recovered from that adverse reaction; that she participated in Singularism's ceremony voluntarily ("Q: Alright, I just wanted to clarify that you took them voluntarily. A: Yeah." "Q: I just wanted to make sure that you weren't forced to take them . . ." A: "No, no, I wasn't." "I knew what I was doing."); that Singularism is "reputable" and "perfectly legal;" and that Singularism "did everything they were supposed to do, which was call my emergency contact, my ex-husband." *See* January 17, 2025 Body Camera Footage, attached as Exhibit Z.

This incident does not undermine Singularism's claims regarding its safety, nor does it indicate that Defendants have a compelling governmental interest in denying Singularism a religious exemption from the Utah Controlled Substances Act. Singularism acted just as a secular mental health facility would act in a similar situation: invoke its emergency procedure, contact the individual's emergency contact, and assist in ensuring the individual receives further medical care. A healthcare system operating under the Utah Psilocybin Act would be required to do no differently. Indeed, the Utah Psilocybin Act contains *no* provisions regarding what a healthcare system must do in the event a patient has an unanticipated adverse reaction to psilocybin, instead insulating from liability or guilt any "individual or entity . . . distributing . . . administering . . . or

supervising the use of" psilocybin. *See* Utah Code § 58-37-3.5. Singularism asserts that its religious healing ceremonies provide the public good of alleviating human suffering, and when unanticipated reactions to psilocybin present themselves, Singularism will continue to follow its emergency procedure to ensure the safety of all its voyagers. *See* Ex. X. All considered, this single, isolated incident does nothing to change the conclusion the Court should reach here: Defendants have failed to demonstrate a compelling interest in barring Singularism's sacramental use of psilocybin outright.

## II. DEFENDANTS HAVE SEVERAL LESS RESTRICTIVE MEANS OF BURDENING SINGULARISM'S RELIGIOUS FREE EXERCISE THAN TOTAL PROHIBITION OF PSILOCYBIN.

Defendants also bear the burden of demonstrating they have *no other means* of accomplishing their governmental interests than prohibiting Singularism's religious practices outright. As the U.S. Supreme Court has stated, the "least-restrictive-means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Under the least-restrictive means standard, Defendants must show they "lack other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion by the objecting parties . . ." *Id.* If "a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 815 (2000)). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

Despite these statements from the U.S. Supreme Court, Defendants argue that it is Plaintiffs' burden to propose less restrictive means and that Defendants need only demonstrate

those proposals are not viable. *See* ECF 64-1, at 9. Even assuming that were correct (and the U.S. Supreme Court's articulation of the least-restrictive means standard indicates it is not), Singularism *has* proposed several means Defendants can take to accomplish their interests that are less restrictive than an outright prohibition on Singularism's religious free exercise. Despite Singularism's inclusion of these proposals in Singularism's past briefings, *see* ECF 9, at 22-26, 29; ECF 19, at 17-18; ECF 59, at 11, Defendants feign ignorance of them.

Before Singularism again articulates those proposals, it is critical to note that despite arguing Utah's Controlled Substances Act can only function as a "closed system of drug distribution" if psilocybin usage is uniformly barred, *Defendants themselves* propose a less restrictive means than outright prohibition: the peyote exemption from the Utah Controlled Substances Act. However, this has never been one of Singularism's proposals,[8] and even if it were, it is not the *least* restrictive means at Defendants' disposal. The proposals Singularism has put before the Court are:

*Defendants Permit, Without Restriction, Singularism's Religious Practices.* Defendants have indicated the ultimate less restrictive means—imposing no restrictions on Singularism at all—was a viable path for Defendants, as they, despite being notified by Singularism of its religious practices in the fall of 2023 and receiving an unspecified "concern" from a citizen, did nothing to stop Singularism's religious practices until November 2024. Further, Defendants permit a similarly situated, but larger, religious organization—The Divine Assembly—which uses

---

[8] Singularism has only raised the peyote exemption from the Utah Controlled Substances Act for the purpose of demonstrating (1) that the Act is not a neutral and generally applicable law and (2) that Defendants' claimed compelling governmental interest in enforcing the Act without exception is undermined by exemptions like the peyote exemption.

12

psilocybin as part of its religious practice, to operate within their jurisdiction without prosecution, as well as other entheogenic religious groups.

