MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com
*Attorneys for Defendants Utah County
and Jeffrey Gray*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;<br><br>    Plaintiffs,<br><br>    vs.<br><br>UTAH COUNTY; PROVO CITY; JEFFREY GRAY;<br><br>    Defendants. | **SUPPLEMENTAL MEMORANDUM OF AUTHORITIES PURSUANT TO COURT ORDER**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and Provo City (the "Provo"), jointly submit this Supplemental Memorandum of Authorities Pursuant to Court Order.  [*See* Order Requesting Supplemental Briefing (Dkt. 77)].

## <u>ARGUMENT</u>

**ISSUE 1:** **What is the best argument that the law at issue here is neutral and generally applicable?[1]**

"General applicability does not mean absolute universality. Exceptions do not negate that the CSAs are generally applicable." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008). A law is generally applicable if it does not, "in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 543 (1993); *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 818 F.3d 1122, 1164 (11th Cir. 2016) (same); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law is generally applicable if it does not make distinctions based on religion.").

One guiding case on this principle is *Church of Lukumi,* 508 U.S. 520. There, the plaintiff challenged a law that prohibited animal sacrifices as a violation of the Free Exercise Clause. *Id.* The Supreme Court held that the "general applicability" standard meant "that government, in the pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Id.* at 545. Ultimately, the Supreme Court found that the laws at issue were not generally applicable because "each of [the] ordinances pursues the city's governmental interests *only* against conduct motivated by religious belief." *Id.; accord State v. Green*, 2004 UT 76, ¶ 21, 99 P.3d 820 (addressing *Church of Lukumi* and recognizing "ordinances were written in such a way as to target only those animal killings that occurred attendant to Santeria religious worship"). Said differently, the case concerned a clear "religious gerrymander." *See Church of Lukumi*, 508 U.S at 535.

---

[1] The Court's Order asked: "What is the best argument that the law at issue here is legally indistinguishable from that at issue in *Smith*?" Defendants have slightly altered the issue to address the standards set by *Smith.*

The Utah CSA does not impermissibly target Plaintiffs. *See id.* at 534 (recognizing city code was "improper targeting of the Santeria religion"). Nor do the exemptions and exceptions in the Utah CSA mean it is not a law of general applicability. Indeed, no court has ever declared that CSAs are anything but neutral laws of general applicability, and dozens have rejected the type of arguments Plaintiffs make.

"The Uniform Controlled Substance Act, first promulgated in 1970, has been the basic law pertaining to control of narcotic drugs in forty-six (46) states." *See* Richard L. Braun, *Uniform Controlled Substances Act of 1990*, 13 Campbell L. Rev. 365, 365 (1991). Before that, there were other uniform drug laws. *See* Uniform CSA (1970), Prefatory Note. These CSAs have always had various exceptions. *See, e.g.*, Uniform CSA § 508(e) (1970) (allowing for "research"); *id.* § 308 ("prescriptions"); Uniform CSA § 301 (agency "may adopt rules . . . relating to registration and control of . . . controlled substances"); *Id.* § 308 ("prescriptions"); *Id.* § 607 ("education and research"). Utah has adopted the uniform code. *See* Utah Code § 58-37-18 (calling for uniform construction). And Utah law has long distinguished between authorized and unauthorized uses of controlled substances. *See, e.g.*, 1898 Revised Statutes of Utah § 1711.

Courts repeatedly have upheld CSA as uniform laws of general applicability despite the presence of potential exceptions. *See Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 874 (1990) ("Oregon law prohibits the knowing or intentional possession of a controlled substance unless the substance has been prescribed by a medical practitioner.").

In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006), the Supreme Court recognized that the federal CSA was a "generally applicable law." *See id.* at 436 ("[T]here may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA.").

2

Initially, in *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D.N.M. 2002), the plaintiff argued that the federal controlled substances act was not generally applicable because the statute "provide[d] a wide variety of exceptions, exemptions and licenses permitting the use of controlled substances in non-religious settings." *Id.* at 1242. Notably, the CSA at issue included exemptions for religious peyote use.[2]  The district court rejected the constitutional challenge.  It noted that the "exceptions specified in the CSA do not implicate the purposes of the law" because the exceptions did not undermine the public health concerns associated with recreational and unregulated use, distribution, and manufacturing of controlled substances. *Id.* at 1246.

