Tanner J. Bean (A17128)
tbean@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>　　　　　Defendants. | **PLAINTIFFS' SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to the Court's Order Requesting Supplemental Briefing and Order Regarding Supplemental Exhibits, *see* ECF 77, Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs" or "Singularism")

1

hereby file this Second Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

**QUESTION 1:** The parties agree that the rule from *Employment Division v. Smith*, 494 U.S. 872 (1990)—that neutral laws of general applicability do not trigger strict scrutiny under the Free Exercise Clause, no matter the burden they impose on sincere religious exercise—controls this case. Later cases, notably *Fulton v. City Philadelphia*, 593 U.S. 522 (2021), elaborate on what it means for a law to be generally applicable. *Fulton* explains, "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 533 (cleaned up). It continues, "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

The Utah Controlled Substances Act contains various exemptions. For example, it provides that "[c]ivil or criminal liability may not be imposed . . . on any Indian . . . who uses, possesses, or transports peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion." UTAH CODE § 58-37-8(12)(a). It also provides that "[a] healthcare system may develop a behavioral health treatment program that includes a treatment based on [psilocybin]." *Id.* § 58-37-3.5(2). And it allows the State to "enact rules waiving the license requirement . . . if waiving the license requirement is consistent with public health and safety." *Id.* § 58-37-6(2)(d).

As noted during the hearing, the law at issue in *Smith* also contained exemptions, yet the Court found that law to be neutral and generally applicable. **What is the best argument that the law at issue here is legally indistinguishable from that at issue in *Smith* (for Defendants)? What is the best argument that the law at issue here is legally distinguishable (for Plaintiffs)?**

**RESPONSE**: The law at issue here, the Utah Controlled Substances Act ("Utah CSA"), is strikingly different than the law at issue in *Employment Division v. Smith*, 494 U.S. 872 (1990), the 1987 version of the Oregon Controlled Substances Act ("Oregon CSA"). Whether the Oregon CSA is reviewed at the 10,000-foot level, as the U.S. Supreme Court did, or at the granular level examining its text, it is far more uniform than the Utah CSA. The various exemptions contained in the Utah CSA, including the exemption regarding secular psilocybin usage, indicate the Utah CSA is not generally applicable. Thus, strict scrutiny review is required.

I.    *Smith*'s Review of the Oregon CSA Was Cursory.

For a decision which upended the U.S. Supreme Court's interpretation of the First Amendment's Free Exercise clause upon the basis that the law at issue was neutral and generally applicable, *Smith* contains very little discussion about the law at issue. The law that was first presented to the Court was Oregon's unemployment benefits act, specifically its provision disqualifying unemployed individuals from benefits if they had been terminated for "misconduct." *See Smith*, 494 U.S. 872, at 874-76; Or. Rev. Stat. § 657.176 (1986). But when the case returned to the Court for a second time, the Court evaluated the religious free exercise argument against the Oregon CSA. *Id.* at 876.

However, the Court did not spend time analyzing the Oregon CSA's language, stating only that "Oregon law prohibits the knowing or intentional possession of a 'controlled substance' unless the substance has been prescribed by a medical practitioner. Ore. Rev. Stat. § 475.992(4) (1987)." *Id.* at 874. The Court appears to have undertaken no further analysis because that was the determination of the Oregon Supreme Court: "the Oregon Supreme Court held that respondents' religiously inspired use of peyote fell within the prohibition of the Oregon statute, which 'makes no exception for the sacramental use' of the drug." *Id.* at 876 (quoting *Smith v. Emp. Div.*, 307 Or. 68, 72, 763 P.2d 146, 147 (1988)); *see also id.* at 891-92 (O'Connor, J., concurring) ("As the case comes to us today, however, the Oregon Supreme Court has plainly ruled that Oregon's prohibition against possession of controlled substances does not contain an exemption for the religious use of peyote.").

However, even the Oregon Supreme Court's decision did not walk through the text of the Oregon CSA, simply concluding "that the Oregon statute against possession of controlled

substances, which includes peyote, makes no exception for the sacramental use of peyote," explaining further in a footnote that

> ORS 475.992(4)(a) prohibits possession of controlled substances listed on a schedule adopted by the State Board of Pharmacy. Peyote is listed on the schedule. OAR 855-80-021(3)(s). Neither the statute nor the regulation make an exception for religious use of peyote, nor do they by reference adopt the [religious peyote] exemption found in federal law, *see* 21 CFR § 1307.31 (1987).

