IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRIDGER LEE JENSEN an | ) | |
| individual, SINGULARISM | ) | |
| a non-profit | ) | |
| corporation, PSYCHE | ) | |
| HEALING AND BRIDGING | ) | |
| LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:24-CV-00887JNP |
| UTAH COUNTY, a political | ) | |
| subdivision, PROVO CITY | ) | |
| a political subdivision, | ) | |
| et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE THE HONORABLE JILL N. PARRISH

January 23, 2025

Zoom Motion for Anti-Suit Injunction
and Motion to Dismiss

**Appearances of Counsel:**

For the Plaintiffs:          Tanner J. Bean
                             Jaqueline Rosen
                             Anna Christiansen
                             Attorneys at Law
                             Fabian VanCott
                             95 S. State Street
                             Suite 2300
                             Salt Lake City, Utah 84111-2323

For Utah County:             Mitchell A. Stephens
                             Justin L. James
                             Attorneys at Law
                             James Dodge Russell & Stephens PC
                             10 W Broadway
                             Suite 400
                             Salt Lake City, Utah 84101

For Provo City:              Nicholas Muhlestein
                             Attorney at Law
                             Provo City Attorney's Office
                             445 W Center Street
                             Provo, Utah 84601

Court Reporter:

                    Laura W. Robinson, RPR, FCRR, CSR, CP
                           351 South West Temple
                          3.303 U.S. Courthouse
                        Salt Lake City, Utah 84101
                             (801)201-9731

1      **Salt Lake City, Utah**                    **January 23, 2025**

2                          **(9:07 a.m.)**

3                  THE COURT:  Do we have everyone we're expecting,

4      Ms. Hola?

09:07:05  5            THE CLERK:  I believe so, Your Honor.

6                  THE COURT:  All right.  Then let's go ahead and

7      go on the record in the matter of *Bridger Lee Jensen and*

8      *others versus Utah County and others.*  The case number is

9      2:24-CV-887.  My name is Jill Parrish, I'm the trial judge

09:07:24  10     assigned to preside over this matter.  We are here today to

11     entertain oral argument on three motions that are pending

12     before the court.

13                  I should indicate for the record, that we're

14     holding the hearing virtually through the use of Zoom video

09:07:42  15     technology.  Let me introduce the members of our court team

16     who are joining us, and then I'll have counsel enter their

17     appearances for the record.  We're joined by Lindsay Hola,

18     my courtroom deputy, and Laura Robinson, my court reporter.

19     We're also joined by my three law clerks, Mr. Eshan Dabak,

09:08:06  20     Ms. Mikaela Cardillo and Mr. Kris Bahr.

21                  Let me now turn the time over to counsel.

22                  MR. STEPHENS:  Good morning, Your Honor.  Mitch

23     Stephens for Utah County and Jeffrey Grey.  Nice to see the

24     court again.  I am also joined by Justin James.  We did this

09:08:25  25     last time where we're in the same conference room so we will

1    try very hard to make sure one of us is always muted and we

2    don't get any feedback.  So if there is a slight delay in

3    between the two of us, that's why.

4              THE COURT:  All right.  Thank you.

09:08:41  5              MR. BEAN:  And for plaintiffs, Your Honor, Tanner

6    Bean, Jackie Rosen and Anna Christiansen.  We are similarly

7    all in the same conference room and trying to do about the

8    same technology set up.

9              THE COURT:  All right.  Well, counsel, I have --

09:08:54 10              MR. MUHLESTEIN:  I'm so sorry, Your Honor.

11              THE COURT:  I'm sorry.

12              MR. MUHLESTEIN:  This is Nick Muhlestein for

13    Provo City, the Provo defendants.

14              THE COURT:  All right.  I apologize.  I was

09:09:07 15    lumping folks into groups, and that was not correct.  Do we

16    have everyone before I move on?  All right.

17              I had originally set this hearing for two days

18    and I had given the parties the opportunity to present two

19    days of evidence if they chose.  Yesterday, I received a

09:09:33 20    stipulation, agreed to by all parties, indicating that the

21    parties had no intention, or I guess they had agreed, that

22    they would not submit any live testimony during this, what

23    had been scheduled as a two-day hearing, and that they

24    intended instead to argue the three motions orally and then

09:10:01 25    likely finish today.

4

1          The parties indicated that they want to begin

2     with arguing the motion to dismiss, then the issues that

3     come into play with plaintiffs' motion for an Anti-Suit

4     Injunction and then finally plaintiffs' motion for a

09:10:22  5     preliminary injunction.  Is that still the desire of the

6     parties?

7          MR. BEAN:  Yes, Your Honor.

8          MR. STEPHENS:  That is, Your Honor.  And with

9     that stipulation, there were several exhibits identified.

09:10:38 10   Those were filed a little bit later in the day mostly

11    because logistically it took more time to put those together

12    and we wanted to make sure the Court was aware of the

13    stipulation as early as we could.

14         THE COURT:  Okay.  Well, I am here to hear

09:10:55 15   whatever it is that all of you want to present to me for my

16    consideration.  So I am -- I am certainly not going to force

17    anyone to put on evidence that they don't intend to present.

18         So let's turn then to oral argument on

19    defendants' motion to dismiss.  That's number 40 on the

09:11:17 20   docket.  Then we'll move to the Anti-Suit Injunction issue,

21    Docket No. 39, and then finally, the motion for preliminary

22    injunction, which was Docket Entry 9.  I know there has been

23    much supplemental briefing that's come in.  I did have an

24    opportunity to carefully review everything that was filed

09:11:45 25   through close of business yesterday.  I have to confess I

1    don't know if there has been anything else put on the docket

2    this morning.  Has there been?

3              MR. BEAN:  No, Your Honor.

4              MR. STEPHENS:  No, Your Honor.

09:11:59  5    THE COURT:  Okay.  So in any event, you can

6    assume for purposes of your argument that I have reviewed

7    your written memoranda.  So if we start with the motion to

8    dismiss, Mr. Stephens, that was your motion, so you will

9    have the floor.  Then we'll hear a response from Mr. Bean

09:12:20  10   and then you will have an opportunity to reply on that

11   motion before we move to the next one.  You may proceed.

12             MR. STEPHENS:  Thank you, Your Honor, and give us

13   just a few seconds because this is one of those handoffs

14   that's going to go to Mr. James here.

09:12:33  15             THE COURT:  Okay.

16             MR. JAMES:  Good morning, judge.

17             THE COURT:  Good morning.

18             MR. JAMES:  I think this is the first time I have

19   been in front of you so it is nice to meet you.  Although I

09:12:47  20   remember being at your desk as a little kid.

21             THE COURT:  Well, I have to say, I don't know in

22   if it qualifies to meet someone over Zoom.  I -- I am not

23   sure that I'm into the technology, but that's the world that

24   we're in post-COVID.  Although I'm always happy to have

09:13:09  25   folks in the courtroom if they want to come.  But lawyers

```
          1    most often don't want to come.

          2             Anyway, you have the floor.  I guess it's better

          3    to say you have the screen.

          4             MR. JAMES:  Thank you.  I wanted to start with

09:13:23  5    the motion to dismiss because my hope is that today can be

          6    very short.  You have seen in our briefing that we want to

          7    address the federal claims and those claims should be

          8    dismissed and with those claims dismissed, the Tenth Circuit

          9    law is pretty clear on this that the remaining state claims

09:13:40 10    should be dismissed without prejudice and go back to state

         11    court.

         12             And so I'm going to focus my arguments today on

         13    the two federal claims.  I'm happy to answer any questions

         14    you have about the state law claims, but as we have argued

09:13:53 15    strenuously in our briefing, those claims should be

         16    dismissed if the federal claims are dismissed.

         17             THE COURT:  And I understand that.  And I believe

         18    that you are correct.  If the federal claims go, the whole

         19    case needs to be remanded.

09:14:10 20             What is your position with respect to what I

         21    should do if the federal claim or claims survive?  Are you

         22    suggesting that I do a partial remand of the state law

         23    claims and have those proceed in state court while the

         24    surviving federal claims proceed here, or what is your

09:14:34 25    position?
```

1           MR. JAMES:  Yeah, those should be remanded.  And

2       because the standard is that if they present unique or

3       uncharted issues of law, generally issues of federalism and

4       comity suggest that the state court system should handle

09:14:52  5       those.  And we're dealing with the state constitution and a

6       newly enacted Utah RFRA statute that has no case law

7       developed on it.  And those issues --

8           THE COURT:  Well that -- I mean with respect to

9       the state RFRA claim, I think we all acknowledge, do we not,

09:15:11 10       that it is modeled after the federal act and there are many

11       other state acts and the language is pretty clear.  Is it

12       really novel just because it hasn't been interpreted?

13           MR. JAMES:  There are, and we briefed this in our

14       motion to dismiss, there are distinctions between the

09:15:30 15       federal RFRA and the Utah RFRA.  Aside from the damages

16       issues that we have kind of focused in on on our motion,

17       there is also questions of what is the relief you get under

18       the Utah RFRA and we have argued again that the relief you

19       get is an affirmative defense and that's it.

09:15:48 20           THE COURT:  Okay.

21           MR. JAMES:  And those are unique issues that Utah

22       courts again should address and that's why even if you were

23       to exercise jurisdiction over the federal claims and keep

24       those, the state claims should be remanded back to state

09:16:01 25       court.

1            THE COURT:  I guess that leads me to ask, why did

2      you remove this case in the first place?  You seem very

3      intent on the fact that you want state courts deciding the

4      state claims, and state courts have concurrent jurisdiction

09:16:18  5      with federal courts over federal claims.  And state courts

6      often decide federal constitutional claims.  I guess I'm

7      just mystified, given what you identified as these very

8      unique issues of state law and what you're arguing are well

9      settled principles of federal law, as to why you removed

09:16:40 10      this in the first place.  It seems like you've just created

11      a lot of complicated factors, or issues, for your client by

12      your removal decision.

13            MR. JAMES:  So we removed so the federal court

14      could address the federal claims.  Of course, state courts

09:17:01 15      are able to address the federal claims.  The First Amendment

16      claim and the Fourth Amendment claim are probably among the

17      most common claims addressed in the federal courts.

18            THE COURT:  Well, they are addressed in the

19      federal courts, but I mean I spent 13 years on the state

09:17:17 20      appellate bench and we had absolutely the same ability there

21      in state court to adjudicate federal claims, and it seems to

22      me that with all the complicated issues that it gives rise

23      to with respect to abstention and the

24      anti-injunction/anti-suit act, it just -- I'm mystified as

09:17:44 25      to why you moved it here.  And frankly, what it suggests to

1    me, is you -- you came here and then when there wasn't a

2    good outcome on the TRO motion, you decided you wanted a

3    second bite at the apple.  So you're second guessing your

4    removal decision and you want to get back to state court

09:18:04  5    where you can find a more favorable forum.

6            MR. JAMES:  So we're not forum shopping if that

7    was, I guess, the implication.

8            THE COURT:  Well, I mean -- I think that -- I

9    think that is an inference that a very reasonable inference

09:18:20 10    that could be drawn by the removal and now the request to

11    remand certain claims even if I keep control of a federal

12    claim.

13            MR. JAMES:  Sure.  And I can understand and

14    appreciate how you see that.  I hope -- I guess Your Honor

09:18:37 15    can appreciate that when a case comes in on a TRO, you act

16    very quickly and you don't always have the benefit of

17    thinking through and analyzing all of the outcomes.  You

18    have to act quick.  And there was a lot going on, and we're

19    still in the view that the federal court is in the best

09:18:57 20    position to address these federal claims.

21            The Utah State Court claims, or the state law

22    claims, have proved to be, in our view, much more nuanced

23    and complex than initially had been looked at.  And that's

24    ferreted out in a lot of the briefing.  So that is why I

09:19:14 25    appreciate though that we have potentially created a little

1    bit of a procedural headache for everybody.  That was not

2    the intention.

3            So I guess as I started, I will focus on the

4    federal claims and why they should be dismissed.  And there

09:19:32  5    are two of them.  There is a First Amendment claim and a

6    Fourth Amendment claim.  Plaintiffs' first claim seeks

7    relief under 1983 for alleged violations of their First

8    Amendment.  In briefing this and reading the cases, this is,

9    in my view, the *Smith* case.  The *Smith* court set the

09:19:53  10   standard for First Amendment claims and the --

11           THE COURT:  Well, and I -- I mean I think I

12   understand the analogies to the *Smith* case.  But there has

13   been further development by the United States Supreme Court,

14   even though *Smith* hasn't been overruled there, there has

09:20:17  15   been further development with respect to what constitutes a

16   law of general applicability, has there not?

17           MR. JAMES:  I think there has -- that standard,

18   general applicability, has been fleshed out further.  But as

19   you have recognized, *Smith* has never been overturned and I

09:20:38  20   am unaware of any case that has gone and said a Controlled

21   Substances Act is not a law of general applicability.

22           THE COURT:  And maybe I am wrong about this, and

23   I have to confess there is a lot of case law here.  I have

24   not had the opportunity to review all of the applicable case

09:21:05  25   law, but there is an exemption under the Federal Controlled

1    Substances Act for Peyote now.  Am I right about that?  And

2    there is also one under the state Controlled Substances Act

3    for Peyote, correct?

4        MR. JAMES:  I believe there are certain

09:21:33  5    exceptions, yes.

6        THE COURT:  Okay.  And that was not the case at

7    the time of *Smith*.  Is that also correct?

8        MR. JAMES:  No, that is not correct.

9        THE COURT:  That's not correct?

09:21:46 10        MR. JAMES:  So at least there may have not been

11    under the Oregon Controlled Substances Laws a religious

12    exemption for Peyote.

13        THE COURT:  Okay.  I guess what I'm struggling

14    with is, is there not now an exemption under the Utah

09:22:04 15    Controlled Substances Act for Peyote?  I mean wasn't that

16    the issue that the Utah Supreme Court decided back in 2004

17    or whenever the *Mooney* case was?

18        MR. JAMES:  I believe that was the decision that

19    the, and I'm sure you're familiar with it, that the Federal

09:22:26 20    Controlled Substances Act applied to the Utah Controlled

21    Substances Act and made Peyote an exception to.

22        THE COURT:  Okay.  So I guess then, does the fact

23    that there is an exception under the Utah Controlled

24    Substances Act for one religious organization to use a

09:22:52 25    particular controlled substance then remove this case from

1    the *Smith* analysis because we now don't have a law with

2    general applicability.  There are exceptions there.

3              MR. JAMES:  There were exceptions in the *Smith*

4    case.  And so I guess the answer to your question, no, it

5    doesn't remove it from the *Smith* standard which is if a law

6    is neutral or generally applicable, it's not subject to

7    strict scrutiny.  It's only if it violates one of those two

8    standards that it becomes subject to strict scrutiny.

9              So the *Smith* case still sets, I think, kind of

10   the standard we analyze it.  And what I understand the

11   question is is essentially are we now applying strict

12   scrutiny because there appears to be some secular or

13   religious exemptions to the Controlled Substances Act.

14             THE COURT:  Right.  And that's the question is

15   what constitutes a law of general applicability and what

16   exemptions remove it from that analysis so that we enter the

17   world of strict scrutiny.  And that's -- frankly, there are

18   a lot of questions there with respect to levels of

19   generality and specific exemptions that I think maybe are a

20   bit tricky.

21             MR. JAMES:  I think that's fair that saying, you

22   know, what general applicability is is still being fleshed

23   out and developed.  But I also think that it is a gross

24   oversimplification to say that because there is some use of

25   a controlled substance, there is some exceptions to the

13

1    otherwise prohibition, that it then is subject to strict

2    scrutiny.  And that's why I say that is the *Smith* case.  In

3    *Smith,* you know, it is in the opinion, it is a sentence of

4    the second paragraph of the opinion, that there are secular

09:24:51  5    exceptions to the Oregon state law express and there always

6    has been.  That's why you have, for example, opioids

7    generally prohibited.  But if a doctor prescribes them,

8    allowed.  That's an exception to the Controlled Substances

9    Act.

09:25:07  10    THE COURT:  Right.  But here we have not just a

11    general exception for prescriptions written by medical

12    doctors, we have something created by the Utah legislature

13    that frankly is, I think, quite shocking in its lack of

14    regulation of something that you're claiming is so dangerous

09:25:41  15    where it simply says, you know what, if you're a secular

16    hospital system, then the psilocybin prohibitions don't

17    apply to you and you have only three simple things you have

18    to do.  You can't give it to someone under 18, you have to

19    report back to the legislature.  I mean it really is quite a

09:26:11  20    shocking exemption made to one type of secular organization.

21    And then we also have the Peyote exemption.

22    So at some point do we have sufficient exemptions

23    that we can say this crosses the line, it's no longer a

24    neutral law of general applicability.

09:26:39  25    MR. JAMES:  I suppose I could create a

1    hypothetical that would get you to that point to say this

2    law is no longer neutral, it is no longer generally

3    applicable.  With what we have today, we're not there.  And

4    none of the case law cited by the plaintiffs would suggest

09:26:57  5    that we're there.

6              And as I started, I'm unaware of a single case

7    that has come down and said that a Controlled Substances Act

8    is not a law of general applicability.  The case law I have

9    seen has all suggested that Controlled Substances Act, just

09:27:16  10    as the *Smith* court ceded, remain a generally applicable law.

11    And there was exemptions, like I said, in the *Smith* case.

12    To your point and concern about the Psilocybin Act, it

13    hasn't been briefed, and it hasn't been litigated in any

14    other case that I'm aware of, but I don't think -- I don't

09:27:37  15    think it is as simple as you have interpreted it.

16              One of the first sections of that act require

17    that the psilocybin that is used be FDA approved and subject

18    to several FDA regulations under the -- I won't get you to

19    the cite but it is in the statute that it is not as simple

09:27:58  20    as hey, if you are a medical provider and they're not 18 and

21    you do a couple of other little things, you can use

22    psilocybin.  It's still subject to, I think, strict control

23    pursuant to the FDA standards.

24              THE COURT:  Right.  But clearly, just by creating

09:28:13  25    a special rule for a hospital organization, it's not a

15

1    generally applicable law, is it?

2              MR. JAMES:  It has to be.  Because that was

3    *Smith.*  I mean otherwise going back --

4              THE COURT:  But *Smith* didn't have an exemption

09:28:30  5    that the law issue in *Smith* didn't have an exemption for

6    certain secular organizations to use the Controlled

7    Substance at issue.

8              MR. JAMES:  I guess I would say of course it did.

9    Because a doctor can prescribe opioids that was otherwise a

09:28:50 10    controlled substance but because it could have been used to

11    control pain.  That was at issue in Smith.

12             THE COURT:  Okay.  But then we get to the Peyote

13    exception and that's an exemption that has no medical

14    strings attached to it, but it applies to a particular

09:29:13 15    religion.  That to me seems like that's also a problem.

16             MR. JAMES:  I tend to agree.  But we're not

17    talking about Peyote.

18             THE COURT:  But we're talking about the

19    Controlled Substances Act.

09:29:26 20             MR. JAMES:  Yes.

21             THE COURT:  And so are we now going to get down

22    to a level of specificity with respect to every single

23    aspect of the Act in determining what level of scrutiny

24    applies?  Can we say, well, we could have exceptions for,

09:29:43 25    you know, every drug in the Act, but as long as there is no

1    exception for Peyote, I mean for psilocybin, then that's not

2    subject to strict scrutiny even though the Act as a whole is

3    riddled with exemptions.

4         MR. JAMES:  Well, I will I guess start with

09:30:04  5    saying because there is a religious exemption for Peyote in

6    the Federal Controlled Substances Act, I'm still unaware of

7    a single case that has come down that has says that the

8    Federal Controlled Substances Act is not or is no longer a

9    law of general applicability.

09:30:21  10         Everything I have seen and everything we've cited

11    to you suggests that the Federal Controlled Substances Act

12    remains a general -- a law of general applicability despite

13    having a Peyote exception under it.

14         And I -- the point, again, is that has always

09:30:37  15    been the case.  There has always been exemptions.  The case

16    law cited by Mr. Bean in his briefing, the *Fulton* --

17    *Philadelphia versus Fulton* or *Fulton versus City of*

18    *Philadelphia*, I suppose, the Supreme Court case, doesn't

19    suggest that because there are in certain circumstances

09:30:57  20    exemptions, that the law is no longer generally applicable.

21         Rather, the exemption at issue there, and in the

22    cases I have read, suggest that when the exemption is given

23    to a governmental official in their sole discretion, that

24    that then becomes and takes the law away from being one that

09:31:16  25    is generally applicable.  But otherwise, to say if there are

17

```
  1    secular uses or exemptions from the law, the law is no
  2    longer generally applicable.  As I have said, that is a
  3    gross oversimplification because there were exemptions in
  4    the Smith case.  There was secular use allowed for otherwise
  5    controlled substances prescribed by a medical provider.  And
  6    so if the law is as Mr. Bean has suggested, which is if you
  7    allow any secular use, you now are subject to strict
  8    scrutiny.  I think Smith would have failed from the start
  9    because it failed that test.  There was secular exemptions
 10    in Smith for certain controlled substances to be used.
 11    That's why I say there always has been.
 12           I'm unaware of any Controlled Substances Act that
 13    just says you can't use any of these substances period, end
 14    of story.  They have always allowed for medical
 15    practitioners to prescribe.  They have always allowed for
 16    research to be done on those drugs.  So there has always
 17    been otherwise exceptions to this law.  That doesn't make
 18    them so they're not generally applicable.
 19           Again, case law suggests that the generally
 20    applicable standard becomes -- is violated when you start
 21    giving governmental officials sole discretion on when or
 22    when not to apply it.  That also hasn't been cited, but
 23    that's also the Board of Regents case that came out, I
 24    think, last year from the Tenth Circuit and the exemption at
 25    issue there.
```

09:31:36 (line 5)
09:31:57 (line 10)
09:32:12 (line 15)
09:32:25 (line 20)
09:32:46 (line 25)

1          Conversely, you have the *Chiles* case that they

2     have cited to support this notion where we're talking there

3     about medical -- mental practitioners being allowed to use

4     conversion therapy in Colorado and whether or not that

09:33:05 5     violated the law.  And because there was no subjective

6     exemptions allowed, the United States -- or sorry, the Tenth

7     Circuit said that that was a law of general applicability.

8     So I agree that the *Smith* case law has been further

9     developed.  I don't think it has gone as far as Mr. Bean has

09:33:25 10     suggested.  And for that reason, it remains -- *Smith* remains

11     good law.  It has not been overturned.  The Controlled

12     Substances Act remains a law of general applicability.

13     There hasn't been any argument, by the way, that it is not

14     neutral, and I'm assuming that that is accepted, that the

09:33:45 15     Controlled Substances Act is a neutral law.

16          THE COURT:  So I think the issue we have been

17     focusing on is critical.  I can tell the sun is in your eyes

18     and I'm sorry about that.  My blinds do the same thing in

19     the afternoon, so I may be doing the same thing this

09:34:06 20     afternoon.  But in any event, I guess the question is if you

21     -- if you lose on this argument and strict scrutiny applies,

22     is it over for you?

23          MR. JAMES:  No.

24          THE COURT:  Okay.  Explain to me why not?

09:34:23 25          MR. JAMES:  Because even if you fail the strict

1    scrutiny argument, we still then go to qualified immunity.

2    And qualified immunity would require a violation of clearly

3    established law.  And the law on this, if you don't accept

4    my argument, is anything but clearly established.

09:34:45  5         THE COURT:  Well, but qualified immunity might

6    apply to claims against individual defendants.  It doesn't

7    apply to claims against municipalities.

8         MR. JAMES:  I would have to go into that further.

9    The claims I've read and as pled, is against the individuals

09:35:08 10   for them violating under 1983.  I don't -- I don't recall

11   seeing a *Monell* liability claim asserted.

12        THE COURT:  Well, I guess I can look.  I know

13   there is a recently amended complaint that was just filed,

14   and I guess we could ask Mr. Bean about that because I -- I

09:35:30 15   scanned the changes to the complaint, but let's see, I am

16   looking at the first claim for relief under 1983 in the

17   First Amendment and it clearly, in Paragraph 73, is pled

18   against defendants Utah County and Provo City and I don't

19   believe qualified immunity applies to those defendants.

09:36:05 20        MR. JAMES:  I would have to review the amended

21   complaint.  But I would not concede that if you find strict

22   scrutiny applies that we are, I guess, dead as we stand as

23   you say.  And Mr. Stephens will perhaps argue this later if

24   we get to it and that is we meet the strict scrutiny

09:36:23 25   standard.

1          And so even if strict scrutiny -- and now we're

2     under the Utah RFRA kind of analysis, I suppose.  And so

3     even if strict scrutiny were to apply, we have met that

4     standard.  Mr. Stephens will be arguing that.  But I would

5     again, I guess, caution and I would find great hesitation to

6     say that the Controlled Substances Act has been amended such

7     that it is not generally applicable because that opens the

8     door to a lot of potentially dangerous uses.  You would then

9     be allowing use of opioids and fentanyl as potentially a

10    religious exercise and make that subject to strict scrutiny

11    and allow a whole host of conduct that, like I said, has

12    never been allowed under any case that I'm aware of.  And it

13    would significantly change the First Amendment analysis

14    under 30 years of case law.  And *Smith* came out, I think,

15    nearly 35 years ago.  And as I have said, to this day I'm

16    unaware of a single case that has come out and said that the

17    Controlled Substances Act, federal or in a state, is not a

18    law of general applicability.  And so that would be a, I

19    think, a first as far as I have read the case law.  And like

20    I said, they have not cited any case law that would suggest

21    to you otherwise that the Controlled Substances Act has

22    become one that is not generally applicable.

23          So that is the First Amendment claim.  I'm happy

24    to address any other questions you have, but I would turn

25    now to the Fourth Amendment claim otherwise.

```
 1              THE COURT:  Okay.

 2              MR. JAMES:  This is the only remaining federal

 3      claim.  I guess I would start with saying that it follows, I

 4      think, logically that if the First Amendment claim is

 5      dismissed, there can be no Fourth Amendment violation

 6      because it is conceded they have violated or at least

 7      potentially violated the law.  Sorry.  And so naturally, if

 8      the First Amendment claim is dismissed, the Fourth Amendment

 9      claim should be dismissed.  But even if you don't buy my

10      argument on the First Amendment, and we're looking solely at

11      a Fourth Amendment claim, that claim is still subject to

12      dismissal and we have argued that that is because of

13      absolute immunity.

14              Now, the opposition I think gets that argument

15      and conflates it a bit.  We have not argued and I do not

16      contend that the police officers or prosecutors are always

17      subject to and protected by absolute immunity.  This issue,

18      rather, is one of, I see, as judicial immunity.  Where most

19      cases I assume you're familiar with they have dealt with

20      deal with a warrantless search or seizure.  In this case,

21      the search and seizure was done pursuant to a warrant, a

22      warrant issued by the Fourth District Court.  And the case

23      law is clear on this that when an officer or an official is

24      carrying out a court's order, they are protected by that

25      judge's absolute immunity which has then kind of been
```

1    described in the case law as quasi, absolute or judicial

2    immunity.  And that would apply here.  The only search and

3    seizure that has been alleged and identified is the

4    execution of the search warrant.

09:39:49  5         There is mention in the opposition of conduct

6    that has occurred before the execution of the search warrant

7    or conduct that occurred after the execution of the search

8    warrant, but that conduct making statements to, for example,

9    a landlord where there is no eviction, there is no seizure

09:40:07 10   pursuant to those statements.  Making statements to the

11   media, same thing.  There is no seizure, there is no search.

12   And so regardless of the propriety of that conduct, the

13   Fourth Amendment is limited to search and seizures.  And the

14   only search or seizure is the execution of the search

09:40:25 15   warrant in this case.

16         THE COURT:  So I understand your absolute

17   immunity argument and I think it's quite persuasive.

18         MR. JAMES:  Thank you.

19         THE COURT:  But absolute immunity applies to the

09:40:41 20   officers and the prosecutor.  But what is the law with

21   respect to municipalities and absolute immunity?  I don't

22   see any argument in your briefing with respect to why the

23   Fourth Amendment claims against Utah County and Provo City

24   should be dismissed, and I -- and I'm assuming you're moving

09:41:06 25   to dismiss the Fourth Amendment claims against the

1       municipalities as well as the claims against the

2       individuals.  But I saw no analysis, other than the absolute

3       immunity analysis, which I don't think applies to

4       municipalities.

09:41:22   5          MR. JAMES:  And I guess what is -- I don't

6       understand, I suppose, if the police officers are protected

7       in their search and seizure of the property in November.

8       What is the search and seizure conducted by the

9       municipalities other than that search and seizure?  Because

09:41:44  10       as I see it, what has happened is the municipality would

11       have a concern about the potential drug use.  They go to a

12       judge and say judge, here is the evidence, is there probable

13       cause?  The judge says yes, there is probable cause, go and

14       execute the search warrant.

09:41:59  15          And so I don't understand how that could be a

16       violation of somebody's Fourth Amendment rights in this case

17       while saying, although the judiciary has said there is

18       probable cause, municipalities you should have second

19       guessed the judiciary on that and you knew or should have

09:42:17  20       known that the judge got that wrong and stopped.  And, yeah,

21       and interfered, I suppose, then with the police officers

22       carrying out the court 's order.  I mean it seems to be a

23       little bit of a slippery slope that, you know, a city is not

24       subject to a court's order I suppose is what the analysis

09:42:40  25       would have to be, correct?

1          And so for all of those same reasons, they should

2     be -- the Fourth Amendment claim should be dismissed.  I

3     don't see how you have an unlawful or an unreasonable search

4     and seizure where it has been ordered by a court.  And so it

09:43:02  5     would apply I would think equally to a municipality.  I

6     guess to rule otherwise, like I said, would create a

7     potentially dangerous -- dangerous precedent where cities

8     are second guessing a judiciaries opinions and orders.

9          THE COURT:  Okay.

09:43:20 10          MR. JAMES:  The plaintiffs', I think, best

11     argument on this issue is that the newly enacted Utah RFRA

12     somehow implicates or changes the analysis there.  I don't

13     think it changes absolute immunity.  This is just an even if

14     type argument.  But I have mentioned qualified immunity and

09:43:49 15     that would apply equally to the extent that the plaintiffs

16     are persuasive in saying that the Utah RFRA has somehow

17     amended or changed the analysis that the police officers

18     knew or should have known that they were violating clearly

19     established law in following a court's order because of a

09:44:06 20     newly enacted statute.

21          I'm happy to get into the state law claims that

22     we have discussed, but like I have said at the outset, I

23     intended to limit my argument and focus in on the state or

24     on the federal claims because with those claims dismissed,

09:44:26 25     the state law claims should be remanded.

1          THE COURT:  And I understand where you're coming

2     from.  I can tell you -- I can tell you that I think there

3     are enough are tricky issues here that I'm going to take

4     this under advisement at the end of the hearing today.  So

09:44:48  5     you may prevail on your motion to dismiss the federal

6     claims, but you're not going to know that now.

7          So I guess if you want to argue the state claims,

8     you can.  If you choose to not argue those orally and submit

9     those on the briefing, you're free to do that as well.

09:45:11 10          MR. JAMES:  All told, may as well hit them

11     quickly.

12          THE COURT:  Okay.

13          MR. JAMES:  So let's be quick.  So we have moved

14     to dismiss the RFRA claim at least to the extent it seeks

09:45:31 15     monetary damages.  And you may have seen, I like the charts

16     that we do, it makes it easy for me to understand the

17     differences between the federal and the state laws and the

18     nuances in the opinions there.  The plaintiffs have come

19     back and argued that hey, this *Tanzin* case that allowed

09:45:51 20     damages under the federal RFRA, the analysis, same analysis,

21     should apply to the Utah RFRA.

22          THE COURT:  Right.  But the language -- well and

23     you can make your arguments on the language, but the list --

24     and maybe I'm confusing it with something else, I'll let you

09:46:12 25     go ahead and make your argument and I won't interrupt.

1          MR. JAMES:  I welcome the interruption.  I think

2     I do better answering questions than just rambling.  At

3     least it sounds better to me.

4          But the federal RFRA and the *Tanzin* opinion

09:46:27  5     focused in when they awarded damages on this word

6     "appropriate."  The federal RFRA says, quote, "A person

7     whose religious exercise has been burdened in violation of

8     the section, may assert that violation as a claim or defense

9     in a judicial proceeding and obtain appropriate relief

09:46:46 10     against a government."

11          The Utah RFRA has similar language.  But true I

12     think important and key differences.  First, is that it

13     changes the "has been burdened" language to "is burdened."

14          THE COURT:  Right.  And then the second is that

09:47:05 15     the word "appropriate" is removed, right?

16          MR. JAMES:  Correct.

17          THE COURT:  So I guess the question is

18     appropriate to me as it seems to be an adjective which would

19     further qualify or limit the term relief.  So I'm trying to

09:47:24 20     understand how you think that the removal of a qualifying

21     term narrows the available relief as opposed to broadens it.

22          MR. JAMES:  And I would say perhaps correct but

23     different which is the *Tanzin* opinion which hinged on that

24     use of the word "appropriate" not on the word "relief."

09:47:49 25     Makes the *Tanzin* opinion inapplicable here.

1              And so, you know, the Supreme Court in analyzing

2     *Tanzin,* focused in on what appropriate relief would be.

3              THE COURT:  Right.  But if -- I guess putting

4     that aside, if I'm just then interpreting what is relief,

09:48:08  5     why would relief be limited?  I suppose your argument then

6     is, well, if it is a present tense, then it's only

7     injunctive relief.  But we all know that something that a

8     state is committing now, by the time it gets adjudicated

9     because courts are very slow, it may no longer be happening.

09:48:34 10     Why does that mean that no monetary relief is available?

11              MR. JAMES:  I think because --

12              THE COURT:  For past behavior.

13              MR. JAMES:  Because the person's religious -- the

14     exercise of religion is no longer being burdened.  And the

09:48:52 15     Utah RFRA is expressly limited to those religious exercises

16     that I'm going to say is being burdened but are presently

17     being burdened.  So because it doesn't allow for, you know,

18     retroactive relief, it's just, you know, present relief.

19     And that's expressed in the statute.  And that's a key

09:49:13 20     difference from *Tanzin,* or sorry, from the federal RFRA,

21     which the Utah RFRA states is expressly kind of modeled

22     after.  And so given the mandates and the rules of statutory

23     interpretation, it's presumed that the omission of the word

24     "appropriate" is intentional and it is supposed to be given

09:49:34 25     meaning.

1            THE COURT:  But again, "appropriate" is a

2    limiting term.  Removing it can't limit anything because it

3    was a limitation, it wasn't an expansive term, it was a

4    limiting term.

09:49:50  5            MR. JAMES:  I understand why you say that.  I

6    disagree.  And I look to the *Tanzin* opinion for that because

7    the court in *Tanzin*, they didn't focus on the word relief

8    and say well, relief means this whole host of things and it

9    is an expansive term and the word appropriate before that

09:50:09  10   that limits it to monetary relief.  The *Tanzin* court focused

11   on "appropriate."  And their whole opinion was based on that

12   word.  Was not based on relief, but appropriate.  And so the

13   *Tanzin* court interpreted appropriate would be an expansive

14   term rather than a limiting term.  Otherwise, why talk about

09:50:29  15   appropriate at all?  They would just talk about relief and

16   say, well, relief means this and therefore monetary relief

17   is included in that and you're allowed damages because it

18   says relief.

