## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>    Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, and JEFFREY GRAY,<br><br>    Defendants. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

Our nation was built on an "essential commitment to religious freedom." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993). As the Supreme Court has repeatedly recognized, this guarantee of religious liberty "lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020). The Religion Clauses of the First Amendment provide the basic guarantee of religious freedom for our nation. U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). Many States have enacted special laws modeled on the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., to provide additional protections for religious exercise. *See* Christopher C. Lund, *Religious Liberty After* Gonzales*: A Look at State RFRAs*, 55 S.D. L. Rev. 466, 469–79 (2010) (summarizing the history of the enactment of these laws). Utah passed its version of RFRA just last year. Utah Code Ann. § 63G-33-201; *see* Katie McKellar, *Utah Legislature Passes Bill to Codify State Version of Religious Freedom Restoration Act*, Utah News Dispatch (Feb. 22, 2024), https://utahnewsdispatch.com/briefs/utah-religious-

freedom-restoration-act-rfra. Laws like these further instantiate the guarantee of religious freedom so central to our republic. But for that guarantee of religious liberty to mean anything, the laws must protect unfamiliar religions equally with familiar ones, both in design and in practice. In this litigation, the religious-exercise claims of a minority entheogenic religion put the State of Utah's commitment to religious freedom to the test.

Plaintiffs are members and associates of a new religious group called Singularism that uses psilocybin mushrooms in its religious ceremonies. After the government raided their spiritual center in November 2024 and seized their mushrooms and scripture, Plaintiffs filed for a temporary restraining order and preliminary injunction in state court, claiming that the Utah RFRA, Utah constitution, and Federal Constitution protect their use of psilocybin, a psychedelic substance otherwise illegal under the Utah Controlled Substances Act. Defendants then removed the case to federal court.

In December, the court held a full-day evidentiary hearing, determined that Plaintiffs were likely to succeed on the merits of their RFRA claim, and issued a temporary restraining order requiring the government to return the mushrooms and scripture.[1] Five days later, the government filed criminal charges against Plaintiff Bridger Lee Jensen, the founder of Singularism, for possession of psilocybin with intent to distribute, possession of THC, and use or possession of drug paraphernalia. Defendants then moved to dismiss Plaintiffs' federal claims, and Plaintiffs moved for an anti-suit injunction against the state prosecution. Plaintiffs' request for a preliminary injunction remained pending.

---

[1] At Defendants' request, the court stayed the portion of its order requiring return of the psilocybin mushrooms. *See infra* pages 15–16.

The court set aside time in January for a further evidentiary hearing, but the parties stipulated to have the motion for preliminary injunction decided without further live testimony. The court then heard argument on the three pending motions and ordered supplemental briefing on several legal and factual questions. Defendants observed in their supplemental brief that the Attorney General of Utah must be notified when, as here, a litigant challenges the constitutionality of a state statute, but that the Attorney General in this case had not been notified of Plaintiffs' constitutional challenges to the Utah Controlled Substances Act. Accordingly, the court ordered Plaintiffs to send the Attorney General appropriate notice, and the court submitted its own certification of Plaintiffs' constitutional claims to him shortly thereafter. The Attorney General has until April 11, 2025 (60 days from the date of the court's certification), to present evidence or argument on the constitutional questions should he wish to do so.

In the meantime, the court has considered Plaintiffs' claim under the Utah RFRA and now GRANTS Plaintiffs' motion for preliminary injunction. The court will rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction in due course.

**FINDINGS OF FACT AND PROCEDURAL BACKGROUND**

The following findings of fact are based on the live testimony that the court heard in December, the allegations of the First Amendment Verified Complaint, the declarations, and the several dozen exhibits that the parties have submitted since the case was filed.

## I.     Singularism, Its Origins, Its Beliefs, and Its Practices

Singularism is a religious organization based in Provo City, Utah, whose core mission is alleviating human suffering. Singularism was founded in fall 2023 by Mr. Jensen after years of exploration convinced him that entheogens, specifically psilocybin, could help spiritual seekers more effectively access the Divine. As a clergyman for Singularism, Mr. Jensen makes

entheogenic spiritual experiences accessible to those in Provo and surrounding communities by facilitating psilocybin ceremonies for participants to connect more deeply with themselves and with God. To best understand Singularism's beliefs and religious practices, it first helps to know a little about Mr. Jensen's spiritual journey.

A.    Mr. Jensen's Spiritual Journey

Mr. Jensen grew up in Provo in a devout family belonging to The Church of Jesus Christ of Latter-day Saints. From an early age, he was taught to revere faith and truth and to seek his own spiritual path. This foundation inspired him to explore and question religion and spirituality more deeply, and he yearned for a personal connection with the Divine. During high school, he immersed himself in the religious and intellectual tradition of his upbringing, competing (and winning) in scripture-mastery competitions, attending seminary classes with dedication, and spending long hours conversing with seminary teachers. His experience serving as a missionary for the Church of Jesus Christ of Latter-day Saints helped him develop his spiritual orientation as he found himself gravitating toward leaders who emphasized love, charity, and devotion over discipline and rigidity. Through his father, Mr. Jensen was also introduced to the works of renowned psychologists and philosophers, and found deep connection with ideas like Carl Jung's that strove to integrate science and spirituality. His exploration of other faith traditions like Buddhism, Taoism, and Hinduism further inspired him to bridge mental health and spirituality in his own life. In his mid-20s, he entered a period of agnosticism and stepped away from the faith of his childhood, but his commitment to bridging the two often-separated spheres of science and religion remained strong.

During that period of agnosticism, Mr. Jensen encountered psychedelics for the first time in Peru when he consumed a sacred drink (likely ayahuasca) with Sherpas speaking an ancient Incan language. That night, he experienced a profound vision of unity, love, and divine

connection—precisely the kind of transcendent experience he had wished for as a young boy. Although this experience was transformative, he kept it private and did not use psychedelics for spiritual purposes for almost a decade. His second entheogenic experience came in Hawaii, and this time too he felt an overwhelming sense of unity with the earth, stars, and all of creation. As he described it, "It was as if God's love enveloped me completely, and I wept for the time I had spent in my twenties dismissing religion as a potential human construct." This experience rekindled his faith in God and his desire to fill his life with meaning and purpose.

Around 2019, after more than 16 years as a successful child and family therapist with referrals from across the world, Mr. Jensen found himself disenchanted with traditional therapy and decided to explore entheogenic practices and the academic literature examining them more deeply. He allowed his therapist license to expire because he worried that his spiritual use of psychedelics might conflict with his work as a licensed therapist. The research from institutions like Johns Hopkins University and Harvard Medical School further convinced him that when approached with care and reverence, entheogens could reveal deep spiritual truths and facilitate healing.

Through his own experiences with entheogens, Mr. Jensen perceived an entity he calls the OctoGoddess calling him to help others connect with God. In response to that call, Mr. Jensen founded Singularism in September 2023, combining ancient, mystical traditions with modern, empirically supported methods. He also established the Psychedelic Therapy Academy, a center for training Singularism's prospective facilitators and interested non-affiliates in psychedelic harm reduction.

B.      Singularism's Beliefs

Singularism's central teaching is that we are all one, we are all connected, and we came from a higher power (hence the name Singularism, which suggests a unity with all things). The expectation is that each participant (whom it calls a voyager) will emerge from a psilocybin ceremony feeling a sense of unity with all things, feeling deeply connected with even his enemies and those who have harmed him. That said, Singularism does not itself claim special access to divine truths but instead considers itself religiously inclusive. One does not need to give up any prior religious affiliation to become a voyager or member of Singularism. Unlike religions that prescribe a core set of beliefs or practices for their members, Singularism encourages each voyager to connect with his own beliefs and experience his own spirituality, whether it is walking with Jesus, praying to Allah, or hearing a call from the OctoGoddess. In Singularism's view, everyone can connect with the Divine and receive equally valid revelation because the great spirit of the universe loves everyone equally.