*Defendants Permit Singularism's Religious Practices According to the Terms of the Utah Psilocybin Act.* The next proposal Singularism has put forth is that Singularism be subject to the applicable requirements of the Utah Psilocybin Act,[9] which permits secular usage of psilocybin in a similar manner to Singularism's religious usage. Such requirements would be that (1) Singularism's usage of psilocybin be, in addition Singularism's religious beliefs, "supported by a broad collection of scientific and medical research"; (2) Singularism administer psilocybin under the direct supervision and control of Mr. Jensen and his facilitators, who are exempted from the licensure requirement of the Utah Controlled Substances Act under the clergy exemption to the Mental Health Professional Practice Act; and (3) Singularism not administer psilocybin to any individuals under 18 years old.[10]

---

[9] Although Defendants say little regarding the Utah Psilocybin Act in their supplemental briefing, what they do say misrepresents that Act. For example, Defendants argue that "the Utah CSA recently enacted a 'very controlled program' to distribute and permit use of psilocybin through 'reputable hospital systems,'" attributing Utah Code § 58-37-3.5(2)-(3) for those quotes. *See* ECF 64-1, at 4. However, those phrases are found nowhere within the Utah Psilocybin Act, nor anywhere in the Utah Controlled Substances Act. Instead, the actual text of the Utah Psilocybin Act demonstrates a very loose and discretionary program, and the only relevant characteristic of a hospital system is its size or affiliation with a university.

[10] Notably, the Utah Psilocybin Act does *not* operate as an affirmative defense, as is the case for some other exemptions from the Utah Controlled Substances Act. *Compare* Utah Code § 58-37-3.5(5) ("An individual or entity that complies with this section when using, distributing, possessing, administering, or supervising the use of, a drug *is not guilty of a violation of this title.*" (emphasis added)) *with* Utah Code § 58-37-8(12)-(14), (16) (affirmative defense related to religious peyote usage available in criminal prosecution, but relief not limited to an affirmative defense; for medical research; for valid license holder; for user in medical research; for bystander of overdose event that aids overdosed individual).

*Defendants Accommodate Singularism's Religious Practices as the Government Has Accommodated Religious Organizations in Other Instances.* Singularism has demonstrated that the government has other less restrictive means to accommodate other entheogenic religious practices in similar circumstances. These circumstances are examples only, and the specifics of such an accommodation would need to be tailored to Singularism's religious practices.

Following the U.S. Supreme Court's *O Centro* decision, for example, as Defendants indicated to the Court during the TRO hearing, the government appears to have found a less restrictive means which accommodated a religious organization's need to import and use sacramental hoasca tea. *See* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 29:23—32:1 ("it looks to me like what you just showed me was a less restrictive means in a similar case"). A similar example can be found in the Ninth Circuit, where the Court issued a permanent injunction that "established guidelines for [a Church's] importation, distribution, and use of Daime tea." *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457, 458 (9th Cir. 2014). Additionally, in April 2024, the U.S. Attorney General, Department of Homeland Security, the Drug Enforcement Administration, and U.S. Customs and Border Protection all entered a public settlement agreement with an entheogenic church regarding the "import, manufacture, distribut[ion], and possess[ion] of ayahuasca for use in religious ceremonies." *See* ECF 9-14, at 1. Each of these instances serve as an example of less restrictive means available to Defendants. Notably, each of these cases arguably pose *more* challenging religious practices to governmental interests than Singularism's do, as each involved the importation of controlled substances.

Given the various less restrictive means available to Defendants, the Court should conclude Defendants have failed to survive strict scrutiny.

### III. DEFENDANTS HAVE CONFIRMED THAT SINGULARISM IS A RELIGION.

Although Defendants have previously attempted to avoid strict scrutiny review by arguing to this Court that Singularism is not a religion, *see* ECF 13, at 23-35, Defendants appear to have abandoned that argument. On January 13, 2025, in response to an application for renewal of a business license Singularism believed it needed to complete in order to operate, Provo City told Singularism that it considered Singularism to be a religious organization. Specifically, Provo City sent Singularism a letter stating, "This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application . . . for Singularism has been closed." January 13, 2025 Letter from Provo City, attached as <u>Exhibit AA</u>.

That Provo City made this determination is significant given that Provo City Code § 6.01.140 specifies that with "respect to exemptions from business license requirements claimed because of charitable, religious or other nonprofit status, the person claiming the exemption shall have the burden of establishing that exemption," meaning that Provo City determined Singularism met its burden of establishing religious status. As a result, the Court should disregard Defendants' prior arguments that Singularism is not a religion. Defendants are estopped by their statements from arguing otherwise.

### IV. DEFENDANTS' RELIGIOUS INSINCERITY ARGUMENT IS INCONSISTENT WITH THE FACTS.

Additional evidence obtained from Defendants confirms that Defendants' argument regarding Plaintiffs' religious sincerity is made only for the purposes of litigation. *See* ECF 19, at

15

25. Detective Julian's police report, which contains additional content beyond what he included in his search warrant affidavit, concludes that "Bridger [Jensen] fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion." *See* Police Report, attached as <u>Exhibit BB</u>, at 12. The report continues and confirms that the Utah County Attorney's Office and Provo City Attorney's Office, despite Detective Julian's understanding of Singularism's religious sincerity, instructed Detective Julian to proceed against Singularism, anyway: "However, when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substances Act." *Id.*