Courts throughout the country agree.  In *United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996), the Tenth Circuit held that the Federal CSA was "a valid neutral law of general applicability." *Id.* at 1481.  This was true even though the Federal CSA exempted religious peyote use.[3]  *Compare* 42 U.S.C. § 1996; 21 C.F.R. § 1307.31; *with* Utah Code § 58-37-8(12)(a). The Federal CSA further allowed for administrative rulemaking and oversight.  *Compare* 21 U.S.C. § 822(d) (allowing Attorney General to waive "consistent with the public health and safety"); *with* Utah Code 58-37-6(2)(d) (allowing division to waive "consistent with public health and safety").  *See also* 21 U.S.C. §§ 821, 871(b) (allowing "rules and regulations"); Uniform

---

[2] *See generally* 42 U.S.C. § 1996a(b)(1) ("[T]he use . . . of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State.").

[3] The exception to the Federal CSA was first enacted in March 1966 with apparent congressional approval. *See* 31 Fed.Reg. 4679 (1966); *see also United States v. Warner*, 595 F.Supp. 595, 598 (D.N.D.1984) (Congress intended to exempt religious use of peyote only by NAC members); *Native American Church of New York v. United* States, 468 F.Supp. 1247, 1249, 1251 (S.D.N.Y.1979) (Congress meant to exempt all bona fide religious peyote use); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 (5th Cir. 1991) (same).

CSA § 301 1990 ("The [appropriate person or agency] may adopt rules . . . ." (brackets in original)); *Id.* at § 302(d) ("The [appropriate person or agency] by rule may waive . . . consistent with the public health and safety.").

In *Olsen v. Mukasey*, 541 F.3d 827 (8th Cir. 2008), the Eighth Circuit held that Iowa's CSA was a law of general applicability despite exceptions for "alcohol[,] tobacco, certain research and medical uses of marijuana, and the sacramental use of peyote." *Id.* at 832. Notably, both Utah and Iowa have adopted the Uniform CSA. Citing *Myers,* the Eight Circuit repeated: "[e]xceptions to not negate that the CSAs are generally applicable." *Id.; see also United States v. Christie*, 825 F.3d 1048, 1052 n.3 (9th Cir. 2016) (recognizing challenge to Federal CSA is "doomed" because the law is "a valid and neutral law of general applicability."); *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, No. CIV. 09-00336 SOM, 2012 WL 6738532, at *9 (D. Haw. Dec. 31, 2012) ("[T]he Controlled Substances Act is a valid and neutral law of general applicability."); *Loop v. United States*, No. 05-575 (JRT/FLN), 2006 WL 1851140, at *2 (D. Minn. June 30, 2006) ("The Controlled Substances Act…is a religiously neutral law of general applicability.").

Here, the Utah CSA is not distinguishable from other states' CSAs or the Federal CSA. And neither the exceptions for peyote use or psilocybin use (or any other exceptions) render Utah's CSA no longer a law of general applicability.

Utah's religious exceptions for peyote use are substantially the same as the exceptions under the Federal CSA that have existed since 1966. Indeed, Utah's peyote exception is mandated by federal law. *See* 42 U.S.C. § 1996a(b)(1) ("[T]he use . . . of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State."). Thus every

CSA in the nation has a peyote exception, either expressly or by way of federal preemption. And yet, no court has declared CSA unconstitutional or denied that they are laws of general applicability.

The recent enactment of Utah Code § 58-37-3.5, which allows limited use of "Drugs for behavioral health treatment" does not undermine the purposes of the CSA. To begin with, CSAs have long allowed for medical research, education, and drug development. *See, e.g.*, Uniform CSA § 607 (1990) ("Education and Research"). Utah's new statute is consistent with these established government purposes. Section 58-37-3.5 is limited to forms of "psilocybin" and "methylenedioxymethamphetamine" that have been approved by the "Food and Drug Administration" for "Phase 3 testing" in accordance with "21 C.F.R. Part 312." *See* Utah Code 58-37-3.5(a)(1). Part 312 does not allow for the uncontrolled, unregulated use, distribution, or possession of otherwise controlled substances. Instead, Part 312 consists of approximately sixty different, detailed subsections spanning more than 50 pages. *See* 21 C.F.R. § 312.1 to §312.320. The purpose of Part 312 is to detail "procedures and requirements governing the use of investigational new drugs," *see* 21 C.F.R. § 312.1(a), while still protecting "the rights, safety, and well-being of human subjects," *id.* § 312.3. The addition to the Utah Code is consistent with this research and safety driven process. Not only does the Utah Code incorporate "21 C.F.R. Part 312," but it further limits use to large medical facilities accustomed to investigational medical treatments and associated research. *See* Utah Code § 58-37-3.5(1)(a)-(b). Utah further requires that the resulting research be reported "to the Health and Human Services Interim Committee" so that the Legislature may "evaluate the medicinal value of any drugs." *Id.* at § -3.5(4).