*Smith*, 307 Or. at 72, 72 n.2. The Oregon Supreme Court noted, however, that "other states link their exemptions to those under federal law," including Utah through Utah Code § 58-37-3(3) (1986). *Smith*, 307 Or. at 72 n.2. That issue was later at play in *State v. Mooney*, 2004 UT 49, 98 P.3d 420 which, in turn, influenced the Utah Legislature's adoption of an express religious peyote exemption in the Utah Controlled Substances Act ("Utah CSA"), *see* Utah Code §§ 58-37-2(1)(w), 58-37-8(12).

All considered, in *Smith*, the U.S. Supreme Court appears to have taken the Oregon Supreme Court's statement at face value: on the issue presented—peyote consumption—the Oregon CSA "makes no exception." Thus, it is unsurprising that *Smith* contains little analysis regarding why the Oregon CSA was or was not generally applicable. The Court's baseline assumption was that the issue had been settled by the Oregon Supreme Court. The U.S. Supreme Court's focus in *Smith* was, rather, what to do when presented with a neutral and generally applicable law that burdens religious free exercise.

## II.    Since *Smith*, the U.S. Supreme Court Has Developed "General Applicability" With More Clarity.

Since *Smith*, the U.S. Supreme Court has been presented with several cases in which the question of general applicability had not already been answered. In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 542-46 (1993), the Court found a municipality's ordinances

4

that had the effect of prohibiting Santeria animal sacrifices to lack general applicability. In doing so, it explained that all "laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protects religious observers against unequal treatment and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 542-43 (cleaned up and quotation omitted). The Court continued, stating that the "principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543.

Beyond, this, however, the Court declined to "define with precision the standard used to evaluate whether a prohibition is of general application," as the ordinances before it fell "well below the minimum standard necessary to protect First Amendment rights." *Id.* The Court then went on to evaluate the underinclusive nature of the ordinances given the municipality's stated interests of "protecting public health and preventing cruelty to animals." *Id.* In that endeavor, the Court held the ordinances failed "to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does." *Id.* The municipality's arguments failed to "explain why religion alone must bear the burden of the ordinances, when many of these secular killings fall within the city's interest in preventing the cruel treatment of animals." *Id.* at 544. Concluding, the Court held that each of the ordinances "pursues the city's governmental interests only against conduct motivated by religious belief. The ordinances have every appearance of a prohibition that society is prepared to impose upon Santeria worshippers but not upon itself. This

precise evil is what the requirement of general applicability is designed to prevent." *Id.* at 545-46 (cleaned up and quotations omitted).

The Court defined a more precise test for general applicability in *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021).[1] There, it stated two ways in which a law could fail general applicability. **First**, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up) (quoting *Smith*, 494 U.S. at 884). The Court pointed to *Sherbert v. Verner*, 374 U.S. 398 (1963), to illustrate this principle. In *Sherbert*, at issue was a Seventh-day Adventist whose religious beliefs prohibited work on Saturdays and an unemployment benefits statute which allowed for individualized exemptions through discretionary interpretation of its standard that a claimant had "failed without good cause . . . to accept available suitable work." *Id.* at 533. The Court explained the government's denial of unemployment benefits through application of this individualized exemption "infringed [the individual's] free exercise rights and could be justified only by a compelling interest." *Id.* at 534.

As for the matter before it in *Fulton*, the Court found that a provision which granted a municipality's commissioner the ability to provide "an exception . . . in his/her sole discretion" to a non-discrimination requirement, even where the commissioner had "no intention of granting an exception," indicated "a system of individual exemptions," such that the municipality could "not

---

[1]     It bears noting that three sitting justices of the U.S. Supreme Court think *Smith* was wrongly decided and should have been overturned in *Fulton*. *See Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 545-627 (2021) (Alito, Thomas, and Gorsuch, J., concurring). Two more sitting justices may consider it in a case where they believe the question is more squarely presented. *Id.* at 543-44 (Barrett, Kavanaugh, and Breyer, J., concurring). Although not necessary for the Court to reach a decision in this case given the Utah CSA's lack of general applicability, Singularism also asserts that *Smith* was wrongly decided and should be overturned.

refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* at 535 (cleaned up). The "inclusion of a formal system of entirely discretionary exemptions . . . render[ed] the contractual non-discrimination requirement [at issue] not generally applicable." *Id.* at 536. That was so because a "formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for complying with the policy are worthy of solicitude." *Id.* at 537 (cleaned up and quotation omitted).