19            THE COURT:  Well, maybe they felt the need to

09:50:41  20   discuss what appropriate meant because the fact that it was

21   an adjective would have limited relief and they wanted to

22   make clear why they didn't believe it should be construed as

23   a limitation.

24            MR. JAMES:  I read *Tanzin* as focusing on the two

09:51:04  25   words we have heard, the two phrases we have highlighted.

1    You know, the court says, well, otherwise if we didn't allow

2    monetary relief the *Tanzin* court how could we remedy these

3    lost plane tickets based on this religious exercise that has

4    been burdened but is not presently being burdened.  So

09:51:24  5    that's how the *Tanzin* court came out with and came to the

6    conclusion that monetary damages have to be awarded because

7    there will be instances where somebody's religious exercise

8    has been burdened.  And in that instance, appropriate relief

9    is always allowed which is monetary relief.  The Utah

09:51:43  10   legislature changed those two words that the Tanzin opinion

11   hinged on and said, no, it is not "has been" but only

12   religious exercise that "is burdened" suggesting that it is

13   going to only be injunctive relief and allow them to obtain

14   relief.

09:52:04  15       I will concede they could have drafted it much

16   better.  But I think you have to take the omission of

17   appropriate and the change of has been to is as an

18   intentional use and purposeful and give it meaning.  And the

19   only backdrop we have to analyze this, and discuss it

09:52:22  20   against, is the *Tanzin* opinion where it follows logically, I

21   think, that if you have taken the two clauses that the

22   *Tanzin* opinion hinged on to find that monetary damages were

23   allowed under the federal RFRA, that the Utah legislature

24   intentionally limited it to injunctive relief only and not

09:52:42  25   monetary relief.

1           And so the RFRA claim, to the extent it seeks

2     monetary damages, should be dismissed for that reason.

3           THE COURT:  Okay.

4           MR. JAMES:  Again, highlighting, I think, why

09:52:56  5     even if the federal claims remain, this should go back to

6     state court to be decided because it is a, like I said, a

7     fairly novel and nuanced question of law that's unsettled.

8           THE COURT:  Okay.  Any other state law claims you

9     wish to address?

09:53:20 10           MR. JAMES:  They assert a state law claim that is

11     kind of a corollary between the First Amendment and the Utah

12     State Constitution.  They argue that the free exercise

13     clause under Utah Constitution is going to be subject to

14     strict scrutiny even though the federal First Amendment

09:53:51 15     clause may not be.

16           And so this assumes that you accept our argument,

17     of course, on the First Amendment claim and that it is a law

18     of general applicability and neutral.  All of the cases they

19     have cited to suggest to you that the analysis under Utah's

09:54:15 20     free exercise clause is now different and subject to strict

21     scrutiny as opposed to the same analysis under the *Smith*

22     case is wrong.  They cite to you three opinions.  Each of

23     those opinions expressly recognize that the Utah Supreme

24     Court, quote, "Never determined whether the free exercise

09:54:38 25     clause in Article 1, Section 4 of the Utah Constitution

1       provides protection over and above that provided by the

2       First Amendment of the United States Constitution and we do

3       not decide that question today."

4              And so there has never been an opinion issued

09:54:55  5       from the Utah Supreme Court that would suggest that the free

6       exercise clause under the Utah Constitution offers or

7       affords protections above and beyond what's offered under

8       the free exercise clause of the federal constitution.

9              And so for all of the reasons that the federal

09:55:13  10      First Amendment claim should be dismissed, that they apply

11      equally to why the First Amendment or the free exercise

12      clause under the Utah Constitution should be dismissed.

13             Sorry, I'm scrolling through here.  That summary

14      of, you know, the argument that the analysis applied to the

09:55:44  15      First Amendment federal claim applies to the analysis for

16      the Utah Constitution claim applies also to the Utah

17      Constitution claim as it relates to an unlawful seizure.

18      They haven't distinguished or otherwise articulated why the

19      analysis should be any different under the Utah Constitution

09:56:04  20      as opposed to the Federal Constitution.  So for all of those

21      same reasons, their Utah Constitution claim for an unlawful

22      search and seizure should also be dismissed.

23             THE COURT:  All right.  Anything else?

24             MR. JAMES:  No, I think I have talked long

09:56:20  25      enough.  I appreciate your time.

 1              THE COURT:  All right.  Mr. Bean, who will be

 2    arguing this motion on behalf of the plaintiffs?

 3              MR. BEAN:  I will, Your Honor.

 4              THE COURT:  All right.  You may proceed.

 5              MR. BEAN:  Thank you.  Just at the outset, I

 6    think it's good as we are here both on a motion to dismiss

 7    and a motion for preliminary injunction to recognize that

 8    defendants' motion, of course, is subject to a far different

 9    standard than, you know, plaintiffs' motion for a

10    preliminary injunction where we're evaluating plausibility

11    in terms of what is pleaded in the complaint versus the

12    likelihood of success on the merits which this court has

13    already indicated that at least for the Utah RFRA claim that

14    plaintiffs have demonstrated substantial likelihood of

15    success on the merits which just sensitizing to, you know,

16    the court to, you know, the unique perhaps posture we're

17    here.  I first want to speak --

18              THE COURT:  I was just going to say I -- I

19    understand that, but I suppose the bigger question is if

20    there is not a basis to get past the motion to dismiss stage

21    with respect to the federal claim, aren't you back in state

22    court and what I think won't matter anyway?

23              MR. BEAN:  Yeah.  And that goes right to the next

24    point I was going to raise which is the issue of the

25    supplemental jurisdiction and whether the court should

1    retain or not.  And of course we think the court should

2    retain jurisdiction over the state law claims.  The primary

3    reason for that is that supplemental jurisdiction statute

4    itself which is 28 U.S.C. 1367 which says that district

09:57:59  5    courts may decline to exercise supplemental jurisdiction.

6             (Reporter asks Mr. Bean to slow down.)

7             MR. BEAN:  Yes, thank you.  So let me back up

8    there.  So speaking to the supplemental jurisdiction and

9    specifically to 28 U.S.C. Section 1367, what I was pointing

09:58:21 10    out was that it includes the term "may decline to exercise

11    supplemental jurisdiction" meaning that the court does have

12    discretion to make that decision.  Of course, that

13    discretion is guided by several factors in that statute

14    including, you know, the novelty of the complexity of the

09:58:40 15    issue of state law, whether that piece of state law

16    predominates over the other claims as well as whether there

17    is factual, legal, and overlap, and whether there is going

18    to be a risk of inconsistent judgments created by remanding

19    the state law claims to the state courts.

09:58:59 20             Of course here, plaintiffs feel that this is an

21    issue which should be resolved together.  There is very

22    significant overlap between the First Amendment claim, the

23    Utah RFRA claim, the Utah constitutional claim.  And we

24    don't think the issues are so novel especially with, you

09:59:15 25    know, the 30 plus years of First Amendment and Federal RFRA

1    case law that we have on hand that would necessitate

2    remanding back to state court.

3              THE COURT:  Although if I dismiss the federal

4    constitutional claim, do you concede then that the rest goes

09:59:37  5    back to the state system?

6              MR. BEAN:  I would concede that it is up to Your

7    Honor's discretion.  That's not the --

8              THE COURT:  You know, the Tenth Circuit case law

9    is pretty tough on that point.  At least I'm hard-pressed to

09:59:54 10    think of any Tenth Circuit authority that suggests that when

11    the federal claim goes this early in a case, that I should

12    hang on to it or that I could even hang on to it.  I

13    think -- I think that unless we have invested years in

14    discovery and we have got a pending trial, I'm -- the Tenth

10:00:26 15    Circuit has been pretty clear that the default is to remand

16    it.  But maybe there is a Tenth Circuit case out there that

17    I'm not aware of.  But --

18              MR. BEAN:  I'm not going to point you to an

19    additional one today, so we'll just rest on that specific

10:00:42 20    point on our briefs.  Of course, we think Your Honor is

21    never going to have to reach this question of deciding

22    whether or not to, you know, remand the state claims because

23    we believe that the First Amendment claim and the Fourth

24    Amendment claim have been stated, you know, to a perfectly

10:00:53 25    acceptable level of plausibility.

1           It is certainly concerning to hear from our

2     perspective that defendants would like even if the court

3     retains jurisdiction over the First and Fourth Amendment

4     claims to still remand the state law claims.  That's where

5     it gets into issues of inconsistent verdict risks that we

6     think are pretty substantial as well as the issues of

7     judicial efficiency having two courts litigate in addition

8     to the criminal case that we have going on essentially the

9     same issues, whether they be as affirmative claims or

10     defenses would be an issue for us.  But that's our primary

11     supplemental jurisdiction.

12           Certainly we understand that, you know, if the

13     court does decide to dismiss the First or Fourth Amendment

14     claims, you know, our position is that the court does have

15     some discretion subject to those Tenth Circuit cases that

16     Your Honor has identified.

17           The last thing on that point, obviously, we will

18     argue this more in the Anti-Suit Injunction motion, but it

19     has been concerning to us essentially that it seems to us

20     and Your Honor said there was an inference that the

21     defendants are essentially trying to flee this venue because

22     they didn't have a successful outcome at the temporary

23     restraining order stage.  And we'll put that more into

24     context in the Anti-Suit Injunction motion and what that

25     removal means and how it might be more preventative in

1    allowing the criminal case to proceed but wanted to add that

2    to this statement here.

3           With that, I did want to go over the plausibility

4    of first the free exercise claims.  We'll start with the

5    federal claim, and then go over the reasonable search and

6    seizure claims and we'll start with the federal claim there

7    unless the court would like to direct me somewhere first.

8           THE COURT:  No, that sounds good.  And let's just

9    jump into what I think is the most significant issue, or I

10    guess the hardest or trickiest, I don't know how I want to

11    describe it, issue in front of me, and that is whether or

12    not the Utah Controlled Substances Act is a neutral law of

13    general applicability.  And frankly, I mean I think

14    Mr. James clearly articulated their position which is why is

15    this not *Smith*?  *Smith* had medical exemptions and the court

16    nonetheless found the law neutral and generally applicable.

17    Why is that not binding on me here?  Should I not just

18    follow *Smith* and conclude that the Utah Controlled

19    Substances Law is neutral and generally applicable and that

20    the medical exemption for psilocybin doesn't change that any

21    more than the medical exemptions changed the analysis in

22    *Smith*?

23           MR. BEAN:  Yes.  Let me speak specifically to

24    Smith first, and then I want to talk about *Smith* as it has

25    been extended in the *Fulton* case and the *Chiles* case in the

1    Tenth Circuit, and as those rules indicate whether something

2    is or is not generally applicable.  So first, as to the

3    *Smith* case, I think the significant distinction there is

4    while there may have been a medical exception, you know, for

10:04:19  5    example, prescriptions or licensure for certain controlled

6    substances, although not typically Schedule I substances,

7    there was not what we have here.  There was not a secular

8    exemption for the usage of Peyote, but a concurrent

9    prohibition of the religious usage of Peyote by the

10:04:42  10    government.

11    So I think that's a very significant point why

12    this case is quite significantly different than *Smith.*  And

13    then as Your Honor has indicated, you know, the developments

14    in *Smith* are pretty significant.  The first one I want to

10:04:54  15    talk about is actually rooted in *Smith's* actual language.

16    So in the *Fulton versus Philadelphia* case from

17    2021, from the Utah Supreme Court, and the Tenth Circuit's

18    adoption of those standards in the *Chiles versus Salazar*

19    case from 2024, they explained when a law is not neutral or

10:05:14  20    generally applicable, and they discuss, you know, several

21    modes and instances where that can be possible.  And I just

22    want to raise two for this court that are applicable here.

23    The first one is where the law at issue had a system of

24    individualized exemptions.

10:05:28  25    Now, that language from *Fulton* and *Chiles*

1    actually comes directly from *Smith* itself.  And essentially

2    *Fulton* illustrates this for us.  In *Fulton,* there was a

3    system of individual exemptions that the court found

4    unanimously.  The City of Philadelphia had entered a -- or

10:05:49    5    had a contract with, you know, adoption or foster care

6    entities that included a nondiscrimination provision

7    something that typically applied across the board.

8            However, that clause reserved, to the

9    commissioner of that particular agency, the discretion to

10:06:07    10   issue exemptions based upon what he saw.  Specifically, and

11   we have pointed out that language to the court in our

12   briefing.  Now even the commissioner in that case said that

13   the commissioner never intended to use that exemption.

14   However, the Supreme Court said that the mere fact that an

10:06:26    15   exemption was included in the government's provision

16   indicated it was a system of individualized exemption.

17   So --

18           THE COURT:  Right.  But -- but that -- in that

19   case, the legislature had delegated the individual exemption

10:06:47    20   to the commissioner.  Here, it's a legislature that created

21   the psilocybin exemption for healthcare institutions which

22   to me, I think, distinguishes it from *Fulton*.

23           MR. BEAN:  And the reason I wanted to continue on

24   this, is that's -- the Utah Psilocybin Act certainly is an

10:07:14    25   exemption which I would say supports the system of

1    individual exceptions.  But the more specific provision that

2    I want to point to in the Utah Controlled Substances Act is

3    Utah Code 58-37-6 subsection 2d.  And this is a very similar

4    section to that that was discussed at issue in the *Gonzales*

5    *versus O Centro* case and has kind of a sister statute that's

6    in federal law at 21 U.S.C. Section 822 subsection D.  And

7    what that section of the Utah code allows the Division of

8    Professional Licensing to do is quote, "Waive the licensure

9    requirement of the Utah Controlled Substances Act if,"

10   return to quotes, "consistent -- if it is consistent with

11   public health and safety."

12          That, Your Honor, is precisely the same sort of

13   exemption and discretionary power that the agency here,

14   DOPL, and, you know, there in *Fulton,* the commissioner,

15   right, has to grant the exemptions subject to their

16   determination of public health and safety which I would say

17   is highly discretionary and up to DOPL's sole discretion.

18          So that conclusion of the piece in the Utah

19   Controlled Substances Act alone, I think, is indicative of a

20   lack of general applicability here.  I think we aid to that,

21   the Utah psilocybin Act, which, you know, the court has

22   indicated has the truly broad scope and that we add to that

23   the other exemptions that are also found within the Utah

24   Controlled Substances Act including the Peyote exception,

25   including the Cannibis exception.  And this really builds to

1    a place where we have a very unique Controlled Substances

2    Act unlike any other states or the Federal Substances Act

3    and we have truly a system of individualized exemptions and

4    additional exemptions which undermine the general

10:09:09    5    applicability.

6                   MR. JAMES:  Your Honor, very quickly, could you

7    tell me that cite again?  I'm trying find it but I feel --

8                   THE COURT:  It was 58-37-6(2)(d).  Did I get that

9    right, Mr. Bean?

10:09:25   10                   MR. BEAN:  You did.  And that is also contained,

11    I believe, in a footnote to our motion, a supplemental

12    brief, I believe.  I'm trying to remember all of the

13    briefing that we have done here, Your Honor, and where it

14    lives, but that is the correct cite.  Thank you.

10:09:41   15                   MR. JAMES:  Thank you.  Sorry, Tanner.

16                   MR. BEAN:  The only other thing I was going to

17    mention in regards to this type of, you know, lack of

18    general applicability that the court identified in *Fulton*

19    and *Chiles*, is this Peyote exemption that we have in the

10:09:56   20    Utah CSA which extends only to, you know, Native Americans,

21    essentially those practicing Native American religion.

22    Which we just want to raise, you know, the equal protection

23    concerns with that.  Plaintiffs have not brought an equal

24    protection claim but certainly, you know, that lends, in

10:10:16   25    some sense, to, you know, the government's position on

1    general applicability, and later on, as we'll talk about,

2    compelling state interest.

3         The second part of *Fulton* and *Chiles* that I

4    wanted to talk about is where a law prohibits religious

10:10:37  5    conduct while permitting secular conduct that undermines the

6    government's asserted interest in a similar way.  This is a

7    separate and independent way of demonstrating a lack of

8    general applicability.  And in *Fulton,* the court gave an

9    example of a past case that it had had involving the

10:10:52 10   Santeria faith which practices animal sacrifice.  And they

11   -- that faith group was practicing in Florida and the

12   municipality there passed an ordinance prohibiting them

13   from, you know, keeping animal carcasses out in public

14   places or disposing of them in public places.

10:11:10 15       And the court found that that law was not

16   generally applicable because it did not prohibit very

17   similar conduct which, you know, posed all of the same

18   risks, you know, public health risks perhaps which was that

19   ordinance still allowed hunters to dispose of their kill at

10:11:26 20   home or a different place.  It allowed restaurants to

21   dispose of animal waste in a place that was open and

22   obvious.  And so that's the sort of juxtaposition we have

23   there.  It's an inequality in treatment even if the law

24   might be facially neutral.  Inequality in treatment between

10:11:44 25   a secular instance and a religious instance.  And that is

1       what we have here, Your Honor, and most clearly demonstrated

2       through the Utah Psilocybin Act, as we call it, that portion

3       of the Utah Controlled Substances Act.

4                It is a strikingly broad law and allows these

10:12:02 5    large healthcare systems in the state to administer

6       psilocybin to individuals, largely up to their discretion,

7       subject to just a few different requirements which the court

8       has already talked about.  Frankly, we believe that it poses

9       all of the same dangers that defendants claim that

10:12:18 10   psilocybin would pose to public safety, to public health, to

11      drug trafficking.  There aren't really guardrails erected in

12      that statute for -- to prevent the sorts of things.

13               THE COURT:  But is it though -- is it more just

14      sort of a piggyback on this generalized notion that all of

10:12:41 15   the Controlled Substances Act allow, I suppose, personalized

16      exemptions based on a prescription by a healthcare provider

17      and this is just a more systemic way to allow hospital

18      systems to essentially fulfill the role of a prescribing

19      medical practitioner for these substances?  I mean all of

10:13:12 20   the Controlled Substances Act allow for physician

21      prescriptions for certain substances.

22               MR. BEAN:  That's true.  And generally I would

23      say not in regard to Schedule I substances, but, you know,

24      if there was a reference in the Utah psilocybin Act to you

10:13:35 25   know and this should be interpreted consistent with, you

43

1    know, how prescriptions are to be provided or something like

2    that, I might agree with the court but that's just simply

3    not in there.  It is just pretty barren how it interacts

4    with the rest of the Utah Controlled Substances Act.  And I

10:13:51  5    would say, you know, it interacts far less with that and at

6    the end, of course, it immunizes, you know, individuals,

7    administering, overseeing, you know, participating in any

8    sort of program erected by a healthcare organization from

9    liability, right?  It's not even an affirmative defense

10:14:10  10    which is most typical under the Controlled Substances Act

11    where there might be some sort of other step-off exemptions.

12          THE COURT:  So at what level of generality do we

13    look at the legislation that's involved to determine if we

14    have got a neutral law of general applicability?  Do we look

10:14:31  15    at the Controlled Substances Act as a whole, or do we drill

16    down and only look at how the Controlled Substances Act

17    applies to the particular controlled substance that is at

18    issue in our litigation?  In other words, is it fair ground

19    to look at the Peyote exemption or are we cabined to looking

10:14:54  20    at what the Act does with respect to psilocybin?

21          MR. BEAN:  I think my answer would be different

22    depending on the type of lack of general applicability the

23    court has indicated in *Fulton* and *Chiles* under the first

24    which we began with the system of individualized exemptions.

10:15:12  25    I do think it is appropriate for the court to review the

44

1    entirety of the Utah Controlled Substances Act including all

2    of the exemptions because the idea here is, you know, that

3    at some point it just becomes so unreasonable that the Act

4    has so many other exemptions for others that the

10:15:27  5    government's position in not providing it to a religious

6    organization becomes unjustified, right?

7            You know, when the law becomes more Swiss cheese

8    than not, right, how can the government not allow a

9    religious organization to receive the same sort of similar

10:15:45 10    exemptions.  It kind of begins to raise the equal protection

11    issues or those concepts, right?

12            So I think under that provision of *Fulton* and

13    *Chiles,* I think that it's appropriate for the court to

14    consider all those pieces.  However, when we are looking to

10:15:58 15    this other mechanism of evaluating whether the law prohibits

16    religious conduct while permitting secular conduct that

17    undermines the government in a very similar way, that is a

18    place where I think the court hones in a little bit more

19    specifically on the substance at issue.  And here, of

10:16:12 20    course, it is psilocybin.  And so the natural comparator

21    under the Utah Controlled Substances Acts is the Utah

22    Psilocybin Act prohibitions within that act.  Does that

23    answer Your Honor's question?

24            THE COURT:  I think so.

10:16:25 25            MR. BEAN:  Okay.  That is what I would like to

1     share with the court as far as general applicability goes

2     with the First Amendment.  Just briefly, I'll comment on,

3     you know, getting to strict scrutiny otherwise.  I don't

4     think anyone disagrees here that the Utah RFRA, Religious

10:16:48  5     Freedom Restoration Act, requires -- or excuse me, review.

6     It's certainly a similar disagreement about whether article

7     Section IV of the Utah Constitution requires strict scrutiny

8     review.  We certainly pointed the court to cases which

9     indicate the Utah Supreme Court's development and thinking

10:17:03 10     on that matter.  We're not here to say that there is a case

11     that has firmly decided the matter, you know, as a matter of

12     something that could be other than dicta but just --

13            THE COURT:  Well, and I guess the question is,

14     assuming that -- I suppose if I disagree with you on the

10:17:23 15     Federal First Amendment claim, again, what I think about the

16     Utah Constitutional Free Exercise claim it becomes

17     irrelevant because the case isn't in front of me any more.

18     But assuming that the Federal First Amendment claim survives

19     a motion to dismiss, is the motion to dismiss procedural

10:17:51 20     stage the appropriate place for this court to get into a

21     full blown analysis of the contours of that Utah

22     Constitutional Free Exercise Claim given the -- I mean I

23     know we have some briefing here, but it seems like it

24     certainly is not the kind of exhaustive exploration of the

10:18:16 25     issue that I would hope to have if I were actually trying to

1    define the contours of that right.

2        MR. BEAN:  Yeah.  And certainly we think it would

3    require some substantial additional briefing if we were to

4    go all the way through that.  I think it is something that

10:18:33  5    would be better left probably for another day.  It's very

6    possible, of course, that this court could decide that it

7    doesn't even reach that analysis because of the Utah RFRA

8    analysis or the First Amendment analysis.

9        THE COURT:  But it's kind of tricky here though

10:18:47  10    because I mean I have a motion to dismiss that's pending in

11    front of me.  And while I may not -- while the outcome of

12    the Utah Constitutional Free Exercise claim may have no

13    bearing with respect to the outcome of the motion for a

14    preliminary injunction, and, in fact, I think is unlikely to

10:19:13  15    have any bearing on the outcome of that motion, I still have

16    a motion to dismiss in front of me and I think I have to

17    decide that claim.  But as you've just indicated, I'm being

18    asked to decide to throw it out or keep it in based on very

19    limited and what I think is inadequate briefing.

10:19:37  20        MR. BEAN:  The only thing I would add to that,

21    Your Honor, is that the defense proposed, you know, that

22    cases in Utah Supreme Court essentially indicate a

23    neutrality standard.  We have taken the court through that

24    in our briefing and we think that neutrality standard is

10:19:50  25    simply inapplicable to the free exercise claims that we have

1    here.  Those provisions about neutrality relate to more

2    establishment clause type concerns in the Utah Constitution

3    than they do here.

4         So certainly, you know, of course we would if the

10:20:07  5    court feels like it needs to decide it, our position is that

6    the Utah court has indicated the way, and to -- where it is

7    most likely to land on what analysis applies to strict

8    scrutiny analysis applies.  But, of course, you know, lots

9    of briefing going on here.  Plaintiffs felt the need to

10:20:26 10   emphasize the First Amendment claim and that Utah RFRA claim

11   first before proceeding there.

12        THE COURT:  Okay.

13        MR. BEAN:  All right.  Let's see.  I think what

14   we will do is we will save our discussion about the two

10:20:42 15   strict scrutiny prongs as defendants appear to have done,

16   the compelling governmental interest and the least

17   restrictive means for discussion on the preliminary

18   injunction although I do think they have some application

19   here for the motion to dismiss because if plaintiffs in

10:21:02 20   their pleadings having demonstrated a substantial burden on

21   their religious free exercise, the burden then shifts to the

22   government to indicate that it does have a specific

23   compelling interest as to denying an exemption to the

24   plaintiffs here, and then must also show that there is no

10:21:18 25   other less restrictive means they could employ other than

1    outright prohibition of psilocybin to accomplish the

2    government's means.  So I will just note that and bookmark

3    that for the court and we can talk about that more

4    specifically unless the court would like to hear that

5    presently.

6              THE COURT:  I'm happy to let you defer.

7              MR. BEAN:  Okay.  Let me move over to the search

8    and seizure claims.

9              THE COURT:  Wait.  And I have to say, I'm

10   somewhat skeptical of these claims.  If -- if we -- if the

11   search hadn't been based on a warrant issued by a judicial

12   officer with absolute immunity, you could have some

13   traction.  But I am just -- I am really struggling to see

14   why those Fourth Amendment claims don't go out the window

15   based on the warrant?

16             MR. BEAN:  Yeah.  And I can see why Your Honor

17   would have that impression.  Essentially our argument is,

18   you know, beyond some of these arguments about immunity

19   related to and flowing from an issued search warrant that

20   the search warrant was essentially procured under, you know,

21   means that should have indicated to the court that probable

22   cause was not present.  You know the officer did include

23   information to the court about some of the claims that

24   Singularism was making as to religious free exercise, but

25   notably absent from that search warrant affidavit were, you

1      know, indications of religious sincerity or --

2             THE COURT:  Well, so do I understand that you're

3      not making a claim that the search was unconstitutional,

4      you're making a claim essentially that the procuring officer

5      committed fraud on the court and therefore that officer

6      ought to be liable for committing fraud on the court and

7      obtaining a warrant.  I mean that's a very different issue

8      than saying that the search was invalid.  I mean if you were

9      going to bring a claim against an -- and I -- against the

10     officer, it wouldn't be for conducting a search, it would be

11     for basically filing a false affidavit to obtain the

12     warrant.

13            MR. BEAN:  Yes.  And we recognize those

14     distinctions.  The case I would point the court to is the

15     U.S. Supreme Court case called *Malley versus Briggs,* that's

16     475 U.S. 335.  And the quote that I just want to highlight

17     for the court there is that a police officer who secures an

18     arrest warrant without probable cause cannot assert an

19     absolute immunity defense.

20            I know we have a lot of other authorities that

21     both parties have cited as to, you know, prosecutorial

22     immunity and issues of the before and after the search

23     warrant issue, but that -- it is almost like a fruit of the

24     poisonous tree type argument, Your Honor, in the sense that,

25     you know, our position is that defendants especially you

1    know the entity level defendants and the final

2    decision-makers here, should have at least instructed or the

3    individual defendants should have included in that search

4    warrant affidavit information about, you know, the bona fide

10:24:34  5    defense that Singularism has, for example, did not include

6    any information that Singularism had had a, you know, record

7    of safety that was untouched at least at the time of the

8    search warrant being procured.  It didn't have any

9    statements about the government's compelling interest in

10:24:51 10    denying Singularism specifically an interest or an

11    exemption, right, such that it would compromise their issue.

12    So there was just some information that wasn't

13    present and we can never second guess this because, of

14    course, the court issued the search warrant.  But had those

10:25:07 15    issues been present, perhaps we would have had a different

16    situation and prevented the search altogether.

17    And I could see how the court might, you know,

18    understand that some of those, you know, pre-search warrant

19    or post-search warrant activities fall a little bit better

10:25:23 20    underneath the free exercise claims rather than the Fourth

21    Amendment claims, but there includes the extent they

22    contribute to what we think is a search without probable

23    cause and thus, you know, obtaining, you know, a detention

24    and obtaining evidence that was not supported by probable

10:25:42 25    cause.

```
 1              Practically, talking about issues of immunity, as

 2     the court has reviewed, we have filed an amended complaint

 3     and that was something we discussed back and forth with

 4     defendants over the past week or so, the past few days.

 5     And, you know, there was the decision made to remove these

 6     law enforcement officers as defendants.  Of course, we have

 7     the present motion to dismiss before you.  That was not a

 8     decision made because of the immunity arguments but rather

 9     the argument I'll talk about in a moment about the bond.

10              Before we leave the immunity issues, beyond what

11     we have put into the briefs, I did want to highlight for the

12     court an issue from a case in the Tenth Circuit about the

13     municipal liability -- or municipal immunity.  And that case

14     is Hennessey versus University of Kansas Hospital Authority.

15     That's 53 F.4th 516 at 527.  It's from the Tenth Circuit in

16     2022.  I'm going to state in terms of scope Eleventh

17     Amendment --

18              THE COURT:  Slow down for a minute.

19              MR. BEAN:  Sorry I get quoting here.

20              THE COURT:  Yeah.  When you read you speed up.

21              MR. BEAN:  That must be some leftover trauma from

22     fourth grade read-aloud or something like that.  But, let's

23     start again.  In terms of scope, Eleventh Amendment immunity

24     extends to states and state entities, but not to counties,

25     municipalities, or other local governmental entities.
```

1          Now, we don't think that the issue of municipal

2     liability was particularly raised in the motion to dismiss,

3     so we really haven't had too much time to address that.  And

4     if the court is interested in receiving supplemental

10:27:31 5     briefing, we're happy to do that, but we just wanted to kind

6     of bookmark that for the court in that we do believe that

7     even if the law enforcement officers were entitled to some

8     level of immunity, the municipalities at issue would not be.

9          Last, let's go to the bond issue.  And the only

10:27:54 10    reason I'm raising the bond issue is just to indicate why

11    the law enforcement officers are being removed.  I think the

12    plaintiffs have some decent arguments about that statute

13    which requires essentially a bond in the amount of

14    attorney's fees that the government would need to expend to

10:28:11 15    prevail in the case.  We have, you know, some issues about

16    that, you know, perhaps even, you know, constitutionally or

17    that it would apply in the case in a First Amendment

18    violation or religious free exercise violation.

19          But frankly, rather than, you know, bringing that

10:28:29 20    fight and expending the time and effort to fight over

21    constitutionality of one of Utah's statutes kind of as a

22    collateral issue in this case, plaintiffs at least at this

23    time have decided to remove the law enforcement defendants

24    and pursue the claims principally against the municipalities

10:28:46 25    and Utah County Attorney Jeffrey Gray.  Of course, if facts

1    indicate to us that, you know, the law enforcement officers

2    fall outside the scope of their official duties such that

3    that statute no longer is applicable, plaintiffs would like

4    to reserve the right to amend their complaint again to add

10:29:03  5    those individuals as to those particular issues.

6         As to the Utah constitutional reasonable search

7    and seizure claim, I don't think I heard counsel argue for

8    immunity here either, but other than what was stated as to

9    the Fourth Amendment, but we would just repoint the court

10:29:25 10    back to the *Stella versus County and the Jensen ex rel,*

11    *Jensen versus Cunningham* cases which indicate that the Utah

12    Governmental Immunity Act does not apply to Utah

13    constitutional claims.

14         I think the only thing I have left over to

10:29:40 15    discuss on this is the issue regarding the Utah Religious

16    Restoration Act damages.  I don't have much more to say than

17    what the court has already kind of questioned plaintiffs

18    about and is included in our briefing.  Simply we think, you

19    know, the removal of the word "appropriate" in the federal

10:30:01 20    version to the Utah version, if anything, just allows even

21    greater relief.

22         THE COURT:  What about the tense change from

23    present tense to past tense?  I think that's -- if we're

24    doing a linguistic analysis here, I think that's a tougher

10:30:17 25    argument for you than the -- than the word "appropriate."  I

1    mean the whole tense thing doesn't suggest relief for past

2    i.e. non-continuing conduct, does it?

3            MR. BEAN:  I think it does.  I don't find much

4    meaning frankly in the change between the tenses here.  I

10:30:42  5    would be very surprised to hear if Utah legislature was

6    attuned to that level.  Of course, we'll take them at their

7    word, but I'll put that in the context of what we have also

8    included in our brief which is statements from the

9    legislature of course indicating that they intended this

10:30:56  10   RFRA to be, you know, the best, most potent.

11           THE COURT:  Well, I understand that.  But absent

12   an ambiguity, I can't look at that stuff.  I'm confined to

13   the language the legislature actually used and I have to

14   interpret what that means.  I can't look at what Senator

10:31:18  15   Weiler said to the Deseret News.

16           MR. BEAN:  True.  And, you know, my understanding

17   and this is something that we could supplement with if

18   necessary, but it sounds like that the Utah legislative, you

19   know, the drafting manual advises the legislature to place

10:31:34  20   things in present tense.  So that may be a reason for the

21   explanation of the tense change and it could be something in

22   additional.  Whatever the case is, I don't think it really

23   has significant impact in this case in removing the type of

24   relief that plaintiffs could obtain.  Because in any event,

10:31:51  25   plaintiffs have both been, you know, sustained substantial

1    burdens in the past, and they expect to in the future and

2    have ongoing burdens.  For example, we have indicated to the

3    court that, you know, in the past, some of defendants

4    statements have caused an issue with plaintiffs' bank

10:32:08  5    accounts.  Of course, the search and seizure is in the past,

6    right?  And then we also, you know, recognize the active

7    burdens that are ongoing such as the failure to return the

8    psilocybin, the threat of eviction, which has not been

9    lifted, the criminal ongoing prosecution and, of course, all

10:32:24  10    of those substantial burdens impact on diminishing the faith

11    membership and ability of those individuals to participate

12    in the religious free exercise in community with

13    Singularism.

14            So for that reason, we think damages are clearly

10:32:41  15    a form of relief available under RFRA in Utah's RFRA.  We

16    think it's consistent with what happened in the *Tanzin* case.

17    We think it's consistent with what is drafted.  And the last

18    thing I'll point you to is if the court -- or if the

19    legislature had intended relief to be limited only to

10:33:02  20    attorney's fees and costs, it would likely have said that in

21    the provision where it discusses attorney's fees and costs.

22    And, of course, that provision is several lines down in the

23    statute and it's a separate subsection.

24            All right.  Well, I think, with that, I don't

10:33:16  25    think I have anything further for Your Honor unless you have

1    questions for me.

2             THE COURT:  All right.  I do not.  I'll turn the

3    time back over to Mr. James to reply.

4             MR. BEAN:  Thank you.

10:33:27  5             MR. JAMES:  All right.  I will be quick and hit

6    on a couple of things and try to field any questions Your

7    Honor may have.  So I'll start with the First Amendment

8    claim and this general applicability which seems to be

9    probably the issue for the day.

10:33:50  10             I quickly tried to do some more research on this.

11   I found a case out of the Eighth Circuit I think is

12   applicable to this analysis and to my argument.  The cite is

13   *Olsen versus Mukasey*, M-U-K-A-S-E-Y.  The cite is 541 F.3d

14   827.  I'll see if I can get you a pincite really quick.