Although one need not participate in the psilocybin ceremonies to be a member of Singularism, the religion does consider psilocybin to play an essential role. As Singularism sees it, we humans are now profoundly deceived about who we are, what our purpose is, and what we desire and need. Psilocybin allows voyagers to temporarily disengage from those deceptions, desires, and needs, and experience sheer consciousness without the burden of their bodies. Although one could perhaps get the same experience through years of dedicated meditation, most people do not have that luxury of time, so psilocybin makes that transformative experience accessible to the average seeker.

Although Mr. Jensen founded Singularism, he is not the prophet of the religion, at least not in the typical sense. Rather, his role is to assist others to access their own spiritual insights through

6

the psilocybin ceremonies. In a sense, then, each voyager is his own prophet, and the facilitator (the one overseeing the voyager's tea ceremony) serves as a scribe by recording the voyager's insights during the ceremony. These recordings become Singularism's core scripture, primarily for the individual voyager but also collectively insofar as different voyagers' insights reveal common truths about human existence and humanity's place in the world (such as the singularity of the universe). Because Singularism believes that each person can receive divine truths, its leaders generally keep their beliefs and spiritualities private to avoid interfering with other voyagers' understandings of their own journeys.

One scripture included in the religion's articles of belief, though, does come from a revelation that Mr. Jensen received through the OctoGoddess during a voyage. That scripture, called the Octadrant, is an epistemological framework for understanding truth, a resource for ongoing discovery rather than a source of eternal truth. It divides knowledge into eight interconnected perspectives (called octants) by the spectrums of Truth, Verifiability, and Awareness. (Imagine a 3D graph where the x-, y-, and z- axes divide the space into eight regions. Each region is an octant, and each axis is a spectrum.) The eight octants are Knowledge, Faith, Discoverables, Deep Mysteries, Lies, Deceptions, Myths, and the Unimaginables. Knowledge is true, verifiable, and aware (i.e., truth is both provable and consciously understood); Faith is true and aware but unverifiable (i.e., truth resonates deeply with intuition but cannot be empirically validated); and so on. Singularism uses the Octadrant to guide voyagers during their psilocybin ceremonies and explain humanity's place within the cosmic structure.

C.    Singularism's Practices

Singularism's central, most distinctive practice is the psilocybin tea ceremony. Participating in a tea ceremony with Singularism is a multistep process beginning with a rigorous

7

screening. During the screening, which can last up to two hours, Mr. Jensen (or whoever happens to be conducting the screening) asks detailed questions about the prospective participant's objectives, mental-health history, and medical history. The goal is ensuring physical and psychological readiness—making sure that voyagers participate because of their own sincere desire for a deep spiritual experience and screening them for preexisting conditions or ongoing medications that could interfere with the psilocybin.

Once a prospective voyager has passed the screening, he is ready for a prep session. During a prep session, the voyager discusses his goals for the ceremony, and the facilitator explains what to bring, what to wear, what to eat, and when to fast. The facilitator also asks the voyager to sign a waiver form and then invites him to set out an intention statement for the ceremony. It could something as simple as "acceptance of the unknown" or "reconnection with God." Finally, the voyager "commit[s] to using the wisdom and insights revealed to [hi]m through the sacred ceremonies . . . to create a more enlightened world."

A tea ceremony typically begins late morning, around 9:30 or 10:00. The facilitator brews the tea using psilocybin mushrooms in front of the participant, who then drinks the tea and begins his voyage. A voyage lasts between five and eight hours, and during that time, the facilitator guides the voyager, now playing the role of his own prophet, to discover spiritual insights and records them on a notepad. For example, one voyager revealed, "Why don't I listen to my body. I need to start listening. Why don't you?" These notes then become sacred scripture, and the facilitator meets with the participant post-voyage to reflect on the notes and discuss how he can strengthen the spiritual gifts received during that session. A voyager typically engages in two to four tea ceremonies. (Mr. Jensen himself participates in about four per year.)

8

Other than the tea ceremonies, Singularism's practice includes observing holidays on the solstices. The ceremonies performed on the solstices are meant to call in the spirits of the season, and they do not include the use of entheogens. Singularism also recognizes Christian holidays like Christmas and Easter.

D.      Singularism's Safety Protocols

For Singularism, safety is paramount, and the organization and its leaders have always striven for full transparency with facilitators, participants, and outside entities (including the government). Singularism has never sought to conceal its use of psilocybin, instead viewing its mission as educating a broader audience about the spiritual power of entheogens and making transformative spiritual experiences more accessible to those in the community.

To do so securely, Singularism has implemented several safety measures, beginning with the treatment of its psilocybin mushrooms, which arrive freeze dried from a lab in Oregon after being tested for contaminants. (Psilocybin is legal for therapeutic uses in Oregon.) The mushrooms are used only as a sacrament; they are never sold or otherwise distributed to non-affiliates for recreational purposes. The mushrooms are stored in a locked safe in Singularism's spiritual center, and only Singularism's facilitators have access to them. As mentioned above, each prospective voyager must pass through a rigorous screening process to ensure psychological and physiological fitness for the psilocybin ceremony. The medical portion of the screening is conducted by two or more facilitators, at least one of whom has a medical degree or background in clinical therapy. And the facilitators always brew the tea in front of the voyagers so that the voyagers can rest assured that no other substances go into the tea. Finally, voyagers must agree not to drive themselves on the day of their voyage. Mr. Jensen is present at the center for each voyage even if he is not himself facilitating it.

Even the best safety protocols, however, cannot entirely eliminate the risk of an accident or unexpected reaction. In Singularism's history, one voyager has had an adverse reaction. This particular voyager had successfully participated in one psilocybin ceremony with Singularism, but as she was completing her second one in January 2025, she began to display symptoms of paranoia and mistrust, and demanded to leave Singularism's spiritual center. Singularism deployed its emergency protocol, calling the voyager's emergency contacts (her mother and ex-husband) and ensuring that she received the treatment she needed at the hospital. Mr. Jensen also remained at the spiritual center until the end of the day as required by the protocol in case the voyager returned. While the voyager was in the hospital, Singularism discovered that she had an undisclosed mental-health issue. According to Mr. Jensen, if that issue had been disclosed during the screening process, Singularism likely would not have included the voyager in a psilocybin ceremony. Throughout this process, Singularism maintained its commitment to transparency and safety, and the voyager called the next day to thank Singularism for coordinating her care with her emergency contacts. At no point was the voyager (or anyone else) in physical danger because of the adverse reaction.

E.      Singularism's Impact on Its Participants

Singularism's participants often come to the religion after exhausting conventional treatments like medication or therapy, partly because they seek healing along both the physical and spiritual dimensions. Based on the record in this case so far, voyagers and facilitators describe their experience at Singularism in uniformly positive terms.

Several witnesses testified that Singularism saved their life—literally. For example, Singularism's office manager, Brandi Lee (who is also a facilitator), found Singularism at a time when she was seriously contemplating suicide; she was suffering from an eating disorder, had recently lost her father, lost a brother to suicide, and then learned that her then-husband wanted to

10

divorce her. She wanted to "find out who [she was], and who [her] highest self [wa]s." She "wanted to find out and connect with God, and . . . the spirits, and [her] ancestors."