## V. DEFENDANTS' DOCUMENTS INDICATE THE NEED FOR FURTHER INJUNCTIVE RELIEF.

Detective Julian's police report also indicates that he obtained reports from the Financial Crimes Enforcement Network ("FinCEN") regarding Singularism. *Id.* The content of those reports indicates that Provo City and the Utah County Attorney's Office's comments to the media, in which they wrongfully claimed that Singularism had no claim to religious free exercise, caused interference with Singularism's financial institution, KeyBank. *See* News Article, attached as <u>Exhibit CC</u>. Both reports demonstrate that KeyBank quoted Provo City and the Utah County Attorney's Office's comments to the media in KeyBank's report to FinCEN regarding Singularism. *See* FinCEN Reports, attached as <u>Exhibit DD</u>. As a result, KeyBank eventually closed Singularism's bank accounts.

This new evidence highlights the need for the Court to enter a preliminary injunction barring Defendants from acting in indirect ways to restrict Singularism's free exercise of religion, including efforts taken to restrict Singularism's ability to hold an account with a financial

institution. Because of this, and in response to Defendants' arguments that Singularism's preliminary injunction request is uninterpretable by Defendants (or law enforcement who might be tasked with following it), Singularism is submitting an updated proposed order further specifying the forms of relief it seeks. *See* Updated Proposed Order, attached as Exhibit EE.

### VI. RELIGIOUS FREE EXERCISE IS A FUNDAMENTAL, INALIEANABLE RIGHT.

Defendants have previously argued that before Singularism was permitted to exercise its religious practices, it was required either to apply for a religious accommodation through the DEA or file an action for declaratory relief with a court. *See* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 183:10-16, 184:21-23, 221:13-22, 236:9-11, 237:5-24 (The Court: "So it's your position that no one can take advantage of the RFRA statute unless that religion or individual files a declaratory judgment action first to get a court order saying we quali[f]y [for] RFRA?" Mr. Millward: "In the context of a controlled substance, yes."). This argument disregards that the free exercise of religion is an inalienable and fundamental right.

James Madison explained in his Memorial and Remonstrance Against Religious Assessments that religious free exercise "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[11] In other words, an individual's right of religious free exercise is not bestowed upon an individual by government, but is inherent to the individual. Congress recognized this when it passed the federal RFRA, as did the Utah Legislature when it passed Utah's RFRA. *See* 42

---

[11] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

U.S.C. § 2000bb(a)(1) ("the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution"); Utah Code § 63G-33-201(1) ("The free exercise of religion is a fundamental right"); *see also Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013) (Congress's protective stance in favor of religious accommodation could not be clearer. RFRA's statement of purpose explicitly reaffirms our national commitment to the 'free exercise of religion as an unalienable right'"). Therefore, when courts evaluate an individual's case regarding the free exercise of religion, the court is not evaluating whether to *grant*, in the first place, the free exercise of religion to the individual, but is only evaluating the *scope* of the preexisting right granted to the individual by statute, constitution, and natural right.

Accordingly, Defendants' argument that religious organizations or individuals must seek declaratory judgment that they have religious rights before they can exercise them is incorrect. That argument would be akin to arguing that before an individual could exercise their right to free speech, the individual would have to ask a court whether the individual had the right, a position that is patently unreasonable. And it is no more reasonable to argue that an individual may be granted the right of religious free exercise only upon application to a governmental agency. Nothing requires individuals or organizations to participate in the religious exemption application process the DEA has created. And many, like Singularism, have chosen not to engage with it, as Congress itself has determined that the DEA's process is significantly flawed.[12] Even so, although

---

[12] *DEA Should Improve Its Religious Exemptions Petition Process for Psilocybin (Mushrooms) and Other Controlled Substances*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (May 2024), available at https://www.gao.gov/assets/880/871083.pdf (noting, among other flaws, that over "an 8-year period—from fiscal year 2016 through January 2024—DEA

Provo City and Utah County do not appear to have a formalized process akin to the DEA's, Singularism practically initiated such a process with Defendants when it sent them letters describing its religious practices and inviting them to dialogue in Fall 2023.

Singularism was under no obligation to seek declaratory judgment, DEA approval, or approval from Defendants before opening its doors to practice the free exercise of religion. As Singularism has argued, the Court's evaluation of its practices indicate it is operating well within the scope of the unalienable and fundamental right which it possesses.

## **CONCLUSION**

For the reasons specified above, as well the reasoning and evidence presented to the Court in Singularism's prior briefing and at the TRO hearing, the Court should grant Plaintiffs' motion for a preliminary injunction.

DATED January 22, 2025.

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
Jacqueline M. Rosen
*Attorneys for Plaintiffs*

---

reported that 24 petitioners requested a religious exemption for various controlled substances. As of January 2024, DEA reported that none of these petitions had been granted an exemption . . .").