In short, Utah's recent exception allowing for psilocibin use in limited, controlled, monitored, and regulated channels so that the Utah Legislature can "evaluate the medicinal value"

does undermine the public health concerns associated with recreational, unregulated use of psychedelic substances. Utah's CSA, like the general CSA, remains a neutral law of general applicability. "[A]llowing certain uses of drugs in controlled scientific, research, and medical environments does not run counter the to government's interest in promoting health." *O Centro*, 282 F. Supp. 2d at 1246.

**ISSUE 2:     If the court determines that Plaintiffs' federal constitutional claims survive the motion to dismiss, does § 1983 authorize the court to enjoin the state prosecution against Mr. Jensen on the facts of this case? If so, would it be a proper exercise of the court's authority to enjoin the prosecution?**

Absent an exception, the Anti-Injunction Act "is an absolute prohibition against any injunction of any state-court proceedings." *Vendo Co. v. Lektro-Ven Corp.*, 433 U.S. 623, 630 (1977); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court . . . ."); *Lone Star Promotions, LLC v. Abbey Lane Quilts, LLC*, 2018 WL 5808802, at *3 (D. Utah Nov. 6, 2018) ("The Supreme Court has . . . made clear that the statute imposes an absolute ban of the issuance of a federal injunction against a state court proceeding"). The Anti-Injunction Act avoids "the inevitable friction between state and federal courts that ensures from the injunction of state judicial proceedings by a federal court." *Vendo Co.*, 433 U.S. at 630; *Lone Star*, 2018 WL 580880, at *3 ("[T]he Anti-Injunction Act is a necessary concomitant of a dual system of federal and state courts and a pillar of federalism reflecting the independence of the states and their courts").

Enjoining the pending criminal prosecution would be improper because: (A) Plaintiffs did not seek injunctive relief under § 1983, (B) an injunction of the criminal proceeding is not the only means of preserving Plaintiffs' alleged rights, (C) the issues has not been certified to the Utah Attorney General.

A. <u>An injunction based on § 1983 must arise from exceptional circumstances that do not exist here, and Plaintiffs waived their right to seek an injunction under § 1983.</u>

The United States Supreme Court has recognized that § 1983 claims can serve as an exception to the Anti-Injunction Act when there are "exceptional circumstances." *See, e.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972). However, that federal statute cannot form the basis for an injunction based on the Utah RFRA or the Utah Constitution. *See, e.g. Kilman v. Co. Dept. Corrections*, 772 Fed. Appx. 774, 746 n.2 (10th Cir. 2019) ("§ 1983 does not encompass violations of state law"); *Love v. McKune*, 33 Fed. Appx. 369, 371 (10th Cir. 2002) (same); *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1098 (9th Cir. 2004) (rejecting § 1983 as means to "enjoin defendants from violating state law and the California Constitution"). *See generally Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law."). Even when the allegations concern a violation of federal rights, "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971).

Plaintiffs bear the heavy burden of demonstrating both the applicability of an exception to the Anti-Injunction Act and the basis for an injunction that alters the status quo. *See, e.g.*, 19 Fed. Proc., L. Ed. § 47:127 ("A party claiming that one of the exceptions to the Anti-Injunction Act applies has the burden . . . ."); *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (confirming moving party has burden); *Stewart v. Dameron*, 448 F.2d 396, 397 (5th Cir. 1971) (reversing §1983 injunctive relief because court "placed the burden on the State to prove the good faith of its prosecution"); *Peters v. United Sates*, 2024 WL 2274079 at *6 (D. Colo. May 20, 2024) (recognizing "this burden as 'almost insurmountable' and 'an all but impossible task'"). Plaintiffs did not even attempt to meet that burden through 42 U.S.C. § 1983.