      **Second**, the Court in *Fulton* explained that a "law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534 (citing *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 542-46). To illustrate this principle, the Court pointed to *Church of Lukumi Babalu Aye, Inc.*, as described above, and the Court's underinclusivity analysis in that case. *Id.*

      Following *Fulton*, the Court decided *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022). There, the Court confirmed that a "government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy*, 597 U.S. at 526 (quoting *Fulton*, 593 U.S. at 533-34). The Court found that, in that case, a school district's challenged policies failed the general applicability test. *Id.* The school district asserted that a football coach had "failed to supervise student-athletes after games" when he knelt in prayer following football games. *Id.* The Court found that this was not a generally applicable requirement, given that the school district "permitted other members of the coaching staff to forgo supervising students briefly after the game to do things like visit with friends or take

personal phone calls." *Id.* at 527. The Court called the school district's alleged policy a "bespoke requirement specifically addressed to [the coach's] religious exercise." *Id.* at 526-27. "Thus, any sort of postgame supervisory requirement was not applied in an evenhanded, across-the-board way." *Id.* at 527.

A common fact pattern from all the cases discussed above is that they arose from the actions of state, not federal, government actors. Where burdens on religious free exercise are imposed by federal actors, they are subject to the federal Religious Freedom Restoration Act. *See City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997). Many of the U.S. Supreme Court's religious free exercise decisions which postdate *Smith* are decided under RFRA, under which the Court is never faced with the question of whether the law at issue is generally applicable because RFRA mandates strict scrutiny review regardless of a law's general applicability (indicating Congress' rejection of the Court's free exercise analysis in *Smith*. *See* 42 U.S.C. § 2000bb-1(a); *Tanzin v. Tanvir*, 592 U.S. 43, 45-46 (2020)). However, the Court's analysis of the compelling interest prong of strict scrutiny in RFRA cases is highly similar to the Court's analysis of a law's lack of general applicability in First Amendment cases when a law "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). Thus, the U.S. Supreme Court's RFRA cases provide further illustration of when a law lacks general applicability.

For example, in *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006), the Court evaluated whether the federal government had a compelling interest in denying a religious exemption to a Christian Spiritist sect to receive communion through hoasca, a Schedule I substance prohibited by the federal Controlled Substances Act ("Federal CSA").

8

There, the government argued that the dangerous nature of hoasca, as a Schedule I substance, "by itself precludes any consideration of individualized exceptions such as that sought" by the Christian Spiritist sect. *Gonzales*, 546 U.S. at 430. The Court rejected this as a sufficient assertion of compelling government interest. In doing so, the Court identified a provision of the Federal CSA that "authorize[s] the Attorney General to 'waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.' 21 U.S.C. § 822(d)." *Id.* at 432. The Court found this provision to undermine the government's reliance on general statements found in the Federal CSA that Schedule I substances were so dangerous that no religious exemption could be provided. *Id.* at 432-33.

The Court also pointed to another part of the Federal CSA, highlighting that "an exception has been made to the Schedule I ban for religious use. For the past 35 years, there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church." *Id.* at 433. The Court continued:

> Everything the Government says about the DMT in *hoasca*—that, as a Schedule I substance, Congress has determined that it "has a high potential for abuse," "has no currently accepted medical use," and has "a lack of accepted safety for use . . . under medical supervision," 21 U.S.C. § 812(b)(1)—applies in equal measure to the mescaline in peyote, yet both the Executive and Congress itself have decreed an exception from the Controlled Substances Act for Native American religious use of peyote. If such use is permitted in the face of the congressional findings in § 812(b)(1) for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs.

*Id.* The Court found this "well-established peyote exemption" to "fatally undermine[] the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA" and that there was no evidence that

the peyote exception "has 'undercut' the Government's ability to enforce the ban on peyote use by

non-Indians." *Id.* at 434-35. Singularism asserts that, had *Gonzales* been brought before the Court

on First Amendment, instead of RFRA grounds, this analysis regarding the Federal CSA's

exemptions would have been relevant to the Court's general applicability analysis.