10:34:19  15   Starting at 832 is the pincite.

16             It's the Eighth Circuit going through and

17   discussing and addressing frankly the exact arguments I

18   think that Mr. Bean has made, which is that the Controlled

19   Substances Act of that state violated and was not --

10:34:36  20   violated the First Amendment and was not generally

21   applicable because he contended, the petitioner contended,

22   that the Controlled Substances Act exempted the use of

23   alcohol, tobacco, certain research and medical uses of

24   marijuana and the sacramental use of Peyote.  The Eighth

10:34:57  25   Circuit rejected that argument saying, quote, "General

1    applicability does not mean absolute universality."  I can't

2    even talk.  Exceptions do not negate that the Controlled

3    Substances Act are generally applicable.  And then they

4    cite, and I think this is helpful, the *O Centro* case that

10:35:18  5    everyone is familiar with, and also *United States versus*

6    *Meyers,* which is a Tenth Circuit case.  The cite is 95 F.3d

7    1475.  But in short, it, I guess, reenforces the argument

8    that I have made which is that just because exceptions exist

9    to a Controlled Substances Act does not make that law

10:35:46 10    generally applicable or does not make it so it is not

11    generally applicable.  There has always been exemptions and

12    every case that I have seen has still held that the

13    Controlled Substances Act are generally applicable.

14         We discussed in my first argument about whether

10:36:06 15    or not qualified immunity would extend to the

16    municipalities.  And I have another case for you that would

17    suggest that at least part of the analysis does.  And this

18    is *Fenn versus City of Truth or Consequences,* 983 F.3d 1143.

19    And it's a Tenth Circuit case from 2020 that suggests that,

10:36:33 20    and I'm quoting, "Because Fenn cannot establish a violation

21    of a clearly established constitutional right, his Monell

22    and supervisory liability claims also fail."  Which suggests

23    that in order to have a claim against the municipalities, in

24    order to have a Monell liability type of claim, you have to

10:36:54 25    have a violation of a clearly established constitutional

1    right which is still the same analysis as the qualified

2    immunity analysis.  And where you don't have any case law

3    that has fleshed out and essentially rebutted or overturned

4    *Smith,* and a plethora of case law that says otherwise, it

10:37:17  5    cannot be held that the city has violated the plaintiffs'

6    First Amendment -- clearly established First Amendment

7    rights in enforcing a Controlled Substances Act that has

8    been enforced since its enactment without question.

9         THE COURT:  So and maybe I'm -- I'm looking at

10:37:40 10    the first claim for relief of the Amended Complaint and it

11    talks about 42 U.S.C. Section 1983 and then the First

12    Amendment claim.  Do we analyze this only through the lens

13    of a 1983 violation dependent upon the First Amendment, or

14    is there an independent First Amendment claim separate and

10:38:14 15    apart from the 1983 claim to which -- and if so, then would

16    the free standing constitutional claim implicate these

17    notions of clearly established law and immunity?  I mean it

18    seems that if we -- if there is going to ever be any

19    development in the first amendment law itself, we can't

10:38:45 20    impose a requirement that the law be clearly established or

21    we would be frozen in time with respect to the First

22    Amendment claim.

23         MR. JAMES:  Oh, gees, Judge, that is a

24    never-ending lunch conversation we have here when we talk

10:39:01 25    about our qualified immunity and the personal issues I have

1    with that analysis, but that's the analysis.  That happens

2    all of the time.  Regularly, cases are dismissed because

3    there is not in the context of a 1983 claim, because it is

4    not a violation of clearly established law and the case is

10:39:23  5    dismissed.

6              THE COURT:  Right.  But that -- I guess what I'm

7    trying to ask, and maybe this was more appropriately

8    addressed to Mr. Bean, is the first claim for relief of this

9    newly filed amended complaint, which as I said I haven't

10:39:43  10   read cover to cover because it was just filed last night, is

11   it -- is it a 1983 claim seeking, you know, money damages,

12   or is it a free-standing First Amendment claim that's just

13   trying to enforce the rights under the First Amendment that

14   isn't dependent on the 1983 qualified immunity analysis?

10:40:16  15   I'm not sure.

16             MR. JAMES:  And I guess I would say, and this

17   happened to me in front of Judge Barlow, I was arguing a

18   qualified immunity argument and I won but he ruled that it

19   didn't satisfy *Iqbal*, *Twombly* standards which was an

10:40:34  20   argument that I didn't even think to make.  And I think that

21   your struggling with that question would highlight the

22   answer to it which I think you've got to take it first as

23   pled which it's pled as a 1983 claim.

24             THE COURT:  Well, it says, 42 U.S.C. 1983 and the

10:40:51  25   First Amendment to the U.S. Constitution.  I guess maybe

1    there are two claims within the claim.

2         MR. JAMES:  I understand 1983 to not -- it

3    doesn't give you your owner set of independent rights other

4    than to assert a constitutional violation claim so they have

10:41:13  5    to be married together.

6         THE COURT:  So how is there ever any development

7    with respect to constitutional law if all of the claims get

8    thrown out they aren't based on clearly established law.  I

9    mean we would be stuck in whatever year 42 U.S.C. 1983 was

10:41:32 10   adopted.

11        MR. JAMES:  I guess to your point, and to the

12   conclusion we have come to here, which the issue you're

13   touching on is an issue that exists not just in this case in

14   the First Amendment, but as to qualified immunity.  And that

10:41:48 15   is the qualified immunity analysis is if you don't violate

16   clearly established law and recent Supreme Court decisions

17   from 2022 suggest that it has to be a case law almost

18   exactly on point, then there is no constitutional violation.

19   And then that presents the problem you're worried about or

10:42:08 20   you're addressing which is fair, but is frankly an issue for

21   the Supreme Court to overturn its qualified immunity

22   analysis.  Because the analysis is that and the concern of

23   developing case law is, like I said, that's something that

24   the Supreme Court would have to change its decisions on on

10:42:28 25   qualified immunity.

1          THE COURT:  But it's interesting because the

2     clearly established law prong of the 1983 analysis is not

3     limited to only Supreme Court opinions, it has also been, as

4     I understand it, interpreted to include circuit case law on

10:42:48  5     point and perhaps even lower court opinions if there are a

6     sufficient number of them.

7          MR. JAMES:  And I suppose the pragmatic answer to

8     your question, although judges rarely do this although I

9     have invited them to, is you could find a violation, but

10:43:11  10     nevertheless dismiss the claim because it wasn't clearly

11     established prior to your decision.  Thereby, you know, kind

12     of fleshing out and fleshing out --

13          THE COURT:  What would happen if I find a

14     violation but don't find liability, monetary, the potential

10:43:37  15     for monetary liability based on that.  What does that do to

16     the dispute on the ground i.e., whether or not Mr. Jensen

17     could continue to use psilocybin in his religious

18     ceremonies?  In other words, because I guess I could declare

19     that it is a violation of the First Amendment, but that

10:44:08  20     there is no potential for a 1983 claim.  But then does it

21     become clearly established so if there are further

22     enforcement efforts, then there is a new claim for 1983

23     liability based on the specific ruling that I have entered

24     in this case meaning it seems like that while there may not

10:44:35  25     be a monetary damages claim, there is certainly an

          1    injunctive relief possibility that can't be ignored.

          2             MR. JAMES:  I don't see how you square what you

          3    said with what the I guess the precedent of the case law is

          4    which is that absent the violation of clearly established

10:45:00  5    constitutional rights, there is no claim.  And so while I

          6    understand that you would struggle with how on earth do you

          7    ever develop this case law, I go back to yes, you're right,

          8    that's an issue that I think the Supreme Court has wrong

          9    because regularly cases are dismissed without developing the

10:45:23 10    case law.  But that's an issue that the Supreme Court has to

         11    change.  You can't, because, you know, there is a practical

         12    problem with the qualified immunity analysis finding a

         13    loophole through the standards and the law that's been

         14    espoused by the Tenth Circuit and the Supreme Court.  And

10:45:43 15    that's the standards that govern the decision, and the

         16    decision then has to be absent a finding that there is a

         17    violation of clearly established constitutional rights,

         18    there is no claim whether against --

         19             THE COURT:  And I just -- I'm trying to think and

10:45:58 20    frankly this is not an issue I focused on in terms of the

         21    case law that we have been talking about, but when the

         22    Supreme Court issues, for example, the *Fulton* opinion and

         23    they changed the law, or they extend the analysis to make

         24    something more clear or clearer that wasn't clear before,

10:46:30 25    what happens to the underlying claims in those cases?  Are

1    they thrown out on the basis that this is what we're

2    deciding now, but it wasn't clearly established before?

3              MR. JAMES:  Oh, gees, I don't know what happened

4    to the underlying claims in those cases.  As we have even

5    seen today, there are arguments that can be made that

6    sometimes they're not made or are not made clearly.  You

7    know, for example, I -- so the answer is I don't know what

8    has happened to those claims.

9              THE COURT:  I mean I guess I need to read those

10   cases with that in mind which is something that I confess I

11   hadn't focused on until we started entertaining this

12   discussion.  But --

13             MR. JAMES:  And I guess I would say that's fine,

14   but it is -- I think unless that argument is squarely made

15   and addressed, that it is not there does not indicate that

16   you can follow a different precedent, right?  The court is

17   silent on an issue doesn't mean that the issue -- that the

18   standard has been changed.  So if the standard is for *Monell*

19   liability, and it's the *Truth or Consequence* case, that

20   absent a finding of a violation of a clearly established

21   constitutional right there is no *Monell* liability.  But even

22   if the *Fulton* case is silent on that issue and those claims

23   remain, that could be because the arguments weren't made.

24   And if the arguments weren't made, I would have loved for

25   judges to make the arguments for me, but that's not their

1    job and I guess I would be out of a job.  So maybe I

2    wouldn't love them to make it for me.

3            But my point is, I would guess, if you go read

4    those cases and those claims remain, check and make sure

10:48:24   5    that the reason they've remained is they've addressed the

6    *Monell* liability issue and this question of was there a

7    clearly established constitutional right and were the claims

8    still retained.  Because my suspicion is, although I haven't

9    read them with that in mind either, that if those claims

10:48:40  10    remained, it's not because they have analyzed the issue of

11    clearly established constitutional rights and found that the

12    law has changed on them.

13            THE COURT:  Okay.

14            MR. JAMES:  But I would circle back and say we

10:48:54  15    are way down in the weeds on that.  I don't think you have

16    to get there because this law is one that's generally

17    applicable.  And because it's generally applicable, there is

18    no First Amendment violation.

19            The final argument I will make goes back to RFRA

10:49:11  20    and damages.  We've talked about a lot of the language of

21    the RFRA, but one of the ones, one additional argument that

22    Mr. Stephens has kind of beat me on the head over is there

23    is still governmental immunity for damages.  And absent the

24    Utah Governmental Immunity Act expressly waiving damages,

10:49:33  25    immunity is retained and it hasn't been waived.  Nothing in

1    the RFRA would suggest that the municipalities or the state

2    has waived immunity for a RFRA violation.  And so for that

3    additional reason, the governmental immunity damages are not

4    available either.

5            I will give you supplemental briefing on who can

6    maintain a constitutional violation and who it can be

7    maintained against.  I'm going back now to common law and

8    *Bivens* actions in the 1983 and immunity.  And if we're way

9    down in the weeds on that, I would request that we could

10   give you some supplemental briefing.  Again, the First

11   Amendment claim should be dismissed because the law is

12   generally applicable.  The Eighth Circuit has said, "General

13   applicability does not mean universal applicability."  There

14   has always existed exemptions for the Controlled Substances

15   Act, even since *Smith*, even the cases before *Smith* that had

16   the stricter standard still recognize that there can be

17   exemptions without there being taken away from a generally

18   applicable case or law.  And so for those reasons, the First

19   Amendment claim should be dismissed.  The Fourth Amendment

20   claim I haven't heard strong arguments on.  That one should

21   be dismissed as well and that leaves us going back to state

22   court with the rest of the claims.  Thank you, Your Honor.

23           THE COURT:  All right.  Before we jump to the

24   next motion, I want to give Mr. Bean the opportunity to

25   address this issue that you and I have been batting around

1    which you indicated you may want to do supplemental briefing

2    on just with respect to the clearly established law and what

3    Mr. Bean intended in his first claim for relief to be in the

4    newly filed complaint.  I know it is your motion to dismiss

10:51:46  5    so you'll get a chance to respond after I hear from him, but

6    I'm just interested in hearing his reaction to --

7         MR. JAMES:  That's fine.  One, I guess, one other

8    thing is that Mr. Muhlestein is on, he, of course, is a

9    joint movant.

10:52:01  10         THE COURT:  That's right.

11         MR. JAMES:  I don't know if he wants to present

12    arguments.

13         THE COURT:  And that was terrible of me to not --

14    so you need to jump in and I am happy to -- let's turn the

10:52:13  15    time over to Mr. Muhlestein to let him add anything that he

16    wants to and I sincerely apologize, Mr. Muhlestein, that I

17    didn't let you have an opportunity to address me before we

18    heard from Mr. Bean.  So let's give you that opportunity

19    now, then we will give Mr. Bean an opportunity, and then

10:52:36  20    Mr. Muhlestein and Mr. James, you will have the last

21    opportunity to reply.

22         MR. MUHLESTEIN:  Your Honor, on this particular

23    topic I had just intended to join with the arguments from

24    co-counsel.  So that's part of the reason I didn't jump in

10:52:50  25    so I wasn't offended because I wasn't intending to on this

 1      particular issue.  But thank you, and we'll submit on what

 2      they have said.

 3              THE COURT:  Okay.  Well, then let's hear briefly

 4      from Mr. Bean on that last issue that Mr. James and I

 5      engaged on and then we'll turn it back to Mr. James who gets

 6      the final word on this motion.

 7              MR. BEAN:  Thank you, Your Honor.  Let's look

 8      first at the 1983 claim for relief.  This difference, there

 9      is not a difference in what I'm about to say in the original

10      complaint and the amended complaint but it is alleged, for

11      the purposes of injunctive relief and damages.  You can see

12      that very end, last, let's see, what is now going to be --

13      what is now Paragraph 82, asked for attorney's fees, 81

14      talks about the unlawful events and, of course, we go to

15      prayer for relief at the very end of the complaint, the

16      first paragraph of that prayer for relief asks for a

17      declaratory judgment.  The sixth paragraph through the

18      seventh paragraph asks for injunctive relief, and then the

19      eighth paragraph asks for money damages, you know,

20      compensatory damages, then we have a request for punitive

21      damages, and then a request for attorney's fees and

22      litigation expenses.  So it really is both that is being

23      asked for in both the First Amendment Claim as well as the

24      other claims free exercise and other claims pleaded.

25              Now, as to the issue of qualified immunity and

1    the conversation we have been having here today on that, I

2    do think it is a good idea if the court thinks it is going

3    to be an issue that it needs to reach, for the parties to

4    perform supplemental briefing.  From my perspective I don't

10:54:47  5    think issue of qualified immunity -- well, I don't

6    understand it to be a raised at all in the original brief in

7    the motion to dismiss.

8          THE COURT:  Right.  And so in your view, does

9    this issue of qualified immunity and whether an action

10:55:02  10    violated a clearly established constitutional right go at

11    all to the declaratory judgment and injunctive relief

12    claims, or is that argument simply limited to the money

13    damages claim.

14          MR. BEAN:  My understanding is that it is far

10:55:19  15    more limited to the money damages claim.  For example, if

16    the court were to find a violation, then a secondary

17    question would be, all right, are damages permitted for this

18    violation.  And to prove that, we would have to go through

19    an analysis about damages.  And my understanding is that one

10:55:34  20    of those elements on that analysis is whether -- what the

21    law was clearly established.  And then of course --

22          THE COURT:  And so your view is that that

23    analysis has no place in determination of your claim for

24    injunctive relief or declaratory judgment?

10:55:49  25          MR. BEAN:  And by extension, you know, on a

1    motion to dismiss, you know, the court could perhaps decide

2    the issue of whether damages should be awarded.  But the

3    other issue about damages under 1983 are issues of flagrancy

4    of the violation which I think are factual issues that are

10:56:06   5    held off until a later date besides the motion to dismiss.

6    But from our perspective, you know, if the Court was just

7    looking at it and for some reason the claim was limited to

8    injunctive relief, the only request I think we could get

9    through the door at least at a motion to dismiss stage.

10:56:21  10    Again, I'm speaking, you know, from my limited engagement

11    with the qualified immunity cases and the clearly

12    established law cases, as I think if qualified immunity was

13    raised at all in the briefing it wasn't in the reply brief,

14    but I don't think we even heard the words "clearly

10:56:36  15    established law" even in the briefing at all.  We're

16    certainly willing and happy to engage further in that in

17    supplemental briefing if it is beneficial for the court.

18             THE COURT:  Okay.  Back to you, Mr. James.  And

19    again, I could just be completely off base, but my

10:56:53  20    understanding of that clearly established inquiry is that it

21    applies to qualified immunity which applies to damages

22    claims, not claims for injunctive relief.  But I could be

23    wrong on that.  And so I suppose if you and Mr. Bean want to

24    file supplemental briefing in the next five days, limited to

10:57:19  25    ten or fewer pages, simultaneous filings on that particular

1    issue, I'm happy to entertain that.

2          MR. JAMES:  Okay.  I'm happy to do what the

3    court, I guess, would like.  My preference if I was king for

4    a day would be, as I have said from the beginning, I don't

10:57:40  5    think we need to get down that far into the weeds on

6    qualified immunity because we have to first to get there

7    find that what has happened is a constitutional violation.

8    And to get there you have to find that the Controlled

9    Substances Act is not a law of general applicability.

10:57:56  10          THE COURT:  All right.  But do I have to find

11    that that was clearly established, or do I just need to find

12    that it's not a law of general applicability?  I mean that

13    is the question.  And I seem to be hearing you argue that

14    because there is not a court that has ever declared that

10:58:15  15    before, because there is no court that has declared the Utah

16    Controlled Substances Act to be other than a neutral law of

17    general applicability, I can't make that finding.  Now maybe

18    that is not what you were arguing, but that's my

19    understanding of what you were arguing.

10:58:32  20          MR. JAMES:  So you're right on my arguments.  I'm

21    -- I wish you wouldn't focus so much on them because the

22    first argument is much better and easier which is that it is

23    a law of general applicability.  But you're right, and that

24    is my argument.  That if you are inclined to find or if you

10:58:53  25    were to find that the Utah Controlled Substances Act is not

1    a law of general applicability, and therefore subject to

2    strict scrutiny, the next step would then need to be, and it

3    doesn't pass the strict scrutiny analysis, and then the

4    final step that I can think of, there is probably more, but

5    the final step would then be can they still be held liable

6    even though I found against them on one and two because the

7    law is not clearly established.  So we're three --

8        THE COURT:  Well, I understand that.  But, and I

9    mean, again, I haven't decided steps one and two yet, and so

10   I guess the question is, if I get past steps one and two,

11   and find myself at step three, I would be interested in

12   knowing if it truly is your position then that I can't allow

13   the claim to go forward.  I have got to dismiss it because

14   there is no clearly established law that says that the Utah

15   Controlled Substances Act is not or is something other than

16   a general -- a neutral law of general applicability.

17       MR. JAMES:  So I go back to -- I am happy to do

18   what the court requests.  My practical approach would say I

19   would like to see the ruling on one and two and save the

20   clients some money on both sides.

21       THE COURT:  Well, I hope we're saving folks

22   money.  So let's do this, I'm not going to order any

23   supplemental briefing.  If I reach a point in trying to

24   resolve this case where I feel like I need supplemental

25   briefing I will issue a docket text order and ask for it.

1    Absent that, you won't need to worry about it.

2              MR. JAMES:  Okay.  Thank you.

3              THE COURT:  All right.  Anything else that you

4    want to say on this motion?

11:00:52  5              MR. JAMES:  One last thing, as a challenge to

6    Mr. Stephens, and that is that I have nothing against

7    mushrooms, I'm a fungi.

8              THE COURT:  What?  Okay, it took me a minute --

9    fungi.  Okay, I get it.

11:01:12  10              MR. JAMES:  We have all been under a lot of

11    pressure on this so a little levity helps, I think.

12              THE COURT:  And obviously, I'm slow to get the

13    joke.

14              MR. JAMES:  So was I.

11:01:24  15              THE COURT:  Okay.  So let's talk.  So I think now

16    we're ready to move to the next motion.  As I have

17    indicated, I have got more work to do before I can resolve

18    this motion.  So just in terms of the schedule for the day,

19    I do have a judge's meeting that I have to attend between 12

11:01:47  20    and 1.  So I'm suggesting that we maybe take a lunch break

21    between, you know, 5 to 12 and I don't know, maybe 1:15.

22    But I think it probably makes sense to jump in to motion

23    number two right now, but I don't know if we need to take a

24    five minute restroom break and give our court reporter a

11:02:14  25    chance to take a break as well.  Then we can come back and

1    work for another 45 minutes before we break for lunch.  But

2    I am interested in counsel's input on those issues.

3              MR. BEAN:  We would be happy to have a short five

4    minute break.

11:02:32  5              THE COURT:  Okay.

6              MR. BEAN:  Otherwise, the schedule sounds great.

7              THE COURT:  Okay.  And back over to the defense

8    side?

9              MR. STEPHENS:  Back to me.  Happy to take a quick

11:02:44 10    restroom break, Your Honor.

11              THE COURT:  Okay.  Let's come back at 10 minutes

12    after the hour and then go to about 5 minutes to 12, and

13    then we'll break until 1:15.  I'm just going to turn off my

14    camera and mic and I will be back in 5 minutes.

11:03:05 15              MR. BEAN:  Okay.  Thank you.

16              MR. STEPHENS:  Thank you.

17              (Recess.)

18              THE COURT:  All right.  Do we have everyone back?

19              MR. STEPHENS:  Yes, Your Honor.

11:14:55 20              THE COURT:  All right.  I believe, parties, that

21    the next matter you indicated you wanted to argue were the

22    legal issues arising from plaintiffs' motion for Anti-Suit

23    Injunction, which is number 39 on the docket.  That motion

24    was filed by Mr. Bean so I think Mr. Bean we are going to

11:15:25 25    reverse the order and let you go first on that motion and

1    then we'll hear a response from defendants.

2         MS. ROSEN:  Your Honor, you're stuck with me on

3    this one instead of Mr. Bean.

4         THE COURT:  Okay.  No, that's fine.  I'm just

11:15:45   5    making assumptions here which I shouldn't make.  But I'm

6    happy to let you be the one to articulate your position on

7    this, so you may proceed.

8         MS. ROSEN:  Great.  Thank you, Your Honor.  In

9    short, this court should not permit defendants to benefit

11:16:00  10    from the crisis that they created by removing this case into

11    federal court.

12         Pursuant to federal statute and case law, this

13    court can and should grant the Anti-Suit Injunction that we

14    are seeking.  The All Writs Act and the Anti-Injunction Act

11:16:16  15    are two federal statutes that really work together.  So the

16    All Writs Act on the one hand says that federal courts can

17    give any necessary and appropriate relief in aid of their

18    respective jurisdictions.  And then the Anti-Injunction Act,

19    on the other hand, states that a court of the United States

11:16:31  20    may not grant an injunction to stay proceedings in a state

21    court except as expressly authorized by act of congress, or

22    were necessary in aid of its jurisdiction, or to protect or

23    effectuate its judgment.  And the interplay between these

24    two acts led congress to add those three exceptions to the

11:16:50  25    Anti-Injunction Act in 1948.  So that's where the baseline

1        of where -- where this court's jurisdiction and where the

2        remedy we're looking for is found.

3                The three exceptions explain how these two acts

4        work together, how they're applied, and they really go to

5        the heart of this case and what we are seeking.  Both the

6        first and second Anti-Injunction Act exceptions are met here

7        and the third is likely to be met in the near future and so

8        I'll just run by each of them very quickly.

9                So first is the expressly authorized by congress

10       exception.  And this exception applies when a federal right

11       or remedy could be frustrated including when the state court

12       case attempt to subvert removal.  That comes from *Mitchum v*

13       *Foster, a* U.S. Supreme Court case from 1972.  And that case

14       said, "A federal law need not expressly authorize an

15       injunction of a state court proceeding to meet this

16       exception."  And in briefing, the defendants argued that

17       because the removal statute doesn't specifically say the

18       court can authorize an injunction against state criminal

19       proceedings that this exception is not met.  But that is not

20       the proper standard under *Mitchum v Foster.*

21               Importantly, Wright & Miller has looked at this

22       as well and has noted that removal cases implicate this

23       first exception to the anti-injunction act.  It's not

24       necessary that the case be the exact same case number.  The

25       inquiry is really whether the federal right or remedy could

1    be frustrated by the state court proceeding.  And in this

2    case -- Your Honor, I am sorry I can't hear you.

3         THE COURT:  Sorry.  I coughed so I muted myself

4    and forgot to undo it.  As I understand it, those cases

11:18:44  5    relying on the removal statute to enjoin a separate state

6    proceeding all involved a situation where the courts were

7    trying to protect the defendant's right to a federal forum.

8    And I think that logic doesn't help you here since it was

9    the defendants who removed and the defendants who want it

11:19:10  10    back in state court.

11         And so it seems to me that there is no need to

12    protect the defendants' right to a federal forum here.  They

13    don't want the federal forum.  And, in fact, you were okay

14    with the state forum because that's where you initially

11:19:28  15    filed the lawsuit and you got dragged here against your

16    will.  So I'm just really struggling to see how the logic in

17    any of those cases with respect to the removal statute helps

18    you.

19         MS. ROSEN:  Yes, I'm happy to address that.

11:19:47  20    Admittedly, we could not find any cases where the party that

21    asked for removal was then asking for the Anti-Injunction

22    Act to bar the relief that was sought in state court.

23    Essentially what defendants are seeking, is for this court

24    to be barred from exercising the same type of authority that

11:20:05  25    a state court pre-removal could have exercised.  And that is

1    the problem that we have with their arguments essentially is

2    that they have created this crisis, and now are asking for

3    the benefit of the statute that was not intended to protect

4    them as the party that removed the case.

5    11:20:20        THE COURT:  Well, and I understand it smacks of

6    forum shopping.  It smacks of unfairness.  But I don't know

7    what the principle -- I mean at least this principle -- I

8    just don't see any authority suggesting that the removal

9    statute gives you the hook that you need given the way this

10   11:20:41   case arose.

11        MS. ROSEN:  And if this -- if you're inclined to

12   not want to step into a state criminal proceeding I

13   understand that inclination certainly.  I think that gets us

14   into the *Younger* argument that the defendants made.

15   11:20:58        THE COURT:  Well, I mean I think you have a much

16   better argument that they have simply waived their -- their

17   *Younger* defense.  So I mean it seems to me that what we

18   really have to look at here is what is my authority under,

19   you know, the All Writs Act and Anti-Injunction Statute to

20   11:21:22   do what you're asking me to do.  And maybe they'll have some

21   thoughts on why their removal didn't constitute a waiver of

22   their *Younger* rights, but just putting that issue aside, I

23   still have got to have authority to do what you're asking me

24   to do or I can't do it.

25   11:21:48        MS. ROSEN:  Yes.  And that leads us to the second

1      Anti-Injunction Act exception for actions that are necessary

2      in aid of this court's jurisdiction.  The defendants seem to

3      be asking for my clients to litigate their case in three

4      separate forums by bifurcating this case, sending the state

11:22:09  5      claims back to state court, keeping the federal claims here

6      if they survive the motion to dismiss, and then also

7      proceeding in the state criminal action.  And that approach

8      would implicate the necessary in aid of jurisdiction

9      exception to the Anti-Injunction Act because this court does

11:22:29 10      have jurisdiction over this case pursuant to the removal

11      statute, and therefore requiring litigation and separate

12      cases in state court that involve the exact same issues here

13      would necessarily implicate this court's jurisdiction and

14      its ability to protect against inconsistent judgments.  And

11:22:52 15      going forward, as we flagged in our initial briefing, this

16      would also implicate the third exception to the

17      Anti-Injunction Act which permits this court to protect or

18      effectuate its judgment.

19              THE COURT:  Well, but that may be the case at

11:23:07 20      some point, but that's not the case now.  There is no

21      judgment in this case.  And I think the language is clear

22      that there has to be a judgment, it can't be a potential

23      judgment.

24              MS. ROSEN:  Certainly.  But we think the same

11:23:20 25      argument, the same policy basis behind that third exception

1    also support the second necessary in aid of its jurisdiction

2    exception here.  I would like to turn the court to *Steffel v*

3    *Thompson*, which is 415 U.S. 452.  And that case talks about

4    the distinction between injunctive relief and declaratory

11:23:40  5    relief.  So if the court is not inclined to find the

6    injunctive relief barring the state criminal proceedings

7    from continuing is warranted, or if the court is more

8    hesitant to fit this case within the Anti-Injunction Act

9    exception, the court is entirely clear, *Steffel* is entirely

11:24:01  10    clear, that the court can still grant declaratory relief

11    advising that there is a constitutional violation and using

12    that declaratory basis is outside of the Anti-Injunction Act

13    and that brings us into the *Younger* doctrine.

14                THE COURT:  Okay.  But so let's stop before we

11:24:19  15    get to *Younger*.  Assume that I'm uncomfortable with

16    enjoining the state court proceeding in a preliminary

17    context because what we have here is a motion for

18    preliminary injunction.  And I'm assuming the Anti-Suit

19    Injunction is part of that request for preliminary relief,

11:24:44  20    it's not a request for final relief.  I think what you have

21    just suggested is, well, if I'm not comfortable with the

22    preliminary injunctive relief I can just issue a declaratory

23    judgment.  But how do I do that in a preliminary fashion?

24    Don't we have to litigate this case to the end before I

11:25:05  25    would be in a position to enter a declaratory judgment and I

1    am not sure how that would help you in the interim.

2        MS. ROSEN:  Yes.  So we -- I am sure that you saw

3    that we filed a proposed order that clarified the relief

4    that we're seeking for the preliminary injunction.  And this

5    is one of the points in that preliminary injunction request.

6    But even if the court is not inclined to grant this

7    injunctive relief and bar the criminal case from proceeding

8    at this time at the preliminary injunction stage, the court

9    can advise through its injunctive relief, essentially advise

10   the state criminal court about the likelihood of success on

11   the merits of my clients case.

12       THE COURT:  So just flesh out a little bit more

13   exactly what you're asking me to do.  To just say to --

14   assuming that I don't want to go all the way to enjoin the

15   state criminal proceeding, what does this look like, what

16   you're asking me to do?  And what's the basis for doing it

17   at this procedural point in the case?

18       MS. ROSEN:  Of course, just as a -- just to cover

19   my basis, we still take the position that you can and should

20   grant the injunctive relief that we're seeking.  But if

21   you're not inclined to do so, I think the *Younger* analysis,

22   even though the analysis and the removal is a separate

23   issue, that line of cases really demonstrates the federal

24   court's ability to stop or to intervene into the state

25   criminal proceedings.  In the cases in which *Younger* did not

81

1    apply, those are state criminal proceedings or pending state

2    criminal proceedings in which the federal court still

3    granted either injunctive relief enjoining the state

4    criminal proceedings from happening, or when the court as in

11:27:13  5    *Steffel* granted declaratory relief.

6         THE COURT:  Did that *Steffel* court grant that

7    before an answer was even filed or was that at the end of

8    the case when judgment was issued?

9         MS. ROSEN:  I would need to read *Steffel* with

11:27:32  10    that in mind I'm afraid.

11         THE COURT:  Okay.

12         MS. ROSEN:  In short, our case is that the -- the

13    same basis and the same policy that prohibits a party from

14    or the state from removing a case from state to federal

11:27:53  15    court under *Younger* also applies under the Anti-Injunction

16    Act.  The Anti-Injunction Act does not require that the

17    federal law that is implicated specifically state that the

18    injunctive relief being sought is available.  All that it

19    requires is that the federal right or remedy could be

11:28:15  20    frustrated including when the state court case attempts to

21    subvert removal.  And that's what we have here.  We have a

22    state court case that was filed before a state criminal case

23    was filed.  The case is then removed by the defendants and

24    that removal of the state court case could be frustrated by

11:28:34  25    the state court case itself.

1          THE COURT:  So I guess -- I mean that raises a

2     couple of issues.  One is, did the state court criminal

3     proceeding actually begin with the search warrant

4     application, that's one issue.  And I guess I'll let you --

5     I'll let you tackle that one first before I throw any more

6     out.

7          MS. ROSEN:  Perfect.  Okay.  So I'll turn -- that

8     was mostly addressed in our reply because, of course,

9     *Younger* was raised on the opposition.  And *Younger* has these

10    -- the elements of *Younger* are presupposing that there is

11    indeed an ongoing state criminal proceeding.  And *Younger*

12    talks about, or excuse me, I'm finding my notes, so in *Hicks*

13    the U.S. Supreme Court talked about whether there are

14    ongoing state court proceedings.  And the point of reference

15    other courts have determined, is the date that the plaintiff

16    filed the federal complaint.  Meaning that the court

17    determines whether *Younger* applies based upon the date that

18    this case was filed not the date of the criminal proceeding.

19    Abstention is only appropriate where the federal case,

20    excuse me, abstention is only appropriate where the state

21    case precedes the federal case, or where the state case is

22    brought before any legal proceedings of substance on the

23    merits has taken place in federal court.  Of course here, we

24    have the TRO hearing and a decision on the TRO before the

25    state court case was ever filed.  Indeed, essentially what

1    defendants are asking for is that because of their removal

2    of this case, this court cannot grant the same relief that a

3    state court could have granted.  They're saying that if --

4    if there was a state court case, which this was, that saw

11:30:36  5    injunctive relief based on an impending criminal proceeding,

6    based on a search warrant that has been issued, that once

7    you remove that case to federal court, the federal court can

8    no longer intervene in that state court case.  But this case

9    was filed in state court and so their analysis under

11:30:55 10    *Younger*, the entirety of *Younger* including when it applies,

11    is inapplicable precisely because they are the party that

12    removed the case into federal court bringing this case into

13    the jurisdiction of this court.

14              THE COURT:  Okay.

11:31:14 15              MS. ROSEN:  I'm happy to get into the exceptions

16    of *Younger*.  Our -- there is just a load of cases that we

17    have included the string cite in our reply about how *Younger*

18    is inapplicable because defendants submit to the

19    jurisdiction of the court by removing the case.  We really

11:31:30 20    think the court need not go any further than that.  But if

21    the court is inclined, we then look to whether there are

22    proceedings of substance on the merits in the federal case

23    before the filing of the state criminal case.  Again, in

24    this case there were because there was a TRO decision that

11:31:45 25    granted the TRO before the state court case was filed.

1          And then finally, as we argue, even if the

2     removal doesn't get us there, the proceedings on the merits

3     doesn't get us there and we're left to *Younger* and its

4     exceptions, we also believe that the exceptions are met.