The night before her first voyage, Mr. Jensen (who was facilitating the voyage) told her to meditate and read her patriarchal blessing. During that voyage, she found herself laughing for several hours and thereby rediscovered the funny part of herself that she had pushed to the side during her marriage because her husband was supposed to be the funny one. She summarized her spiritual insight as "There you are, Brandi." In subsequent voyages, she found her father and brother at peace, walked alongside Jesus, and embraced Heavenly Mother and Father. In those encounters, Jesus taught her that true spirituality resides within all of us, and Heavenly Mother and Father assured her that they were with her every step of the way in her life journey. As she described her takeaway from these experiences, "[S]pirituality isn't just in a box, in a . . . religious organization . . . . Spirituality is so broad, and I was able to take away that I am special, and that everyone is special, and that we all just need to love each other. That was the answer from Jesus[—]love, just love."

Other witnesses expressed that Singularism had helped them rediscover a faith that they thought they had lost, possibly forever. For instance, Jenna DenBleyker, a facilitator in training, explained that she found Singularism after she grew increasingly disconnected from God and some of the people closest to her. Try as she did, she could not rekindle her faith. That is, until she experienced a psilocybin ceremony. The entheogen "facilitated [the] renewed spiritual connection [that she] had been seeking for decades." She continued, "I was able to experience God not by traveling through space to where I imagined that He resided, but by having him show up in the very air molecules that surrounded me . . . , always near and available to me."

11

F.      Government Recognition of Singularism's Religious Practices

Two government bodies—the Utah Division of Professional Licensing and Provo City—have already recognized Singularism's religious use of psilocybin. After Mr. Jensen's therapist license had expired, the Division received a complaint that Mr. Jensen was practicing mental-health therapy without a license. Mr. Jensen explained the basics of Singularism and his role in the religion to the Division and asserted that he qualified for the clergy exemption to the licensing requirement. (The clergy exemption allows "a recognized member of the clergy" to provide mental-health therapy, among other kinds of treatment, without a license "while functioning in a ministerial capacity." UTAH CODE ANN. § 58-60-107(2)(b).) The Division's investigator then closed the complaint as unfounded.

Separately, Singularism applied to Provo City for a business license to operate its spiritual center. Religious organizations and non-profit organizations are not required to obtain a license if they conduct their activities wholly for charitable, religious, or non-profit purposes, and the burden rests on the organization claiming the exemption to establish that it is entitled to the exemption. PROVO CITY, UTAH, CITY CODE §§ 6.01.130, .140. Provo City responded to Singularism's application with a letter stating that "churches or religious organizations are not required to obtain a business license to operate . . . for activities directly associated with religious purposes" and closed Singularism's application accordingly.

## II.   Procedural History of This Action

When he founded Singularism and opened the spiritual center in September 2023, Mr. Jensen sent the Provo City Council and Provo City Mayor Michelle Kaufusi a letter "to establish an open line of communication." The letter explained what Singularism is, disclosed its entheogenic religious practices, and invited local government officials to ask any questions they

12

may have had and to tour Singularism's spiritual center. It concluded, "Singularism is optimistic that through partnership and dialogue, it can foster an environment that respects diversity and upholds individual rights."

The government did not take Singularism up on its invitation. Instead, over a year later on November 11, 2024, officials arrived at the spiritual center to execute a search warrant based largely on the affidavit of an undercover officer who had posed as a prospective Singularism facilitator. The officers came by around five pm so as not to disturb any religious ceremonies and proceeded to search the premises for over an hour and a half. Mr. Jensen, maintaining his stance of full transparency, showed the officers the safe where Singularism kept its psilocybin. They seized the psilocybin, psilocybin paraphernalia, sacred scripture, and a small amount of THC that Mr. Jensen kept there for his own use (Mr. Jensen is also affiliated with the Church of the Native Americans, which uses marijuana as a sacrament). During the search, the officers recommended that Singularism cease its religious practices and told Mr. Jensen to expect criminal charges. Two days later, the Provo City Police Department sent a letter to the landlord of Singularism's spiritual center claiming that Singularism was a drug-distributing nuisance, instructing the landlord to evict Singularism as soon as possible, and threatening civil abatement if the landlord did not comply. The landlord responded saying that Singularism has been an "exemplary tenant[]" and requesting that further action be deferred until Singularism's legal status had been finally adjudicated in the courts. In January 2025, at the hearing on the various motions resolved in this order, Defendant Provo City expressed that it did not intend to follow through on the threat of eviction.

Singularism's leaders were deeply dismayed by the government's response to their new religion—first silence, then a criminal investigation. Mr. Jensen, who is himself from Provo, testified that it was extremely difficult "to be accused of being a nuisance to a city [he]

13

love[s], . . . in a country [he] really love[s]" because of "an involuntary spiritual calling." Although the seizure of the psilocybin sacrament was frustrating, he was "much more concerned" when the officers started taking the scripture—"scripture that [he and others] ha[d] written and worked for years on." Ms. Lee described a "feeling of obviously betrayal and fear, . . . fear [for] all of us[,] . . . [fear] of not being able to practice what [she] believe[s] is a way to help better humanity." Unsurprisingly, the government's actions took a toll on Singularism's strength as a religious organization. Singularism could not pay its employees for at least one month, and Mr. Jensen's disclosures to voyagers about Singularism's legal troubles reduced participation overall.

Given these developments, Singularism (along with Psyche Bridging and Healing, the LLC through which Singularism runs its business operations) and Mr. Jensen filed suit in the Utah County Fourth District Court on November 19, 2024, against Utah County, Provo City, and several individuals, seeking, among other things, (1) a declaratory judgment that Defendants' actions violated their right to free exercise under the First Amendment to the U.S. Constitution; right to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution; right to free exercise under article I, section 4 of the Utah constitution; right to be free from unreasonable searches and seizures under article I, section 14 of the Utah constitution; and right to free exercise under the Utah RFRA; and (2) an injunction ordering the government to return the psilocybin, paraphernalia, and sacred scripture, and forbidding the government from interfering with their religious exercise.[2] A few days later, on November 27, Defendants removed the case to this court under 28 U.S.C. §§ 1331, 1441, 1446.

---

[2] Plaintiffs originally sued the following individuals: Jeffrey Gray, the Utah County Attorney; Troy Beebe, the chief of the Provo City Police Department; Brian Wolken, a captain of the Police Department; Jackson Julian, a detective of the Police Department who served as the undercover

On December 13, the court held a full-day evidentiary hearing on Plaintiffs' request for a temporary restraining order and concluded that Plaintiffs were likely to succeed on the merits of their claim that Defendants' actions violated their rights under the Utah RFRA. Under that statute, once a plaintiff shows a substantial burden on sincere religious exercise, the burden shifts to the government to show that the challenged law furthers a compelling state interest using the least restrictive means. UTAH CODE ANN. § 63G-33-201(2), (3). The court found that Plaintiffs were "likely to be able to show a substantial burden on the exercise of their beliefs about ps[i]loc[y]bin, that those beliefs [we]re sincere, and that those beliefs [we]re religious in the way that the law conceptualizes religion." ECF No. 24 ("TRO"), at 2. It also found that "the government ha[d] not shown a compelling interest in prohibiting Singularism from using ps[i]loc[y]bin outright and accordingly ha[d] not carried its burden." *Id.* The court found the other preliminary-relief factors satisfied (irreparable harm and balance of the equities) and therefore issued a temporary restraining order requiring the government to return the seized materials as soon as possible. *Id.* at 3.