On December 2, 2024, the Court ordered Plaintiffs to "address the federal standard for granting injunctive relief." [*See* Dkt. 5]. The Plaintiffs' resulting motion asked the Court to enjoin Defendants "from prosecuting Plaintiffs" [Dkt. 9-18], but Plaintiffs did not rely on § 1983 as a basis for their request. [*See generally* Dkt. 9 (Motion) (no reference to § 1983); Dkt. 19 (Reply) (no reference to § 1983)]. This was true even though Defendants' Opposition raised the Anti-Injunction Act. [*See* Dkt. 13 at 12 (quoting 28 U.S.C. § 2283)]. Plaintiffs subsequent "Motion for Anti-Suit Injunction" likewise did not assert § 1983 as a basis for action. [*See* Dkt. 39]. Instead, Plaintiffs only argued that 28 U.S.C. §1446(d), the removal statute, authorized the requested injunction. [*See id.* at 4-6]. Plaintiffs' reply was the same. [*See* Dkt. 58 (no reference to § 1983)]. Plaintiffs then filed their ***fifth*** memorandum in support of their requested injunction on January 22, 2025 – the day before oral argument. [*See* Dkt. 71]. Plaintiffs' fifth filing on this issue yet again did not argue that an injunction should issue based on § 1983. [*See id.* (no reference to § 1983)]. Plaintiffs have not sought an injunction pursuant to § 1983.

"Issues not raised" by a party "are deemed abandoned or waived." *Tran v. Trustees of State Colleges in Co.*, 355 F.3d 1263, 1266 (10th Cir. 2004); *accord Uckerman v. O'Malley*, 2024 WL 4028229 at *2 (D. Utah Sept. 3, 2024) ("Plaintiff waived his arguments . . . made for the first time in his reply brief."); *Klein v. Plaskolite, LLC*, 2024 WL 4253010 at *20 (D. Utah Sept. 20, 2024) ("Arguments that are underdeveloped and inadequately briefed are deemed waived."); *Utah Physicians for a Healthy Environment, Inc. v. Harley-Davidson of Salt Lake City, LLC*, 2024 WL 3276844 at *11 n.137 (D. Utah July 1, 2024) ("Defendants have waived this issue by failing to adequately brief it."); *Tracy J. v. Kijakazi*, 2022 WL 2080137 at *5 (D. Utah May 20, 2022) ("Plaintiff waived this issue . . . ."). "[A] litigant who fails to press a point by supporting it with pertinent authority . . . forfeits the point." *Tran*, 355 F.3d at 1266.

8

Plaintiffs made no request for an injunction pursuant to § 1983, let alone satisfy the extraordinarily high burden required for that relief. Regardless of whether § 1983 *could have* supported Plaintiffs' position, the Plaintiffs did not make that argument. The Court should not make it for them. Nor should it render the extensive briefing and all-day hearings pointless by moving the target to an issue Plaintiffs repeatedly eschewed.

B. <u>Regardless, Section 1983 does not support an injunction in this case.</u>

"Even though an action brought under § 1983" can be an exception the Anti-Injunction Act, "the underlying notions of federalism which Congress has recognized in dealing with the relationship between federal and state courts still have weight." *Rizzo v. Goode*, 423 U.S 362, 378 (1976). Such an injunction must "be used sparingly, and only in a clear and plain case." *Id.* The Court must "abide by standards that go well beyond those of private equity jurisprudence." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). Although the Supreme Court concluded that § 1983 may serve as an exception to the Anti-Injunction Act under "exceptional circumstances," the Supreme Court also declared that its decision did "not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 243. Indeed, the Supreme Court "emphatically" acknowledged "the fundamental policy against federal interference with state criminal prosecutions." *Id.* at 230.