Similarly, in the Court's compelling interest analysis in *Burwell v. Hobby Lobby Stores,*

*Inc.*, 573 U.S. 682 (2014), the Court evaluated exemptions from the contraceptive mandate at issue

in that case. It pointed out that (1) the contraceptive mandate did not apply to employers with less

than 50 full-time employees (some "34 million workers"), *Hobby Lobby Stores, Inc.*, 573 U.S. at

697, 699-700, (2) the implementing agency was authorized "to establish exemptions from the

contraceptive mandate for 'religious employers'" which the agency defined to include "'churches,

their integrated auxiliaries, and conventions or associations of churches,' as well as 'the

exclusively religious activities of any religious order,'" *id.* at 698, (3) "certain religious nonprofit

organizations" were exempt, *id.*, and (4) there were exempted "a great many employers from most

of its coverage requirements" because they provided "grandfathered health plans" (for example,

"[o]ver one-third of the 149 million nonelderly people in America"), *id.* at 699-700. The Court

stated that "[a]ll told, the contraceptive mandate presently does not apply to tens of millions of

people." *Id.* at 700 (quotation omitted).

With this background, the Court evaluated the government's asserted interests "such as

promoting 'public health' and 'gender equality,'" and "ensuring that all women have access to all

FDA-approved contraceptives without cost sharing." *Id.* at 726-27. It continued:

> The objecting parties contend that HHS has not shown that the mandate serves a
> compelling government interest, and it is arguable that there are features of ACA
> that support that view. As we have noted, many employees—those covered by

> grandfathered plans and those who work for employers with fewer than 50 employees—may have no contraceptive coverage without cost sharing at all.
>
> HHS responds that many legal requirements have exceptions and the existence of exceptions does not in itself indicate that the principal interest served by a law is not compelling. Even a compelling interest may be outweighed in some circumstances by another even weightier consideration. In these cases, however, the interest served by one of the biggest exceptions, the exception for grandfathered plans, is simply the interest of employers in avoiding the inconvenience of amending an existing plan. Grandfathered plans are required "to comply with a subset of the Affordable Care Act's health reform provisions" that provide what HHS has described as "particularly significant protections." 75 Fed. Reg. 34540 (2010). But the contraceptive mandate is expressly excluded from this subset. *Ibid*.

*Id.* at 727. Although the Court decided to skip the rest of the compelling interest analysis in favor of resolving the case on the least restrictive means analysis, *id.* at 728, Singularism asserts that the Court's analysis would have been relevant in determining whether the contraceptive mandate was a generally applicable law had the case been brought under the First Amendment.

### III.    The Utah CSA Is Highly Distinguishable from the Oregon CSA.

Taking into consideration the above, a comparison of the Utah CSA and the Oregon CSA shows they are highly distinguishable. First, a high-level analysis like that engaged in by the Court in *Smith* shows they are distinguishable. The *Smith* decision appears to have concluded the Oregon CSA was generally applicable because the Oregon Supreme Court said it did not contain an exception for use of peyote, even without analyzing the text of the statute. Even at this high level of analysis, the Utah CSA is distinguishable. The Utah CSA *does* contain an exception for use of psilocybin, as Singularism has explained in its prior briefing. *See, e.g.,* ECF 9, at 22-23. Thus, had the Utah CSA been before the *Smith* court, it is likely the Court would have determined it was not generally applicable and that the case merited strict scrutiny review.

Second, more appropriate than this high-level, cursory analysis, is the two-part analysis that the U.S. Supreme Court has indicated (in *Church of Lukumi Babalu Aye, Inc.*, *Fulton*, and *Kennedy*) is required to determine whether a law is generally applicable. This analysis confirms that the Utah CSA is not generally applicable and is highly distinguishable from the Oregon CSA.

In considering whether a law lacks general applicability because "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," the Court has provided several examples, indicating that a law that is riddled with exemptions cannot be generally applicable. To start, the Utah CSA contains a provision allowing Utah authorities (the "division") to waive "the licensure requirement [if] consistent with public health and safety." Utah Code § 58-37-6(2)(d); Utah Code § 58-37-2 (defining "Division" to mean "the Division of Professional Licensing" ("DOPL")). The U.S. Supreme Court found the federal version of that exemption to indicate a lack of the government's compelling interest. *Gonzales*, 546 U.S. at 430-35.