11:32:04  5     Defendants' actions, in removing the state -- the court case

6     from state court to federal court, implicate the bad faith

7     exception to *Younger.*  They seem to be trying to litigate

8     this case in three separate forums.  They would like the

9     case bifurcated so that our clients have to proceed in a

11:32:23 10     state criminal case, a state civil case, and a federal civil

11     case.  They removed the case, then they have argued that the

12     case shouldn't be removed and that the court should not

13     exercise supplemental jurisdiction.  They failed to comply

14     with the TRO after it was issued.  They filed criminal

11:32:38 15     proceedings notwithstanding that they knew that the

16     injunction against criminal proceedings was specifically

17     sought in this ongoing case.  They failed to inform the

18     state criminal proceedings about the injunctive relief that

19     was granted at the TRO stage.  We think that just

11:32:55 20     demonstrates a whole host of bad faith sufficient to meet

21     the *Younger* exception if we even get there which we do not

22     think we should.

23          THE COURT:  Okay.  Anything else?

24          MS. ROSEN:  No.  Happy to answer any questions,

11:33:10 25     but otherwise I'm done.

1          THE COURT:  All right.  Let's turn it over to

2     hear a response and then we will turn it back to you for a

3     reply.

4          MR. STEPHENS:  Thank you, Your Honor, I

11:33:21  5     appreciate your patience.  Mitch Stephens on behalf of Utah

6     County and Jeffrey Gray.  I want to take off and just

7     clarify that there are, as we see it, three different

8     reasons why the motion for Anti-Suit Injunction should be

9     denied.  Any one of them is enough for the denial.

11:33:45 10          THE COURT:  Okay.  So let's start with *Younger*

11     because I'm -- I think there is ample authority to suggest

12     that you waived *Younger* as a defense.

13          MR. STEPHENS:  If I understand that argument,

14     there is a split of authority as to whether or not removal

11:34:06 15     constitutes waiver of *Younger.*  We cited authority that

16     supports our position in the opposition, it's in footnote

17     one or two, I believe.  It was in a footnote because this

18     waiver argument hadn't been made yet.  And then the

19     plaintiffs responded with their authority out of circuit.

11:34:25 20     They rely -- their lead case, best case, is a Seventh

21     Circuit case.  There is another Seventh Circuit case that

22     had a strong dissent that came out the other way when

23     talking about *Younger* removal, but it is an unsettled

24     question, certainly in the Tenth Circuit and in other

11:34:45 25     federal courts, whether or not removal is a waiver of

1    *Younger.*  And even then you have to sort of carefully parse

2    out the basis for removal because there is potentially a

3    difference or distinction between a removal based on a

4    partial federal question in which case there is still a

11:35:10    5    question as to whether or not the court can or should

6    exercise supplemental jurisdiction over the state law

7    claims.  First, just as an example, removal on a diversity

8    issue where now you're expecting that all of the claims have

9    to stay in front of that court because there is no basis to

11:35:24    10   parse them out.

11             If I can share the screen, Your Honor, I want to

12   just talk to you about the case that the plaintiffs haven't

13   focused on, that is, I think helpful.  Although I will

14   concede it is only helpful because it still leaves some

11:35:49    15   questions.  Can you see my screen okay?

16             THE COURT:  I can.  It's the *Ohio Civil Rights*

17   *Commission* case.

18             MR. STEPHENS:  Correct.  And this is a case where

19   the United States Supreme Court is talking about waiver of

11:36:05    20   *Younger.*  I'm trying to zoom in and somehow it keeps zooming

21   out.  So you can see what happened here in this case.  The

22   Commission, so it goes to the United States Supreme Court.

23   The Commission, the government entity, had argued abstention

24   in the district court and oral argument to the Supreme

11:36:26    25   Court.  And by the way, remember, when we're talking about

1    *Younger* waiver, one of the interesting things that we do

2    know from the Tenth Circuit is that the issue can be raised

3    sua sponte.  So at least in that respect, the waiver has to

4    be stronger or more clear than, for example, an arbitration

11:36:45   5    waiver, right?  An arbitration waiver, if a party doesn't

6    raise it in the court, the court doesn't raise that sua

7    sponte.  *Younger* does get raised sua sponte.  In other

8    words, silence is not enough to constitute waiver because it

9    is going to be brought up sua sponte by the court.  And then

11:37:06   10    in the Supreme Court, the other side of the case responded,

11    they filed a post argument brief, urging that the Commission

12    had waived any claim to abstention because it had stipulated

13    in the district court that that court had jurisdiction of

14    the action.  That's the same thing effectively as putting

11:37:27   15    the case in front of the court and recognizing that you have

16    jurisdiction over the action.

17            THE COURT:  Well, does recognizing that I have

18    jurisdiction equate to making a decision to give me

19    jurisdiction when I otherwise wouldn't have it.

11:37:43   20            MR. STEPHENS:  And that's why I say this case is

21    helpful, admittedly not dispositive.

22            THE COURT:  I mean I guess I can go back to the

23    questions that I was asking Mr. James.  Why did you remove

24    it when the state -- you want it in state court and the

11:38:00   25    state courts have concurrent jurisdiction over the federal

1    claims, and you're taking the position now that the state

2    law claims raised such nuanced and unsettled areas of law

3    that they have no business being here anyway.  I mean given

4    that that is your position, the only explanation I have as

11:38:29  5    to why you don't want to continue in federal court is that

6    you didn't like my ruling on the TRO.

7         MR. STEPHENS:  And let me try and respond to

8    that.  So why did we remove to federal court?  You're

9    correct, the 1983 claims could be litigated in state court.

11:38:52 10    You also have, given your unique experience, probably some

11    recognition that they are far more often litigated in the

12    federal courts.  I did, for example, a search for 1983 and I

13    think in the last five years there is one published case

14    from the Utah Appellate Courts.

11:39:13 15         THE COURT:  But I spent 13 years on the Utah

16    Supreme Court and I firmly believed then and I believe now

17    that state courts are equally capable of and should decide

18    issues of federal law when they are packaged with issues

19    that state courts, as you put it here, are uniquely able to

11:39:47 20    decide.  There is nothing -- I'm not sure that there is

21    anything about the federal claims that would suggest that I

22    would be better at deciding them than the state court judge

23    who drew this case initially.

24         MR. STEPHENS:  Yeah.  And I mean no disrespect to

11:40:05 25    the state courts or the state court judges.  Obviously,

1       we also respect those courts.  It was removed because of the

2       federal claims.  That's the answer to the question.  It was

3       removed because of the federal claims.  I do want to

4       hopefully respond to this idea that really now what we're

11:40:27   5       talking about is forum shopping.  Because that's -- that's

6       not the intention.  In fact, if you go back to the

7       opposition to the TRO/Preliminary Injunction which, of

8       course, was filed before the court's ruling, we recognize in

9       that opposition that it may be appropriate and suggest that

11:40:48   10      perhaps these claims should be split out.

11               THE COURT:  Of course because you could hedge

12      your bet.  I mean, what you knew at that point is that if

13      I -- if I would have ruled in your favor on the TRO, you

14      never would have requested that anything be split out and

11:41:09   15      sent back to the state court.  And but --

16               MR. STEPHENS:  I don't think that's accurate, in

17      fairness, Your Honor, because we still would have been

18      moving to dismiss the federal claims and would have

19      recognized that on dismissal the state claims would have

11:41:22   20      been remanded back to the state court because that's the

21      Tenth Circuit's analysis.

22               We expected, still expect, that the state claims

23      are going to be back in the state court and the federal

24      claims are going to be prosecuted in the federal court.  And

11:41:36   25      that happens all of the time.  And that's why when you go

1    back to this analysis of is it a waiver?  Have we clearly

2    given up the idea that state issues can and should be

3    decided in the state --

4         THE COURT:  Well, but I -- the question of

11:41:52  5    whether you wanted state issues to be decided in the state

6    is an issue that's distinct from whether or not you made an

7    affirmative decision to submit yourself to the jurisdiction

8    of this court by removing the entire action when I would

9    have had nothing to do with this case but for that decision

11:42:16 10    on your part.

11         MR. STEPHENS:  I understand the court's position

12    there.  I guess the only thing I can say back is, again, if

13    we're talking about a waiver, the case law is not resolved

14    and certainly not resolved in the Tenth Circuit.  And

11:42:37 15    indeed, if the motion to dismiss is granted as we contend it

16    should be, we have always anticipated that these state

17    issues would be back.  And accept this or not, what we have

18    anticipated from the beginning, is that the process of

19    removal would resolve in this court handling the federal

11:42:57 20    1983 claims that form the basis for the court's

21    jurisdiction.  That we would prevail on those and that the

22    state court claims would then be allowed to pursue and in

23    fact would have to be pursued in the state court.  And

24    that's why I recognize and I can see the court's perspective

11:43:17 25    that how this may feel to the court.  But that is not what

1    in fact we were trying to do in any sense.  Instead, what we

2    were trying to do is allow the federal claims to go forward

3    in the federal court and anticipated and seek that the state

4    claims proceed in the state court.

5            THE COURT:  But I guess I'm still struggling with

6    why was it helpful or beneficial, necessary, advisable, to

7    have federal claims proceed in federal court when you

8    anticipated that the state claims would be decided in the

9    state court, and the state court was perfectly capable of

10   deciding the federal claims?  I mean I just don't understand

11   the why we wanted to set up what has turned out to be

12   frankly a complicated mess.

13            It would have just been so easy to let the state

14   court decide these issues in the first place.  Now we have

15   the prospect if -- I mean I guess you took a gamble that you

16   were certain to win on a motion to dismiss the federal

17   claims.  But what you were also doing was taking a

18   calculated risk that we would have three separate

19   proceedings going on because you've taken the position now

20   that even if I don't dismiss the federal claims, the state

21   claims need to be split off and remanded and we have got a

22   state criminal prosecution going on and if I deny the motion

23   to dismiss, then a federal 1983 action going on which gives

24   rise to no judicial economy, the prospects of very -- of

25   inconsistent judgments.  I mean it's just -- it's frankly

1    not the way that the case should have been resolved.

2    MR. STEPHENS:  And I appreciate that and, you

3    know, the benefit of hindsight is sometimes different than

4    what happens on an expedited basis over Thanksgiving with a

11:45:45  5    -- with briefing.  Given where we are, we still contend that

6    that is the outcome that should -- that should occur.

7    Now, does that mean that all three cases are

8    going to be all handled and the same thing simultaneously?

9    No, not necessarily.  For example, *Younger.*  If we're

11:46:03  10   talking about *Younger,* what does that mean?  Well, the --

11   and we briefed this and presented this, when there are

12   damages claims associated with *Younger* that relate to what

13   is happening in the state court case, and in particular

14   state court criminal case, this case is stayed pending the

11:46:20  15   resolution of the state criminal case and then based on that

16   outcome the court can determine what to do with the damages

17   theories.  So is that the plaintiffs' preference?  No.  Does

18   that result in some wild inefficiency?  Also no.  Quoting --

19   THE COURT:  Well, I mean what it results in

11:46:43  20   though is that my determination if I don't dismiss the

21   federal claims and I find a likelihood of success on the

22   merits on the First Amendment or RFRA claims, what that then

23   I mean I guess that's great for you because then you don't

24   have to do anything on the federal front.  And in the

11:47:07  25   meantime, all the plaintiffs are off in state court having

1    to defend a criminal proceeding.  I mean I understand why

2    this looks good for you, but I think that the question was,

3    was that a decision you made when you decided to ask me to

4    exercise jurisdiction over this case?

11:47:32    5    MR. STEPHENS:  And I guess I would say I'm not

6    sure let's say the case, civil case, had remained in the

7    state court.  I think the scenario that you just described

8    where in theory the civil judge could have said hey, this is

9    what I think is likely to happen.  But in a nonfinal

11:47:50   10    judgment, the criminal case would still remain pending and

11    that criminal judge is going to have to determine what to do

12    with the criminal case whether it's this civil court or a

13    different state civil court that's issuing a nonfinal

14    opinion on an injunction, right?

11:48:09   15    So, again, the efficiency is, I would say, driven

16    by the fact that the criminal process is inherently separate

17    from the civil process.

18    THE COURT:  And what about inconsistent

19    judgments?  I think what you're suggesting is that I would

11:48:27   20    essentially have to abdicate any ability to provide

21    effective relief to a state court judge because I can't do

22    anything even though you -- you were the ones who brought it

23    here.

24    MR. STEPHENS:  Well, I would say I think that is

11:48:46   25    the *Younger* analysis is that when the case is pending, that

1          it gets stayed.

2                   THE COURT:  Well, but again, I guess we're back

3          to whether or not you waived the *Younger* abstention right

4          that you had by making a decision to bring it here.

11:49:04  5                   MR. STEPHENS:  Understood.  And again, our

6          position is no, that stipulating to jurisdiction, that even

7          if you failed the *Younger,* to argue *Younger,* that that is

8          not enough to constitute a waiver.  And when you look at

9          going back to the Supreme Court case, when you look at the

11:49:21  10         distinction, right, and what the court has said they

11         recognize that states may, of course, voluntarily submit to

12         federal jurisdiction even though it might have had a tenable

13         claim for abstention and then they cite some cases.  But

14         they say that in each of those cases the state expressly

11:49:41  15         urged the court or the district court to proceed to an

16         adjudication on the constitutional merits.  And I pulled

17         those cases to try to get examples of what they're talking

18         about there.

19                   So, for example, in the *Ohio Bureau versus Hodory*

11:49:57  20         case, right, there the Supreme Court recognized that the

21         government, quote, "Had not argued *Younger*."  Well, that

22         wasn't enough, that's the sua sponte issue.  Had not argued

23         that *Younger* requires a remand.  But then moreover, at oral

24         argument they resisted the suggestion of such a remand.  In

11:50:17  25         *Brown,* the New Jersey attorney general pushed for a

1    jurisdiction, quote, "To obtain a more expeditious and final

2    resolution of the merits of the constitutional issue."  In

3    other words, in those instances, the government entity

4    expressly not only failed to raise *Younger,* but expressly

11:50:42  5    said that they were not wanting to implement *Younger*.

6         And here, again, from the first filing, we

7    recognize that in cases similar to this one, where cases

8    have involved religious rights, religious freedom, and I

9    believe the *Summum* case, the case that we specifically

11:51:03  10    cited, where there were questions about both the First

11    Amendment and the Utah Constitution that they were split and

12    the federal issues were adjudicated in the federal court and

13    the state issues were adjudicated in the state court.  And

14    we made that request from the beginning which was consistent

11:51:23  15    with what could happen and we contend should happen under a

16    jurisdictional -- supplemental jurisdiction analysis.  Even

17    putting *Younger* aside, if you just think I'm wrong about

18    *Younger,* I get it, open split, open question.  If you just

19    say, "Mitch, you're wrong."  You still should deny the

11:51:47  20    motion because the Anti-Injunction Act prevents you from

21    granting the relief that they seek.  And the parties don't

22    really disagree on at least the starting point for the

23    Anti-Injunction Act.  In fact, plaintiffs reply and I

24    believe they're quoting the Tenth Circuit they say as

11:52:07  25    follows:  The Anti-Injunction Act, quote, "Is an absolute

1    prohibition against any injunction of state court

2    proceedings unless one of the three exceptions applies."

3            The exceptions don't apply and the plaintiffs

4    haven't and can't establish that the exceptions apply,

11:52:32  5    right?  The in aid of -- or there is the argument that they

6    make that it is expressly authorized by statute and then

7    they cite the removal statute.  But the removal statute is

8    talking about jurisdiction over claims that are removed, the

9    civil claims, and the civil process removed to the federal

11:52:51 10    court.  They haven't cited a single case from any court that

11    has relied on the removal of civil claims statute to enjoin

12    a criminal case that is always a separate proceeding.

13    Instead, they're talking about, and the case they cite, it

14    was one from Delaware, cases removed involved state and

11:53:12 15    federal claims.  The plaintiff gets upset, files an amended

16    complaint that cuts out the state court claims and then

17    files just that those claims copy and paste and files them

18    in a new case in the state court.  And the federal judge

19    says that doesn't work.

11:53:30 20            That's the type of situation that they're citing.

21    Or a situation where the case is removed but the plaintiff

22    keeps filing with the state court anyway.  Or the state

23    court judge says hey, don't care, I'm going to keep this one

24    and keep working on it.  In that instance, of course the

11:53:46 25    court can say this case is in front of me, state court

1    doesn't have jurisdiction any more over this civil issue.

2    They don't have anything that extends that into this

3    framework.

4            The next argument they make then is the argument

5    that it's necessary for the court's jurisdiction.  The

6    problem that they have is that the Tenth Circuit disagrees.

7    We cited this case.  This is the *Tooele County versus United*

8    *States* case, 2016, Tenth Circuit.  This appeal concerns two

9    suits in state and federal court and statutory limitations

10   on the power of the federal court to enjoin the state court

11   case.  The court then analyzes the exception to the

12   Anti-Injunction Act.  In fact, it says, the district court

13   violated the Anti-Injunction Act, recognizes that

14   injunctions are narrow, the court has to resolve any doubts

15   in favor of allowing the state court proceedings to

16   continue.  And then it expressly talks about the second

17   exception.

18           The second statutory exception is limited.  It

19   applies only when both the federal and state suits

20   constitute in rem or quasi in rem proceedings, and the

21   federal court was the first to take possession of the

22   property, the rem. We're not talking about in rem

23   jurisdiction.  And even if we were, even if you say the

24   mushrooms themselves are in rem, they're the property.

25   Number one, that would be very, very narrow; and number two,

1    the state court was the first to take possession because the

2    state court issued the search warrant.  They tried in their

3    reply to say, well, yeah, that's what the Tenth Circuit

4    says, but, you know, maybe -- maybe that's wrong because the

5    Tenth Circuit is citing an old case from the Supreme Court.

6    It's the law in the Tenth Circuit.  In fact, if there is any

7    question, we can look at other cases that have applied --

8    have applied this.  If you shepardize Tooele County, you

9    will see that this continues to be relied on including as

10   recently as 2023, 2024.  If you want to see an example,

11   District of New Mexico applied it in 2023, 689 F.Supp.3d

12   1033.  It's the standard in the Tenth Circuit.  And outside

13   of the Tenth Circuit it is not even clear the cases that

14   they're relying on that they would apply anyway.

15            Going back to *Younger*, there was a question which

16   case actually came first.  Is it the search warrant, is that

17   the criminal process, or is it the filing of the criminal

18   information.  There is an answer to that as well.  It's

19   actually in another Utah county case, *Kingston versus Utah*

20   *County*, this is the Tenth Circuit from 1998.  Ms. Kingston

21   appeals the district court's denial of her motion for

22   preliminary injunction restraining officials in Utah County

23   from initiating any criminal proceedings based on allegedly

24   improperly seized evidence.  The court then goes on,

25   recognizes the standard that we put in, the Supreme Court's

1    recognition that *Younger* can apply even when criminal

2    process is contemplated.  In this case, defendants began an

3    investigation and executed a search warrant to obtain the

4    evidence that they considered necessary to support criminal

5    charges.  Ms. Kingston then filed her federal complaint with

6    likely knowledge that criminal charges were imminent.  She

7    requested a temporary restraining order to prevent them from

8    filing those charges.  The court says, well, why don't you

9    hold off filing charges until I can determine what to do.

10   Defense initiated criminal charges three days after the

11   district court's decision.  We conclude these facts are

12   sufficient to establish the existence of the pending state

13   proceeding, criminal proceeding.  Although Ms. Kingston had

14   not been charged, the allegedly illegal activity had already

15   taken place.  The investigation had been conducted, the

16   search warrant had been executed, the necessary evidence had

17   been obtained, and you can go on from there.  The outcome --

18        THE COURT:  Mr. Stephens, I hate to interrupt

19   you, but my meeting is starting in two minutes.

20        MR. STEPHENS:  I'm sorry, Your Honor.

21        THE COURT:  That's okay.  So just remember where

22   you are in your argument.  We'll reconvene at 1:15 and you

23   can pick up where you left off.

24        MR. STEPHENS:  Thank you.

25        THE COURT:  All right.  And I think I am just

100

1    going to, again, mute myself and turn my camera off.  I

2    suppose you can do that or you can re-login, whatever you

3    prefer.

4                MR. STEPHENS:  Great.  Thank you.

01:14:00  5                (Recess.)

6                THE COURT:  Do we have Mr. Bean back and

7    Mr. Stephens back?  I'm getting some feedback.  I don't

8    know.  I think we're okay.  I apologize that my meeting went

9    a bit longer than I anticipated, but Mr. Stephens, you have

01:23:51 10    the floor and I'll turn the time back over to you to pick up

11    where you left off.

12                MR. STEPHENS:  Thank you, Your Honor.  I think we

13    had more or less covered *Younger,* we had more or less

14    covered the Anti-Injunction Act.  Again, if either one of

01:24:04 15    those applies, it results in the Anti-Suit Injunction, the

16    motion for Anti-Suit Injunction being denied.

17                The only other argument that we had made in the

18    briefing, you have heard some of this already, is the issue

19    of supplemental jurisdiction.  I don't intend to address

01:24:22 20    what you have already heard.  I suppose the only thing that

21    I would add is maybe two clarifications.  One, that we

22    contend that analysis needs to be done and supports

23    remanding the state claims back to the state court

24    regardless of whether the motion to dismiss is granted.  It

01:24:41 25    is a simpler analysis, of course, if the motion to dismiss

1    is granted but we think it is an analysis that has to happen

2    either way.  And then the other thing I would add that I

3    want to make sure is not lost as the court considers the

4    request and the issues, is that while there is some overlap

01:25:01  5    between the criminal case in the state court and issues that

6    are in front of this court, we have talked about the time,

7    we've talked about the state court case came first.  But on

8    top of that, it is not a complete overlap.  We talked last

9    time about the fact that there are marijuana charges that

01:25:22 10    are not in front of this court, that are in front of the

11    state court, that arise from facts that the judge and the

12    prosecutor and the police and the jury are going to have to

13    be determining in that criminal case regardless of what

14    happens in this proceeding.

01:25:37 15            THE COURT:  So could I just simply, if I chose or

16    decided that it was appropriate to enjoin the state court

17    proceeding, could I just enjoin the prosecution on the

18    psilocybin and limit it to that charge?

19            MR. STEPHENS:  Assuming I have lost on *Younger*,

01:26:10 20    assuming I've lost on the Anti-Injunction Act, I'm not aware

21    of anything that would say as a pure matter of law you

22    absolutely cannot.  What I would say is that it would be

23    wildly inefficient and certainly would, I think, trigger the

24    type of supplemental jurisdiction analysis that the court

01:26:27 25    should be performing among probably other analysis that

1    should happen.  Because again, to explain the circumstances

2    to go forward with the criminal prosecution of the marijuana

3    case, it arose from the same search warrant.  Let's just go

4    through one, for example --

01:26:46  5         THE COURT:  But it also strikes me, I mean the

6    marijuana charge and the drug paraphernalia charges are

7    misdemeanors.  The only felony at issues is the psilocybin

8    charge.  I suspect that, who knows, maybe that results in

9    some kind of a plea deal, I don't know.  But it is certainly

01:27:11 10   of a whole different magnitude than a felony charge for the

11   psilocybin.

12         MR. STEPHENS:  I think that's right.  But even if

13   only the marijuana charge went forward and the paraphernalia

14   charge went forward, for example, we -- and to be clear, and

01:27:28 15   I said this last time, I don't have anything to do with the

16   criminal case, nor candidly do I know enough about criminal

17   law to be very eloquent about those proceedings.  But let's

18   just invent a scenario to see how it would be difficult for

19   the court to parse out the two.

01:27:46 20        If, for example, there were a challenge to the

21   search warrant, and an argument that the marijuana charge

22   should be dismissed or suppressed because it resulted from

23   the search warrant that has RFRA implications, I don't know

24   how you would parse that out, the way that you just

01:28:02 25   suggested, without staying either the marijuana case or

1    having the type of duplication that I think is behind the

2    court's question of could he have paused on half of it.  Or

3    if the detectives on the stand in explaining the

4    circumstances that lead to the seizure and why they were

01:28:21    5    there, right, like because this all happened at the same

6    time, I think it wouldn't be simple to just okay, this part

7    goes forward and that part doesn't.

8            THE COURT:  So before I let you finish up, I'm

9    interested in hearing your response to Ms. Rosen's

01:28:43    10    suggestion that somehow even if the state criminal

11    proceeding was not enjoined there is something that I could

12    do in way of a declaratory judgment that would have

13    potentially preclusive effects on the pending state criminal

14    proceeding.  What are your thoughts on that?

01:29:06    15            MR. STEPHENS:  I don't think that works and I

16    will give two reasons why.  One, you're not being asked to

17    make a final judgment or enter a final judgment and I think

18    that's really what they're talking about.  Two, if you look

19    at the case that they cite for that argument, the *Steffel*

01:29:27    20    *versus Thompson* case from the Supreme Court, I'm just going

21    to read the last paragraph of that opinion because I don't

22    think it provides the support that they're hoping.  Supreme

23    Court's last paragraph, majority opinion, "We therefore hold

24    that regardless of whether injunctive relief may be

01:29:45    25    appropriate, federal declaratory relief is not precluded

1    when no state prosecution is pending and a federal plaintiff

2    demonstrates a genuine threat of enforcement of a disputed

3    state criminal statute whether an attack is on the

4    constitutionality of the face or as applied."  That's not

01:30:05  5    the scenario that's in front of this court quite obviously.

6              THE COURT:  Okay.  All right.  Anything else that

7    you want to say with respect to the Anti-Suit Injunction

8    issue?

9              MR. STEPHENS:  No, Your Honor, unless you have

01:30:21 10    any further questions for me.

11             THE COURT:  I do not.  Ms. Rosen, you may reply.

12             MS. ROSEN:  Thank you.  A few points to hit so

13    I'll start with the *Younger* removal versus waiver just to

14    clarify something.  Here, we are not talking about a waiver

01:30:40 15    of asserting that *Younger* applies, we're talking about

16    submitting to the court's jurisdiction via removal.  So the

17    line of cases that discuss waiver and whether *Younger* has

18    been waived is a different line of cases than the cases

19    saying that by removing a case to federal court the

01:30:57 20    defendants have submitted to jurisdiction via that removal.

21    And that goes to *Younger* itself which is based upon comity

22    as the doctrine that applies.  Rather, it's *Younger*'s

23    non-application to cases removed by the government is a

24    fundamental fairness analysis.  It's not about whether there

01:31:19 25    has been a waiver of raising *Younger,* it's about whether

1   *Younger* is even applicable in the first place.  So that's

2   kind of a distinction in the case law that I wanted to draw.

3            Second, looking to supplemental jurisdiction,

4   just off the bat, I don't think this is entirely relevant to

01:31:36  5   this motion and I know that Mr. Bean addressed it a bit

6   earlier today.  But in any case, removal allows the

7   defendant to decide where the case should be brought and

8   where it should be heard.  The defendant gets to weigh that.

9   They get to consider whether it's more advantageous for

01:31:52  10  them, whether there is a reason to proceed in state court,

11  or if they want to make a change to federal court.  Removal

12  is not intended to allow defendants to choose both options.

13  They get to choose one option, not both.  And defendants'

14  actions here, which seek to set up a scenario where if the

01:32:11  15  federal law claims are not dismissed, my clients are

16  potentially in three different forums, is not the scenario

17  that removal was created to enact.  The rule of removal is

18  really to give the defendants the opportunity to weigh in on

19  what forum.  It's not to give them every opportunity to

01:32:30  20  choose every forum.

21            Moving on to the Anti-Injunction Act, the express

22  authorization exception, that first exception applies.  And

23  for this we cited *Davis International* which is a Third

24  Circuit case from 2010 to talk about applicability of that

01:32:49  25  first exception in cases where there -- it is not the same

106

1    case number in state court or federal court.  So it is not a

2    new filing in the state court case that was removed, it's a

3    separate case.  And there the Third Circuit affirmed the

4    federal court injunction that relied on the removal statute

01:33:07  5    to enjoin a separate state court proceeding which were filed

6    after a party was displaced with an unfavorable ruling in

7    the federal court.

8        THE COURT:  So has this ever been applied in the

9    context of a civil case in federal court enjoining a

01:33:25  10    criminal case in the state court?

11        MS. ROSEN:  So I could not find any case law

12    where we have the same sort of defense, defense being raised

13    in a criminal case and relief sought under that same

14    analysis affirmatively as plaintiff.  However, the cases in

01:33:47  15    *Younger,* in the *Younger* line of cases where the court found

16    *Younger* inapplicable, allow a federal court to enjoin a

17    state court proceeding.  The distinction -- sorry.

18        THE COURT:  Well, I was just going to say though

19    I mean *Younger* is a waivable issue.  That seems to me to be

01:34:09  20    a completely different issue than whether or not I have the

21    authority in the first place to even do what you're asking

22    me to do.  I mean the one is a defense, I suppose, assuming

23    that I have the authority in the first place.  I mean the

24    Anti-Injunction Act goes to the existence of that authority.

01:34:30  25        MS. ROSEN:  Yes.  And I think even though the

1    cases are dealing under the Anti-Injunction Act that we

2    could find with a removal scenario we're dealing with

3    multiple civil cases instead of criminal cases.  None of the

4    cases discuss that distinction.  They look to whether the

01:34:49 5    claims in the state court action bar litigating the same

6    claims in the federal court action.  And that's exactly what

7    we have here.  The defendants are unhappy with the TRO that

8    was granted.  After that TRO, they filed a state criminal

9    proceeding and that state criminal proceeding is looking to

01:35:04 10    litigate the same claims at issue here.

11         So even though that distinction hasn't been drawn

12    out by case law, and there is not a lot of case law

13    discussing this particular scenario, in fact they couldn't

14    find any nor have defendants cited any with this particular

01:35:19 15    scenario, the reasoning of those cases, particularly of

16    *Davis* and the Third Circuit, continue to apply given this

17    scenario.

18         As far as the Anti-Injunction Act second

19    exception, or the necessary in aid of jurisdiction exception

01:35:34 20    to the Anti-Injunction Act, defendants have focused a lot on

21    Tooele County and understandably so.  It is Tenth Circuit

22    law.  But we are not asking the court to overrule the Tenth

23    Circuit nor could we.

24         Before the court in the Tenth Circuit there was

01:35:50 25    not an issue of removal.  The Tenth Circuit was only looking

1   at whether a case was sufficiently close to an in rem action

2   that under the in rem portion of the second exception to the

3   Anti-Injunction Act, the court could enjoin the state court

4   proceeding.  And there the court said no.  But it made sense

01:36:10   5   there in Tooele County for the court to cite to pre-1948

6   Amendment Anti-Injunction Act case law because the in rem

7   exception had existed since then.

8          In the 1948 amendment which added to statutes

9   these three exceptions that were developing case law

01:36:28   10   previously, the revisor's notes specifically clarify that

11   the second exception applies where cases are removed to

12   federal court.  So because *Tooele County* was in rem, and it

13   made sense to apply that pre-amendment interpretation that

14   this case presented a different issue that was not an issue

01:36:46   15   at all in *Tooele County* which is the second exception for a

16   necessary in aid of this court's jurisdiction and is an

17   application to a removed case, which was not the case there.

18          THE COURT:  So it seems like these *Younger* cases

19   that recognize the ability of a federal court to grant

01:37:07   20   injunctions against state prosecutions have relied on

21   basically Section 1983 claims as the basis for that.  Is

22   that the claim you're making here, or I mean it seems like

23   we're spending a lot of time talking about in rem

24   proceedings.  But I am just wondering if the presence of a

01:37:35   25   1983 claim in this court could provide a basis under that

1    second prong of the Anti-Injunction Act in aid of my

2    jurisdiction to allow the injunction.

3           MS. ROSEN:  Yes.  I think that could.  To be

4    frank, I think that would fit better under the first

01:38:02  5    analysis which is the expressly authorized by congress

6    analysis because that first exception was created when a

7    federal right or remedy could be frustrated including when

8    the state court attempts to subvert removal.

9           And I think the 1983 claims that we have made and

01:38:20 10    these constitutional claims that we have made could be

11    frustrated by the state court criminal proceedings.  So I

12    would place that more so under that first exception than the

13    second.

14           THE COURT:  Okay.

01:38:30 15           MS. ROSEN:  Yup.

16           THE COURT:  So -- all right.  I think I

17    understand.  I was trying to shoehorn it into the wrong

18    exemption.

19           MS. ROSEN:  We're happy to take whichever one you

01:38:47 20    shoehorn it into.  But I do think it fits more cleanly under

21    the first.

22           I would also like to address the issue of when

23    *Younger* applies, which case came first, was the search

24    warrant sufficient to find that *Younger* applies.  How does

01:39:03 25    this work with the removal.  And I think it's a two-step

1    analysis.  The first step is was the case removed?  And we

2    can stop there.  The case was removed so *Younger* is

3    inapplicable.  We don't need to go into which case began

4    first.  But even if we do get there, in the TRO hearing, the

01:39:18  5    defendants challenged the admittance of the harm to my

6    client by arguing that the warrant and search were not

7    evidence of imminent harm.  And that really undercuts their

8    argument that this criminal proceeding filed days after the

9    TRO hearing actually began before the TRO hearing.  I don't

01:39:38  10    think that's -- because *Younger* is based upon comity and

11    fairness, I don't think the application of *Younger* would be

12    proper.

13        And then finally, just to clarify a statement I

14    made earlier that I don't think was sufficiently clear, if

01:39:53  15    this court decides that the Anti-Injunction Act doesn't

16    allow the relief that we have requested, the injunction of

17    the state court criminal proceeding which to be abundantly

18    clear we believe it does allow that remedy, but if the court

19    decides not to follow us there, the declaratory judgment

01:40:12  20    that we would be seeking is essentially the declaratory

21    judgment declaring that the plaintiffs are likely to succeed

22    on their claim that defendants' actions violated plaintiffs'

23    First Amendment right of religious free exercise.

24        So it would be a declaratory relief specific to

01:40:30  25    the point of the case at which we're at now.  It would not

1    be a finding on the final merits of this case, if that makes

2    sense.

3          THE COURT:  All right.  I would like to just turn

4    the time back over for a minute to Mr. Stephens to get your

01:40:49  5    take, Mr. Stephens, on whether the 1983 claim would give me

6    the authority to grant an injunction against state

7    prosecutions.  It seems that 1983 has been cited by courts

8    who have issued such injunctions and I didn't ask you about

9    that while you were on, but I would be interested in hearing

01:41:19 10    your take on that and then I will let Ms. Rosen have the

11    last word on it.

12          MR. STEPHENS:  I guess what I would say is,

13    candidly, Your Honor, I'm caught a little flatfooted on this

14    because it was not something that the plaintiffs had argued

01:41:34 15    as a basis for an Anti-Suit Injunction in their motion.  In

16    fact, 1983 is cited one time as part of the statement of

17    facts recognizing that they had filed a claim for 1983, and

18    then in the reply it is not cited at all.  So I'm answering

19    this without the full benefit of the circumstances in which

01:41:59 20    a 1983 injunction could be appropriate.

21          I'll tell you I'm aware that there is at least

22    some case law out there suggesting that in certain instances

23    1983 can be the basis for an injunction, but neither side

24    has briefed, presented, argued, whether that type of relief

01:42:22 25    is appropriate here or whether -- what the limits are either

1    from the Supreme Court or the Tenth Circuit.  And so I

2    apologize.  I don't have all those answers.  They weren't

3    presented or requested.