Five days later, on December 18, the government filed criminal charges against Mr. Jensen and moved to stay the portion of the temporary restraining order requiring return of the mushrooms. The government argued that it was obligated to retain possession of the mushrooms for the criminal case under Utah's evidence-retention laws. The court, although skeptical of Defendants' argument, granted the motion for a partial stay, reasoning that "the most prudent course" was to err on the side of avoiding premature interference with the pending state

---

officer investigating Singularism; and John Does 1–4, police officers with the Police Department. At the hearing on January 23, 2025, Plaintiffs stated that they did not wish to proceed against any of the individual Defendants except for Jeffrey Gray. *See* ECF No. 83 (First Amended Verified Complaint).

prosecution. ECF No. 56 (Order Granting Motion to Stay and Denying Motion for Expedited Discovery), at 5.

Shortly after the government filed criminal charges against Mr. Jensen, Plaintiffs moved for an anti-suit injunction against the state-court prosecution, and Defendants moved to dismiss Plaintiffs' claims. According to Plaintiffs, the criminal case—initiated after this court had issued a temporary restraining order in Plaintiffs' favor—is the government's effort to relitigate in a more favorable forum the same issues presented in this action; so, they request that this court enjoin further proceedings in the state criminal case until the issues in this civil action have been finally resolved. In Defendants' view, the federal claims in Plaintiffs' complaint fail; accordingly, they request the court to dismiss the federal claims and thereafter decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims and remand them to the state court. This court scheduled a two-day evidentiary hearing in January 2025 to hear additional evidence and argument regarding these two motions and Plaintiffs' then-still-pending motion for preliminary injunction.

Soon after Plaintiffs filed their motion for anti-suit injunction and Defendants filed their motion to dismiss, Defendants moved for expedited discovery, claiming that they needed discovery to prepare for the preliminary-injunction portion of the hearing in January. Although their argument was not in theory unreasonable, the court found their discovery requests offensively overbroad. For example, Defendants sought discovery on "each instance where [Mr.] Jensen consumed drugs prohibited by the Controlled Substances Act between 2015 and the present" and "documents sufficient to identify each individual to whom Plaintiffs have administered psilocybin from 2019 to present." ECF No. 4 (Motion for Expedited Discovery), at 4, 6. That is, Defendants' requests concerned criminal conduct far in the past and effectively demanded Singularism to disclose the identities of all individuals who had affiliated with the religion. In the court's view, "the sheer

16

breadth of the requests strongly suggest[ed] that Defendants' purpose [wa]s to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose." Order Granting Motion to Stay and Denying Motion for Expedited Discovery at 6. Accordingly, the court denied Defendants' motion for expedited discovery.

On January 22, the day before the scheduled two-day hearing, the parties stipulated that they would present only argument, no additional evidence, at the hearing. The court heard argument on the three motions and ordered supplemental briefing. As Defendants noted in their supplemental brief, the Attorney General of Utah was not notified of the constitutional challenges in this action even though he was supposed to be so notified. The court ordered Plaintiffs to notify the Attorney General accordingly, and the court sent him its own certification of the constitutional questions. The court cannot to rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction until the Attorney General has had an opportunity to present evidence or argument on the constitutional questions underlying those motions. In the meantime, the court resolves Plaintiffs' motion for preliminary injunction based on their claim under the Utah RFRA.

## ANALYSIS

Plaintiffs seek a preliminary injunction barring enforcement of the Utah Controlled Substances Act as applied to their psilocybin ceremonies. To succeed on their motion, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the government is the opposing party, the third and fourth factors merge. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). And "[i]n the First Amendment context," or quasi–First Amendment context as here, "the likelihood of success

17

on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (internal quotation marks omitted).

In this order, the court considers only Plaintiffs' Utah RFRA claim because the Attorney General is entitled to respond to their constitutional claims and his deadline for doing so has yet to expire. As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability," unless "the government entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3). The Utah RFRA, like its federal counterpart, is a quasi-constitutional statute, meaning that it protects a fundamental constitutional right (namely, the right to free exercise of religion) and supersedes other conflicting statutes unless those other statutes are explicitly exempted. *See id.* § 63G-33-101(6)(b)(ii)(A) (defining substantial burden to include burdens imposed by "law, statute, ordinary, rule, policy, order, or other assertion of governmental authority"); Bethany Ao, Comment, *Achieving Appropriate Relief for Religious Freedom Violations in Prisons After* Tanzin, 90 U. CHI. L. REV. 1967, 1971 (2023); Douglas Laycock, *The Religious Freedom Restoration Act*, 1993 BYU L. REV. 221, 254. And courts interpreting the federal RFRA have looked to constitutional cases for guidance in applying RFRA, whose compelling-interest test was expressly adopted from constitutional caselaw predating *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693–95

18

(2014). So, both federal RFRA and federal constitutional cases inform the court's analysis here under the Utah RFRA.

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Plaintiffs do not claim that they satisfied this requirement but point to an exception: the notice requirement "does not apply if the government action alleged . . . (i) is ongoing, and complying with [the requirement] will place an undue hardship on the person or increase the harm suffered by the person." *Id.* § 63G-33-201(5)(b).

The court concludes that Plaintiffs' case falls under the exception for ongoing government action. Plaintiffs have established that psilocybin mushrooms are used as a sacrament in Singularism, so each day that Plaintiffs are deprived of their sacrament they suffer harm to their religious exercise. The Utah Controlled Substances Act prohibits Plaintiffs from using psilocybin, and the government still possesses the mushrooms that the officers seized in November. The court recognizes that the reason the government still possesses the mushrooms is that the court granted Defendants' request to keep the mushrooms pending resolution of Plaintiffs' motion for preliminary injunction on the finding that the potential harm to the government of having to return the mushrooms outweighed the harm to Plaintiffs of being deprived of the mushrooms in the

meantime. But that finding does not mean that Plaintiffs do not suffer any harm from the deprivation of their mushrooms. Even if the ongoing-action exception did not apply, however, Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024, and because 60 days have passed since that time, Plaintiffs' Utah RFRA claim is properly before the court.[3]

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate a substantial burden on sincere religious exercise. Based on the evidence in this case, Plaintiffs have established that the government has substantially burdened their sincere religious exercise. Simply put, Plaintiffs offer a sacramental psilocybin tea to their voyagers, who then embark on a spiritual journey by which they write their own scripture. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—substantially burdens the free exercise of Singularism and its adherents. *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants argue that complying with the Utah Controlled Substances Act does not substantially burden Plaintiffs' religious exercise for three reasons apart from the sincerity and character of their beliefs: Singularism values compliance with governmental laws (like the Controlled Substances Act); it does not require the use of psilocybin mushrooms; and it expressly

---

[3] One could potentially argue, though the court would be skeptical of this argument, that if a Utah RFRA plaintiff fails to provide a notice of claim at least 60 days before filing suit and the notice exception does not apply, then the court must dismiss the case entirely once the defendant points out the plaintiff's failure to comply with the notice provision. Even under this argument, however, Plaintiffs' RFRA claim would be properly before the court because Plaintiffs filed an amended complaint (which operates as a new complaint) on February 5, 2025—more than 60 days after they emailed their notice of claim.

defers to medical providers. But these arguments amount to an assertion that Singularism is not what its adherents claim it is—in other words, that the government is best situated to interpret Singularism and its teachings. The government's claimed ability to interpret Singularism and its teachings contrary to the way in which Singularism and its adherents do runs headlong into the long-established principle that "it is not within the judicial function [or] judicial competence to inquire whether the [plaintiff] . . . correctly perceive[s] the commands of [his] . . . faith." *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981). Even if psilocybin were not essential to Singularism's practice, the Utah Controlled Substances Act would still be vulnerable to Plaintiffs' challenge. After all, the Utah RFRA, building on basic First Amendment principles, protects not just practices mandated by the claimant's religion or practices common to all members of that religion but rather any practices motivated by sincere religious belief. UTAH CODE ANN. § 63G-33-101(2); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1991).