Injunctions under § 1983 are, therefore, limited to the "exceptional circumstances" where it is "essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." *Id.* at 230, 242. No such loss exists in this case. Plaintiffs have not even established an irreparable injury. "If there is no injury other than that incidental to every criminal proceeding brought lawfully and in good faith, there is no irreparable injury." *Winn v. Cook*, 945 F.3d 1253,

1259 (10th Cir. 2019); *accord Gordon v. Utah*, 2009 WL 2984039 at *3 (D. Utah Sept. 16, 2009) ("[T]he fact that Plaintiff must appear on criminal charges in state court is insufficient to establish such an injury."). "[O]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction . . . is federal injunctive relief against pending sate prosecutions appropriate." *Mitchum*, 407 U.S. at 230-31.

Here, the criminal prosecution does not represent a loss of Plaintiffs' constitutional rights. *See, e.g.*, *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (affirming a district court's refusal to enjoin criminal proceeding, recognizing that "a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights"). To the contrary, the criminal process is the embodiment of Plaintiffs' constitutional rights. *See* Utah Const. Art. I, §§ 10, 12; U.S. Const. Am. V, VI. Plaintiffs will have the opportunity to challenge their charges and call and confront witnesses, including through the presentation of evidence concerning their purported religious practices.

Nor can Plaintiffs establish that an injunction of the criminal prosecution is the "***only***" means of safeguarding their federal rights. *See, e.g.*, *Moore*, 442 U.S. at 430 (reversing injunction of criminal proceedings pending a determination of the constitutionality of a statute, noting that "the only pertinent inquiry" when considering whether to enjoin state criminal proceedings is "whether the state proceedings afford an adequate opportunity to raise the constitutional claims"). The United States Supreme Court has limited federal intervention under § 1983 to "exceptional circumstances" where it is the only means to "prevent great, immediate, and irreparable loss of a person's constitutional rights." *Mitchum*, 407 U.S. at 42.

"Any doubt as to the application of the Act's three exceptions must be resolved in favor of permitting the state court to proceed." *See Lone Star*, 2018 WL 5808802, at *2. Because

Plaintiffs have not proven that the criminal prosecution will result in a permanent loss of their constitutional rights, a federal injunction of the state court prosecution is not warranted.

C. It would be an improper to rely on § 1983 and enjoin the pending criminal case without first certifying the alleged constitutional issue to the Utah Attorney General.

The State of Utah is prosecuting Plaintiffs. And, Plaintiffs are challenging the validity of the Utah Code – specifically the Utah CSA. [*See also* Order Re: Supplemental Briefing (Dkt. 77) at Question 1]. However, the State of Utah is not before the Court. Nor did Plaintiffs notify the Utah Attorney General. Their failure violates the Utah Code. *See* Utah Code § 78B-6-403 ("If a statute . . . is alleged to be invalid, ***the attorney general shall*** be served with a copy of the proceeding and be entitled to be heard."). Plaintiffs also violated the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 5.1. "A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly: (1) file a notice of the constitutional question . . . and (2) serve the notice and paper . . . on the state attorney general if a state statute is questioned . . . ." *Id.* R. 5.1(a); *see also id.* at Notes (2006) (broadening notice provisions "to better assure . . . that the attorney general is able to determine whether to seek intervention"); DUCiv. R. 5.1-1(b).

Additionally, this Court "must, under 28 U.S.C. § 2403, certify to the appropriate attorney general that a statute has been questioned." Fed. R. Civ. P. 5.1(b). "In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn into question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene . . . ." 28 U.S.C. § 2403(b) (emphasis added); *see generally Oklahoma v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (remanding because of failure to comply with §2403(a)). "In cases in which neither the parties nor the district court notifies the appropriate

official of the constitutional challenge, any orders of the court must be stayed or vacated . . . ." 4B Fed. Prac. & Proc. Civ. § 1154 (4th ed.).  That said, "where the constitutionality of the statute has been upheld," failure to certify is harmless because "there is 'no practical purpose to be served.'" *Merrill v. Town of Addison*, 763 F.2d 80, 83 (2d Cir. 1985).

Plaintiffs ***did not*** assert § 1983 and the alleged unconstitutionality of Utah's CSA as a basis for their requested injunction.  Instead, they largely focused on the Utah RFRA.  Perhaps that explains why the Utah Attorney General was not notified that the Utah CSA has been challenged as unconstitutional.  Regardless, the Court should not now utilize § 1983 as a basis for enjoining the continued enforcement of the Utah CSA because the mechanisms and protections set forth in Rule 5.1(b) and 28 U.S.C. § 2403(b) have not been followed.