Further, this exemption is highly similar to the examples of "mechanism[s] for individual exemptions" provided in *Sherbert* (discretionarily interpreting "good cause") and *Fulton* (granting exceptions in government's "sole discretion"). It also fits the U.S. Supreme Court's qualitative definition of "mechanism[s] for individual exemptions" by allowing Utah authorities "to decide which reasons for complying with the policy are worthy of solicitude," here meaning the reasons for licensure exemption Utah authorities find are consistent with public health and safety. Even if Utah authorities have "no intention of granting an exception" to Singularism under this provision, the fact that they *could*, under this provision, determine that Singularism's religious practices are "consistent with public health and safety," renders the Utah CSA "not generally applicable,

regardless whether any exceptions have been given . . ." *See Fulton*, 593 U.S. at 537. Moreover, Utah's authorities *have* granted Mr. Jensen a very similar exemption. DOPL confirmed Mr. Jensen's right to practice mental health therapy without licensure under the clergy exemption. *See* ECF 9, at 9, 28-29.

Although the *Smith* court did not evaluate the text of the Oregon CSA, had it done so, it would have discovered that it, too, contains a similar exemption, allowing Oregon authorities to "waive by rule the requirement for registration of certain manufacturers or dispensers if it finds it consistent with public health and safety." Or. Rev. Stat. § 475.125(4) (1987) (Oregon CSA attached in full as Exhibit II). On this basis alone, were the *Smith* case heard again today after *Church of Lukumi Babalu Aye, Inc.*, *Fulton*, and *Kennedy*, it is doubtful the U.S. Supreme Court would find the Oregon CSA to have been generally applicable.

Even if that exemption would not have altered the *Smith* decision, the Utah CSA contains many other exemptions that further undermine its general applicability in ways not demonstrated in the Oregon CSA. As Singularism has previously argued, the Utah CSA exempts secular medical cannabis usage, Native American religious peyote usage, and, most importantly, secular psilocybin usage, with additional exemptions provided under the same title for clergy mental health practitioners from licensure, as well as practitioners of hypnosis. *See* ECF 9, at 22-25.[2] None of these exemptions are present in the Oregon CSA. Defendants cannot credibly argue the Utah CSA

---

[2]     Although not contained in the Utah CSA, it is worth noting that elsewhere in the Utah Code, there is an exemption for the religious consumption of wine. *See* Utah Code § 32B-10-605(1)(a) ("A religious organization that provides or allows to be provided an alcoholic product to a person as part of the religious organization's religious services: (a) does not violate this title by providing or allowing the provision of an alcoholic product as part of a religious service; and (b) is not required to hold a license or special use permit to provide or allow the provision of an alcoholic product for religious services.").

is generally applicable as compared to the Oregon CSA. If the use of controlled substances for thousands of Utahns, including "Native Americans practicing their faith" is permitted by the Utah CSA, "it is difficult to see how" Defendants "can preclude any consideration of a similar exemption" for Singularism's small religious community. *See Gonzales*, 546 U.S. at 433. These are precisely the sort of equal protection concerns that underpin the general applicability requirement and here, require strict scrutiny review.

In considering whether a law lacks general applicability because the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," the Court can look to the underinclusivity analysis in *Church of Lukumi Babalu Aye, Inc.* and the analysis in *Kennedy*. Similar to both of those analyses is the analysis that Singularism has included in prior briefing, which indicates that the Utah Psilocybin Act, found within the Utah CSA, undermines Defendants' claimed interests of public health, public safety, and drug trafficking in all the same ways as Defendants speculate Singularism's religious practices would.[3] *See* ECF 59, at 7-11. This analysis explicitly evaluates equal protection concerns that

---

[3]     Not only are Defendants' alleged harms regarding psilocybin speculative, but they also flatly contradict the legislative history behind the Utah Psilocybin Act. Although the Court need not go beyond the text of the Utah Psilocybin Act to find the Utah CSA is not generally applicable, statements in legislative hearings prior to the Utah Psilocybin Act's passage include various supportive statements for psilocybin's beneficial usage to the community, especially for those experiencing PTSD, anxiety, and treatment-resistant depression. The Utah Psilocybin Act passed *unanimously* out of both chambers of the Utah Legislature, and, as the legislative history shows, followed a multi-year task force the legislature had convened to study the beneficial uses of psilocybin (although the legislature does not appear to have adopted many of the taskforce's detailed proposals in the Utah Psilocybin Act). *See generally S.B. 266 Medical Amendments,* Utah State Legislature (2024), available at https://le.utah.gov/~2024/bills/static/SB0266.html (Committee Hearings and Floor Debates). *See also Utah Mental Illness Psychotherapy Drug Task Force Report to the Utah Legislature* (Oct. 2022), available at https://le.utah.gov/interim/2022/pdf/00004231.pdf ("The published clinical trial data also suggest that psilocybin-assisted psychotherapy, employing a carefully specified intervention, may be more