4            THE COURT:  Right.  And that's why we have these

01:42:39  5    dialogues is because I sometimes think of things during the

6    course of this that don't occur to me as I'm -- as I'm just

7    reading briefs.  So I appreciate your take on that.

8            Ms. Rosen, I don't know if you have anything else

9    to say on that specific issue?

01:42:59 10            MS. ROSEN:  I do not, Your Honor.  Thank you.

11            THE COURT:  Okay.  Thank you.

12            All right then, I believe that means we're ready

13    to move on to the final motion which is the motion for a

14    preliminary injunction.  That also is a motion that was

01:43:16 15    filed by or on behalf of your client.  Mr. Bean, who will be

16    arguing that?  And you're on mute.  And while you're

17    unmuting yourself, I'm sorry, Mr. Muhlestein, I neglected to

18    ask you if there was anything you wanted to weigh in on that

19    last motion, and please do not be afraid to jump in, at any

01:43:43 20    point, if there is something that you would like to add.

21    But before I turn it over to Mr. Bean, I should ask you

22    about the anti-suit part of the case.

23            MR. MUHLESTEIN:  No, Your Honor.  I intended just

24    to join with the county representatives on this.  And I will

01:44:01 25    note that the court overrides the issue of the filing of the

1      criminal lawsuit.  That is not something that the City, you

2      know, has the ability to do anyway so it is less stress,

3      regardless.  But I'm just -- I align with the county

4      representatives.  But I do -- I will be intending to, I

01:44:19  5      believe Mr. Stephens will be doing the response on the

6      upcoming issue and I will intend to follow him so we'll be

7      prepared for that.  If I get missed, I'll jump in that time

8      because I definitely am intending to have a substantive

9      statement there.  Thank you.

01:44:34  10              THE COURT:  Okay.  And Mr. Stephens, you need to

11      remind me at the end of your presentation then to turn it

12      over to Mr. Muhlestein.  Sometimes people's boxes drop off

13      my screen and then I neglect to see them.  So don't be

14      afraid to speak up.  And it looks like, Mr. Bean, you are

01:45:00  15      back on and you are still muted however.

16              MR. BEAN:  Yes, I fixed that.

17              THE COURT:  Okay.  You have the floor.

18              MR. BEAN:  Thank you.  We have already discussed

19      some of the issues that I would like to raise regarding the

01:45:18  20      preliminary injunction in the context of the motion to

21      dismiss discussion.  Principally, those are the issues that,

22      you know, general applicability as it relates to the First

23      Amendment and otherwise, you know, the paths for strict

24      scrutiny and how to get there.  So I am not going to repeat

01:45:33  25      those unless the court has more specific questions to this.

114

1    But we will be looking more into the rest of the factors of

2    the strict scrutiny analysis in the context of the overall

3    likelihood of success on the merits argument and that is

4    where I should start.  Of course, our motion for preliminary

01:45:52  5    injunction is in the context of the four factors for

6    injunctive relief which in the context with the government

7    defendants, defendants that we do have, the third and fourth

8    factors merge, so I will just talk about those three factors

9    today.

01:46:06  10    As to the --

11    THE COURT:  Before you jump in on those factors,

12    I think there has been a fair amount that has transpired

13    since we had the TRO hearing, and we had the TRO and you got

14    the scripture back, I stayed the part of the TRO that

01:46:30  15    related to the mushrooms.  You've now also moved for an

16    Anti-Suit Injunction.  I'm just wondering if you could

17    clarify for me, before we start talking about entitlement to

18    the injunction, what relief are you specifically seeking

19    with respect to the preliminary injunction separate from the

01:46:54  20    relief that you're seeking in the Anti-Suit Injunction?

21    MR. BEAN:  Yes.  Let me pull that up just

22    quickly, if I can.  Okay.  So to that point, and

23    anticipating Your Honor might, you know, ask this question,

24    you know, and address some of the specificity questions that

01:47:18  25    were raised by the defendants at the TRO hearing previously

115

1    about how to practically go about enforcing whatever

2    injunctive relief is ordered, we did submit as exhibit I

3    believe it is marked EE to our supplemental briefing in

4    support.

01:47:33   5              THE COURT:  Let me see if I can -- oh, okay,

6    let's see.

7              MR. BEAN:  Docket No. 71 dash --

8              THE COURT:  Docket No. 71.  I just -- I am just

9    trying to call that up.  It was -- so I just wanted to see

01:47:55  10   if it is an attachment to the -- well, here's the problem.

11   I'm not sure that I actually received that because when I --

12   when I click on and I know you've mentioned earlier that you

13   had included that, but when I go to the electronic document,

14   which let's see, what number is it again?

01:48:27  15             MR. BEAN:  It is 71-9.  I believe we also

16   e-mailed the court.

17             THE COURT:  Okay.  So I was looking for a hot

18   link that said Exhibit EE but it's actually number 9?

19             MR. BEAN:  Yes, probably has the ECF Number would

01:48:45  20   be 71-9.

21             THE COURT:  I see it now.  I have it on my

22   screen.

23             MR. BEAN:  Okay, great.  If you scroll to Page 5

24   that is where the specific forms of relief are requested.

01:48:57  25   As far as the, you know, what might be considered overlap

116

1    goes between the request for Anti-Suit Injunction and, you

2    know, request for that relief or similar relief and through

3    the preliminary injunction context, that is contained at

4    Paragraph 4 on that page.  Essentially -- well, it says,

01:49:16  5    "Defendants are prohibited from criminally prosecuting

6    Mr. Jensen related to psilocybin or the results of the

7    November 11th, 2024 search."  And then after they have kind

8    of specified the case.

9         THE COURT:  So are you also seeking to enjoin the

01:49:31  10    marijuana prosecution?

11         MR. BEAN:  Yes, we are.  That is, you know, it's

12    kind of that fruit of that poisonous tree arguments.  I know

13    even counsel raised issues of potential suppression that

14    perhaps could be raised more specifically in the criminal

01:49:48  15    action.  That is what the request is.  We do think that the

16    THC issue, however, is quite severable.  We're not asking

17    for relief related to the return of THC, for example.

18         THE COURT:  What about the paraphernalia

19    misdemeanor charge?  Does the paraphernalia relate to the

01:50:13  20    psilocybin or to the marijuana?

21         MR. BEAN:  My understanding is that it relates to

22    the psilocybin.  That has already been returned all of the

23    items that related to that.  So there was like a grinder and

24    a scale.  Those have all -- those have been voluntarily

01:50:29  25    returned by defendants which we, of course, appreciate, even

1    though that was not ordered in the TRO relief.  So that's

2    not an issue that's quite as present or requested.

3              THE COURT:  But I'm still asking about whether or

4    not -- I guess you're seeking to enjoin the marijuana

01:50:49  5    prosecution, but you indicate that may be severable.  I'm

6    trying to figure out where the paraphernalia charge fits in.

7              MR. BEAN:  Yes.  I think it attached to the

8    psilocybin charge.  So where we say in Paragraph 4 here,

9    "criminally prosecuting Mr. Jensen relating to psilocybin,"

01:51:08  10    that would extend, in our view, to the psilocybin

11    paraphernalia charge.  Perhaps, you know, defendants think

12    otherwise, and again, I'm not going to speak to the exact of

13    the criminal charging document, and just, you know, from the

14    context of a civil counsel here but that would be our

01:51:28  15    request.

16              THE COURT:  Okay.

17              MR. BEAN:  Any other questions on the proposed

18    order?

19              THE COURT:  You want me to enjoin them from

01:51:42  20    making statements to third parties?

21              MR. BEAN:  Yes.  And I can --

22              THE COURT:  And what's the authority for that?

23              MR. BEAN:  The factual basis behind this is this

24    is new information since we last met at the TRO hearing.

01:51:59  25              THE COURT:  Well, I understand the new

1    information, I have seen the FINRA references.  I'm asking

2    what is the legal authority for prohibiting them from making

3    statements to third parties.  That sounds like a gag order

4    and a violation of the First Amendment, a different part of

01:52:17  5    the First Amendment.

6            MR. BEAN:  Right, so many parts.  It's just

7    relying on the same authorities that we are asking for the

8    rest of this relief simply under the Rule 65.  We understand

9    that there are, you know, some attendant First Amendment

01:52:34  10   issues there.  We attempt to narrow that request to

11   statements that are intended to impact directly or

12   indirectly Singularism's ability to freely exercise its

13   religious practices, to address that issue.  But, of course,

14   you know, this proposed order is up for Your Honor's

01:52:51  15   interpretation, revision.  But that is a request to simply

16   avoid, you know, something like that occurring again, you

17   know, whether that be because, you know, some license is not

18   provided that the government says is needed or whether, you

19   know, a financial institution hears a similar statement or

01:53:11  20   receives a similar statement that would, you know, cause

21   them to effect practical verdicts on the organization's

22   right just to exist as the organization even separate from

23   its religious nature.

24           THE COURT:  Okay.  I am looking at number three.

01:53:31  25   "Defendants are prohibited from threatening to evict or

119

1    taking direct or indirect action to evict." I mean, I don't

2    think defendants have the ability to evict your client.

3           MR. BEAN:  So that is what they have threatened

4    in the eviction letter.

01:53:53  5           THE COURT:  They have threatened third parties,

6    right?

7           MR. BEAN:  That's -- that is true.  And

8    essentially what will happen under the eviction statute is

9    they would either -- and I will have to think back on this a

01:54:06  10   little bit further, but my understanding of the eviction

11   statute is that either municipality, Provo City or Utah

12   County, could bring an eviction action, eviction by

13   abatement action.  And it could be my understanding against

14   landlord but it could also be directly against Singularism.

01:54:24  15   And in that action, you know, should the -- should the

16   government prevail in that action, you know, they would be

17   entitled perhaps to fees.

18           Interestingly enough though, in that action the

19   government would have to prove essentially the opposite of

01:54:38  20   the preliminary injunction framework that we're going to

21   discuss right now in order to prevail.  And if they do not,

22   then, you know, the landlord or whomever else the civil

23   abatement action is against also has the ability to obtain

24   attorney's fees from the government.  So I'm not sure

01:54:56  25   they're going to do that, I think we heard in the proffer

1    from the TRO hearing last time that Provo City essentially

2    said that the eviction letter was an empty threat and that

3    they send these letters to individuals or landlords which

4    they know or have reason to suspect have had some nuisance

01:55:16    5    in a rented leased space.  But despite doing that, they have

6    not really had any follow through with that.

7    Now, I don't know if that is true or not, there

8    hasn't been a civil abatement action filed yet, but there

9    has also not been any sort of retraction of this letter that

01:55:32    10    they will not move forward with eviction proceedings.  So

11    that's what this direct or indirect action to effect

12    Singularism is about.  Whether that's a direct action

13    against Singularism or whether it is taken through other

14    means via a landlord or some how else.

01:55:52    15    MR. MUHLESTEIN:  Pardon me, but now that I see

16    things are clarified as well in the earlier meetings, we did

17    want to get on the record that Provo City is not intending

18    to move forward with the sort of eviction threats, you know,

19    motion actions discussed and so I am not sure exactly how

01:56:12    20    clearly that was stated in the TRO, but it is not our

21    intention to continue with that.

22    THE COURT:  Okay.  Thank you.

23    MR. BEAN:  All right.  If you don't have any

24    other further questions about the proposed order, I'm happy

01:56:26    25    to jump back in and begin with likelihood of success.

1          THE COURT:  Okay.

2          MR. BEAN:  All right.  So up front, just as far

3     as the likelihood of success standard goes, it appears that

4     parties are in agreement on what this likelihood of success

01:56:46  5     on the merits standard requires.  First, defendants haven't

6     disputed the citation to *Harmon versus city of Norman*

7     *Oklahoma*, that's a Tenth Circuit case from 2020, which says

8     that the likelihood of success on the merits factor is the

9     most important factor in this preliminary injunction

01:57:07 10    analysis.  Nor do I understand defendants to have challenged

11    that same case in its explanation that to demonstrate a

12    likelihood of success on the merit, plaintiffs need only to

13    make a prima facie case of their claims.

14          And so proceeding with those standards, looking

01:57:24 15    towards each of the causes of action.  Now, we have already

16    talked about, you know, the certain paths to strict scrutiny

17    that we believe are available very clearly under the Utah

18    RFRA, under the First Amendment, and under the Utah

19    Constitutions free exercise claims so I will not rehash

01:57:43 20    those.

21          What I do want to do is go to the two prongs of

22    strict scrutiny to determine whether based on the assertions

23    or evidence presented from defendants and that they have

24    shouldered their burden.  And it is their burden, even on a

01:58:02 25    preliminary injunction hearing, to shoulder the burden of

122

1    proof here on these two prongs, the strict scrutiny.

2            The first is compelling government interest, and

3    the second is least restrictive means.  Now, as to the

4    compelling government interest, I also do not understand

01:58:22  5    defendants to dispute the standard for what sort of

6    compelling interest we have to have here.  That compelling

7    interest is not just a generalized compelling interest.  It

8    must be specific.  So specific that it must be specific to

9    the particular claimants at issue which are here are

01:58:40  10    Singularism.  So in effect the question before this court is

11    not whether there might be a generalized interest in

12    enforcing the Controlled Substances Act, but instead whether

13    defendants have an interest at the highest order in

14    prohibiting Singularism outright from practicing its faith

01:58:59  15    and having an exemption from the Controlled Substances Act.

16            Now, all of defense arguments so far to this

17    point have rested on generalized assertions of government

18    interest.  What they have pointed to are various sources

19    from different indications, maybe studies, maybe reports

01:59:19  20    about certain seizures of psilocybin that might be involved

21    in other seizures or drugs, et cetera.  And while I

22    appreciate, you know, the marshalling of those sources, the

23    fact of the matter is they just don't really impact the

24    analysis here where the compelling interest burden is so

01:59:37  25    specific to Singularism.  And they really can't.  They are

1    not capable of doing so because those sources just don't

2    contain information factually about Singularism.  If there

3    had been done perhaps a study on Singularism's religious

4    practices and what occurred, et cetera, et cetera, that

01:59:53  5    could be relevant.  But we don't have that here.  And so

6    what we're really evaluating is what factual sources does

7    the government have to indicate that advancing an exception

8    to Singularism specifically will impact its stated interests

9    to the public safety, public health, or drug trafficking, as

02:00:16 10    I understand them.

11         Now, certainly there are some events that

12    transpired last week which I'll get into in a moment, but

13    previous to that event, the government has not asserted

14    literally any evidence of any issue about public safety,

02:00:32 15    public health, or drug trafficking.

16         THE COURT:  What do we make about the amount of

17    psilocybin that was seized?  I mean the quantity, based on

18    -- and I'm no expert on drug quantities and how much it

19    would take for a singular or Singularism voyage, but it

02:00:58 20    seems like it is a much larger quantity than Singularism's

21    historical voyages would have required.

22         MR. BEAN:  Yeah, I'm not one to engage in math if

23    I don't have to, but I think it is important to talk about

24    that here.  There is some discrepancy about the amount of

02:01:20 25    psilocybin that was actually seized.  Plaintiffs understand

124

1      that, you know, as phrased in the initial seizure reports

2      that it seems like far more than what was actually seized

3      from their perspective and that is further supported by the

4      lab reports document which was attached as an exhibit to our

5      supplemental briefing as Exhibit W, which would be ECF 71-1.

6              In that lab report, it talks about things in

7      terms of milligrams.  At first -- and I can be corrected as

8      perhaps defendants have some different information here, at

9      first I thought maybe that's just the testing amount, right,

10     that they're testing just a portion of the psilocybin

11     seized.  However, if you look to the content, for example,

12     it talks about there are two items of psilocybin.  And the

13     first says the total weight of the mushroom-like material

14     was less than 100 milligrams, and then continues to say, the

15     entire sample was used for analysis.

16             And then for the item B it also says, the total

17     weight of the mushroom-like material was 204 milligrams plus

18     or minus six milligrams.  And then gives like a certainty

19     level about the weight as to about 95 percent.

20             So there is some factual, not sure confusion is

21     the best way to say that, psilocybin that has been obtained.

22     So --

23             THE COURT:  So remind me, I think, and I'm sure

24     Mr. Stephens can correct us when he gets to his argument,

25     but the initial number that the government relied on was a

125

1    number of grams as opposed to milligrams but maybe I'm

2    misremembering.

3              MR. BEAN:  I believe that's true and I think

4    that's in the 400 number, something like that.  I don't have

02:03:08 5    that off the top of my head.  Let's see.  I can certainly

6    find that for the court.  Yeah, I think it is something like

7    458 grams is what was stated.  But then, you know, that

8    seems like that might be a factual issue that we have here.

9    But even assuming there wasn't a factual issue, and know

02:03:27 10   there was, let's just say, a large amount of psilocybin that

11   was seized, I don't think that's necessarily dispositive or

12   really indicative of a particular issue here.  I think the

13   idea would be, you know, if psilocybin had a very large

14   amount of -- if Singularism had a large amount of psilocybin

02:03:46 15   the implication could perhaps be drawn that in addition to

16   whatever performed ceremonies with psilocybin, they're

17   distributing it or something to their members, or by some

18   other means.  And there hasn't been any evidence presented

19   that there has been any sort of distribution.  Rather, the

02:04:03 20   evidence has been that the ceremonies and the psilocybin

21   occur only at the spiritual center and no individual member

22   or voyager gets to walk out of the spiritual center, you

23   know, with a bag of psilocybin or anything like that.

24             THE COURT:  So how many -- how much does the

02:04:23 25   evidence indicate is used on a standard voyage?

1          MR. BEAN:  That appears to vary depending upon

2     the individual voyager, as well as perhaps the individual

3     voyage that they're on, if they have done it previously.

4          THE COURT:  What's the range?

02:04:40  5          MR. BEAN:  My understanding is about one to

6     seven-ish grams or something like that the evidence I think

7     we have before the court.

8          THE COURT:  One to 7 grams or milligrams?

9          MR. BEAN:  I believe grams.

02:04:55 10          THE COURT:  So maybe I'm just completely

11    confused, but according to the Google conversion,

12    300 milligrams equals .3 of a gram.  So that would suggest,

13    and again maybe Mr. Stephens can help when it's his turn,

14    but if they -- if the lab report said there were

02:05:20 15    approximately 300 milligrams, that would be less than one

16    gram.  That wouldn't even be enough for one voyage.

17          MR. BEAN:  Yeah, and that's why I kind of bring

18    that discrepancy to the court.  I did precisely the same

19    thing.  I got on Google and put it into a conversion because

02:05:41 20    anything related to the metric system frankly I'm hesitant

21    to approach with confidence.  But, you know, that's my

22    understanding that's the discrepancy so it could be a very,

23    very small amount.  So they do not have a practice of

24    maintaining a lot of psilocybin onsite for the very point

02:05:58 25    of, you know, perhaps if the spiritual center is breached in

1    a robbery, or something like that, they wouldn't want to

2    have, you know, a significant amount that would cause some

3    sort of adverse effect by it, you know, leaking to the

4    community.

02:06:11   5        The other precaution they take is they also

6    include a letter, you know, we question the effectiveness of

7    this, stating to an individual that does, you know, reach

8    the source of psilocybin that it is intended solely for

9    religious use, and that taking it out, you know, and using

02:06:29   10   it in any sort of context, recreational or otherwise, is

11   prohibited, you know, not allowed and could subject the

12   individual, you know, to criminal or civil consequences as

13   well.

14        THE COURT:  Okay.

02:06:46   15        MR. BEAN:  Speaking -- and maybe that's just the

16   finishing point on what I was saying as far as evidence

17   sources that the government might have to indicate some sort

18   of particularized interest in preventing Singularism from

19   moving forward, I don't think that shows any sort of problem

02:07:02   20   to drug trafficking.  Certainly there is no evidence that

21   any particular individual was able to obtain psilocybin from

22   Singularism and remove it from the spiritual center for any

23   reason.

24        Now, I do want to address head-on an incident

02:07:17   25   that occurred in fact just last week.  This is the first

1       incident of any sort of adverse reaction that any voyager

2       has had at the Singularism Spiritual Center.

3               It is not something that is, you know, unheard

4       of.  Of course, there are very rare instances of adverse

02:07:37  5    reactions happening.  These sorts of adverse reactions

6       happen also in other contexts, in other medical research

7       facilities, the same sort of things.  And because that is a

8       possibility, excuse me, Singularism plans for and has an

9       emergency protocol for such events which it employed in this

02:07:55 10    instance.  And I don't know how much Your Honor has been

11      able to go through of that information.

12              THE COURT:  I read the allegations in the amended

13      complaint with respect to that but I didn't go into the

14      medical records.

02:08:12 15             MR. BEAN:  Okay, yeah.  Well, let me just apprise

16      the court briefly.  I'm sure the defendants will go into

17      this in more detail.  But essentially there was an

18      individual, you know, she had an adverse reaction on her

19      second instance in which she was partaking in a Singularism

02:08:27 20    ceremony.  She received more psilocybin in that ceremony

21      than she received in the first, which is typical to happen

22      for voyagers, and she had an adverse reaction to it

23      leaving --

24              THE COURT:  I would say an adverse reaction.  I

02:08:43 25    take it it was not so much a physical reaction as paranoia.

129

1       Is that -- is that a fair assessment?

2               MR. BEAN:  That's a completely fair assessment.

3       It was a localized mental and emotional reaction.  The

4       supplemental declaration of Mr. Jensen goes into that and

02:09:02  5     his observations as to what symptoms she was experiencing.

6       So from his observation, there were no sorts of physical

7       symptoms that would have caused him to, you know, take her

8       and to be hospitalized immediately rather than being

9       released to her designated emergency contact which she was.

02:09:19  10            So there is -- there is context about that.  The

11      individual left in a vehicle with her emergency contact, but

12      the paranoia was such that even with her emergency contact

13      she felt the need to contact law enforcement who did respond

14      and then eventually took her to the hospital which is just

02:09:37  15    about, I think, like a two minute drive in a car away from

16      the location of Singularism.

17              She proceeded to receive treatment and was

18      released that same evening, my understanding is.  And the

19      next day law enforcement did follow-up with her to see how

02:09:54  20    she was.  They did bodycam footage that day as well when she

21      has returned back to her rational state, not in the state of

22      paranoia any longer.  And in that bodycam footage, she

23      explains that yes, she went to Singularism willingly.  She

24      wanted to do it.  She understood that the word she used for

02:10:15  25    Singularism was reputable and perfectly legal and that she

1    had simply a bad adverse reaction to it and explained that

2    to the officer.  She also, you know, during that visit with

3    law enforcement, wrote a voluntary statement.  That doesn't

4    address everything she says in the bodycam footage, but she

02:10:34   5    does speak to the voluntary nature of her participation with

6    Singularism.

7            But there is, of course, some other -- some

8    bodycam footage of her while she is in a paranoid state

9    which, you know, I think to any individual who is not

02:10:48   10    experienced or have experience with someone who is

11    undergoing something would be very alarming so it's helpful

12    to view that bodycam footage from the day after just to

13    understand her rational, her reasoning, and her

14    understanding and her feelings towards Singularism after she

02:11:05   15    returned to that state.

16            And, you know, defense might have the opportunity

17    today.  That's the kind of limited area of fact inquiry and

18    testimony that we're speaking of today.  Mr. Jensen's

19    supplemental declaration is limited to that incident.  So if

02:11:21   20    defendants choose to do some examination, that's what we

21    expect it to be limited to.

22            But the overall picture, Your Honor, and the

23    reason for raising and discussing this, is we don't think

24    this indicates a significant change in any of the arguments

02:11:35   25    about public safety or public health.  Singularism followed

131

1    all of the same sorts of emergency protocols as other

2    leading institutions, secular institutions even would, such

3    as John Hopkins or Harvard who publish their emergency

4    protocols that Singularism models after.

5    02:11:53    And certainly, those risks, to the extent there

6    are risks in handling individuals who have unanticipated

7    issues, is one that is shared by organizations like secular

8    organizations under the Utah Psilocybin Act that might

9    administer psilocybin to individuals.

10    02:12:13    Factually, the last piece I wanted to talk about

11    that event is it appears, based on Mr. Jensen's observations

12    and some communications that he had with the individual's

13    emergency contacts, that some mental health issues likely

14    were not disclosed in Singularism's screening process.  And

15    02:12:34    had they been disclosed, it is unlikely that Singularism

16    would have proceeded to allow her to participate in the

17    ceremony.

18    And while unfortunate, that is likely also

19    something that happens in comparable secular contexts where

20    02:12:47    an individual does not disclose certain, you know,

21    pre-conditions to some sort of treatment or something and

22    some adverse reaction results and is dealt with.

23    So for all that said, that really is the sum, in

24    our view, of any factual information that relates or could

25    02:13:04    relate to the government's shouldering of their burden to

132

1    demonstrate a compelling interest in denying Singularism

2    specifically a religious exemption.  The case law, this

3    particular piece that I think is most relevant for the

4    court's analysis, and really does merit a full read if the

5    court hasn't had the opportunity, is the *Gonzales versus O*

6    *Centro* case.  And the reason I raise that is because in the

7    government's supplemental brief, they raise this concept

8    about needing to enforce a closed regulatory system which is

9    the Utah Controlled Substances Act.  And if that is not

10   allowed and we allow exemptions, then the whole system

11   essentially will be compromised and First Amendment nor RFRA

12   should be allowed to compromise such a system.  But that is

13   the precise argument that the government made in *O Centro*

14   that the U.S. Supreme Court rejected.  And it goes on for

15   pages about this, but the U.S. Supreme Court begins saying

16   that, you know, just the fact that the Controlled Substances

17   Act at the federal level contain certain congressional

18   findings but the dangers of any particular controlled

19   substance doesn't do anything to justify the compelling

20   interest here.

21        Notably, the defendants have cited there are

22   similar congressional findings from the Federal Controlled

23   Substances Act as well as legislative findings from the Utah

24   legislators in position of the Controlled Substances Act in

25   Utah.  Now, we similarly think those things just don't meet

1    the level of compelling interest justification here.

2            Additionally, as something raised in *O Centro* and

3    the other cases that went to -- well, let me speak to *O*

4    *Centro* just slightly more.  The other issue *O Centro* raised

02:15:00  5    was the issue of lack of compelling interest demonstrated by

6    exemptions in the Controlled Substances Act.  So to the

7    extent the court is looking for some exemption analysis

8    related to the Controlled Substances Act, it certainly can

9    be found in *O Centro*.  It says that the Peyote exemption, as

02:15:16  10    well as that individualized sort of discretionary exemption

11    to grant exemptions from licensure we talked about

12    previously, those two exemptions together indicated that

13    this is a system that can bear, that can brook some

14    departures from a uniformed closed system, right?  In that

02:15:35  15    sense, the U.S. Supreme Court found that that undermined the

16    government's assertion of the compelling interest in the

17    fact that exemptions for others, including on a religious

18    basis, were present within the Federal Controlled Substances

19    Act.  And we think the same is even more true when we look

02:15:51  20    to the Utah Controlled Substances Act which contains further

21    exemptions and, of course, the more specific and very broad

22    exemption related and shown in the Utah Psilocybin Act.

23            But the other thing that the controlling cases

24    from the Supreme Court identify is that courts should reject

02:16:15  25    slippery-slope type arguments or speculative or hypothetical

1    harm type arguments.  They have done this again and again,

2    first in *Hobby Lobby,* in the *Fulton* case, and also the

3    *Ramirez versus Collier* case.

4              Essentially, the concept is that the government

02:16:30  5    can't just say, well, if I grant this exemption, then I'm

6    going to get a flood of other problems, right?  And we heard

7    some similar analysis about this earlier today like if we

8    grant this exemption to the Utah Controlled Substances Act,

9    we're going to have all sorts of opioid problems, right?

02:16:47  10   The government in this burden is -- has to have evidence

11   that something like that would, in fact, occur because of

12   this particular religious claimant's actions.  And there is

13   just nothing like that here present.  Absent evidence and

14   the speculative issues or harms should be disregarded and

02:17:06  15   there are several that are pointed out in our briefings, you

16   know, about defendants arguing about potential risks or

17   hypothetical harms.  We think none of those contribute to

18   shouldering their burden.

19              Now, last, let's even assume that this compelling

02:17:23  20   interest prong is not so specified and it could just be

21   shouldered at a general level.  We think there are various

22   issues that undermine the government's assertion of public

23   safety, public health, drug trafficking concerns even at

24   that higher level.  First, and most critically, it seems

02:17:40  25   that the government's assertion that psilocybin is just an

135

1    inherently dangerous drug likely to lead to all sorts of

2    horrible such as suicide, interference with traffic, et

3    cetera, et cetera, those are all very credibly undermined.

4    But the legislature's passage of the Utah Psilocybin Act

02:17:58   5    last year part of that decision by the legislature must have

6    been that psilocybin is not so dangerous that it can't be

7    given to anyone as the government is asserting here and now.

8            Certainly, the government has decided that it has

9    some beneficial uses in the secular context here and that

02:18:18  10    those uses are so beneficial that it doesn't need to be

11    subject to very intense monitoring or very intense strict

12    procedures as the Utah Psilocybin Act is to avoid a lot of

13    controls that you might have expected from an act like this.

14    For example, it doesn't contain any issues about sourcing of

02:18:38  15    psilocybin.  It doesn't contain any --

16            THE COURT:  But I thought I heard an argument to

17    the contrary on that issue this morning that it had to come

18    from some kind of specialized lab.  That was something that

19    Mr. James, I believe, indicated this morning.

02:19:00  20            MR. BEAN:  Yeah.  I believe what he might be

21    referring to is the act defines the word drug, and it

22    defines the word drug to include psilocybin of the type

23    that, you know, the FDA has approved.  But beyond that,

24    where that psilocybin comes from is not specified.  It is

02:19:17  25    further not specified in the issues about purity level or

1    testing requirements or how, you know, it is delivered to

2    the agency, what happens after it is delivered, that sort of

3    thing.

4        THE COURT:  Other than the very vague testimonial

02:19:33    5    evidence we had in the last hearing about your client's

6    source of the psilocybin, is there evidence in the record

7    that sheds light on that?

8        MR. BEAN:  We pointed the court to this because

9    in supplemental briefing defendants argued that Singularism

02:19:50    10    was getting it off the street.  That is simply not true.  We

11    pointed the court to a transcript cite in the TRO hearing in

12    which I believe Ms. Lee said they got it from a lab in

13    Oregon.  We didn't get further into it because, you know,

14    frankly, we don't think it is relevant, as if she were

02:20:07    15    evaluating a substantial burden, and certainly where the

16    Utah Psilocybin Act does not require that the source of any

17    particular location, we don't think it has relevance here

18    either.

19        THE COURT:  Just so I'm clear though, the only

02:20:20    20    evidence that we have is that it was delivered by a woman, I

21    forgot her name, who got it from a lab in Oregon.  That's

22    the sum total evidence on the record?

23        MR. BEAN:  That's what I understand, yup.

24        And as far as, you know, other factual

02:20:38    25    information, I mean the evidence, we introduced the lab

1    report which I was quoting from earlier.  One important

2    thing to note is that the psilocybin was seized.  It was

3    identified as psilocybin.  The report doesn't say anything

4    about any other sort of contaminates contained in there.  So

02:20:55  5    to the extent the argument is that there is a potential for

6    contaminants, the only evidence we have is that it was pure

7    psilocybin.

8          As to other issues that undermine even

9    generalized interests in the assertion of compelling

02:21:08  10    government interest, we do think it is -- the assertions of

11    these interest are certainly undermined by defendants

12    inaction meaning after Singularism put the defendants on

13    notice nearly without keeping more than a year before the

14    search and seizure happened, defendants did nothing for, you

02:21:25  15    know, essentially a year to stop that.  If they were truly

16    so concerned about public safety and public health and drug

17    trafficking to the point they claim in their briefing, one

18    would have expected them to act earlier especially when as

19    they show in, I believe it is Detective Julian's search

02:21:44  20    warrant affidavit, there was some unspecified, unnamed

21    individual who lodged some concern.  Still not a lot of

22    details on what the concern was in the fall of 2023, but

23    still, nothing was done and additionally nothing was done

24    after Utah County and Provo City determined to make

02:22:03  25    statements to the media that they did not believe that

138

1    Singularism had any sort of protection for their religious

2    practices.  It just goes to say if those concerns were so

3    present in their mind, why didn't they act.  Similarly and

4    related, we have -- Singularism has provided allegations

02:22:20  5    that the complaint and some citations to the website of

6    these organizations that are similar Entheogenic religious

7    groups.  One just I will note in specific --

8            THE COURT:  And I -- I mean that is an

9    interesting question because those other religious groups,

02:22:39  10    as I understand it, reside in Tooele County or Salt Lake

11    County.  So they are different defendants than we have

12    present here.  I mean as I look over the list of defendants

13    in this particular case, it's Utah County, Provo City, and

14    Jeffrey Gray, who is the county attorney, I don't know how

02:23:06  15    we can make some kind of -- I mean how we can say well it

16    can't be a serious problem because some prosecutor in a

17    different jurisdiction isn't doing anything about it.

18            MR. BEAN:  Yeah, I understand that.  And

19    certainly some of those organizations might be centered in

02:23:26  20    different places in Utah.

21            THE COURT:  Are any -- I guess the relevant

22    question is are any centered in Utah County?

23            MR. BEAN:  Yes.  And that is one I was going to

24    point out.  Divine Assembly, we understand, to be centered

02:23:39  25    in Orem, for example.  And they are a far larger

1    organization than Singularism.  From my perspective, if I

2    were to remove my, you know, religious eyes about the merits

3    of religious protections, you know, and just view this as a

4    secular angle about safety issues, they seem far more

02:23:57  5    dangerous.  For example, if you get on their website, they

6    sell religious exemption cards, they literally sell mushroom

7    growing kits that you can do at home.  That sort of stuff

8    that would be surprising, far more surprising from a public

9    safety and health angle, than we have seen in Singularism

02:24:16  10   where it is a very controlled environment, you know, where

11   emergency protocols are involved, following, you know,

12   reputable secular or medical emergency protocols.  And so

13   that is just -- that is to the point.

14        So I recognize, Your Honor, you know, that some

02:24:29  15   of them may be headquartered or perhaps performed some of

16   their religious ceremonies in places other than Provo or

17   Utah County, but at least one and the most critical one,

18   Devine Assembly, does have presence, significant presence,

19   in Utah County.

02:24:45  20        The last two things about undermining just a

21   general level of the government interest is one, defendants

22   have not said really anything about the clergy exemption

23   that the Department of Occupational -- Department of

24   Occupational and Professional Licensing, DOPL, I don't know

02:25:07  25   if I'm saying that acronym correctly, but that they have

1    granted to Mr. Jensen, you might recall, Your Honor, from

2    our last hearing, essentially around the same time negated

3    by a few weeks of the search and seizure, some individual

4    unknown at this point, made some sort of a complaint about

02:25:27  5    Mr. Jensen's lack of licensure to DOPL.  And they

6    determined, following their investigation, that he was

7    entitled to continue practicing under the clergy exception

8    to the Mental Health Practices Licensure Act, that he could

9    continue practicing as a mental health therapy.  Meaning,

02:25:47  10    you know, actually practicing that therapy, not just, you

11    know, practicing some sort of therapy but practicing that

12    therapy with all of the same rights and privileges as a

13    licensed individual.