Having failed to challenge Plaintiffs' interpretation of their own religion, Defendants then challenge the sincerity and character of Plaintiffs' beliefs. To prevail on their motion for preliminary injunction, Plaintiffs must establish that their beliefs underlying their psilocybin use are sincere and religious. *See Hobby Lobby*, 573 U.S. at 717–18 & n.28. Pretextual beliefs or beliefs rooted in nonreligious considerations do not qualify for protection under RFRA. *See United States v. Christie*, 825 F.3d 1048, 1055–56 (9th Cir. 2016). The sincerity inquiry is important for eliminating sham free-exercise claims, but "it must be handled with a light touch, or judicial shyness." *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012). So, "the inquiry into the sincerity of [the] plaintiff's religious beliefs is almost exclusively a credibility assessment." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) (cleaned up).

As for assessing the character of the beliefs underlying the conduct for which the plaintiff claims an exemption, district courts in the Tenth Circuit consider the following factors, known as the *Meyers* factors after the leading case: (1) *Ultimate ideas*—"Religious beliefs often address fundamental questions about life, purpose, and death." (2) *Metaphysical beliefs*—"Religious beliefs often are 'metaphysical,' that is, they address a reality which transcends the physical and immediately apparent world." (3) *Moral or ethical system*—"Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'" (4) *Comprehensiveness of beliefs*—"Another hallmark of 'religious' ideas is that they are comprehensive[,] . . . provid[ing] the believer with answers to many, if not most, of the problems and concerns that confront humans." (5) *Accoutrements of religion*—The presence of "external signs" like a founder or prophet, important writings, gathering places, keepers of knowledge, ceremonies and rituals, structure or organization, holidays, diet, clothing, and propagation to non-believers "may indicate that a particular set of beliefs is 'religious.'" *United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir. 1996). No one factor is dispositive.[4] *Id.*

Based on all the evidence in the record, the court has no difficulty concluding that Plaintiffs are sincere in their beliefs and that those beliefs are religious in nature. Begin with the government's own recognition that Singularism is a religion. As described earlier, when Mr.

---

[4] Defining what religion is in a way that accommodates the vast diversity of religious beliefs, practices, and traditions across time and space is no small feat, and social scientists have dedicated entire books, if not entire careers, to the question. *See, e.g.*, CHRISTIAN SMITH, RELIGION: WHAT IT IS, HOW IT WORKS, AND WHY IT MATTERS (2017). The caselaw attempts not to answer comprehensively what makes a religion—a question best left to those social scientists—but rather to identify what qualifies an individual or organization for religious protections under the law. So, in saying here that Singularism is a religion, the court is saying simply that the court finds Singularism to be the kind of entity that qualifies for legal religious protections.

Jensen was investigated by the Utah Division of Professional Licensing for practicing mental-health therapy without a license, he explained his belief that as a facilitator at Singularism, he qualified for the exemption for "recognized member[s] of the clergy." UTAH CODE ANN. § 58-60-107(2)(b). The Division agreed with him and closed the complaint as unfounded. And when Singularism applied to Provo City for a business license to operate its spiritual center, the City responded by saying that Singularism did not need a license to conduct its religious activities. Although these statements and actions from the Division and the City do not estop Defendants from challenging Plaintiffs' religious sincerity, they are nonetheless persuasive evidence that Singularism is a legitimate religion and that its adherents are sincere in their practices.

Next, all of Singularism's witnesses connected their practice of Singularism to their faith journeys, expressing that the tea ceremonies had helped them rediscover their religious faith. Mr. Jensen, for example, stated that he founded Singularism after psychedelics helped him experience "an overwhelming sense of unity with the Earth, the stars, and all of creation . . . [,] as if God's love enveloped [him] completely" and thereby "awakened in [him] a renewed faith in God." As he further explored entheogenic spiritual practice, he encountered the OctoGoddess, a spiritual entity, who revealed to him the Octadrant, an epistemological framework for processing truth in its different dimensions. Ms. Lee testified that her voyages, during which she met Jesus and her Heavenly Parents, "opened up a lot of spiritual gifts that [she] didn't quite realize [she] had," such as "communicat[ing] with angels and spirits." And Ms. DenBleyker, for her part, testified that Singularism "helped facilitate [the] renewed spiritual connection [that she] had been seeking for decades" by allowing her to "experience God . . . in the very air molecules that surrounded [her,] . . . always near and available to [her]." These witnesses, whom the court finds very credible, show that Singularism's entheogenic practice is intimately connected with fundamental questions

23

about life and addresses a reality that transcends the physical world. Indeed, as Mr. Jensen explained, "[W]e are profoundly deceived about who we are and what we are, and what our purpose is, about what our desires are, . . . [a]nd the essential role of psilocybin is that for a few moments you can disengage from some of those temporal real deceptions . . . [and] experience she[e]r consciousness without the burden of our bodies."

Moreover, Singularism features several "accoutrements" of religion, as the caselaw calls it. Most simply, it has prophets and a scripture. As Mr. Jensen explained, during a tea ceremony, the voyager is a prophet receiving spiritual insight, and the facilitator serves as a scribe to record those insights; thus, the recordings from every voyage individually and collectively become Singularism's sacred scripture. On top of that, the tea ceremony is a carefully organized and guarded ritual. The voyager must first pass a screening to ensure his sincerity, and during the prep session, he sets an intention for the voyage. Other preparations for the tea ceremony could include something more familiar from larger religions, such as fasting and reading and internalizing one's patriarchal blessing.

Defendants observe that Singularism "does not claim special access to divine truths," instead encouraging its practitioners to more deeply "discover and define their own beliefs," and explicitly states that "no organization, including [it], has all the answers to life's most difficult questions." In Defendants' view, these features weaken Singularism's claim to be a religion because they show that Singularism's beliefs are not comprehensive. *See United States v. Quaintance*, 471 F. Supp. 2d 1153, 1162 (D.N.M. 2006) (holding that a religious belief is comprehensive if it includes "multiple beliefs" and is "uniform" across members). As the court sees it, however, these features less so detract from Singularism's religious nature than they illustrate Singularism's commitment to existential humility. Existential humility means holding

24

cherished beliefs regarding the meaning of life and death loosely enough to revise them with more evidence, data, and experiences—that is, holding profound beliefs alongside a recognition of the limits of our knowledge and our fallibility. *See* Jeffrey D. Green, W. Keith Campbell & Daryl R. Van Tongeren, *Existential Humility: Strong Tests of Intellectual Humility*, 18 J. POSITIVE PSYCHOLOGY 259 (2022); Alberto R. Coll, *"That Vast External Realm": The Limits of Love and Law in International Politics*, *in* AGAPE, JUSTICE, AND LAW: HOW MIGHT CHRISTIAN LOVE SHAPE LAW? 291, 308 (Robert F. Cochran, Jr., & Zachary R. Calo eds., 2017). As Mr. Jensen put it, "I think that people do too much pretending about what [they] know. So I want to very sincerely guide people into what they truly believe and help them find their purest religion . . . ."