**ISSUE 3:**       **If the court determines that Plaintiffs' federal constitutional claims do not survive the motion to dismiss and remands the remaining claims to the state court, will the temporary restraining order stay in place or be dissolved? Is this an issue to be decided by this court or by the state court on remand?**

The Tenth Circuit has consistently held that once a federal court remands a case to state court, it no longer has jurisdiction over any part of the case, including a temporary restraining order. "It is long-settled that a remand order renders the district court 'without jurisdiction' over remanded claims, such that any continued litigation over those claims becomes a 'futile thing.'" *C&M Props., L.L.C. v. Burbidge*, 563 F.3d 1156, 1162 (10th Cir. 2009) (quoting *In re Bear River Drainage Dist.*, 267 F.2d 849, 851 (10th Cir. 1959) (citing *Hammond Hotel & Improv. Co. v. Finlayson*, 6 F.2d 446, 447 (7th Cir. 1925)).  Similarly stated, "a remand order 'takes precedence' and district court should not take action on pending motions before or after remand." *Id*. (quoting *Kromer v. McNabb*, 308 F.2d 863, 865 (10th Cir. 1962)).

In *Hammond Hotel & Improv. Co. v. Finlayson*, the Seventh Circuit dismissed an appeal seeking to reinstate a temporary restraining order after the federal district court had remanded the

case to the state court. 6 F.2d 446, 447 (7th Cir. 1925). "Neither the restraining order nor a temporary injunction would have served any purpose after the cause was remanded to the state court, since by the very act of remandment the further jurisdiction of the [federal] District Court over the action ceased." *Id*. In other words, "the remandment itself operated to vacate any injunctive order[.]" *Id*.

Here, upon remand to the state court, this Court's jurisdiction would be terminated, and any injunctive orders would similarly be vacated. This stands to reason because the primary hurdle a petitioner must overcome in a motion for a preliminary injunction is to establish that the petitioner "has a substantial likelihood of success on the merits of its claims." If all of the petitioner's federal claims have been dismissed, and the federal court declines to exercise supplemental jurisdiction over the remaining state claims, Plaintiff's motion for temporary restraining order and preliminary relief fails because Plaintiff can no longer succeed on the merits before this Court.

Finally, as a practical matter, Defendants have returned to Plaintiffs all items requested by Plaintiffs and ordered by this Court except for the psilocybin mushrooms. The Court's TRO is effectively moot.

**ISSUE 4:    What quantity of psilocybin was seized at Singularism's spiritual center on November 11?**

Pursuant to the Search Warrant, Provo City police "located psilocybin mushrooms [at Singularism] in various forms, including dried whole mushrooms, ground or powder mushroom material, and capsules containing mushroom material." [*See* Declaration of Jackson Julian at ¶ 13, attached here as Exhibit A.] Officers found the psilocybin mushrooms in various containers, including "glass bowl for whole mushrooms, glass bowl for mushroom powder, various paper cups with handwritten lettering with mushrooms, capsules, and several sealed bags containing

mushrooms." [Julian Dec. at ¶ 14.] After seizing the mushrooms, officers placed the mushrooms, powder and capsules of mushroom material, and the sealed mushroom packages into evidence bags. [*Id*. at ¶ 15.] The weight of all the mushrooms and mushroom-like material, including the evidence bags, was 459.8 grams. [*Id*. at ¶ 18; *see also* Return to Search Warrant, attached as Exhibit 5 to Jullian Dec.]



Photographs of the seized psilocybin mushrooms, powders, and pills show the variety of mushrooms and various containers used to store mushrooms and mushroom-like materials. [*See* Julian Dec.at ¶¶ 13-14; the photos are attached as Exhibit 4 to Detective Julian's declaration.] According to Detective Julian, "this is the greatest quantity of psilocybin mushrooms that [he] has seized." [*Id*. at ¶ 16.] Due to the nature and condition of the psilocybin mushrooms and mushroom-material, there were concerns by law enforcement about "potential exposure to psilocybin, especially from the mushroom-like material in the powder form and any spores from the whole mushrooms." [*Id*. at ¶ 17.] Based on those concerns and efforts to minimize exposure and potential contamination from the psilocybin mushrooms and powders, Detective Julian has limited removal of mushrooms from the sealed packages. [*Id*. at ¶ 17, 19-20.]