undergird the general applicability requirement which here require strict scrutiny review. The Oregon CSA contained no exemption for secular (or religious) peyote usage, so it would have been impossible for the *Smith* court to evaluate the Oregon CSA's general applicability on this basis.

According to the above, the Court should find the Utah CSA is not generally applicable and proceed to strict scrutiny review of Singularism's First Amendment claim.

**QUESTION 2:** The cause of action for Plaintiffs' federal constitutional claims is § 1983, which is an "Act of Congress that falls within the 'expressly authorized' exception [to the Anti-Injunction Act]." *Mitchum v. Foster*, 407 U.S. 225 (1972). **If the court determines that Plaintiffs' federal constitutional claims survive the motion to dismiss, does § 1983 authorize the court to enjoin the state prosecution against Mr. Jensen on the facts of this case? If so, would it be a proper exercise of the court's authority to enjoin the prosecution?**

**RESPONSE**: The Court should exercise its authority to enjoin the state court proceeding against Mr. Jensen because (1) 42 U.S.C. § 1983 falls within the express authorization to the Anti-Injunction Act ("AIA"), as established in *Mitchum v. Foster*, 407 U.S. 225 (1972), and (2) exercise of such authority is proper because *Younger* abstention is not applicable to this case.

The Third Circuit has explained the interaction between *Mitchum* and *Younger*, clarifying that *Mitchum* determines whether a federal court has the statutory authority to issue an injunction under the AIA, while *Younger* addresses whether the court should nevertheless decline to exercise such authority. *See Ivy Club v. Edwards*, 943 F.2d 270, 277-78 (3d Cir. 1991). Here, both elements

---

effective than placebo-assisted psychotherapy in acute treatment trials for treatment resistant depression (TRD) and in care at the end of life for patients with symptoms of depression and anxiety.") (recommending that the Utah Legislature allow the FDA's approval process to be the means of proceeding with legalization of psilocybin); *H.B. 167 Mental Illness Psychotherapy Drug Task Force*, Utah State Legislature (2022), available at https://le.utah.gov/%7E2022/bills/static/HB0167.html.

weigh in favor of issuing the injunction: this Court has clear statutory authority under the AIA, as clarified in *Mitchum*, and *Younger* does not require the Court to decline to exercise such authority.

**I.   Section 1983 Meets the Express Authorization Exception to the AIA.**

The AIA generally prohibits federal courts from enjoining state court proceedings, subject to three exceptions, one of which is when Congress has expressly authorized such injunctions. 28 U.S.C. § 2283. The Supreme Court in *Mitchum* definitively held that § 1983 falls within this exception, permitting a federal court to enjoin state court proceedings in § 1983 actions.

In *Mitchum*, the Supreme Court examined the legislative history of § 1983, tracing its origins to the Civil Rights Act of 1866 and the Reconstruction-era congressional debates. 407 U.S. at 239-42. The Court concluded that "Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." *Id.* at 242. The Court further emphasized that Congress plainly authorized federal courts to issue injunctions in § 1983 by permitting a "suit in equity" as a form of redress. *Id.* Thus, the Court held that "§ 1983 is an Act of Congress that falls within the 'expressly authorized' exception" to the AIA. *Id.* at 242-43.

This understanding was reemphasized in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 633 (1977) (plurality opinion), where the Court recognized that "one of the clear congressional concerns underlying the enactment of § 1983 was the possibility that state courts, as well as other branches of state government, might be used as instruments to deny citizens of their rights under the Federal Constitution." Under *Mitchum* and *Vendo Co.*, § 1983 meets the express authorization

16

exception of the AIA, granting this Court the authority to enjoin the state criminal proceeding against Mr. Jensen.