14             THE COURT:  Well, I mean, I thought that, and

02:26:02  15    maybe I need to take a closer look at that, I thought that

16    what they said was to the extent that he is giving advice to

17    parishioners and serving as a -- in a religious role, he

18    could counsel people.  I mean did they really imbue him with

19    all of the same rights as someone who was licensed as a

02:26:29  20    mental health therapist because, for example, did he even

21    have to have the psychology degrees or the clinical

22    experience that would be required to be a licensed mental

23    health therapist to qualify for this clergy exemption?  Or

24    is that available to anyone regardless of training or lack

02:26:53  25    of training who wants to counsel people in a religious

141

1    setting?

2            MR. BEAN:  Yes, it really is quite broad and

3    allows them to do other things.  The primary restriction for

4    folks under the clergy exemption is just they cannot

02:27:08  5    represent themselves to the public or their parishioners as

6    having a certain title.  So there is a list of certain

7    titles in the statute which says you can't say those things

8    for the public.

9            THE COURT:  But I guess what I'm asking is, can

02:27:24 10    anyone, who makes a claim to hold an ecclesiastical

11    position, qualify for that exemption even though they have

12    zero training in clinical practice or mental health?

13            MR. BEAN:  Yes, that's my understanding.  I think

14    probably the most common application of the clergy exemption

02:27:44 15    is to Latter-day Saint Bishops who are providing spiritual

16    counseling, many of whom I expect don't have that sort of

17    training.

18            THE COURT:  Okay.

19            MR. BEAN:  So that goes to that point.  And then

02:27:54 20    the last point we want to just point out is that, you know,

21    defense counsel short cited many sources about the dangers

22    of psilocybin.  I think we have been pretty thorough in our

23    briefing in pointing out that we don't think those sources

24    really say what they say.  We could certainly get into a war

02:28:09 25    of articles here about, you know, the articles supporting

142

 1      benefits and then against, but we don't think it is really

 2      relevant to the court's analysis so we haven't done that

 3      other to point to maybe one article that was previously

 4      introduced before the court, because the really relevant

02:28:24  5  inquiry is the factual evidence related to Singularism

 6      itself as to compelling government interest.

 7              And so for all those reasons, for the specificity

 8      reasons and even if, you know, the interests are

 9      non-specific, we still don't think they make the -- they

02:28:40 10  shoulder their burden under that first prong, the strict

 11     scrutiny analysis.

 12             Now, as to least restrictive means, let's assume

 13     for a moment that the government has an interest.  And this

 14     is some times what, you know, Utah or the U.S. Supreme Court

02:28:55 15  will do is it will assume for the purposes of argument that

 16     there is a governmental interest and then move to least

 17     restrictive means and find that least restrictive means is

 18     not satisfied.  That, I believe, is what happened in the

 19     *Hobby Lobby* decision, for example.

02:29:08 20         Now, just from the outset, defendants argue that

 21     they only need to respond to least restrictive means

 22     proposals that plaintiffs put forward.  I don't see that

 23     reflected in the Supreme Court cases that touch least

 24     restrictive means specifically *Hobby Lobby,* Holt, and Cobbs,

02:29:30 25  *Fulton.*  Those cases really say if there is any other way

```
 1    for the government to achieve its objective, that it is less

 2    restrictive and outright prohibition and permits some level

 3    of religious free exercise, it must do so.  And under that

 4    standard, we think that the defendant -- defense do have to

 5    prove that.  However, even if it is correct that plaintiffs

 6    have to put forth proposals that the defendants get an

 7    opportunity to kind of shoot down, they have done that and

 8    they have done that from the start of the briefing in this

 9    case.

10         So I just want to walk through those proposals.

11    And the key here is we're looking for the least restrictive

12    proposal, right?  That's what the government has to do.  And

13    if there is a least restrictive proposal proposed by us or

14    maybe even defendants, that should indicate to the court

15    that the defendants have not met their burden of less

16    restricted means brief here.

17         So the first, and this is the most least

18    restrictive, I would say, is that the least restrictive

19    means is simply for defendants to do nothing and allow

20    Singularism to continue on its practices as it has been

21    practicing for the past year plus, just as defendants

22    allowed Singularism to do even after receiving information

23    about it opening from Singularism from a concern from some

24    citizen, and even after their media statements to the public

25    that Singularism didn't have religious freedom protections.
```

144

1    Amid all those things, it still did nothing.  Similarly,

2    also it has done nothing from our understanding of any

3    prosecutions of any Divine Assembly member.  Defendants have

4    produced no evidence that any Devine Assembly member or any

02:31:09   5    other member of an Entheogenic religion have been prosecuted

6    to indicate some uniform application on this issue as to all

7    sorts of religious organizations.  So that simply is least

8    restrictive means we seek here.  Allow Singularism to

9    continue its practices as it has.

02:31:27   10           Now defense, I imagine, will not be very

11    satisfied with that proposal because, you know, of concerns

12    they might have for the public interest.  But we have also

13    set forth additional proposals.  The next least restrictive

14    means would be to simply allow Singularism to practice its

02:31:43   15    religious practices under the terms of Utah Psilocybin Act.

16    And essentially that would be in addition to kind of the

17    religious practices that inform Singularism, Singularism

18    would also be required to administer its psilocybin

19    ceremonies supported by a broad collection of scientific and

02:32:04   20    medical research which the term that the secular healthcare

21    organizations have to make that determination, right?  And

22    that's certainly something that Singularism can do and

23    already does do, based upon research from Harvard Medical

24    School, John Hopkins, et cetera.  So that would not be a

02:32:25   25    difficult item for Singularism to meet.

1          Similarly, it would require Singularism to

2     administer psilocybin under the supervision of, you know,

3     clergy, mental health practitioners like is already being

4     done with Mr. Jensen under that sort of clergy exception

02:32:43  5     from DOPL.

6          Now, the Psilocybin Act talks about licensed

7     individuals, but that mental health or excuse me that clergy

8     exemption for mental health practitioners lives also under

9     the same title as the Utah Controlled Substances Act.  And

02:32:57 10     the Utah Psilocybin Act says that any individual licensed

11     under the title is one that can supervise.  And through that

12     interplay, Mr. Jensen, of course, is a perfect candidate.

13     And frankly, you know, he may very well be able to

14     administer some sort of psilocybin program with better

02:33:15 15     efficacy and more safety than a health organization in Utah

16     doing it for the first time without experience under the

17     Utah Psilocybin Act.

18          Now, the last requirement under that proposal

19     would be a requirement that Singularism only administer its

02:33:32 20     ceremonies to individuals above 18 years old.  And that is

21     already a rule that it follows.

22          So all of those things are met.  I don't think it

23     would be reasonable to impose a requirement that Singularism

24     somehow purchased 15 hospitals in order to be qualified for

02:33:51 25     that least restrictive means.  I just don't think that is

1    possible or reasonable.  And so those are the applicable

2    portions in the Utah Psilocybin Act.  We could also talk

3    about whether --

4         THE COURT:  Well, just out of curiosity, how many

02:34:05    5    healthcare systems in the state qualify under that

6    Psilocybin Act or was this actually just an invitation to

7    IHC to do this?

8         MR. BEAN:  I really do consider that to be the

9    case.  It does also interpret it in terms of relation to

02:34:26    10    University Healthcare systems, so the U's healthcare system.

11         THE COURT:  So it was basically a private statute

12    for IHC and the University of Utah?

13         MR. BEAN:  Correct.  And then the last thing I

14    was going to say is there also is a requirement for those

02:34:44    15    health organizations to report to the legislature, and I

16    think in July of 2026, basically say, how did it go?  Tell

17    us what happened?  And now, you know, those health

18    organizations are not under that obligation until, of

19    course, that time.  Perhaps, you know, defendants would be

02:35:01    20    interested, or plaintiffs would be interested in coming up

21    with some sort of reporting mechanism about safety, but I'm

22    not sure that makes complete sense here or not even an issue

23    for the healthcare systems.

24         THE COURT:  Now this morning an argument was made

02:35:18    25    that the Utah Psilocybin Act not only authorized the studies

1          to go on but immunized, I suppose, the two hospital systems

2          from any liability.  Is it your claim that your client would

3          also be entitled to that same immunity from potential

4          liability that those institutions enjoy under the act?

5              MR. BEAN:  I think that's a strong claim to make

6          but I do think it is supported by the text of the statute,

7          right?  For example, if the healthcare organizations

8          encountered an adverse consequence, for example, that they

9          maybe weren't equipped to handle and it resulted in some

10         sort of like compensable injury, it is very possible that

11         that immunity would immunize them somehow from that some

12         sort of injury or would immunize them from prosecution, you

13         know, when the individual complaints to law enforcement

14         about what had been done to them.

15             THE COURT:  Right.  But so that's my question is

16         if your claim is that you need to be treated similarly, is

17         it also your claim that your client should be immunized from

18         any potential liability for things that go awry?

19             MR. BEAN:  I doubt my client would insist on that

20         but I am going to assert that here because that is the face

21         of the statute.  And so I think it is important for us to

22         put forth that as the least restrictive means.  Again, you

23         know, perhaps the Utah legislature can question the wisdom

24         of putting in such a broad grant of immunity to the

25         healthcare systems there but if we're going to talk about

1    parity between secular and religious practices that have the

2    same comparable features, I do think that makes sense to

3    include.

4         Note the third kind of category of proposal that

02:37:14  5    plaintiffs have put forward is basically just pointing to

6    other instances where the government has made it work in

7    some fashion.  And these instances are not perfectly

8    analogous to what we have here and frankly I think they are

9    more difficult situations to handle.  But they are instances

02:37:31 10    of, you know, showing how there is a less restrictive means

11    by which this could be done with the government than an

12    outright prohibition of psilocybin.

13         And the first is demonstrated by the *O Centro*

14    case.  If you might recall during the TRO hearing last time,

02:37:47 15    we were able to look over the preliminary injunction order

16    that was issued upon remand from the Supreme Court's

17    decision in *O Centro.*  And it did list several conditions

18    about how to do things including, you know, things related

19    to the importation of the controlled substance into the

02:38:05 20    United States.  There are a lot of detailed considerations

21    in there, detailed possibilities.  And so as an example, a

22    very similar example, is Ninth Circuit's decision in *Church*

23    *of the Holy Light of the Queen versus Holder*, you know,

24    where similar Daime tea and importation of controlled

02:38:20 25    substances, religious use, possession.  The best and

1    probably most public example of the government finding a way

2    to do this is last year the DEA and a variety of other

3    federal agencies came together with, I believe, a 15-page

4    settlement agreement which we have included as an attachment

02:38:39    5    I believe to our initial brief, which indicated that they

6    also found a way to do this.  And there are lots of terms in

7    there, of course, about, you know, reporting and this is how

8    the controlled substance is going to be imported and there

9    are even requirements about who can take it to what setting.

02:38:59    10    And notably, I think it is interesting, that that settlement

11    agreement allows the sacramental substance there to be taken

12    and the ceremony performed in any location as long as the

13    identified individual is the one that tranports it there and

14    takes control of it during the situation, which, you know,

02:39:15    15    is not an issue for Singularism because it only performs its

16    ceremonies at its spiritual center.

17             So I don't want to go through all of the

18    specifics of those possibilities but they just are all

19    examples of the least restrictive means that the government

02:39:27    20    could take here besides an outright prohibition.

21             THE COURT:  How do the Peyote exemptions work?

22             MR. BEAN:  Under the Utah Controlled Substances

23    Act?

24             THE COURT:  Yes.

02:39:36    25             MR. BEAN:  Yeah.  So that is the last point I

1    wanted to make here.  You're probably anticipating my

2    outline.  That is not a proposal that I anticipated putting

3    forward.  The reason we raised it is to identify, you know,

4    lack of general applicability, or lack of a compelling

02:39:50  5    interest because the Utah Controlled Substances Act contain

6    so many exemptions.  However, they do function in two

7    different ways.  For example, it can be asserted as an

8    affirmative defense, Peyote exception, in a criminal action.

9    And they -- it also contains a provision above the

02:40:07  10   affirmative defense provision I don't have at the top of my

11   mind, but it also allows for a more general liability

12   perhaps, you know, could also raise it in a similar way as

13   RFRA was raised here in another civil action.

14            Now, this is interesting.  The defendants

02:40:30  15   actually identify this.  And I will say I really haven't

16   seen an engagement with the least restrictive means prong

17   under the strict scrutiny analysis until the government's

18   supplemental brief from last Friday.  And it's interesting

19   to me that they include the discussion of the Peyote

02:40:47  20   exemption.  For my part, it is an identification on their

21   part that there is a less restrictive means.  Now, is that

22   the least restrictive means and is that the means I think

23   the court should take, you know, in fashioning maybe

24   preliminary injunction relief or maybe some sort of final

02:41:03  25   injunctive relief on the terms that Singularism should

1    exercise its religious practice?  No, I don't think that.

2    But the fact of and mere identification of a less

3    restrictive means from the government itself should indicate

4    that it has failed to carry its burden.  That there is no

02:41:21  5    other less restrictive means possible.  So that's why I

6    think that is interesting.

7            Does Your Honor have further questions about the

8    operation of the Peyote exception?

9            THE COURT:  I do not.

02:41:33  10            MR. BEAN:  Okay.  For all those reasons, you

11    know, those three, I guess I would say categories of

12    proposals of less restrictive means, the government really

13    hasn't carried its burden of demonstration here.  And

14    because it fails on that prong, it also fails on the

02:41:46  15    compelling interest prong, there is significant likelihood

16    of success for plaintiffs here on that prong of the

17    preliminary injunction analysis.

18            Now, defendants don't want the court to reach

19    strict scrutiny review understandably because it is a hard

02:42:04  20    burden for them to bear and as for the reasons we have said

21    they don't bear that burden.  And so what they're attempting

22    to do is basically breakdown plaintiffs initial burden which

23    is to demonstrate a substantial burden on sincere religious

24    free exercise.

02:42:19  25            The most significant attempts defendants have

1    made in this regard are that argument about Singularism not

2    being a religion or if it is a religion that it is not

3    sincere and its religion is a front for some drug operation.

4         Certainly we disagree with that and the weight of

02:42:38  5    evidence we don't think supports that finding at all.  The

6    court found in its previous TRO order that Singularism was a

7    religion as contemplated by the law, and there was a lot of

8    discussion about the *Meyers* case, the *Meyers* factor in

9    previous briefing.

02:42:53 10         But before we get there, I do want to raise one

11    of the new documents that was submitted to Your Honor.  It

12    is ECF Document 71-5.  And this is also a recent

13    development.  So this is a letter from Provo City that was

14    sent to Singularism on January 13th, 2025.  The context for

02:43:19 15    this letter is that Mr. Jensen understood that to continue

16    operations to exist in the space, et cetera, in Provo City,

17    he would need to have some sort of business licensure.

18    Following that discussion, it eventually led to this letter

19    in which Provo City tells Mr. Jensen/Singularism, that it

02:43:42 20    does not need a license to operate and says, quote, "Under

21    Provo City Code Section 6.01.130, churches or religious

22    organizations are not required to obtain a business license

23    to operate.  This exemption is limited to activities

24    directly associate with religious purposes.  An application,

02:44:00 25    application number, for Singularism has been closed."

153

1          Now, this is a representation from one of the

2     defendants that, in fact, Singularism is a religious

3     organization.  And this representation is particularly

4     significant --

02:44:13  5          THE COURT:  Just quickly, I mean it does go on to

6     say that, "If your organization engages in activities

7     outside the scope of religious operations, such as running a

8     commercial enterprise or selling goods," I guess arguments

9     could be made that your client does both of those.

02:44:33 10          MR. BEAN:  I think arguments could be made as to

11    that as far as perhaps a licensure issue.  But as to the

12    matter of, you know, whether Provo City has made a statement

13    regarding the religious status of Singularism, we don't

14    think that is disputable.  And, of course, I would also

02:44:53 15    point the court to the *Hobby Lobby* decision which discussed

16    religious organizations that do have any sort of commercial

17    components.  There, the court went as far as to say that

18    even if the only reason for the organization's existence is

19    to produce a profit, as long as it is still a religion, that

02:45:13 20    organization doesn't lose its religious rights.

21          The other reason I think this letter is

22    significant is actually the following section in the Provo

23    City Code which is Section 6.01.140 and that actually

24    defines kind of the burden that a religious organization

02:45:30 25    would need to prove their religiosity to Provo City.  And it

154

1    is very interesting because that means that Provo City in

2    its determination review of this business application,

3    licensure, made the determination that Singularism had met

4    its burden of proving religiosity.  Now, the point of all of

02:45:54  5    this, Your Honor, is simply to say that there has been a lot

6    of discussion about whether Singularism is a religion and

7    now we have a statement from Provo City that says they in

8    fact are.  From our perspective, that means that defendant

9    should be stopped from asserting further that Singularism is

02:46:09  10    not a religion.

11           Now, even if Your Honor was not inclined to, you

12    know, use that as evidence of estoppel for the defendants'

13    arguments about the religious nature of Singularism, the

14    next thing we would look to is the Utah RFRA definition of

02:46:24  15    free exercise of religion.  I don't even think we need to

16    get into *Meyers* at all, because Utah RFRA contains a very

17    capacious definition of free exercise of religion.  This is

18    in Utah Code 63g-33-101 subsection 2.  It defines free

19    exercise of religion to mean the right to act, to refuse to

02:46:48  20    act, in a manner substantially motivated by a sincerely held

21    religious belief regardless of whether the exercise is

22    compulsory or central to a larger system of religious

23    belief.

24           And that last piece is particularly relevant here

02:47:03  25    because a lot of these factors that we're seeing in *Meyer*

1    are factors which, you know, are trying to say that there is

2    this large cohesive or some other, you know, centralized

3    hierarchal organization that looks religious according to

4    maybe traditional terms of what a religion looks like.  But

02:47:25   5    the Utah RFRA does not speak in those terms or those factors

6    of *Meyers*.  It says, you know, something -- a religious

7    practice that is compulsory or central to a larger system of

8    religious belief or practices a religious belief regardless

9    of whether that it exercises compulsory or central to a

02:47:45   10    larger system of belief, whether that larger system of

11    belief be an organized religion or something different.  So

12    under that definition we think that the religiosity issue is

13    resolved here.

14         Now, even if we get to the *Meyers* factors, Your

02:48:07   15    Honor, and I won't take you through all of the *Meyers*

16    factors because we have done that, I think, well in the

17    briefing, but, you know, there are some criticisms of that

18    case, of course, as it relates to defining what a religion

19    is.  There are several other jurisdictions in the country

02:48:22   20    that take far different approaches to finding what a

21    religion is.  But even if we're taking the *Meyers* factors,

22    you know, at face value, and there has been really

23    substantial amount of evidence adduced to the court both in

24    terms of Mr. Jensen's declarations about his religious

02:48:40   25    history and the reason for the formation, his kind of

1    encounter with the Devine which instructed him to form

2    Singularism.  The various declarations by other Singularism

3    members attesting to their participation in the religious

4    nature of Singularism.  The testimony that we had from those

02:48:56  5    individuals -- some of those individuals at the last hearing

6    that was particularly compelling, as well as all of the

7    doctrinal statements, pages and pages of doctrinal

8    statements that Singularism has produced which go to all of

9    these different *Meyers* factors.

02:49:11  10         For all those reasons, we think that Singularism

11    has plainly proven that it is a religion as far as the law

12    contemplates.  It's a religion and the defendants have

13    appeared to have agreed as well and that should not be any

14    bar for the court reaching the strict scrutiny analysis.

02:49:28  15         Now, the second portion of that discussion is

16    assuming it is a religion then are they truly sincere?  And

17    the court already found that Singularism was sincere in its

18    TRO order and we would encourage the court to maintain that

19    order here.  This is just purely a factual issue.  It's just

02:49:46  20    a weight of the evidence issue, I think, for the court.  We

21    would assert that all those same sources that I have just

22    talked to you go very strongly to the sincerity of religious

23    practices at issue, but also that the sources produced by

24    defendants show that they too understood that Singularism

02:50:08  25    was sincere.  For example, what I point to is Detective

157

1    Julian he executed a search warrant affidavit.  But in the

2    documents that were submitted to the court most recently,

3    and this was 71.6 to the supplemental brief, and this is an

4    updated police report through December 2002.  And toward the

02:50:30   5    bottom, Mr. -- or Detective Julian makes a conclusion.

6    There is a header conclusion, I believe it is on Page 13 of

7    the PDF, but he essentially says, "Bridger fully feels that

8    since he has founded the religion of Singularism, his use

9    and providing of psilocybin to individuals is legal and

02:50:50   10    protected under federal law as part of the Freedom of

11    Religion."

12          And this statement is consistent with statements

13    found throughout the rest of the police report indicating

14    that there were multiple moments where Julian and

02:51:05   15    investigators found evidence of uniform assertions of

16    religious sincerity.  And despite that, there was some sort

17    of skepticism and more predominantly that in fact the Utah

18    County and Provo City Attorneys Offices instructed Mr. --

19    Detective Julian, after relaying that information, to

02:51:24   20    proceed anyway.

21          So the next sentence, after the one I just quoted

22    says, "However, when speaking with the Utah County and Provo

23    City Attorney Offices, it has been expressed that

24    Singularism is not exempt from the Utah Controlled

02:51:38   25    Substances Act."  And then he proceeds and finishes the

1    paragraph and says, "Due to these factors, this case will be

2    referred to the Utah County Attorney's Office for screening

3    of charges."

4         THE COURT:  Of course, that doesn't suggest that

02:51:49  5    he is not sincere.  It just suggests that he is not exempt

6    from the Utah Controlled Substances Act.  Those are two

7    different things.

8         MR. BEAN:  Certainly, Your Honor.  And my point

9    of raising this is it appears that Detective Julian

02:52:04  10   essentially told, you know, his prosecuting superiors his

11   understanding of their assertions of religious sincerity.

12   And so that now we're here in litigation, there are some

13   significant arguments made about religious sincerity and the

14   investigator doesn't seem to have had that position.

02:52:27  15        Let's see.  The other evidence that defense

16   appeared to assert against religious sincerity is a lot of

17   quoted conduct from like LinkedIn profiles, Mr. Jensen's

18   past secular, you know, entities that he might have had a

19   website that lingered on, or something like that.  We just

02:52:48  20   don't think those are persuasive and it also appears that

21   there is kind of an implication that because Singularism

22   accepts money in relationship to religious practices, that

23   that in and of itself indicates some sort of insincerity.

24        And in response to that argument I would just

02:53:04  25   point again the court back to the *Hobby Lobby* decision which

159

1          talked about religious rights being completely maintained

2          for any sorts of religious organizations even those that are

3          seeking to exist solely for profit which Singularism is not,

4          but it does have a financial interchange component for some,

02:53:19  5    at least for most, perhaps, of the Singularism members.

6                   For all those reasons we don't think there is a

7          legitimate challenge to the sincerity piece of this

8          analysis.

9                   Last, as to this initial kind of threshold

02:53:34  10   decisions before we get into the strict scrutiny, there is

11         an argument that Singularism's religion was not

12         substantially burdened.  Again, this is an issue that Your

13         Honor has already spoken to, at least in part in your TRO

14         order and we would encourage the court to maintain that

02:53:47  15   decision.

16                  Most importantly, looking to the Utah RFRA's

17         definition of substantially burdened, it is very, very broad

18         about what constitutes a substantial burden.  And this is at

19         63G dot -- or -33-101 subsection (6).  It begins with the

02:54:09  20   broad definition of what substantially burden means and then

21         in another smaller subsection it says, and here are some

22         examples.

23                  So substantially burden means that government

24         action, directly or indirectly, can be anything that

02:54:25  25   constrains, limits, or denies, compels a person to act, or

1    fail to act, in relation to religious practices.  Including

2    direct or indirect really opens the scope of what a

3    substantial burden can be.  And even if that weren't broad

4    enough and clear enough to include the sort of conduct that

02:54:44  5    is at issue in this case, those examples, you know, where it

6    says that substantially burden includes and then it lists

7    any of the following, some of the things that are included

8    there are a burden regardless of whether that burden is

9    imposed by, law, statute, ordinance, rule, policy, order or

02:55:04 10    other assertion of governmental authority, or any other

11    means.  And also, the government's actions to apply or

12    enforce an act against an individual, organization, or

13    enforce a law, statute, ordinance, rule, policy, order, or

14    other assertion of governmental authority.  And one take

02:55:24 15    away there is that it is really not a huge and significant

16    bar or substantial burden because the definition of

17    substantial burden is so significant.  I think defendants'

18    primary argument in this substantial burden area is that the

19    criminal prosecution or at least threatened criminal

02:55:40 20    prosecution before it actually proceeded is a threat.  From

21    their perspective, simply defending an action in a judicial

22    proceeding can't possibly amount to substantial burden.  But

23    looking at the definition under Utah's RFRA, there is just

24    simply no room for that and that definition of substantial

02:56:00 25    burden is just so broad.

1          And of course, Your Honor we think there is

2    significant substantial burdens here both in relation to

3    the, you know, impact that the media statements had upon

4    plaintiffs' financial accounts.  We think that there is

02:56:18  5    burden related to, of course, the search and seizure, the

6    deprivation for any period of time for any of those items

7    seized and the continuing deprivation of the psilocybin.

8    The continuing threat of eviction.  Although we did hear

9    today, you know, that perhaps there is no interest in

02:56:34  10   pursuing that.  But that's the first time I have heard that.

11   So, you know, that is something that has been a concern.

12   And then also, just the impact of the criminal case, of

13   course, and the impact of all those things combined really

14   leads to a substantial diminishing in the body of the

02:56:53  15   faithful for Singularism who feel comfortable enough to

16   participate in ceremonies despite the consequences they're

17   seeing could be taken against them.  And for that reason,

18   you know, we do think there is a substantial burden here.

19          If Your Honor doesn't have any other questions

02:57:12  20   about substantial likelihood of success, if not I will move

21   onto just irreparable harm and kind of the last two prongs

22   of the analysis here.

23          THE COURT:  All right.  And I'm happy to let you

24   move on if you think it will be fairly brief.  Otherwise --

02:57:29  25          MR. BEAN:  I do, just a page.

1          THE COURT:  I was going to say we have been going

2     for about an hour-forty-five and I'm sensitive to giving our

3     court reporter a break.

4          MR. BEAN:  Of course, yes.

5          THE COURT:  So I don't know how much more you

6     have.  If it is under five minutes, I'll let you go.

7          MR. BEAN:  I'll try to do one or two, that's what

8     I'm aiming to do here.  But like I said from the beginning,

9     I think the issue really does hinge on the likelihood of

10    success here, that's the most important TRO factor.

11          The irreparable harm issue I don't think is a big

12    disputed issue.  The defendants haven't disputed the First

13    Amendment or RFRA violations amount to irreparable harm.

14    That's contained in the *Heidemann versus South Salt Lake*

15    cases from the Tenth Circuit as well as the District of New

16    Mexico decision in *O Centro* which cites some other Tenth

17    Circuit authority.  The court already found irreparable harm

18    here and we would encourage the court to maintain that.  And

19    I already went through the harms that they're under.

20          And then the last is the harm balancing

21    essentially here.  We would assert that the harms to the

22    plaintiffs far outweigh the harms to defendants in this

23    action especially where there really isn't a significant

24    compelling interest for the government to assert here for

25    the reasons we have stated previously.  And that's all.

1    Thank you.

2         THE COURT:  All right.  Well, let's take our

3    afternoon break at this point.  It's about 3:00.  Let's

4    come -- let's take 15 minutes and come back at what, 13

02:58:56  5    minutes after the hour and we'll turn the time over to

6    Mr. Stephens to respond to the presentation you have just

7    made.

8         MR. BEAN:  Thank you.

9         (Recess.)

03:24:58  10         THE COURT:  All right.  Do we have everyone back?

11         MR. STEPHENS:  Yes.

12         THE COURT:  All right.  Mr. Stephens, you have

13    the floor.

14         MR. STEPHENS:  Thank you, Your Honor.  I'm going

03:25:10  15    to try to move fast given the time of day and there is a lot

16    of substance to cover.  I want to just start by quickly

17    responding to some of the arguments that Mr. Bean made and

18    in particular about some of the documents.

19         One of the last points that he had discussed was

03:25:25  20    the police report.  And he argued that that established that

21    the conduct at issue was substantially motivated by a

22    sincerely held religious belief.  But let me just call out

23    some of the language that Mr. Bean did not point out.

24         This comes from the detectives report, a lot of

03:25:47  25    this is also in the declaration affidavit that was submitted

1    with the search warrant.  The detective explained that he

2    had been told Singularism's support of other religions.  You

3    don't have to leave one religion to join Singularism.

4    Instead, it adds to whatever beliefs you already have.  What

03:26:05  5    do the wellness center --

6              THE COURT:  I mean not to belabor the point, but

7    is there some authority to suggest that for a religious

8    belief to be sincere it must be exclusive and include

9    rejection of other -- other religious beliefs?

03:26:24  10             MR. STEPHENS:  I'm glad you asked that.  Let me

11    maybe pull up and start slightly different, to just get

12    straight to that point.  We talked last time about the

13    *Meyers* factors.  And I think that certainly is an analysis

14    in the *Meyers* factors and falls within those factors.

03:26:47  15             Mr. Bean has contested that that's not the right

16    analysis and he argued that this is a state RFRA act and he

17    told you today that some of the language of the Utah RFRA is

18    slightly different.  So let's look at a state RFRA, this is

19    Idaho, 2013, *State versus Cordingley*.  Appeals from denial

03:27:07  20    involved marijuana paraphernalia charges and he argued that

21    he had a RFRA right.  Here's the exercise of religion that

22    Mr. Bean told you makes this case so that *Meyers* doesn't

23    really apply.  You are going to recognize that language.

24    Substantially motivated by religious belief whether or not

03:27:33  25    the exercise is compulsory or central to a larger system of

165

1   religious belief.  That's the point that Mr. Bean

2   emphasized.  And then the Idaho Court had to determine

3   whether or not this individual's claims work.  And they

4   determined it did not.  And the court relied on the

03:27:53  5   following type of factors.  "The COCT," that was the name of

6   the church abbreviated, "is a community with an emphasis on

7   spirituality rather than am emphasis on any particular

8   religious belief.  The goal is to obtain enlightenment and

9   it can be had by Catholics, Jews, and even Atheists.  The

03:28:12  10  only connecting fiber among the various members is their use

11  of marijuana" and here we could insert psilocybin, "to help

12  them in this pursuit.  Despite some of the trappings of

13  religion, this is nothing more than a basic philosophical

14  belief that such use will help with enlightenment."  It goes

03:28:31  15  on, another set of facts.  There the leader of the church

16  acknowledged that the church is not so much as a religion as

17  it is a companion to religion.  The church presents itself

18  as an ideology or a philosophical belief as to how people

19  can become enlightened, but it does not have a comprehensive

03:28:51  20  belief system with the trappings of religion.  Instead, it

21  provides a sacrament, a drug, that is to be used as an

22  accompaniment to other religious beliefs.  The court goes

23  on.  They're limited in addressing the ultimate ideas.  The

24  founder testified that it was established as a means of

03:29:14  25  taking negatives and changing them into positives with the

166

1    help of the sacrament, that the purpose was helping people

2    through marijuana get back in touch with their spiritual

3    selves so that they could connect.  They do not believe in

4    the concept of a singular God or singular issue but rather

03:29:31  5    they believe in the universe.  Put another way, aside from

6    an abstract belief that marijuana or mushrooms placed one in

7    touch with their spiritual self, the church did not address

8    the fundamental questions answered by most religions.

9         Other factors.  That the focus is on the

03:29:56  10    consumption of marijuana.  That's the common factor in that

11    case.  Here, it is mushrooms.  The church is a companion to

12    whatever individual faith structures each member, using the

13    examples of Buddhists and members of the LDS Church, where

14    each member pursues his own faith, but members are united.

03:30:16  15    And how are they united?  Through their use of the drug.

16         No other beliefs, practices, or sacrament, or the

17    like, that did not pertain to the use of the drug.  The

18    singular focus insufficient as a matter of law to constitute

19    a comprehensive set of religious beliefs.  Most glaringly,

03:30:40  20    the church is focused on the use of marijuana, here

21    mushrooms, to a degree that has consistently been found not

22    to be in indicative of statutory recognized for religious

23    practice.  And then they go on and say, so what is it about,

24    this is quoting, I believe, from the district court, "It is

03:30:58  25    about teaching people that they are spiritual human beings

167

1    and it is a companion to religion whatever religion you

2    are."  It would be, you know, a means of discovering your

3    spirituality.

4         So in answer to your question, yes, yes.  Saying

03:31:14  5    it is just a spiritual accompaniment, or something that

6    unites everybody, doesn't work.  It is not enough to say

7    that you believe in mushrooms and mushrooms help every other

8    belief that everybody else might have.  That's just

9    legalizing mushrooms.

03:31:35  10         Going back to the police report because counsel

11    emphasized this and I want to make sure that the -- that the

12    record here is clear about what the detective was told and

13    what the detective believed.  The detective was told that

14    Singularism is supportive of other religions.  You don't

03:31:55  15    have to leave any other religion to join, it adds to the

16    beliefs that already exist.  That's pretty much the same

17    language that we just read from Idaho.  Their use of

18    psilocybin at the Wellness Center unlocks the mind and allow

19    the clients to get the best therapeutic care possible.  Not

03:32:15  20    a spiritual, not a religious focus, instead that is now

21    blurring the line with medical care and that is a point that

22    I'm going to emphasize again later.  Then he goes on and the

23    detective was told by Mr. Jensen that the way Mr. Jensen

24    founded the religion was by talking to his lawyer to review

03:32:35  25    prior cases in which people claimed religious exemption,

168

1    where those claimants won or lost, the judge's comments, and

2    used that to create a roadmap to create his religion of

3    Singularism.

4              So what was the officers, the detectives

5    conclusion?  It wasn't what Mr. Bean argued that this was a

6    substantially motivated by a sincerely held religious

7    belief.  Instead, the conclusion was that there was probable

8    cause that Mr. Jensen was running an illicit business under

9    the guise of a religion.  That's what the police report said

10   in context.

11             Now, what else do we have that goes to this

12   issue?  Sorry, I'm switching between screens here, Your

13   Honor.  That's the wrong one.  Apologies.  What else do we

14   have?  And this is evidence from the last hearing and I'll

15   go through it quickly because I know Your Honor heard it.

16   Singularism takes no position on the existence of God?

17   Exactly.  Yes.  Doesn't take a position on what God consists

18   of?  Yes.  Does Singularism declare what the ultimate origin

19   of the universe is?  No.  You say those who believe in God,

20   I believe your testimony earlier was that Atheists could be

21   members of Singularism, is that correct?  Yes.  You also

22   mentioned those who believe in an afterlife, is it true that

23   you could be a member of Singularism without believing in an

24   afterlife?  Yes.  This was Ms. Lee, you testified regarding

25   the overarching belief is that all is one and we're

1    connected by a golden thread.  Is that fair?  Yes.  Again,

2    that sounds like the Idaho case, Universalism.  But even

3    then, do Singularism's members actually have to hold any of

4    those beliefs to participate in a ceremony?  No.  Is there a

03:34:57  5    scripture that Singularism promotes?  Not that I'm aware of.