To be sure, a commitment to existential humility need not foreclose prescribing certain beliefs to define the boundaries of a religious community. But in the context of the full record here, including the statements and testimony referenced just above, Singularism's expressions of existential humility appear more to be sincere invitations for its members to discover religious truth through its psilocybin ceremonies than a neglect of religious beliefs altogether. Considering that existential humility is important for enabling and supporting the smooth functioning of a pluralistic society like ours, it would be inappropriate to hold Singularism's existential humility against it. *See* David Robson, *Why 'Existential Humility' May Be the Answer to Today's Culture Wars*, NEWSCIENTIST (Nov. 15, 2023), https://www.newscientist.com/article/mg26034652-700-why-existential-humility-may-be-the-answer-to-todays-culture-wars; David French, *Pope Francis is Turning Certainty on Its Head*, N.Y. TIMES (Sept. 19, 2024), https://www.nytimes.com/2024/09/19/opinion/pope-francis-god-election.html.

Defendants also observe that Singularism does not offer a moral or ethical system for its adherents. On this point, the court agrees—Singularism's ethical teaching appears to be simply

that its members should love others because love is "humanity's ultimate purpose in life." *See Quaintance*, 471 F. Supp. 2d at 1161 ("A simple phrase may sum up a morality, but the phrase alone cannot be the extent of the morality."). The court's agreement with Defendants on this point is not to suggest that love is anything less than a noble ethical lodestar; indeed, the world could always use more love. Rather, all it means is that Singularism lacks the kind of systematized concepts of right and wrong behavior that the *Meyers* factor refers to. But the absence of a moral or ethical system does not mean that Singularism is not a religion because this factor is simply one of several non-dispositive factors. *Meyers*, 95 F.3d at 1484.

Finally, Defendants point to several other pieces of evidence that in their view undermine Singularism's claim to be a religion entitled to protection under the law: Singularism's citations to scientific and medical research on the therapeutic potential of psilocybin; Mr. Jensen's testimony that he sought a safer way of using psychedelic drugs after observing unethical behaviors within the underground psychedelic community; Mr. Jensen's testimony that he has been using psychedelic drugs for several years now (i.e., that his drug use predates Singularism's founding); and Singularism's financial interest in administering psilocybin. Although some of this evidence may raise eyebrows at first glance, on closer examination the court is not convinced that it detracts from Singularism's claim of religious sincerity.

Singularism's citations to scientific and medical research on psilocybin hardly undermine its claims. An overlap between scientific and religious reasons for a practice "cannot render th[ose] actions . . . any less religious." *University of Great Falls v. NLRB*, 278 F.3d 1335, 1346 (D.C. Cir. 2002). Indeed, many religious practices in more common religions, such as gathering in community for music, prayer, and fellowship, can be justified by a litany of nonreligious reasons and scientific research. *See, e.g.*, Sandra Feder, *Religious Faith Can Lead to Positive Mental*

26

*Benefits, Writes Stanford Anthropologist*, STANFORDREPORT (Nov. 13, 2020), https://news.stanford.edu/stories/2020/11/deep-faith-beneficial-health (describing recent anthropology research finding that "religious involvement . . . is better for [the] body in terms of immune functions and reducing loneliness"). Those nonreligious justifications do not make the practice of communal worship any less religious, and the same goes for Singularism's practice of psilocybin tea ceremonies.

Mr. Jensen's testimony about his past use of psychedelic drugs and desire to find safer ways of using them may at first support the inference that he conveniently founded Singularism as a religion to bypass the law and engage in otherwise-illegal drug use. However, the evidence as a whole weighs against this inference. For example, he testified at great length about his spiritual revelations from his voyages and his conviction that psilocybin is nearly essential for ordinary people to be able to access spiritual experiences and wisdom. He further testified that he engages in only about four voyages a year, and a typical package for a new voyager consists of two to four voyages. This evidence cuts against a finding that Mr. Jensen's beliefs about psilocybin are insincere or that Singularism is no more than a drug-distribution operation masquerading as religion. *Compare with United States v. Meyers*, 906 F. Supp. 1494, 1504 (D. Wyo. 1995) (claimant seeking religious exemption for marijuana explained that his religion "[wa]s to grow, possess, and distribute marijuana" and that he "smoke[d] between 10 and 12 joints per day").

As for Singularism's financial motivation, it admittedly looks suspicious at first that Singularism charges about $1,600 per tea ceremony (so given that two to four ceremonies is a standard package, members pay anywhere from $3,200 to $6,400 for participation). This fact looks even more problematic for Singularism's claims considering Mr. Jensen's testimony that the marginal cost of the psilocybin used in each voyage ranges from $50 to $150 depending on the

dose. Once again, however, the full context strongly suggests that Singularism is driven by religious rather than purely financial considerations. Mr. Jensen testified that he was making over $120,000 a year as a licensed mental-health practitioner before founding Singularism; now, he makes considerably less—$3,400 per month, or $40,800 per year. (Defendants did not introduce any evidence to challenge his testimony on this point.) He also testified that he was asked by the OctoGoddess to found Singularism to make transformative spiritual experiences more accessible. If Mr. Jensen were actually motivated by the promise of large profits, he would not have given up a stable six-figure salary to found Singularism and receive a monthly payment that barely puts him past the poverty line.[5]

But even if Mr. Jensen made more money at Singularism than he previously did as a therapist, or even if the evidence suggested that Singularism made considerable profits on facilitating psilocybin voyages, the court's finding would not change. To begin, for-profit businesses can claim religious-liberty protections because "[b]usiness practices [may be] compelled or limited by the tenets of a religious doctrine." *Hobby Lobby*, 573 U.S. at 710. So, a religious claimant's for-profit status—or by extension evidence that the claimant makes large sums of money from its religious activities—does not necessarily mean that its free-exercise claims are disingenuous. Religious protections, after all, are not only for the destitute. *See* Lukas Hund, *The Finances Behind Vatican City*, MICH. J. ECON. (May 24, 2022), https://sites.lsa.umich.edu/

---

[5] Mr. Jensen is divorced with four children. The federal poverty line for a family of five in 2025 is $37,650. *See* Office of the Assistant Sec'y for Planning and Eval., *Poverty Guidelines*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines (2025). Although he is now in a relationship with Ms. Lee, who works 20 to 30 hours earning $40 an hour at Singularism, Ms. Lee also has four children of her own. In any event, based on the evidence presented, the court finds that Mr. Jensen gave up a significantly more remunerative career to follow his religious calling to found Singularism.

mje/2022/05/24/the-finances-behind-vatican-city ("[T]he Roman Catholic Church[, which certainly qualifies for religious protections, is] one of the largest and wealthiest organizations in the world."). Moreover, prominent religions like the Church of Jesus Christ of Latter-day Saints, which no one would doubt qualifies for religious-liberty protections under the law, require payment of tithes for good-standing membership. *See* Peggy Fletcher Stack, *Does Tithing Requirement for Entry into LDS Temples Amount to Mormons Buying Their Way into Heaven?*, SALT LAKE TRIB. (Mar. 26, 2018), https://www.sltrib.com/religion/2018/03/26/does-tithing-requirement-for-entry-into-lds-temples-amount-to-mormons-buying-their-way-into-heaven ("[T]o gain access to the sacred spaces and saving rituals of a Mormon temple, LDS believers must donate 10 percent of their income to the church."). Singularism's payment expectation for its tea ceremonies is analogous and similarly does not negate its free-exercise claims.[6]

From all the evidence in the record, the court is hard-pressed to find, as Defendants urge, that Singularism is essentially a drug-dealing business cloaked in a minister's robe. To the contrary, the court is convinced that Singularism is a legitimate religion and that Plaintiffs are sincere practitioners of it. This is not a case where a group of people claim a religious right to do little more than use and distribute large quantities of drugs. *Compare with, e.g.*, *Quaintance*, 471 F. Supp. 2d at 1172 (officers seized enough marijuana for 229,000 joints, suggesting an illegal commercial rather than legitimate religious purpose); *Meyers*, 906 F. Supp. 2d at 1504 (marijuana church's "only ceremony revolve[d] around one act: the smoking and passing of joints"). By establishing the sincerity of their religious beliefs, Plaintiffs have fulfilled their responsibility of

---

[6] The court also heard evidence that Singularism has on occasion given discounts or performed ceremonies for free.

establishing a prima facie case under the Utah RFRA, shifting the burden to the government to demonstrate that the Utah Controlled Substances Act accomplishes a compelling state interest using the least restrictive means.