Following Provo City police department's seizure of the psilocybin mushrooms, a portion of single mushroom weighing .9 grams was field tested by Detective Jackson Julian. [*See* Julian Dec. at ¶ 20.] Det. Julian returned the unused portion of the tested mushroom – .7 grams – to the police department's evidence locker. [*Id*.; *see also* Provo Police Evidence Custody History Report at pg. 2, attached as Exhibit 7 to Dec. of Julian.]

In addition, Provo Police sent two samples of the seized mushroom-like material to the Utah Bureau of Forensic Services – the State Lab – to test and analyze the samples for controlled substances. Both samples tested positive for psilocyn. The first sample of mushroom-like material weighed less than 100 milligrams and tested positive for psilocyn. [*See* Dec. of Julian at ¶ 19.] The entire first sample was used in the test, but a glass vial containing the extract from the sample was returned to Provo police. [*Id*. (citing Forensic Analysis Report at pg. 2, attached as Exhibit 6 to Dec. of Julian).] The second sample of mushroom-like material weighed 204 milligrams +/- 6 milligrams and also tested positive for psilocyn. [*Id*.]

15

Based on a conversion of 1% psilocybin per 1 gram of dried Psilocybe cubenisis mushroom, the standard dose of psilocybin is 25 milligrams or 2.5 grams of dried Psilocybe cubensis mushroom: "Current clinical trial protocols . . . us[e] a fixed psilocybin dose, most commonly 25 mg[.]" [MacCallum et al., "Therapeutic use of psilocybin: Practical considerations for dosing and administration," *Frontiers in Psychiatry* (Dec. 2022) at pgs. 4-5, Table 2 (last visited on January 30, 2025), a copy is attached as Exhibit B.]

This analysis is consistent with studies or clinical trials involving psilocybin that are being regulated through the Food and Drug Administration, which Utah's Drugs For Behavioral Health Treatment Act (commonly referred to as the "Psilocybin Act") cited when defining "psilocybin" as a drug "that is in federal Food and Drug Administration Phase 3 testing for an investigational drug described in 21 C.F.R. Part 312." Utah Code § 58-37-3.5 (1)(a). For example, in a currently pending study, "Psilocybin-Assisted Therapy in Treatment-Resistant Depression," the study plan notes that "[p]articipants will be administered one dose of a 25mg capsule of psilocybin." [*See* McClure M.D., Robert K et al., "Psilocybin-Assisted Therapy in Treatment-Resistant Depression," Sponsor: Univ. of North Carolina, Clinical Trials ID: NCT06303739. https://clinicaltrials.gov/study/NCT06303739?intr=psilocybin&locStr=United%20States&country=United%20States&aggFilters=phase:3&rank=1&tab=table National Library of Medicine (last visited on February 3, 2025), attached as Exhibit C.]

Testimony from Singularism's representative, Brandi Lee, indicated that the dose of psilocybin used for Voyagers varied. [*See* TRO Transcript at 99:8-20, excerpts attached as Exhibit D.] Lee further confirmed the evidence that Singularism had provided doses to some Voyagers between 2 grams and others 3.5 grams. [*Id*. at 99:12-14; 102:16-21.] Plaintiffs had well over 100 times that amount. [*See* Julian Dec. at ¶ 18; Return to Search Warrant (Ex. 5 to Julian Dec.)]. It

remains the "greatest quantity of psilocybin mushrooms" Detective Julian has ever seized.  [Julian

Dec. at ¶ 16].[4].

        Dated this 5th day of February 2025

                JAMES DODGE RUSSELL & STEPHENS, P.C.

                */s/ Mitchell A. Stephens (signed with permission)*
                Mitchell A. Stephens
                Justin L. James
                Dillon P. Olson

                *Counsel for Utah County and Jeffrey Gray*

                PROVO CITY LEGAL

                */s/ Richard A. Roberts*
                Gary D. Millward
                Richard A. Roberts

                *Counsel for Provo City*

---

[4] Defendants referenced various documents during oral argument on January 23, 2025.  Those additional exhibits also are filed with this memorandum as Exhibit E-I.