## II. Because *Younger* Abstention Does Not Apply, the Court Should Exercise Its Authority to Issue an Injunction.

Although § 1983 provides the Court with authority to enjoin a state court proceeding, there are certain circumstances where a federal court should nonetheless refrain from doing so—when the principles of comity and federalism require abstention, as explained in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. However, *Younger* abstention does not apply here for three independent reasons[4]: (1) Defendants removed the case to federal court, (2) there were already proceedings on the merits in federal court before the state court case was filed, and (3) the bad faith/harassment exception to *Younger* is met.

First, *Younger* is inapplicable where government defendants themselves remove the case to federal court, submitting to federal jurisdiction over the case. *See, e.g.*, *Ohio Bureau of Emp't. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system."); *Ryan v. State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1136 (7th Cir. 1981) (finding removal "renders Younger abstention inapplicable"); *Blair v. Bd. Of Sugarcreek Twp.*, No. 3:07-CV-056, 2008 WL 11352586, at *3, 5 (S.D. Ohio May 22, 2008) (concluding that *Younger* did not apply because "Defendants are 'state' actors who voluntarily submitted to a

---

[4]      These reasons are briefed in detail in Plaintiff's Reply in Support of the Motion for Anti-Suit Injunction. *See* ECF  58. Thus, this argument is limited to only the main points from that briefing.

federal forum and cannot now demand that the federal court dismiss the case or force the case back into the state's own system pursuant to the *Younger* Abstention Doctrine.").

Second, *Younger* is also inapplicable as the state court case against Mr. Jensen was filed after proceedings of substance in this case (namely, the Court's grant of a temporary restraining order against Defendants). *See Steffel v. Thompson*, 415 U.S. 452, 475 (1974) ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute."); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217-20 (11th Cir. 2002) ("if we define too narrowly what constitutes proceedings of substance on the merits, . . . we would risk creating an expansive '*reverse removal power*' in that state prosecutors, in effect, would have broad discretion to remove federal civil rights actions to state criminal court on a routine basis, even after the plaintiff had invested precious time and resources to bringing the federal litigation."); *Graham v. Breier*, 418 F. Supp. 73, 77-78 (E.D. Wis. 1976) (finding that an *ex parte* TRO constituted a proceeding of substance on the merits in federal court); *Wal-Mart Stores, Inc. v. Rodriguez*, 236 F. Supp. 2d 200, 209-10 (D.P.R. 2002) (same where the TRO was granted after "both sides were given the opportunity to be heard prior to issuance of the order").

Finally, *Younger* is also inapplicable because there is great and immediate danger of irreparable injury, including bad faith or harassment. As detailed in Plaintiffs' Opposition to Defendants' Expedited Motion to Stay, ECF 38, the exception for bad faith or harassment applies here. Defendants' removal of the case to federal court, argument that this Court should not hear the claims that Defendants removed, challenges to every element of Plaintiffs' case without persuasive evidence, refusal to abide by the TRO, filing of criminal charges against Mr. Jensen

after the TRO was issued, and failure to notify the state court of the TRO decision, taken together, demonstrate bad faith and harassment.

Because (1) the federal court has authority to issue an injunction pursuant to the express congressional authorization exception to the AIA (clarified in *Mitchum*) and (2) *Younger* does not prohibit the Court from exercising such authority, this Court should exercise such authority and enjoin the state court criminal proceeding against Mr. Jensen.

**QUESTION 3**: **If the court determines that Plaintiffs' federal constitutional claims do not survive the motion to dismiss and remands the remaining claims to the state court, will the temporary restraining order stay in place or be dissolved? Is this an issue to be decided by this court or by the state court on remand?**

**RESPONSE**: Rule 65 clarifies that TROs expire after 14 days unless extended by the Court. Fed. R. Civ. P. 65(b)(2). Utah's rule follows the same 14-day timeline. Utah R. Civ. P. 65A(b)(2). Here, the Court did extent the TRO, stating that the "TRO shall remain in place until the court either dissolves it or converts it into a preliminary injunction." ECF 24, at 3.

When a TRO is issued in a state court case, which is subsequently removed to federal court, "such state court orders remain in effect" but "after removal, the federal court merely takes up where the state court left off," meaning that a TRO "issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does it remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal." *Flying Cross Check, L.L.C. v. Central Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1256 (D. Kan. 2001) (internal citations and quotation marks omitted).