6    I'm told it's faith affirming, it's a way for me to connect

7    with my sense of the divine.

8           All right.  So let me see if I can confirm and

9    rephrase this.  It takes whatever you believe, like the

03:35:14  10   Idaho case, it takes whatever you believe and adds a little

11   bit of a multiplier.  It takes whatever you believe and adds

12   mushrooms or marijuana.  Is that what you're saying?  Yeah.

13   That's probably it.  It enables one's relationship with the

14   divine exactly the argument in the case that we just looked

03:35:33  15   at.  Do you ever join for celebrations of holidays?  No.

16   Are there any holidays?  Not that I'm aware of.  Have you

17   ever heard of the Ten Commandments?  Yes.  Does Singularism

18   have something familiar?  No.  Does Singularism answer where

19   you go when you die?  No.  What about where you were before

03:35:48  20   you were born?  No.  When life begins?  No.  Other than

21   psilocybin, have you participated in any other religious

22   ceremony?  No.  Why?  Because psilocybin is the religion

23   just like marijuana was in Idaho.

24          Again, Mr. Jensen in this case confirming you

03:36:11  25   don't have to forego any other religious belief, practices,

1    ideas, you can believe whatever you want.  Can you be a

2    member of Singularism without using psilocybin, right,

3    because that would indicate that hey, maybe there is more to

4    this than just we believe in mushrooms.  The answer

03:36:32    5    Mr. Jensen gave, I haven't thought about that, it hasn't

6    come up.  No one has ever asked me that before.  Because the

7    only common factor that exists for Singularism is the use of

8    mushrooms.  Just like in Idaho, the only common factor was

9    the use of marijuana.  That was the core belief.

03:36:59    10    Again, we can go on.  Everyone is empowered to

11    define their own beliefs?  Yes.  Does it answer all of

12    life's most difficult questions?  No.  Can it teach that

13    members -- does it teach members are empowered to discover

14    their own truths?  Yes.  Does not claim access to divine

03:37:17    15    truths?  No more than anyone.  Singularism helps people to

16    be themselves?  True?  Free to believe whatever they believe

17    so long as it doesn't harm mankind.  In fact, that's similar

18    to the hypocratic oath.  Yeah.  The hypocratic oath is

19    enough to establish a religion where beyond -- were beyond

03:37:40    20    the protections of RFRA.

21    Now, we can also look at their own website.  What

22    does it mean that our practice is faith affirming?  We

23    welcome everyone, all faith backgrounds.  We are trained in

24    helping people unlock themselves.  Inclusive.  It allows

03:38:06    25    participants from any faith.  Explores spiritual experiments

1    to compliment and enhance their own faith.  It is

2    indistinguishable from the Idaho case and frankly from

3    *Meyers* as well.

4            Now, on top of that, right, on top of that when

03:38:27  5    we're talking about is it substantially motivated by

6    sincerely held religious belief and also when we start

7    talking about government interests and restrictive means.

8    On both sides of this we have to recognize that these

9    plaintiffs are consistently blurring the line between any

03:38:51 10    alleged religious belief and the practice of medicine or

11    mental health therapy.  And we see this again and again from

12    their own materials where they describe it as legal

13    psilocybin therapy.  The nation's largest psilocybin

14    treatment center.  Again, treatment center.  Legal mushroom

03:39:20 15    therapy.  Treatment center.  Psychedelic therapy journey

16    provides a structured professional and legal approach to

17    psilocybin therapy that distinguishes us from informal and

18    recreational practices.  Skills of a true practitioner

19    psychedelic therapy.  In fact, certificate of organization

03:39:41 20    for Psyche Healing & Bridging, one of the named plaintiffs,

21    what's their business purpose?  Market, sell products,

22    materials and services in the field of mental wellness and

23    healing.  Like a business dealing with therapy.

24            They reference the bank records, or I should say,

03:40:05 25    the Department of the Treasury's flagging of bank records as

1    though that was something that my clients or the defendants

2    had done that was inappropriate and a cause for injunction.

3    Let's just be clear about this, right.  This comes from the

4    United States Department of the Treasury.  The entry date

03:40:29  5    was November 2023 for investigation between July and

6    November 2023.  Why do I emphasize those dates?  Utah RFRA

7    was not even adopted, let alone enacted, nor was the Utah

8    Psilocybin Act.  So already there is some question there.

9    But then what was the investigation as found?  Well, what

03:40:54 10    the treasury found was that plaintiffs had received wires

11    from individuals who were known mental health supporters,

12    startup investors.  One wire had the memo "buy-in."  They

13    appear to be business start-up investments for purpose of

14    starting up a business.  That doesn't seem like a religion.

03:41:16 15    On top of that, on top of that, this is then what the

16    Department of Treasury found and why they had flagged this,

17    in addition to their own research which discovered the news

18    article with the statements from the defendants.  The branch

19    found the customer unusual as he clearly articulated that he

03:41:36 20    does not want the government to find out about his cash

21    withdrawals and learned to keep cash under ten grand from

22    his father.  The employee stated the customer is always in a

23    hurry and only wants to conduct transactions with her.  She

24    gets anxiety when he is in the branch because he is rushing

03:41:52 25    her.  She finds overall cash withdrawals odd for the type of

1    business and does not know the purpose.  He was in the

2    branch yesterday, again to open an account.  Decided against

3    it because it would exceed the $10,000 flag.  Cash

4    withdrawals are conducted for unknown purposes.  Coupled

03:42:08  5    with the client's knowledge and apparent attempt to evade

6    reporting, suspicious activity identified.

7              That's right, that's what we're talking about

8    before the RFRA was enacted, before the Utah Psilocybin Act

9    was enacted, and it's true in connection with this and

03:42:28  10    because of this flag they do investigation and find the

11    statements that were made that the defendants didn't see a

12    religious right.  And frankly, based on plaintiffs'

13    arguments, there wasn't a religious right at that time

14    because the acts hadn't been passed.

03:42:46  15              But again, you're talking about business buy-ins

16    in connection with a mental health clinic that's advertised

17    as a mental health clinic.  And what that leads to is the --

18    the fact that the plaintiffs can't establish that the use is

19    limited to religious users.  And let's look at this.  This

03:43:18  20    is the Ninth Circuit's opinion in *United States versus*

21    *Christie*.  The Tenth Circuit is not typically know as being

22    a very conservative court.  And there, they're being asked

23    whether the federal court can criminally prosecute two

24    ministers of the Hawaii Cannibis Ministry who admit to using

03:43:37  25    and distributing large quantities of Cannibis by claiming --

1    but who claim they were doing so for religious purposes.

2    The government argues that it has a compelling

3    interest in mitigating the risk that Cannibis from the

4    church will be diverted to recreational users.  The facts of

03:43:58 5    this case demonstrate that mandating full compliance with

6    the CSA will help to advance this compelling interest to a

7    meaningful degree.  We agree.  The defendants in this case

8    have argued that there is a compelling interest in

9    mitigating the risk that mushrooms from Singularism will be

03:44:18 10    diverted to recreational users.

11    THE COURT:  So how do you respond then to

12    Mr. Bean's argument regarding the Divine Assembly or Magic

13    Mushroom Church which operates within your client's

14    jurisdiction.  I mean they are passing out mushroom kits to

03:44:41 15    everyone, it appears they're not engaging in the same kind

16    of careful supervision and control.  They're a much larger

17    organization and apparently, Mr. Urquhart and his followers

18    have not had the same issues with your clients that

19    Mr. Jensen had.

03:45:09 20    MR. STEPHENS:  I will say, Your Honor, it is not

21    clear to me, and in fact I think it is inaccurate to say,

22    that the Divine Assembly is operating in Utah County and

23    based in Utah County.  I say that for a few different

24    reasons.  Let me walk through them.  The Divine Assembly,

03:45:25 25    this is their State of Utah registration, their address is

175

1    Salt Lake City, Utah.  The Facebook page, and I'm happy to

2    submit this to the court if you would like, indicates that

3    they're operating in Salt Lake City, Utah.  Let me also read

4    to you from the transcript where Mr. Jensen was asked about

03:45:49 5    this at the TRO hearing because Mr. Bean made this argument

6    previously and through this questioning.  Mr. Jensen

7    testified, the answer is that the founder of the Divine

8    Assembly communicated with me recently that he has never had

9    one interaction.  When I told him about that raid, he said

03:46:14 10    he is just not afraid of it happening to him and that this

11    seems -- that this problem seems to be unique to Utah Valley

12    or to me.

13            In other words, the testimony last time was

14    seemed to distinguish Divine Assembly from Utah Valley.

03:46:32 15    Even putting all of that aside, if the plaintiffs had

16    presented this, had proven this, had established it, and

17    they haven't, right, again, we get back to distinguishing

18    factors.  Certainly they haven't established that the

19    alleged religious beliefs of the Divine Assembly are

03:46:50 20    comparable to Singularism, nor have they established that

21    the Divine Assembly markets, represents, holds itself out as

22    providing medical therapy the way that plaintiffs do.  And

23    even if all of that were true, it is still a bit like saying

24    because you haven't caught everybody speeding on I-15, you

03:47:12 25    can't issue a ticket to anybody speeding on I-15.

         1              THE COURT:  Well, it does go though to your claim

         2    of this compelling government interest and the danger in

         3    allowing the plaintiffs to continue to operate.

         4              MR. STEPHENS:  And I understand that to a degree.

03:47:39 5    But what I would say back is if that's really the standard,

         6    then the only way that any mushroom user or alleged

         7    religious mushroom user could be prosecuted is if all of

         8    them were being prosecuted at exactly the same time.  If

         9    they had started with Divine Assembly, Divine Assembly would

03:47:59 10   be saying aha Singularism.  If they start with Singularism,

         11   they say aha Divine Assembly, right?

         12             That doesn't -- that doesn't work and they

         13   certainly haven't provided cases that say unless everybody

         14   is being prosecuted at once, unless you stranglehold the

03:48:17 15   black market, unless you prosecuted everybody who has

         16   claimed a religious exemption, you can't prosecute anybody.

         17             And, again, even with all of that, I would still

         18   turn back to and take you back to the analysis in -- sorry,

         19   I need get this back up, the court's analysis -- can you see

03:48:47 20   that again, Your Honor?

         21             THE COURT:  I can.

         22             MR. STEPHENS:  The *Christie* case.  In the

         23   *Christie* case, all right.  Where the government argued they

         24   had a compelling interest in mitigating the risk that it

03:48:58 25   will be diverted.  Ninth Circuit, we have little trouble

1    concluding that the government had the compelling interest

2    in preventing drugs set aside for sacramental use from being

3    diverted to nonreligious recreational users.  A risk of

4    diversion, after all, simply means the threat that Cannibis,

03:49:18  5    mushrooms, an illegal Schedule I controlled substance, will

6    wind up in the hands of people whose use is disconnected

7    from any sincere religious practice.

8         THE COURT:  Well, although I mean that quote that

9    you just read doesn't suggest that the government's interest

03:49:37 10   is in a complete ban.  I mean it says the government's

11   interest is in making sure that there is not diversion.  And

12   I don't know if you've cleared the hurdle of least

13   restrictive means.  There certainly has to be a less

14   restrictive means to preventing diversion than just shutting

03:50:03 15   the church down.

16        MR. STEPHENS:  That same argument was made in

17   *Christie*, and the response was, where diversion has been

18   established, where that risk is manifest, then it is the

19   least restrictive means.  In fact, here is the conclusion,

03:50:20 20   right.  The record in this case exceeds where the record in

21   *O Centro* fell short because the district court concluded

22   there is specific evidence that the distribution methods

23   created a realistic possibility the Cannibis intended for

24   the members of the ministry would be distributed instead to

03:50:37 25   outsiders who are merely feigning membership in the ministry

1    and adherence to its religious tenets.

2              THE COURT:  Tell me what facts you have to

3    suggest that you met that here?

4              MR. STEPHENS:  Yeah.  So in addition to their

03:50:53  5    advertisements and their direct marketing for mental therapy

6    for medical therapy, let me take you to a specific, a very

7    specific evidence, specific instance, that we know about

8    because of a call that happened last week.  Because this is

9    not a hypothetical concern or a mere thought or potential of

03:51:17 10    confusion.  Even without this -- even without discovery,

11    without depositions, without knowing who all is purported to

12    take this, we do know this is an existing problem.  And I am

13    going to play for Your Honor a few different things

14    beginning with a 911 call from last week.

03:51:33 15              (Audio played.)

16              MR. STEPHENS:  Pause there.  Are you able to hear

17    that, Your Honor?

18              THE COURT:  I did.  I couldn't make out anything

19    but I heard it.

03:51:54 20              MR. STEPHENS:  Okay.  Well, I paused it quickly

21    because I didn't want to just keep going if you couldn't.

22              (Audio played.)

23              MR. STEPHENS:  I will pause there.  That is

24    Exhibit G to the exhibits that were filed yesterday.  And

03:54:19 25    let me turn to, the officer responds with a body camera.

1      And I'm going to play a few clips here and let me see if it

2      is possible to share this screen.  These clips will confirm

3      what you heard already in the 911 call that this person,

4      this woman, understood that she was there for therapy and

03:54:44  5      had been referred for therapy.

6              THE COURT:  Where are we physically at the

7      beginning of the bodycam footage?

8              MR. STEPHENS:  We are in the parking lot of

9      Singularism.

03:54:56  10              THE COURT:  Okay.

11              (Audio played.)

12              MR. STEPHENS:  And I'm sorry to interrupt.  There

13      is some foul language here.  I apologize I don't know how to

14      do anything about that, I assume it's not the first time for

03:55:18  15      the court, but I just note it.

16              THE COURT:  Okay.

17              (Audio played.)

18              THE COURT:  It's muted.  I don't know what

19      happened to the sound.

03:55:40  20              MR. STEPHENS:  Hmm.

21              THE COURT:  It was there for -- until you -- it

22      was there, then when you paused it, the sound didn't come

23      back.

24              MR. STEPHENS:  Let me then maybe try this again.

03:55:55  25      I'll just re-share and not interrupt again.

1          (Audio played.)

2          THE COURT:  I have lost sound again.  I can see

3     her lips moving but no sound.  Are you hearing sound?

4          MR. STEPHENS:  I'm hearing sound.

03:56:39  5          THE COURT:  Okay.  So the court reporter,

6     Mr. Bean and I are not hearing sound.

7          MR. STEPHENS:  Here's what I'm going to do.  I'm

8     going to mute my microphone and we'll try to have the sound

9     come through Mr. Justin's -- or Mr. James's video if that

03:56:57 10    works.

11          THE COURT:  Okay.

12          (Audio played.)

13          THE COURT:  The sound went away again.

14          MR. STEPHENS:  I don't know what is happening

03:57:38 15    there.

16          THE COURT:  Well, I suppose you submitted this as

17     an exhibit, I can watch it independently.  But why don't you

18     give me your commentary analysis of what it was that we

19     would have heard.

03:57:53 20          MR. STEPHENS:  What you would have heard, this

21     Exhibit M, there are two body camera footages in Exhibit M.

22     What you would have heard is a very distraught woman who had

23     taken drugs at Singularism and who repeatedly said that she

24     did so because her therapist referred her.  And that she was

03:58:12 25    there for treatment and that she was there for therapy.  She

1    does not mention, at any point, any connection to the

2    church, religion, spirituality, the OctoGoddess, the

3    universe, or anything that is in anyway connected to the

4    argument that the plaintiffs are making about their alleged

03:58:33  5    constitutional or RFRA right to do this.

6            Instead, she says clearly and repeatedly that she

7    is there because she was being treated.  And the next day,

8    this woman, the police officers follow-up in Exhibit G that

9    was submitted yesterday, and these were filed with the

03:58:56  10    court, the videos and the audio was filed with the court

11    conventionally, because they couldn't be filed

12    electronically so you should have a thumb drive with these.

13    The next day the police officers interview her at her house,

14    make sure she is okay and check in on her.  She again

03:59:18  15    confirms that she was there because she had been referred by

16    a therapist for PTSD treatment.

17            THE COURT:  So do you -- can we try that video

18    and see if the sound problems persist.

19            MR. STEPHENS:  Let me try that again, or a

03:59:34  20    different one here.  And I suppose if I can't share the

21    video, we can maybe hear the audio through my microphone but

22    I'll start with the video.

23            (Audio of Exhibit G played.)

24            MR. STEPHENS:  It goes on from there, Your Honor,

04:01:07  25    it is about 13 minutes total.  I'm happy to play all of it

182

1    if Your Honor would like.

2            THE COURT:  That's okay.  I think I get the gist

3    and I can watch it myself.

4            MR. STEPHENS:  And there is also a statement that

04:01:19   5    she ultimately provided to the -- to the officers that has

6    been attached.  Let me just share that.  All right.

7    Indicates, "I was recommended to the treatment facility by

8    my licensed therapist.  I went there of my own free will and

9    took the treatment willingly."  And she does clarify this in

04:01:40  10    that final video, it was when she was under the influence

11    she was unclear, scam, tricked, she didn't know what she was

12    taking.  Here she clarifies that she was there on her free

13    will, took the treatment willingly, had a severely bad

14    reaction, became scared and hysterical.  It goes on from

04:02:00  15    there.

16            But the point that I'm emphasizing here is

17    exactly this first part and what's not said anywhere in any

18    of the videos or in any of the written statement or even in

19    the supplemental declaration of Mr. Jensen filed yesterday.

04:02:19  20    Nobody, nobody has said that Claire Hart was there to take

21    sacrament or to worship the OctoGoddess.  Nobody has said

22    that she was there because she wanted access to the universe

23    or because she is a sincere believer or follower of

24    Singularism.  Nobody has said that this was a religious

04:02:42  25    experience for her, that this was about connecting to her

1    religious beliefs or that she was there to see God.

2    Instead, the evidence is she was there to receive therapy

3    for her PTSD because an arsonist had burned down her house

4    previously and she thought it was legal.  All right.  Her

04:03:02  5    therapist couldn't prescribe it herself and instead referred

6    her to the plaintiffs so that she could get medical

7    treatment that a licensed therapist wouldn't provide.

8         Again, we go back to that Ninth Circuit case and

9    the government interest in the Ninth Circuit case and the

04:03:27  10    discussion in that case.  And that's what we have.  We don't

11    have just the risk or the concept that this is going to be

12    used by nonreligious individuals.  We know that that's

13    happening because we have seen that even without going and

14    asking other people why they have done it and we know that

04:03:51  15    this is going to be a problem in the community because it

16    has been a problem in the community, right?  In the months

17    since the court's ruling, the police officers have had to

18    respond, the paramedics have had to respond, the fire

19    department has had to respond.

04:04:06  20         THE COURT:  Okay.  So beyond this incident that

21    you have just described, tell me about the rest.

22         MR. STEPHENS:  So, again, we have -- well, I

23    guess what I would say, Your Honor, is we shouldn't have to

24    and I don't think need to show that there is a thousand

04:04:24  25    incidents of abuse before we get --

184

1          THE COURT:  Well, and that's not what I asked.

2     But you just threw out that in the month or so since our

3     last hearing we have had fire departments and paramedics and

4     police respond and you have just shown me one response by

04:04:42  5     the police.  So tell me about the rest?  You just can't

6     throw it out there and then tell me you don't need to tell

7     me about it.

8          MR. STEPHENS:  No, I am sorry, Your Honor, I

9     misunderstood what you're asking.  So to be clear, and this

04:04:54 10     probably would have been clarified had the video played, the

11     police initially respond, two officers.  The fire department

12     responds so that they have an emergency response and then

13     she is taken by ambulance to the hospital at the emergency

14     room.  That followup that you were able to see was the next

04:05:11 15     day after she had been released for medical treatment.  So

16     all three responded.  We have included the fire department's

17     notes as one of the exhibits that were submitted yesterday.

18     The police report is Exhibit L.  I believe the fire

19     departments notes are also included in Exhibit L.  And when

04:05:39 20     you watch that body camera footage you also see the

21     interaction with the fire department as well.

22          And again, that is consistent with how the

23     plaintiffs themselves market when you describe yourself as a

24     mushroom wellness center providing mental therapy and

04:06:02 25     medical therapy, it is not surprising that you're going to

1    get people who are there not because they're there to

2    worship, but because they are there to recover from PTSD or

3    some other -- some other medical issue.  And on that note, I

4    find it interesting that one of the pushes that they have

04:06:24  5    made, and one of the orders that they want from the court is

6    that they should be allowed to act just like they fall

7    within the Psilocybin Act.

8         In other words, they want the ability to treat

9    the way that a medical provider would at the University of

04:06:42 10   Utah Hospital or Intermountain Healthcare.  And that's the

11   relief that they're telling you is the -- is the least

12   restrictive means that should be adopted.  And that is not

13   the purpose of a religious freedom.  The purpose of

14   religious freedom is not to allow unlicensed practice of

04:07:02 15   medicine which is what has clearly happened.

16        Focusing also on the Psilocybin Act, it is not

17   this broad catchall that I think plaintiffs have tried to

18   make it out to be that just opens the floodgates of

19   psilocybin.  When you look at Utah Code 58-37-3.5, drug is

04:07:23 20   clearly defined as a form of psilocybin that is in FDA phase

21   three testing for an investigational drug described in 21

22   CFR part 312.  Part 312 is its own federal regulation that

23   spans about 60 pages.  They have not identified whether

24   there even is a form of psilocybin that is in phase three

04:07:53 25   testing, let alone that the form of psilocybin that they're

1    providing is that same form.  So it's not that there has

2    just been some floodgate and they're falling within the

3    flood gate, they certainly have not established that.  And

4    then on top of that, that statute goes on to identify that

04:08:16  5    the healthcare system has to provide the psilocybin under

6    the direct care of the licensed medical providers at a

7    licensed medical facility.  And again, that's not what we

8    have here and that's why when something went wrong they

9    didn't take Ms. Hart around the corner to be treated at the

04:08:43  10    medical facility, they called an ambulance so she could be

11    taken to a medical facility.

12           THE COURT:  Does the act require all of this to

13    occur in a hospital or could it occur at a clinical

14    psychologist's office who is employed by IHC?

04:09:02  15           MR. STEPHENS:  The act says used by a patient

16    only under the direct supervision and control of the

17    healthcare system and the healthcare systems care providers

18    who are licensed under this title.  Now, the healthcare

19    system is defined as a --

04:09:20  20           THE COURT:  Right.  But presumably a clinical

21    psychologist employed by IHC could -- would be under the

22    supervision of her employer and providing this in an office

23    that's not located in a hospital.

24           MR. STEPHENS:  Yeah.  And potentially a clinical

04:09:39  25    psychiatrist would also have the ability to then prescribe

1    other medication if and when there was an adverse incident.

2        THE COURT:  IHC employs clinical psychologists

3    who don't have prescribing authority.

4        MR. STEPHENS:  And they also have to implement a

04:09:56  5    system to ensure that this is a safe system.  And on that

6    note, the supplemental declaration that you got from

7    Mr. Jensen yesterday, we object to that declaration in part

8    because he speculates about whether or not his practices are

9    consistent with healthcare practices under the Psilocybin

04:10:22  10    Act.  He hasn't even established that either IHC or the

11    University of Utah has yet to actually adopt or administer

12    psilocybin under the Psilocybin Act.  Because before they

13    may do so, they have to develop a healthcare treatment

14    program that includes certain conditions.  We don't have and

04:10:43  15    he hasn't presented any evidence of what those healthcare

16    treatment programs look like.  He doesn't have any personal

17    knowledge of what those healthcare program treatments look

18    like and he can't say that his is consistent with that.

19    Certainly he can't say that it is consistent with a phase

04:10:57  20    three FDA approved drug that he is buying off of the black

21    market.  They push back and said well, it's not really the

22    black market they get it from a lab.  Let me hit that head

23    on by quoting the testimony from again that TRO hearing.  At

24    that TRO they were asked about the lab and the answer was

04:11:31  25    they didn't know what the lab was.  That they couldn't say

1    who the lab was, they couldn't say who the grower was, they

2    were just told.

3              THE COURT:  I mean I think it is more accurate

4    you're saying "they," you asked the office manager --

5              MR. STEPHENS:  Right.

6              THE COURT:  You asked Mr. Jensen.  And it's also

7    the case that when your own lab tested the psilocybin that

8    was seized, it wasn't tainted.

9              MR. STEPHENS:  It wasn't tainted, it also wasn't

10   psilocybin, it was psilocin.  But you're right, it wasn't

11   tainted, this batch.  All right.  But that doesn't mean that

12   every other batch is safe.  That doesn't mean that there

13   aren't problems with trafficking illegal drugs across state

14   lines and that doesn't mean that it's an FDA approved Class

15   3 investigational drug, in any instance, let alone in every

16   instance.

17             THE COURT:  Explain to me the distinction between

18   psilocybin and psilocin.

19             MR. STEPHENS:  I'm not an expert, so I --

20             THE COURT:  So you know more than I do.

21             MR. STEPHENS:  I will tell you my understanding

22   is that at some point psilocybin breaks down and I don't

23   know if it degrades into psilocybin or psilocin or is

24   processed into psilocin.  They're closely related.  The

25   reaction, the same thing, you can test for both separately,

189

1      I can't give you much beyond that.  I know they're in the

2      same family together.

3                  THE COURT:  Okay.  Well, while we're talking

4      about that, talk to me about the quantities that were

04:13:17  5      seized.

6                  MR. STEPHENS:  Yeah.  So the quantities that were

7      seized, you have -- so you have the sworn return from the

8      affidavit that is included in the docket.  I'm looking

9      through my notes to get you an exact docket number.  Let me

04:13:46 10      just -- maybe I can do it quicker by pulling up that docket.

11      This is included with our opposition to the TRO.  The search

12      warrant return is Docket 13-5.  Verified under penalty of

13      perjury by officer -- Detective Julian.  But it was

14      459.8 grams of psilocybin mushrooms.

04:14:23 15                  The report that they have made reference to today

16      I had not seen this argument until late last night, but I

17      assume the answer, and this is a bit of an assumption I will

18      admit is the difference between testing and talking about

19      the portion of an active ingredient which would be a

04:14:53 20      percentage or fraction of the overall product.  So when

21      they're administering three grams of mushrooms, the mushroom

22      is not 100 percent psilocybin or psilocin, that's going to

23      be a portion of the active ingredient.  I assume that's the

24      difference between milligrams and grams.

04:15:17 25                  THE COURT:  Well, it seems to me you have the

1      mushrooms, you seized them, you still have them.  I think

2      that I would like you to submit something from whoever

3      analyzed them and clarify this.  Because I think this is a

4      significant issue.  It is a significant issue as to whether

04:15:39  5      they have got 90 doses of this stuff or a third of a dose.

6              MR. STEPHENS:  Yeah.  Yeah, I'm happy to do that.

7              THE COURT:  I don't know that the plaintiffs are

8      in a position to answer it because you have got the

9      mushrooms and you are the one who -- it was your officer who

04:16:01  10     filled out the return of the warrant and it was your lab

11     report that created the discrepancy.

12             MR. STEPHENS:  Well, the lab report did not come

13     from either of the defendants.

14             THE COURT:  Well, I mean you had control of the

04:16:16  15     substances so you sent it somewhere and asked somebody to

16     analyze it.

17             MR. STEPHENS:  Understood.  I'm happy to have or

18     ask Provo and have their officer confirm that it was 459

19     that was stated under oath.  If we need another declaration

04:16:30  20     confirming that.

21             THE COURT:  Well, I want to know -- I want to

22     know if -- based on what Mr. Bean argued, it looks like two

23     items were sent to the lab and then we had an analysis as to

24     those items.  We need to know were there other mushrooms

04:16:49  25     that were sent to the lab or was the -- were the two

1    mushrooms sent to the lab it?  And how do we -- I mean I

2    appreciate your effort to think of a way to explain the

3    discrepancy, but I don't think it is evidence.

4              MR. STEPHENS:  Yeah.  And what I would say is

04:17:09  5    what we know is evidence is the sworn declaration from the

6    officer that seized these and -- but I'm happy to go and

7    ask.  Again, if they had raised this at the TRO I would have

8    the answer ready.  It came up briefly in the filing

9    yesterday and again today.  And also --

04:17:30 10              THE COURT:  That's because they didn't have your

11    lab report until more recently, correct?

12              MR. STEPHENS:  I don't know when they received

13    the lab report, but I believe they can answer that.  I'm

14    also happy to put Mr. Jensen under oath and ask him whether

04:17:45 15    he had less than half of an ounce of mushrooms or more than

16    half of an ounce mushrooms.  The plaintiffs are certainly

17    going to know how often they buy these, where they're buying

18    them, whether it was a third of a dose or whether it was

19    many doses.  Because, again, certainly they had the ability

04:18:06 20    to do that and when they submit supplemental declarations

21    they --

22              THE COURT:  Well, they did.  But you now have the

23    mushrooms in your exclusive possession.  You didn't return

24    them.  And so at this point they're handcuffed with respect

04:18:20 25    to telling me -- I mean they don't know what you analyzed,

1    what you sent out, and what went into the lab report.

2              MR. STEPHENS:  Understood.  And I am happy to

3    clarify how much went to the lab and whether that was all of

4    it, right?  But the evidence that has not been disputed is

04:18:42  5    regardless of what the lab received, what was seized, was

6    459.8 grams of mushrooms.  And again, I'll give you the

7    answer of whether some of that was sent to the lab or

8    whether the milligrams is reflective of the active

9    ingredient.  I understand the court's question, I'll get it.

04:19:06 10              THE COURT:  Okay.

11              MR. STEPHENS:  In contrast to the fact that 459.8

12    grams were seized when the search warrant was executed, and

13    given that, we also know that they have fewer than 100

14    voyagers.  You heard at the TRO the dosage, you heard again

04:19:28 15    representations from counsel the dosage.  We're talking

16    about somewhere in the order of 150 doses that were seized

17    at one time which again is consistent with the concern that

18    we're not -- that this is not an instance where we can

19    safely say this is only being used by the occasional

04:19:50 20    religious observer.  Instead, the government can show, has

21    shown, and has played video showing, that it is being

22    diverted to those who haven't been established as religious

23    observers just like in that Ninth Circuit case.

24              THE COURT:  So one other question that I think

04:20:19 25    you have raised with respect to this incident of the woman

193

1        who had the difficulty was -- does -- and maybe a better way

2        to ask it is this.  Clearly, she said she went there because

3        she was referred by her therapist.  But I suppose that

4        someone who goes to a Catholic shelter for dinner and a

04:20:49  5   place to sleep wouldn't necessarily be going there for

6        worship or to engage in religious activities.  So does that

7        mean then that, you know, the shelter, the Catholic shelter

8        then is not doing something religious?  I mean is everything

9        -- I mean I go to the congregation or to a Christmas party

04:21:18 10  at my church.  That's probably not religious, maybe it's

11       more social, but it doesn't mean that my church isn't a

12       religious organization.

13             MR. STEPHENS:  I understand that point.  But when

14       we're talking about what's the government interest, it's not

04:21:40 15  that we need to prevent Christmas parties, it's what's the

16       government interest and the concern is that just like in

17       that Ninth Circuit case, *Christie*, that we know people are

18       going and receiving a Schedule I drug for nonreligious

19       reasons.  Now, does that mean that Mr. Bridger -- or sorry,

04:22:00 20  Mr. Jensen isn't sincere?  I think we can say it certainly

21       calls that into question, but it doesn't matter, right.

22       Just like in the Ninth Circuit did they, did the church in

23       that case, the Hawaii Cannibis Ministry, did they sincerely

24       believe?  Maybe, maybe not.  But when it's going to people

04:22:22 25  who don't sincerely believe and the church doesn't have

194

1    mechanisms in place to prevent that or to ensure that's not

2    the case, then the government interest is present and does

3    need to be protected to enforcement of the Controlled

4    Substances Act.  Because otherwise, if Mr. Jensen's belief

04:22:44  5    is enough, why couldn't you just throw open the door and say

6    I believe in mushrooms so strongly that you can get them

7    even if you don't believe.  And then the mushrooms law, the

8    Schedule I drugs, the CSA, has just been blown apart because

9    one person -- one person's belief is enough.

04:23:06  10            THE COURT:  Okay.

11            MR. STEPHENS:  I appreciate the court's time.  If

12    you have more questions, I'm happy to address them.  If not,

13    I will let Provo, I know that their counsel wanted to speak

14    to this issue and I am happy to give some time to him.

04:23:28  15            THE COURT:  All right.  Mr. Muhlestein, we didn't

16    forget you.

17            MR. MUHLESTEIN:  As a preliminary issue,

18    plaintiffs' counsel did bring up a question of the letter

19    relating to the business license.  And unfortunately, I

04:23:44  20    didn't realize about this until quite recently.  I was able

21    to pull some of the forms used for plan for the business

22    license they have not been filed with the court.  But if you

23    would allow me to bring them up on the screen and show them,

24    then we can explain some of the what I think the

04:24:04  25    significance of that letter is.

1          THE COURT:  Well, I'm happy to let you bring them

2     up and put them on the screen, but I would ask that after

3     the hearing today you file copies of them on the electronic

4     docket or we won't --

04:24:16  5          MR. MUHLESTEIN:  Sure.

6          THE COURT:  -- we won't have a record.

7          MR. MUHLESTEIN:  Sure.  Yeah, so let me see if I

8     can.  Sorry, I don't use a lot of zoom so I'm not -- it will

9     take me a minute to get.

04:24:42 10          THE COURT:  That's okay.  I use Zoom a lot and I

11     would not be capable of showing documents.

12          MR. MUHLESTEIN:  There are two that I'm going to

13     want to show, I think, but we'll start.  So I mean I think

14     the key point here this says one of the pages of the license

04:25:02 15     request this is when they fill it out online and here under

16     the activity description it said, "Singularism is a

17     contemporary church and religion dedicated to fostering

18     mental wellness, spiritual growth, and relief from

19     existential suffering."  It is not a matter of saying,

04:25:24 20     you're a religion, it's saying you say you're a religion,

21     this is a business license, therefore, as it later says in

22     it, if your organization engages in activities outside of

23     the scope of the listed operation, such as running a

24     commercial enterprise or selling goods --

04:25:38 25          THE COURT:  Sir, you need to slow down.  Sir,

196

1    when you read you go really fast, so if you can --

2                MR. MUHLESTEIN:  Yeah, like I said I was warned

3    about that.  I apologize.

4                THE COURT:  All right.

04:25:48  5                MR. MUHLESTEIN:  I apologize for speaking over

6    Your Honor.  I'm --

7                THE COURT:  That's okay.  I'm just trying to help

8    out our court reporter because she is fast, but she's not as

9    fast as you were going.

04:25:57 10                MR. MUHLESTEIN:  Yeah, so a little slower then.