Defendants initially argue that the psilocybin ban serves the government's interests in preventing abuse, preventing possible harms from drug use such as suicidal ideation, and protecting the public from illicit drug trafficking. The court does not doubt that these interests are compelling in the abstract, but the government must go beyond "broadly formulated interests" like these to satisfy its burden. *Fulton*, 593 U.S. at 541 (quoting *O Centro*, 546 U.S. at 431). That is, "[t]he question . . . is not whether the [government] has a compelling interest in enforcing its [psilocybin laws] generally, but whether it has such an interest in denying an exception to [Plaintiffs]." *Id.* On this front, Defendants have cited studies showing that psilocybin is one of the most commonly used hallucinogens, that psilocybin trafficking is closely linked with trafficking for other drugs like fentanyl and marijuana, and that psilocybin mushrooms may be tainted and therefore cause harm to even sincere users. They also claim that the single search of Singularism's spiritual center in November yielded about 150 doses of psilocybin, a quantity that in their view is suspicious because it represents about half of all doses Singularism has administered in its 15-plus-month history.[7]

---

[7] Defendants base their calculations on the testimony of Plaintiffs' witnesses at the December 13 hearing. According to Mr. Jensen, about 100 voyagers have participated in a psilocybin ceremony through Singularism, each voyager participates in 2 to 4 ceremonies total, and the dose for each ceremony is anywhere between 2 and 3.5 grams of psilocybin mushrooms. Assuming that 100 voyagers have participated in 3 voyages each using 3 grams of psilocybin for each voyage, Singularism has administered 900 grams of psilocybin mushrooms total.

The parties disagree about the quantity of psilocybin mushrooms seized in November. According to Defendants, the single search in November yielded over 450 grams of mushrooms and mushroom-like material—half, if not more than half, of the total that Singularism has presumably

On the one hand, the evidence suggests that Plaintiffs ensure a high level of safety for Singularism's voyagers and the surrounding community. The mushrooms are tested at the lab in Oregon for contaminants before being freeze dried for transportation to Singularism's spiritual center, only facilitators have access to the mushrooms (which are never used other than in the sacramental tea ceremonies), and every voyager must undergo a careful screening process with two or more facilitators, at least one of whom has a background in medicine or clinical therapy. And when a voyager has a rare adverse reaction to the psilocybin (as has happened once in Singularism's history), Singularism and Mr. Jensen follow the safety protocol, which includes calling the voyager's emergency contacts, remaining at the facility in case the voyager returns, and getting the voyager treatment in the hospital if necessary.[8]

On the other hand, Singularism itself does not seem to have a rigorous method to test for contamination, and diversion to non-affiliates in theory could be occurring based on the quantity of psilocybin Singularism appears to keep on hand. That said, the government has not shown evidence of actual contamination or actual diversion in Plaintiffs' case. To be sure, the government can establish a compelling interest in denying Plaintiffs an exemption even without proof of actual diversion by pointing to evidence suggesting a real risk of diversion. *Christie*, 825 F.3d at 1057–

---

administered over 15 months. Plaintiffs speculate that the actual amount was closer to one-third of this amount, but because the mushrooms have been in the government's custody, Plaintiffs have not been able to ascertain the quantity. The court finds Defendants credible on this point and therefore takes 450 grams to be the quantity of mushrooms seized in November.

[8] As noted above, one voyager showed signs of paranoia and mistrust during a voyage, and Singularism coordinated her care with her emergency contacts and supported her receiving treatment in the hospital. The next day, she expressed gratitude to Singularism for ensuring her safety throughout her episode. The court finds that at no point during that episode did the voyager threaten her own or anyone else's physical safety.

58 (upholding a finding that the plaintiffs' assumedly religious use of cannabis created a real risk of diversion in part because of "lax enforcement of [their] distribution protocols"). But the evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin more likely than not creates a meaningful risk of compromising the government's compelling interests. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1262 (D.N.M. 2002) (holding that the government had failed to show a compelling interest when the evidence as to the health risks of plaintiffs' sacramental use of hoasca was "in equipoise").

Even if the evidence supported a finding that the government had a compelling interest in denying Plaintiffs an exemption, the government must still show that its approach is the least restrictive means of accomplishing that interest. On this front too, the court concludes that the government has not met its burden. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the [plaintiff's] exercise of religion . . . ." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Although the government need not "refute every conceivable option in order to satisfy the least restrictive means prong," it must "refute the alternative schemes offered by the challenger . . . through the evidence presented in the record." *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011). And it must "explain why obvious and available alternatives are not workable . . . , especially those that have been proven to work in analogous circumstances." *Singh v. Berger*, 56 F.4th 88, 104 (D.C. Cir. 2022); *see also Hobby Lobby*, 573 U.S. at 692 (noting that the government had already devised a less restrictive scheme for religious nonprofits and putting the burden on the government to explain why a similar scheme could not work for religious for-profit corporations).

32

Defendants argue that the burden rests on Plaintiffs to suggest alternative schemes. Although a religious plaintiff may sometimes be required to suggest an alternative regulation that lessens the burden on his religious exercise while still accomplishing the government's compelling interest, the burden of satisfying the least-restrictive-means prong ultimately rests on the government, which "must at a minimum explain why . . . [it] reject[s a] readily at hand alternative[]." *Singh*, 56 F.4th at 104. Here, the most obvious alternative at hand is for the government to simply do nothing. After all, the government waited over a year after Singularism opened its spiritual center—at which time Mr. Jensen had fully disclosed Singularism's practices—to perform its criminal investigation. Defendants have pointed to zero evidence that this do-nothing period threatened its interests in public safety.[9]

But assuming that some form of regulation is necessary for the government to protect the public, an alternative is readily at hand in the Utah Controlled Substances Act itself. Two alternatives, in truth. First, the Act creates an exemption for psylocibin administered as part of behavioral health treatment programs developed by certain healthcare systems and imposes relatively few restrictions on how covered healthcare systems may use psilocybin.[10] UTAH CODE ANN. § 58-37-3.5. The main restrictions are that the drug must be in phase 3 testing by the U.S.

---

[9] Plaintiffs have also submitted evidence that the Divine Assembly, a far larger self-described magic-mushroom church based in Salt Lake County with a possible presence in Utah County, has never been investigated or threatened, despite that the Divine Assembly even sells home-growing mushroom kits and membership cards. *See Are You Ready to Grow Mushrooms?*, THE DIVINE ASSEMBLY, https://www.thedivineassembly.org/grow-kits.

[10] The exemption applies to private, non-profit healthcare systems that operate at least 15 hospitals in the state and healthcare systems affiliated with public institutions of higher education. It thus appears that the exemption is essentially private legislation for Intermountain Healthcare (the only private healthcare system operating at least 15 hospitals in the state) and University of Utah Health Care (the only healthcare system affiliated with a public institution of higher education in the state).