Applying the logic of *Flying Cross Check* to the inverse scenario, remand, if a case is sent from federal court back to state court, the federal TRO would similarly remain in effect upon

remand and would expire under the terms of the order unless the state court affirmatively modified those terms. *See Chang v. Buffington*, 256 P.3d 694, 701 (Haw. 2011) (orders issued by a federal court after removal but before remand "would ordinarily remain in effect, following the remand, until the state court took appropriate action to modify or set them aside") (citation omitted); *In re C & M Properties, L.L.C.*, 563 F.3d 1156, 1166 (10th Cir. 2009) ("Interlocutory decisions in remanded claims made by the district court prior to remand remain open to review and revision in state court; such orders carry no persuasive effect. . . . The state court is free to revisit any issue decided by the federal court in a remanded claim prior to remand, and is 'perfectly free to reject the remanding court's reasoning.'") (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 647 (2006)). Thus, here, should the Court remand the state law claims to state court without deciding Plaintiffs' motion for a preliminary injunction (which, as Plaintiffs have argued elsewhere, the Court should not do), the TRO would remain in effect until the state court decided to dissolve the TRO, convert it into a preliminary injunction, or otherwise alter the TRO order.

**QUESTION 4**: **What quantity of psilocybin was seized at Singularism's spiritual center on November 11?** The parties should cite to record evidence to support their position. If the record is unclear, the parties should submit additional exhibits to support their position.

**RESPONSE**: Plaintiffs are skeptical of the statement made in the Return to Search Warrant, signed by Detective Julian, that "459.8 grams psilocybin mushrooms" were seized from Singularism's spiritual center. *See* ECF 13-15. As stated in the Third Supplemental Declaration of Bridger Jensen, filed herewith, Singularism estimates only 1/3 the amount that Detective Julian described, or approximately 153.26 grams, was seized from Singularism's spiritual center. Exhibit FF, at ¶¶ 3-11. One possible explanation for why Detective Julian's statement is inaccurate is that

he may have weighed the psilocybin in the storage cups in which they were kept, which were thereafter returned to Singularism. *Id.* Defendants' lab report of Singularism's psilocybin also raises the question of the accuracy of Detective Julian's statement, as between the two items of psilocybin tested, it contained at most 304 milligrams, yet stated that was the total weight of the mushroom-like material. *Id.* Because Defendants remain in possession of Singularism's sacramental psilocybin, it is impossible for Singularism to know with certainty how much psilocybin law enforcement seized. *Id.*

Whatever the precise amount, Defendants have provided no factual evidence to the Court that Singularism, after opening its spiritual center, ever provided psilocybin to any of its voyagers outside of its spiritual center. Defendants have also provided no factual evidence that any Singularism voyager, or any other individual, has ever been permitted to take psilocybin out of the spiritual center. Defendants have provided no evidence that Singularism has ever provided any individual psilocybin for non-religious purposes. And Defendants have provided no evidence that Singularism stores psilocybin in a way that makes it likely to be subject to theft. Absent this evidence, the mere amount of psilocybin in Singularism's possession cannot support Defendants' claimed compelling interests in the promotion of public safety and public health or prevention of drug trafficking.

**ADDITIONAL EVIDENCE**: In addition to the documents Singularism has already filed with the Court, Singularism adds the following for consideration on Singularism's request for a preliminary injunction:

- Third Supplemental Declaration of Bridger Jensen, attached as <u>Exhibit FF</u>;

- Instagram and Facebook posts from The Divine Assembly, indicating its activity in Utah County, attached as <u>Exhibit GG;</u>

- Waiver form of Singularism voyager that experienced an adverse reaction to psilocybin, indicating the individual's religious attestations and motivations for participating in Singularism's ceremonies, attached as <u>Exhibit HH.</u>

Plaintiffs have met and conferred with Defendants regarding additional documents Defendants will be submitting in support of their supplemental briefing. Plaintiffs do not object to the documentary evidence that Defendants have indicated to Plaintiffs they will file as attachments to their supplemental brief. Plaintiffs reserve the right to object to the content of any declarations Defendants may file and the right to seek cross examination regarding the content of any declarations.

DATED February 5, 2025.

<u>/s/ Tanner J. Bean</u>
Tanner J. Bean
Jacqueline M. Rosen
*Attorneys for Plaintiffs*