11    This is just what is in the letter sent January 13th.  It

12    says, "If your organization engages in activities outside of

13    the scope of religious operations such as running a

14    commercial enterprise or selling goods, additional

04:26:16 15    regulations may apply and compliance will be required."  So

16    the way, from my looking into these things and what I have

17    been able to observe, is that in responding to this

18    application this way, it's not saying we affirm, we believe

19    that you're, you know, authentic religion on top of it.  I

04:26:36 20    think even this is not really the same question is whether

21    or not A, a religious exemption might apply, but I think it

22    is more just the whatever employer viewed Singularism on

23    this place says it is a church, it's asking for a business

24    license.  You don't get a business license for a church so

04:26:54 25    they denied that and said if you're doing business, then you

1    still -- then you still need to go through the process of

2    that.  But when you are just simply saying I'm a

3    contemporary church and religion instruction on spiritual

4    wellness and spiritual growth, well, and fundamental growth,

04:27:11  5    et cetera, that is not -- that is a church not a business

6    per se.

7          And then let me see if I can -- and I suppose --

8    I mean as far as the filing goes, given everything that we

9    have for it but I think that line just saying that is we are

04:27:36 10   a church and elsewhere in the document does again say

11   religious organization, that that is how it is interpreted,

12   not it is not a we believe you're a church per the RFRA

13   standards.  I think ultimately there are different standards

14   as well, but that's just not even saying business license is

04:27:53 15   not required for religious organizations.  That's not saying

16   we've determined you have an exemption, it's saying if you

17   need a business license apply for the business license, but

18   the religious organization in and of itself doesn't need a

19   business license.

04:28:08 20         And as far as what I was going to address is

21   somewhat different from what Mr. Stephens said which is that

22   though I certainly join with his arguments regarding

23   the questions over sincerity and questions of the, you know,

24   whether or not drugs can be used and indeed have been used

04:28:31 25   by people not seeking those efforts there, I also sort of

1    wanted to dive a little more into the specific incident

2    here.  And given our issues with the video, I guess I won't

3    try and repeat it, maybe it will work better, but I think

4    just discussing a little bit of what you would be able to

04:28:49  5    review a little bit later.  You have the basic idea that

6    Ms. Hart, she goes there and she receives the mushrooms.  At

7    some point I think later on in the journey she, you know,

8    becomes very paranoid, hysterical, believes she is being

9    kidnapped.  You also see, if you watch the whole video, she

04:29:11 10    becomes very hostile to her ex-husband bringing up sort of

11    generic recriminations from the past.  Yeah, with the

12    officer, again, I'm not trying to repudiate her character in

13    saying this, but clearly this is an extremely unpleasant

14    situation for her at the end of her interview with the

04:29:33 15    officer when he says, you know, it's is not up to me what

16    you do if you go back, she shakes her head quite vigorously.

17    And this sort of experience, and I guess I should just

18    continue, apart from her, the personal sort of stress she

19    had, there are dangers, you know, beyond just the feelings

04:29:52 20    given her paranoia, some are experiencing bad or potentially

21    injure themselves or injure someone else they believe

22    they're causing, you know, danger to them and preventing

23    these sorts of, you know, extreme, you know, episodes of

24    mental distress and paranoia.  That is an interest we have

04:30:10 25    both in terms of the -- that the state has or the city,

1    anyway, I suppose, both in terms of the -- gees, my mind has

2    gone blank.  But for our purposes, I'm most interested in

3    terms of the public interest with regards to the preliminary

4    injunction which is what we're discussing now.  Having that

04:30:37  5    happen to people is against the public interest.  And when

6    we look at the record overall, I think we can say that or it

7    appears, anyway, that this is not some remote once in a blue

8    moon possibility.  It happens.

9            As was noted in the TRO hearing, Mr. Jensen said

04:31:01 10    that at that time, and this was December 13th of last month,

11    so obviously there would be more now, there have been fewer

12    than 100 voyagers and they couldn't say exactly how many, I

13    don't think that even necessarily implied there were close

14    to that, that is how we could ballpark it.  I believe Brandi

04:31:14 15    Lee, who is not the founder but who is someone who has had

16    extensive, you know, experience there, said she observed, I

17    think, about 30.

18            So given the limited number of these that

19    acknowledge to have happened, one of them, if it continues,

04:31:33 20    again, we can't say, oh, there is the one in a hundred

21    chance this is happening, but the fact that given that this

22    is very small organization, hasn't, you know, hasn't sort of

23    reached only has possibly still only had within the two

24    figures of voyagers nevertheless, at least one of them has

04:31:55 25    this sort of extreme experience which one, caused them great

1    pain, caused a risk that others would be injured, or that

2    therapy injured -- or that she would injure herself.  And

3    finally yeah, it does impact others.  It requires response

4    from police and fire and things like that.  And even just

04:32:14  5    the impact on the husband, you know, of having been put in a

6    situation where he is the emergency contact, he is told you

7    have got to go get help for her, he is not a mental health

8    expert, as far as we know.  We only have the background on

9    him, but I think he was someone close to them.  But this

04:32:35  10    sort of event is against the public interest.  And we have,

11    given that it has happened here, there is no reason to

12    believe it won't happen again if the actions continue

13    unabated.

14        And it also concerns me that plaintiffs don't

04:32:54  15    seem to think that there is anything that they can do to

16    make it safer.  They say basically, they insist, in fact,

17    that they're, you know, following protocols that are used

18    with, you know, other organizations.  But I think that there

19    -- so we can't create a system it is going to prevent this

04:33:13  20    from happening.  They have just got to say, well, the best

21    we can do is keep a close watch on them, we observe them,

22    and we send them to their emergency contact when this

23    happens and then screen them.

24        THE COURT:  But I suppose, and maybe this isn't a

04:33:29  25    perfect analogy, but anybody taking a prescription might

1    have an adverse reaction.  Now, some of them might manifest

2    in terms of -- I mean I have seen cases where certain mental

3    health medications can cause suicidal ideation in some

4    people.  Those are frequent warnings that we see on a lot of

04:33:58  5    prescription medications.  We've got folks who might take an

6    antibiotic and have a terrible adverse reaction that puts

7    their life at risk.  But I guess that the point is, there is

8    never going to be any system that is going to have a

9    100 percent guarantee of no adverse reactions, and so we're

04:34:23 10    always engaging in some kind of a balancing test with

11    respect to various interests, are we not?

12              MR. MUHLESTEIN:  I guess I would say that.  And I

13    think that when we turn to the Psilocybin Act, I think

14    that's sort of comparing them, counsel has already done this

04:34:43 15    to some degree to show sort of the limitations here, which

16    is that Psilocybin Act which again psilocybin is broadly

17    illegal in Utah, but can be used by, you know, certain major

18    health systems.  And granted, they do only have, you know,

19    it's not an extremely detailed act to say very carefully

04:35:06 20    determine what the best safety protocols are, but I think

21    the reason that exists is because they don't know, that's

22    why they have limited this to major health systems which

23    have the resources, and, you know, the sort of general

24    experience with implementing new drugs or just treatments

04:35:23 25    generally.  So there is -- there is a great -- there is more

202

1    plausible --

2         THE COURT:  Right.  I guess I'm just -- the test

3    is if we get that far is least restrictive means.  And I

4    suppose maybe there are some more restrictions that would

04:35:46  5    help in a -- with responding to someone who has an adverse

6    reaction.  But I mean I'm even thinking about, you know,

7    what has happened in the Cannibis industry.

8         We now have Cannibis that's hitting the market

9    that is 100 or 200 times more powerful than it was back in

04:36:08  10   the '70s and '80s when people were smoking weed.  And I have

11   heard of some terrible psychiatric or physical reactions to

12   that kind of Cannibis, but we still allow people to get

13   medical marijuana cards and to use it relatively

14   unsupervised.

04:36:31  15        MR. MUHLESTEIN:  And, again, I guess, if we were

16   to that point with psilocybin, even though perhaps from a

17   practical standpoint that might not be a good thing, we

18   wouldn't be having this argument.  Right now it's still in

19   this fairly experimental stage where now plaintiffs here are

04:36:47  20   basically -- even setting aside the religious angles, they

21   certainly they present it as being a combination, right, of

22   both religion and, you know, it is that therapy underlying

23   religion.  But they want to take something which is

24   currently limited to, again, major healthcare systems who

04:37:12  25   will then provide a report to, you know, the Health and

1    Human Services which may well, you know, that could result

2    in psilocybin becoming, you know, restrictions loosened or

3    it could result in them being tightened.  We just don't know

4    yet.

04:37:27    5        And I think there is a strong public interest

6    against sort of having an informal quasi-therapeutic system

7    for this.  I mean that's sort of why I think this is so

8    peculiar about plaintiffs wanting to be covered under the

9    Psilocybin Act with another comparison they talked about

04:37:51   10    which is that most of the people under that exception

11    regarding, you know, clergy how they can be a -- how they

12    can be healthcare therapists, LDS bishops are the most

13    common ones.  So, you know, when you combine these thoughts,

14    since if you're under the Psilocybin Act, you don't

04:38:12   15    necessarily need a religious belief in it.  So then when we

16    take their, you know, reasoning to its end, any LDS bishop,

17    I guess, can become his own personal psilocybin therapist

18    because why should he not fit under the exception that is

19    being requested of the plaintiffs here.  And I think the

04:38:34   20    reason why it shouldn't be is that one, the experiences here

21    have shown that there are significant dangers with this

22    drug.  Again, we have at least one major incident that we

23    know of in what had only -- had been in double digits of

24    users, users is not proper, or patients, I suppose, if you

04:38:55   25    want to be a more neutral one.  You have had one of those

1    and what they're asking is basically to be able to continue

2    to do this, continue to provide this treatment basically

3    without any sort of oversight from anyone that maybe we

4    could hypothetically come up with something, I guess, but

04:39:15  5    they're asking for a -- they're asking for a preliminary

6    injunction based on that we haven't immediately created some

7    sort of a system to make psilocybin completely safe when we

8    -- we've seen the dangers from them even if -- even if we

9    assume that they were to convert to, you know, somehow we

04:39:36  10    can show that everyone was a real true religious believer.

11         The dangers to the people taking the psilocybin

12    still exist and they're still interested in preventing it.

13    And to clarify, I mean like I say, they relate to one

14    another similar language, but I was more discussing the

04:39:56  15    preliminary injunction in terms of the I think once we

16    actually have full discovery, a full, you know, fuller

17    understanding of all of the circumstances here, then you can

18    make a clearer decision as to what the risks are.  But now

19    that we have, again, one significant incident and not a lot

04:40:19  20    of certainty about how this church works, then I'm -- we

21    would be taking grave risks by saying yes, you get to just

22    do it openly without any real oversight and without any hope

23    of prosecution at this stage without knowing more.

24         THE COURT:  All right.

04:40:46  25         MR. MUHLESTEIN:  And just briefly, there is also

1    the -- this came up somewhat in the briefing, I think

2    somewhat in the TRO, still does leave law enforcement in a

3    some untenable position, particularly some of the more broad

4    ones where they say, no -- no searches, no interference.  I

04:41:06  5    mean, given that we don't know where these mushrooms come

6    from, we know that they come from Oregon, if they say, as I

7    think was brought up in some of the, I don't know, briefing,

8    what if we stopped a van, an Inge van that has the mushrooms

9    in it?  Are we interfering with them?  How do we know that

04:41:31  10    Inca or Inge, I'm not sure which it is, is only working with

11    them, only working legitimately.  Where are the limits of

12    creating sort of an exception for this particular

13    organization.  It is very hard to know at this point.  And

14    while it doesn't seem like there is a good way to create one

04:41:56  15    that doesn't, as Mitch Stephens has suggested, it doesn't

16    create this inherent hole in the regulation system which

17    allows for people to use them regardless if they have the

18    religious interest.

19              THE COURT:  All right.  Anything else?

04:42:12  20              MR. MUHLESTEIN:  I don't think so, Your Honor.

21    Thank you.

22              THE COURT:  Okay.  I'll turn it back over to you,

23    Mr. Bean, for a reply.

24              MR. BEAN:  All right.  I will try to do the best

04:42:30  25    I can to get through this concept before five, because I

1    know we're come up with that deadline.  I would just like to

2    start with some of the standards that we talked about

3    applying to the strict scrutiny analysis prongs.  For

4    example, I didn't hear any arguments from defendants here

04:42:43  5    about the specificity of the compelling interest required

6    that needs to be factual evidence regarding Singularism.  So

7    I take it defendants agree with that.

8         I also didn't hear any arguments against the

9    Supreme Court statement about rejecting the speculative

04:42:58  10    nature of claims, although I think we just heard plenty,

11    especially from Provo City, regarding some speculative

12    claims that have no basis in fact.

13         THE COURT:  What do we do with -- I mean we do

14    now have at least one documented case where it appears that

04:43:16  15    the administration of the psilocybin had not anything to do

16    with a religious experience and everything to do with a

17    referral from a mental health practitioner who believed in

18    psilocybin as a mental health drug but not necessarily a

19    religion so she sent a client to see Mr. Jensen?

04:43:51  20         MR. BEAN:  Yes.  And I know you --

21         THE COURT:  That's a -- let's just say that is --

22    that puts a significant -- I guess it sheds a significantly

23    different light on what's going on here than what was

24    presented at the TRO.

04:44:11  25         MR. BEAN:  Yes.  And let me clear up that

1    confusion.  I know since it looks like we're exceeding

2    somewhat our stipulation about what evidence is going to

3    come in here, I do want to share two things.

4              What I'm currently sharing on my screen is a

04:44:25  5    document that has already been admitted, excuse me, let me

6    see if I can take that over.  Oh, boy, Zoom is interfering

7    my view.  One moment, please.  Okay.  Can the court see that

8    now?

9              THE COURT:  Yes.

04:44:44 10              MR. BEAN:  So what this document is, it has been

11    filed as 9. -- or 9-3 ECF.  This is a blank waiver form that

12    Singularism uses for every single one of its Voyagers.  I

13    won't go through it in detail, but it frequently talks about

14    the religious context of Singularism and that these

04:45:03 15    individuals are coming to this space for that in particular.

16              I'll just kind of look at this paragraph here,

17    Declaration of Personal Spiritual Necessity.  It begins, "I

18    recognize and sincerely declare that participating in this

19    Entheogenic ceremony is vital and central" and it just

04:45:18 20    continues to talk about how it is integral to spiritual

21    journey.

22              THE COURT:  Well, I mean I understand that, but I

23    suppose if everyone who went to the marijuana church that

24    was the subject of one of the cases that we have been

04:45:37 25    talking about had signed a paper that said, you know, I'm

1    declaring my personal spiritual necessity through pot, I

2    don't know that it would have changed nor should it have

3    changed the outcome.  I mean I guess the question is, if

4    we're looking at the potential for having this psilocybin be

04:46:10  5    distributed to folks who don't have a sincere religious

6    belief, maybe the sincerity of Mr. Jensen's religious belief

7    is not the issue.  The issue is whether others are taking

8    advantage of him in order to just get the drug.

9        MR. BEAN:  Yes, Your Honor.  And in response to

04:46:32 10    that, you know, I can certainly see in other cases, perhaps

11    in the *Christie* case, for example, the facts indicating that

12    there were individuals who were in fact, you know,

13    essentially, you know, committing fraud or something upon

14    the organization to induce them to provide them information.

04:46:45 15        But the fact of the matter is we don't have any

16    evidence here that that has happened or that any of -- any

17    factual individual has presented, has got past the gate for

18    some reason other than a secular nature.  And I know that

19    defenses counsel has kind of raised those videos of Ms. Hart

04:47:03 20    to indicate that.  And for that reason, I want to show you

21    just the last page of her particular waiver form.  And I'm

22    happy to, after maybe doing some redactions on this

23    document, provide the full document, it needs to be under

24    seal, but this is the last page where she said her intention

04:47:20 25    statement.  And here she says that, "Her intention is to

209

1    heal spiritually and connect with God."  So we do have

2    specific evidence about Ms. Hart that she came to

3    Singularism for this particular purpose.  She may not have

4    mentioned that and, you know, by happenstance in her

04:47:38  5    voluntary statement she just puts it in writing, or when

6    they were there in the law enforcement capacity but that's

7    what was indicated to Singularism and has no other reason to

8    suggest otherwise.

9              THE COURT:  Is that in the record?

04:47:51 10              MR. BEAN:  It is not in the record, so I will

11    file it.

12              MR. STEPHENS:  I'm going to object, Your Honor.

13    This isn't in the record, it hasn't been provided to me, and

14    it's not part of the stipulation that's in front of us.

04:48:02 15              THE COURT:  Well, it sounds like maybe you

16    presented something that wasn't part of the stipulation

17    either.  Why don't the two of you get together, and if there

18    is relevant evidence regarding this point, why don't you

19    agree that it can all be submitted within three days from --

04:48:20 20    three business days from today, and let's get it on the

21    record.

22              MR. BEAN:  We have no objection to that, Your

23    Honor.

24              MR. STEPHENS:  And I am happy to meet and confer

04:48:32 25    with counsel.  I just, without knowing what else they have,

1     it's hard for me to say that we wouldn't have changed

2     witnesses or subpoenas or things.

3          THE COURT:  Well, if that's the case, then let me

4     know that.  We'll convene a very short hearing.  I mean I --

04:48:47  5     I want to decide this case on the available facts, and I

6     don't think it behooves anyone to keep certain things from

7     me based on technicalities.

8          MR. STEPHENS:  I agree with that, Your Honor.

9          THE COURT:  Okay.

04:49:07 10          MR. BEAN:  Your Honor, we wouldn't have exceeded

11    the stipulation, you know, for example the information about

12    the Divine Assembly, its location, that was not part of the

13    stipulation, nor was the information that Provo City shared

14    about, you know, some documents behind the Provo City, you

04:49:24 15    know, statement about the religious exemption from business

16    licensure.  So that's why I bring this up.

17          THE COURT:  That is a fluid process.  I'm asking

18    questions, you're responding.  I think everything is

19    operating in good faith.  If there is relevant evidence, I

04:49:38 20    want to see it.

21          MR. BEAN:  Certainly.  Well, along that point, I

22    mean so we have -- we have Ms. Hart's statement there

23    regarding what her spiritual intention was.  I do think we

24    have to stick to what the Supreme Court has said issuing a

04:49:53 25    sort of speculative argument.  And I fear, and I haven't

1    seen any evidence presented, other than this idea that

2    perhaps, you know, Ms. Hart is an exemplar of some sort of

3    distribution of drugs which I haven't seen any example of in

4    the documents.

5                The other thing I want to say in regard to

6    Ms. Hart is, you know, I certainly encourage the court to

7    review the rest of the videos.  On Page 10 of our

8    supplemental brief, you know, we took some of the statements

9    from the video where she meets with law enforcement the next

10   day.  You could tell from the video that she was, you know,

11   significantly different, she had retained coherency.  And so

12   I'm just going to point the court to that section of our

13   brief, I won't rehearse the statements for you, but they're

14   certainly significant in indicating how she felt about the

15   event even after enduring such a difficult experience that

16   that was.

17               Before I get into just a few minute points, I did

18   also want to point out that defense has not spent any time

19   discussing the *O Centro* case and how it indicates that just

20   assertions about governmental uniformity in application of

21   the Controlled Substances Act don't win the day.  And so

22   again, I refer the court back to that for pretty lengthy

23   discussion in both *O Centro* that is directly relevant here.

24               As far as the religiosity issue, I'll just point

25   the court back to the Provo City letter first.  I think it's

1    pretty significant what's contained in there.  I didn't hear

2    an argument that somehow, you know, Provo City or, you know,

3    all defendants for that matter, are not estopped from

4    arguing under, you know, *Meyers* or other issues.

04:51:33   5            THE COURT:  You know, that's an interesting

6    question because I think, and maybe I'm wrong, but when

7    someone comes in and applies for a business license and then

8    they say they're a church, I would suspect you've got some

9    clerk who is checking boxes and not really thinking about

04:51:57  10    things.  And I'm not sure that it's tantamount to a reasoned

11    decision by the municipal authorities that this is a

12    legitimate church.  I mean it's -- it's a reaction to a

13    checked box kind of a thing and I -- I just I'm really

14    struggling with how much weight to give that.

04:52:23  15            MR. BEAN:  Yeah.  And I would tend to agree in

16    the absence of that specific Provo City Code Section I cited

17    earlier which is 6.01.140 which I would just like to quote.

18    It says that, quote, "With respect to the exemptions from

19    business license requirements claimed because of charitable,

04:52:41  20    religious, or other nonprofit status, the person claiming

21    the exemption shall have the burden of establishing that

22    exemption."  And for what I take from that is they're

23    placing the burden of establishing an exemption on the

24    applicant.  But however, and they are making as Provo City,

04:52:57  25    a determination whether that showing has been made.  And we

1    have seen here that Provo essentially took the information

2    received, it said that it passed the burden, passed that

3    information back to Singularism.  So I do think it is a

4    pretty significant judgment call that they did in fact make.

5    04:53:14         THE COURT:  So I guess then we get back to maybe

6    the flip side of the question that I asked Mr. Stephens

7    which is legitimate religious organizations can engage in

8    nonreligious activities, I suppose, and it doesn't mean that

9    they're not a church or a religious organization, just like

10   04:53:43 my congregation can throw a Christmas party as a social

11   function.  So then I guess it comes down to is in fact the

12   psilocybin really the lynchpin of this religion, or is this

13   religion just which based on Mr. Stephens argument doesn't

14   really have, I suppose, any kind of -- well, as he put it,

15   04:54:17 you can believe whatever you want and believe it in -- at

16   the same time that you believe in Catholicism or Judaism or

17   Hinduism, it is just additive.  Then I guess you're to the

18   point of deciding is the psilocybin just simply something

19   that's not essential or is the religious organization a

20   04:54:44 front for distribution of psilocybin.  I mean I think that's

21   the argument he's making.

22         MR. BEAN:  Right.  And so let me start on that

23   with referring the court back to the *Hobby Lobby* decision.

24   I wanted to quote the specific portion that I have been

25   04:55:01 referring to about how money enters the fray here.  In that

1    decision, the court explained that faith infused businesses

2    don't lose religious protections just because they seek,

3    quote, "To make a profit as a retail merchant," end quote,

4    or because, quote, "The purpose of such corporations is

5    simply to make money."

6            And Singularism is not asserting that that is its

7    purpose.  But if it were, it appears the U.S. Supreme Court

8    has said that that would be a perfectly legitimate purpose

9    allowing for RFRA protections.

10           And in that case, at issue, there was a gigantic

11   arts and craft store that was making the argument, for

12   example, which didn't even provide particular religious

13   services to anyone for which it was doing business.

14           THE COURT:  But didn't that have to do with

15   whether or not they had to contribute to a healthcare plan

16   that they found objectionable on religious grounds?  And I

17   think that's a different context than a claim that this

18   organization really doesn't have any sincerely held beliefs

19   and exist only to facilitate distribution of a Schedule I

20   Controlled Substance.

21           MR. BEAN:  Yeah.  And I understand how you might

22   draw some distinction like that.  The next thing I wanted to

23   point the court to, which is also cited at Page 26 of one of

24   our briefs which is ECF Document 9-18, is identifying

25   specifically what you said, Your Honor.  Other organizations

215

1    that are of religious character but are providing services

2    to the public even for cost.  Now, we have provided an

3    example of Christian Therapy Services, for example, that are

4    providing therapeutic services to others.  Or Catholic

04:56:47  5    Social Services providing services, you know, to others.

6            And again, you know, Singularism is not the type

7    that is asserting that what it is doing -- it is religious,

8    but it serves all comers of no religious character and

9    doesn't mind their religious character.  Because it does

04:57:03  10   make a religious requirement and asks of them as a critical

11   step in their screening procedure as indicated by the waiver

12   I showed the court.

13           Now, let's see, I'm cognizant of time, Your

14   Honor.  What would you like me to --

04:57:21  15           THE COURT:  Well, I mean -- I don't want to cut

16   you off if there are things that you really want to say.  I

17   mean 5:00 doesn't cause the Zoom screen to blow up although

18   I am sensitive to everyone's schedules.  If folks have

19   another 10 or 15 minutes to get this wrapped up, we can do

04:57:45  20   that.  If they don't, I guess we could come back at nine in

21   the morning because that day was set aside as well.  So I'm

22   amenable to counsel's desires on this point.

23           MR. BEAN:  Certainly.  I think I could get

24   through what we need to in 10, 15 minutes assuming we don't

04:58:04  25   have a lot of questions here.  But I'll try to do that if

1    that is amenable.

2              THE COURT:  Well, let's see what Mr. Muhlestein

3    and Mr. Stephens think and what our court reporter thinks.

4              MR. STEPHENS:  If there is no objection from the

04:58:23  5    court reporter and the court staff, I'm happy to get this

6    wrapped up.  I think that makes the most sense.

7              THE COURT:  Ms. Robinson?

8              COURT REPORTER:  I'm fine, Judge, however long

9    you want to stay.

04:58:32 10              THE COURT:  Okay.  Mr. Muhlestein?

11              MR. MUHLESTEIN:  Yes.  My normal hours are until

12    six, so certainly it's definitely more than 15 more minutes.

13              THE COURT:  Okay.  Mr. Bean, back to you.

14              MR. BEAN:  Okay, thank you.  I'll do my best

04:58:48 15    here.

16              As far as other elements of, you know,

17    spirituality here and whether this is a religion or not, I'm

18    not going to take the court through the whole TRO transcript

19    again.  I will just cite the court back to Plaintiffs'

04:58:59 20    Exhibits R, P, Q and S.  It's pages and pages and pages of

21    doctrinal statements.  It includes information about

22    creation stories, different connections, you know, that

23    golden thread concept is mentioned, it's explained in

24    extensive detail.  The necessity of psilocybin to

04:59:17 25    essentially the existence of the human and the access to the

1    divine self and the divine itself.  So there is a lot, lot

2    there.  I'm not going to spend all of the time there, it

3    will take us a long time to do that, but the weight of the

4    evidence, we think, certainly weighs in favor of the

04:59:33  5    religiosity there even if we need to go factor by factor

6    through some test to indicate that.

7         Which as I have said, I do not think the Utah

8    RFRA requires with its definition saying that religious

9    exercise of religion is protected even if it is not

04:59:47 10   compulsory or central to a larger system of religious

11    belief.

12         Now, just a very brief point as to the issue of

13    Divine Assembly.  And this is something that I will have to

14    file after with the court.  And let's see if I can actually

05:00:03 15   share it.  What I'm sharing is just a screenshot of an

16    Instagram social media post.  And the reason we're sharing

17    this is for the content in the comment which says, 2-Healing

18    Collective, 532 East 800 North, Orem, of about the -- up at

19    the top you can see mushroom sacrament and to the left of

05:00:30 20   that you have a circle with T-D-A inside of it.  TDA is The

21    Divine Assembly.  And I'll indicate to the court, and we

22    could certainly lay foundation further for this and

23    testimony, but indicating that, in fact, The Divine Assembly

24    is operating in Orem and below it, it says, "We call it

05:00:48 25   church, but don't let that trigger you.  It's just a place

1    to meet other like-minded community members and take

2    advantage of learning, growing, more into the space of

3    mushroom healing."

4            THE COURT:  Well, I guess what that doesn't say

05:00:59  5    is whether they just have a group of like-minded people

6    meeting in Orem talking about mushrooms, or whether they're

7    actually having mushroom experiences in Orem, or passing out

8    mushroom kits or selling mushrooms.  I mean maybe -- maybe

9    it's a support group in Orem, but the mushroom distribution

05:01:26 10    goes on in Salt Lake County.

11            MR. BEAN:  Certainly.  And we're not asserting it

12    says more than what it does.  So that just raised some

13    evidence of activity in Utah County with The Divine

14    Assembly.

05:01:38 15            I did want to speak to the *Christie* decision that

16    was talked about.  And we think, you know, the facts of that

17    case are really significantly distinguishable from what we

18    have here.  I won't take the court through, you know,

19    line-by-line with that, but it is worth noting, for example,

05:01:54 20    it looks like in that case the website of that organization

21    assured that members would not be subject to arrest or

22    prosecution or conviction on marijuana charges as soon as

23    they sign up.  That signing up was very easy with the

24    reverend even boasting about, you know, people enrolling,

05:02:11 25    enrolling people who came to Hawaii on cruise ships, for

1    example.  Similar to The Devine Assembly, sanctuary kits

2    were available for purchase through the website.  It doesn't

3    appear that there were any minimum age requirements and

4    members could be -- and minors could be members.  The

05:02:27    5    ministry had never recalled rejecting anyone from acceptance

6    of the faith at all.

7            The Cannibis there at issue was obtained from

8    various sources including the black market, and was consumed

9    either during, on-site at the location, or members could

05:02:42    10    pick up from the location Cannibis and take it to wherever

11    they wanted to consume it.  And essentially, the

12    distribution that allowed people to show up and receive it

13    without even having to meet with the spiritual leader at all

14    including where there was a line out the door for the

05:02:59    15    individuals lining up to, you know, grab a bag of Cannibis

16    and head out with distributing half a pound of Cannibis a

17    day to 60 or 70 people.

18            So I could go on about that, but the facts are

19    just so substantially different than the case at issue

05:03:13    20    indicating that there was a lot of factual indications of

21    governmental interest in that case, but those factual

22    indications are absent from what we have here.  What I have

23    heard is just largely speculative evidence or there is a

24    risk or there is a potential for what could happen, right?

05:03:30    25    And I think that even if we, you know, tested those risk

220

1    applications, the same are all true in the context of the

2    Utah Psilocybin Act under the healthcare systems watch.

3            THE COURT:  How much -- how many doses of voyager

4    mushrooms does your client contend were seized?

05:03:53  5            MR. BEAN:  What my understanding is, what

6    Mr. Jensen would say, would be a third or so of what was

7    represented.

8            THE COURT:  So about 30 doses?

9            MR. BEAN:  Um, probably so, yeah.

05:04:05  10           THE COURT:  30 to 40 doses?

11           MR. BEAN:  Yeah.  Again, calling on my math here,

12   but a third of some sort.

13           Okay.  I'm just checking my notes here.  And

14   last, there were some assertions about, you know, just

05:04:27  15   general assertions about, you know, adverse effects for

16   people experiencing psilocybin are against the public good.

17   And I think, you know, that could be an argument if the Utah

18   Controlled Substance Act bans psilocybin in all instances.

19   But where the Utah legislature has acted to allow psilocybin

05:04:45  20   to be administered in healthcare organizations with, you

21   know, no particular provisions regarding what happens in the

22   event of adverse event.  I don't think that the legislature

23   has indicated that it is against the public good to, you

24   know, or it is against the public good to prevent any

05:05:02  25   adverse effects.

1          Let's see here.  Okay.  I think that is all I

2    have for now, Your Honor, unless you have any further

3    questions?

4          THE COURT:  All right.  I can't think of any

05:05:26  5    questions now, but it sounds like there may be some loose

6    evidentiary ends that counsel would need to wrap up.  And

7    what I would like to do is reflect on this this evening and

8    just decide whether there are any issues or cases that I

9    would like to see supplemental briefing on.  If there are, I

05:05:54  10    will issue a docket text order tomorrow asking you to file

11    simultaneous briefs on those issues by the end of next week.

12    Hopefully you can work out any evidentiary issues or

13    concerns that you have by then as well.  If you need my help

14    in resolving any of those, you can let Ms. Hola know and we

05:06:19  15    can set up a brief virtual hearing to address those things.

16          And then I will, once I have all of that

17    information, I will quickly, to the best of my ability, get

18    an order out.  And in the interim, I'll leave in place the

19    very limited TRO with the portion relating to the mushrooms

05:06:51  20    stayed.  So we'll just maintain the status quo for another

21    week or so while I get the rest of the information that I

22    need to issue a ruling on the three motions that are in

23    front of the court.

24          If anyone has any objection to that procedure,

05:07:09  25    please let me know.  I'm happy to entertain any objections.

1    MR. STEPHENS:  I don't have an objection, Your

2    Honor, I have maybe a personal request.

3    THE COURT:  Okay.

4    MR. STEPHENS:  If you want supplemental briefing,

05:07:22    5    can I get a few extra days only because I have four summary

6    judgment replies that are -- have been extended and now due

7    next Friday given the hearing.

8    THE COURT:  I think that's fair.  I mean I -- I

9    mean I am sensitive to the fact that we have, I think, very

05:07:41   10    legitimate claims on both sides with respect to the

11    injunction issue.  We're trying to balance, you know, the

12    government interest against a claim of infringement on

13    religion, but I also think it's important to get this right

14    and to not issue something without adequate briefing on all

05:08:12   15    of it.  I think there are some tricky legal issues, as well

16    as factual issues, that are embedded in this dispute.  And

17    so how many additional days do you need, Mr. Stephens?

18    MR. STEPHENS:  Not many.  I agree with you that

19    it is important to get this resolved quickly.  And I know

05:08:30   20    the court has moved things around to get us here.  If I

21    could have Wednesday instead of -- the following Wednesday,

22    that would be great.

23    THE COURT:  Okay.  Is that okay with you

24    Mr. Muhlestein and Mr. Bean?

05:08:41   25    MR. BEAN:  Yes.  I'm just checking my calendar.

1    One moment.  So that looks like it would be February the

2    5th; is that right?

3                THE COURT:  I guess I need to pull up a calendar.

4    Let's see, today's the -- so I believe that you are correct,

05:09:04    5    it would be February 5th.

6                MR. BEAN:  That looks doable for us.  Thank you.

7                THE COURT:  Okay.  So like I said, I will get an

8    order out tomorrow and let you know if there is anything I

9    need supplemental briefing on.  I think you can just file

05:09:19   10    simultaneous briefs.  We don't need to let you respond to

11    each other.  Give me your best arguments on whatever issues

12    that I might identify.  Maybe I won't identify any, but I do

13    want to go back over my notes and if there are questions

14    that I am unclear on, for example, one of the questions that

05:09:43   15    struck me is something maybe needing supplemental briefing

16    would be the question of 1983 and how that plays in with the

17    Anti-Injunction Act and aiding the court's jurisdiction

18    which Mr. Stephens pointed out really hadn't been briefed.

19                So that's one issue, but I'll try and formulate

05:10:08   20    that in a coherent -- into a coherent issue or question.

21    There may be others.  I just want to think about it

22    overnight.  I'll get something out tomorrow, and then I

23    suppose that would give us everything we need to get an

24    opinion out once we have an opportunity to digest what you

05:10:30   25    file on February 5th.

1                    Is there anything else we need to address before

2      we adjourn?

3                    MR. BEAN:  Not from our side, Your Honor.  Thank

4      you.

05:10:40  5          MR. STEPHENS:  No, Your Honor.  Thank you for

6      your time.

7                    THE COURT:  All right.  And Mr. Muhlestein,

8      anything else?

9                    MR. MUHLESTEIN:  Nothing else, Your Honor.  Thank

05:10:46 10    you.

11                   THE COURT:  Okay.  That sounds good.  I'll look

12     forward to hearing from you.  And good luck with all of the

13     work you have pushed to the side while you have been working

14     on this.

05:10:58 15          MR. STEPHENS:  Thank you, Your Honor.

16                   (Court adjourned at 5:20 p.m.)

17

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE**

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 11th day of February, 2025.

___*Laura W. Robinson*_____

Laura W. Robinson

RPR, FCRR, CSR, CP