Food and Drug Administration, that it must be used under the supervision of a "licensed" provider, and that it may not be used by minors. *Id.* § 58-37-3.5(1), (3). Other than that, it appears that healthcare systems have wide discretion to determine how to administer psilocybin. Defendants do not attempt to explain why the government could not implement an analogous system of oversight for Singularism's sincere religious practices. The evidence in the record suggests it would not be particularly difficult to do so. Singularism already does not administer the drug to minors, and the Utah Department of Commerce Division of Professional Licensing recently determined that Mr. Jensen qualifies for a clergy exemption to the licensing requirement for mental-health practitioners. It also likely would not be difficult for Plaintiffs to ensure that their psilocybin is of the same variety allowed by the behavioral-treatment exemption.

Second, the Act creates a religious exemption for peyote. That exemption provides, "Civil or criminal liability may not be imposed under this section on any Indian . . . who uses, possesses, or transports peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion . . . ." UTAH CODE ANN. § 58-37-8(12)(a). The Act requires no more of the claimant than that the claimant use (or possess or transport) the peyote for sincere religious purposes connected with a Native American religion, and the exemption provides the claimant an affirmative defense (established by a preponderance of the evidence) in a prosecution alleging a violation of the Act regarding peyote. *Id.* § 58-37-8(12)(b). Peyote, like psilocybin, is a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(V), (Y). Defendants do not attempt to explain why the government could not create a similar exemption for sincere religious use of psilocybin. Defendants thus have not satisfied the least-restrictive-means component of strict scrutiny, so Plaintiffs have shown a likelihood of success on the merits of their statutory free-exercise claim.

34

Although the likelihood of success on the merits often controls the outcome in a case like this one where the motion for preliminary injunction is based on a quasi–First Amendment claim, the court must still consider irreparable harm and the public interest. Plaintiffs have satisfied the court that they will be irreparably harmed absent preliminary relief. Defendants' enforcement of the Utah Controlled Substances Act against Plaintiffs and Defendants' continued possession of the psilocybin mushrooms seized in November deprive Plaintiffs of their religious sacrament. And Plaintiffs have introduced evidence that Singularism is losing adherents because of Defendants' actions. No amount of damages later can compensate Plaintiffs for these injuries. As to the public interest, it "favors [P]laintiffs' assertion of their [quasi–]First Amendment rights," particularly because Defendants have not shown that Plaintiffs' actions have threatened public safety. *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997).

"[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. The government has not done so here, and the court accordingly grants Plaintiffs' motion for a preliminary injunction. Defendants are ordered to return the psilocybin mushrooms seized in November along with any other items seized and not yet returned. Moving forward, Defendants are also ordered not to interfere with Plaintiffs' sincere religious use of psilocybin until this litigation is complete. That means Defendants may not treat Plaintiffs' sincere religious use of psilocybin from the date of this order as unlawful under the Utah Controlled Substances Act. Note that this injunction does not prevent the government from

continuing to prosecute Mr. Jensen in the pending state criminal case.[11] Indeed, the court lacks authority at this point to enjoin or interfere with any proceedings in state court.[12]

---

[11] In their motion to stay a portion of the court's temporary restraining order, Defendants argued that requiring immediate return of the mushrooms would jeopardize the state prosecution and force the government to violate evidence-retention laws. Out of an abundance of caution, the court granted Defendants' motion for a partial stay, although the court expressed skepticism about these arguments. Now, having had the opportunity to consider these arguments in greater depth, the court finds them unconvincing and deems it appropriate to require the government to return the mushrooms.

As for the first contention, requiring return of the mushrooms will not stymie the state criminal case because that case turns entirely on the purely legal question of whether Mr. Jensen is entitled to a religious exemption under the Utah RFRA. After all, Mr. Jensen admitted in open court during the December 13 hearing that he possessed, used, and administered psilocybin. The government may use his testimony to establish the elements of a Controlled Substances Act violation should Mr. Jensen put the government to its proof; the government will not need the physical mushrooms.

Regarding the second contention, it is true that the government is ordinarily required to "retain evidence of a felony offense" while a criminal case is pending (and Mr. Jensen's prima facie violation of the Controlled Substances Act is a felony offense). UTAH CODE ANN. § 77-11c-301(1). But the claimant of the property "may file a petition . . . for the return of the property that is being retained as evidence" in "the court in which criminal proceedings have commenced" or in "the district court with [proper] venue . . . if there are no pending criminal proceedings." *Id.* § 77-11a-305(1)(a), (b). If the claimant establishes "by clear and convincing evidence" that he "may lawfully possess the property," then "the court may order that the property [be] . . . returned to the claimant." *Id.* § 77-11a-305(2)(b)(i), (3)(b).

When Plaintiffs first filed for a temporary restraining order and preliminary injunction requiring return of the mushrooms, no criminal proceedings were pending. Plaintiffs filed their complaint in the Utah County Fourth District Court, the same court where the criminal proceedings against Mr. Jensen are now pending. Before that court could assess Plaintiffs' claim for return of the mushrooms, Defendants removed the action to this court. Given the factual findings and legal analysis above, this court finds by clear and convincing evidence that Plaintiffs have established that they may lawfully possess the mushrooms. Utah law requires then that "the agency with custody of the [mushrooms] . . . return [them] to [Plaintiffs] as expeditiously as possible." *Id.* § 77-11a-305(4).

[12] The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from granting injunctions to stay proceedings in a state court except in three limited circumstances. One of these is when an Act of Congress has "expressly authorized" the federal court to grant the injunction, *id.* Section 1983, under which Plaintiffs have brought their constitutional claims, "is an Act of Congress that falls within the 'expressly authorized' exception." *Mitchum v. Foster*, 407 U.S. 225, 243 (1972). But enjoining the state-court prosecution under § 1983 would require the court to evaluate

*      *      *

"Religious liberty is one of America's great contributions to the world." Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 Univ. Ill. L.R. 839, 840. But a commitment to religious liberty in the abstract does not dictate one way or another whether a religious group like Singularism should receive an exemption from a State's controlled-substances law. Abstract commitments must be instantiated through concrete legal regimes, and different societies claiming fealty to the same abstract religious-liberty principle may choose different legal regimes. Whatever legal regime a society chooses, however, it must apply its protections equally to unpopular or unfamiliar religious groups as to popular or familiar ones if that commitment to religious liberty is to mean anything. As sang Jonas Gwangwa, a South African jazz musician who was exiled by the apartheid government, "Freedom for some is freedom for none." Indeed, the very founding of the State of Utah reflects the lived experience of that truth by members of the Church of Jesus Christ of Latter-day Saints. Perhaps it is ironic then that not long after enacting its RFRA to provide special protections for religious exercise, the State of Utah should so vigorously deploy its resources, particularly the coercive power of its criminal-justice system, to harass and shut down a new religion it finds offensive practically without any evidence that that religion's practices have imposed any harms on its own practitioners or anyone else.

---

Plaintiffs' constitutional claims, which the court may not do until the Attorney General of Utah has had an opportunity to present evidence or argument on those claims.

## CONCLUSION AND ORDER

The court **ORDERS** Defendants to return any items seized from Singularism's spiritual center not yet returned as soon as possible but no later than 14 days from the date of this order. The court also **ORDERS** Defendants to not interfere with Plaintiffs' sincere religious use of psilocybin from the date of this order until this litigation is complete.

Signed February 20, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge