IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, <br><br>     Plaintiffs, <br><br> v. <br><br> UTAH COUNTY, PROVO CITY, and JEFFREY GRAY, <br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR ANTI-SUIT INJUNCTION** <br><br><br> Case No. 2:24-cv-00887-JNP-CMR <br><br> District Judge Jill N. Parrish |

In February, the court issued an order granting Plaintiffs' motion for preliminary injunction under the Utah Religious Freedom Restoration Act ("RFRA"). ECF No. 92; *Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812 (D. Utah Feb. 20, 2025). That left Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction. The court could not rule on these motions at that time because they required resolving Plaintiffs' constitutional claims, which the court could not consider until the Attorney General of Utah had had an adequate opportunity to weigh in with evidence or argument on Plaintiffs' constitutional challenges. The court sent notice to the Attorney General of Plaintiffs' constitutional claims and gave him until April 11 to present evidence or argument. On April 11, the Attorney General notified the court that he joined in and adopted the arguments made in Defendants' briefing on their motion to dismiss. Before the court issued a decision resolving the two pending motions, the parties requested a 60-day stay because they were engaged in settlement discussions. The stay has now expired, the court has not received notice of settlement, and the remaining two motions are ready for resolution. For the reasons

below, the court DENIES Defendants' motion to dismiss and GRANTS Plaintiffs' motion for anti-suit injunction.

## ANALYSIS

The court's previous order thoroughly laid out the factual and procedural background of this case. *Jensen*, 2025 WL 582812, at *2–8. Nothing noteworthy has occurred since. The court assumes familiarity with this background and proceeds directly to the legal analysis.

### I.    Defendants' Motion to Dismiss

When considering a motion to dismiss, the court must "accept all well-pled allegations in the complaint as true and view them in the light most favorable to the nonmoving party." *Davis-Warren Auctioneers, J.V. v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000). The court should not grant the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.* (internal quotation marks omitted).

Defendants move to dismiss all claims in Plaintiffs' complaint. The court first addresses the claims under the Federal Constitution, then the claims under the Utah constitution, and finally the claims under the Utah RFRA.

#### A.    Federal Constitution First Amendment Claim

The Free Exercise Clause of the First Amendment to the U.S. Constitution, incorporated against the States through the Fourteenth, forbids the States from making any law "prohibiting the free exercise [of religion]." U.S. CONST. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (incorporating the Clause against the States). Under the so-called *Smith* rule after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522,

533 (2021). A law fails to be "neutral" when it "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. And a law fails to be "generally applicable" when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. If a law burdens sincere religious exercise and is either not neutral or not generally applicable, it is subject to strict scrutiny.[1] *Id.* at 533.

---

[1] Courts debate whether the Free Exercise Clause protects only against "substantial" burdens on religious exercise (as opposed to simply burdens, whatever the degree). Before *Employment Division v. Smith*, 494 U.S. 872 (1990), free-exercise claims were often analyzed under *Sherbert v. Verner*, 374 U.S. 398 (1963). *Smith* summarized the *Sherbert* test as follows: "governmental actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883 (emphasis added). In rejecting the *Sherbert* test, the *Smith* Court stated, "It is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field." *Smith*, 494 U.S. at 886–87.

Some judges have read this language from *Smith* to suggest that courts may not constitutionally require that litigants demonstrate a substantial burden on free exercise before claiming protection under the Free Exercise Clause. *See, e.g.*, *Wiggins v. Griffin*, 86 F.4th 987, 1000 (2d Cir. 2023) (Menashi, J., concurring) ("The substantial burden test . . . is constitutionally offensive. It conflicts with the reasoning . . . in *Smith*."). Some circuits do not require litigants to show a substantial burden; others still do. *Compare Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) ("There is no support for th[e] assertion [that the plaintiff must show a substantial burden]."), *with Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.").

Although it has not squarely addressed the issue, the Tenth Circuit appears not to require that a burden on religious exercise be substantial to trigger First Amendment protections. *See Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021) ("The Supreme Court's free exercise cases primarily address *laws that burden religious exercise*." (emphasis added)). And recent Supreme Court cases have relied on the sincerity of the plaintiff's claim, not substantiality of the burden. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).

In line with recent circuit and Supreme Court decisions, this court declines to require Plaintiffs to show a substantial burden for their federal constitutional claims. However, the analysis would

When a law is subject to strict scrutiny, the government must show that the law "advances interests of the highest order" (i.e., that it advances compelling interests) and "is narrowly tailored to achieve those interests" (i.e., that it is the least restrictive means of achieving those interests). *Id.* at 541. The government may not couch its compelling interests in broad terms, such as promoting the public safety or ensuring equal treatment of protected groups; rather, it must articulate the "harm of granting specific exemptions to particular religious claimants." *Id.*

Plaintiffs' allegations, if proven, would establish that the government has burdened their sincere religious exercise. Plaintiffs allege, for example, that they "administer[] . . . ceremonial and sacramental psilocybin to [their] voyagers [i.e., spiritual followers]" during their ceremonies and that the Utah Controlled Substances Act categorically prohibits this conduct. ECF No. 2-2 (Complaint), at 9. Being deprived of a sacrament undoubtedly constitutes a burden on religious exercise. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), *vacated on other grounds*, 443 F. App'x 302 (9th Cir. 2011).

The more difficult question is the appropriate level of scrutiny. Defendants argue that the Act is neutral and generally applicable and that it therefore triggers only rational-basis review (which, the court agrees, it would undoubtedly pass). As they see it, the broad prohibition on possession or distribution of psilocybin does not target religion, either in its history or in its text, and any secular exceptions for psilocybin apply regardless of religious beliefs or affiliations. On the other hand, Plaintiffs argue that the law is not generally applicable, and therefore triggers strict scrutiny, because it allows certain healthcare systems to administer psilocybin in specific

—————————————

proceed no differently even under the alternative formulation because the court finds the burden of Defendants' actions on Plaintiffs' religious exercise to be substantial. *See infra* Section I.E.

nonreligious situations—that is, it provides exemptions for secular use but not for religious use. Although the issue is close, the court agrees with Plaintiffs.

The Utah Controlled Substances Act generally makes it unlawful to knowingly and intentionally possess, use, or dispense a controlled substance. UTAH CODE ANN. § 58-37-8(1)(a)(i), (2)(a)(i). Psilocybin is listed as a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(Y). A separate provision of the Act creates an exception for "[d]rugs [used] for behavioral health treatment." *Id.* § 58-37-3.5. This provision allows certain healthcare systems to "develop a behavioral health treatment program that includes a treatment based on a drug that the healthcare system determines is supported by a broad collection of scientific and medical research." *Id.* § 58-37-3.5(2). And it defines "drug" to include "any form of psilocybin . . . that is in federal Food and Drug Administration Phase 3 testing for an investigational drug." *Id.* § 58-37-3.5(1)(a). As long as the healthcare system "ensure[s] that [the psilocybin] . . . is used by a patient [who is at least 18 years old] only under the direct supervision and control of the healthcare system and [its licensed] providers," it may distribute, possess, and administer the drug without penalty. *Id.* § 58-37-3.5(3), (5). But the Act creates no exceptions for sincere religious use of psilocybin.

Plaintiffs do not argue, and the court sees no reason to doubt, that the Act is neutral: nothing in its text or history suggests that it was enacted to target any particular religious practice. Nevertheless, the law creates an exemption for secular psilocybin use without also creating an exemption for religious psilocybin use. Whether the secular exemption causes the law to no longer be generally applicable turns on the extent to which the secular use and Plaintiffs' sincere religious use undermine the government's stated interests. If the secular use undermines the stated interests to the same or greater degree than Plaintiffs' religious use does, then the law is not generally applicable. *See Fulton*, 593 U.S. at 534.

5

The governmental interest behind the Act, at least according to Defendants, is preventing harm from and abuse of substances that are dangerous or addictive. A religious exemption for Plaintiffs risks undermining these interests, they claim: the psilocybin used for a voyage may be tainted, a facilitator may fail to recognize a contraindicating drug, or a recreational user may pose as a religious practitioner to obtain psilocybin for illegal, nonreligious purposes. But these same risks inhere in the secular exemption, too, especially since the medical exemption imposes no sourcing, testing, or chain-of-custody requirements for the psilocybin administered by healthcare systems. For example, a hospital may source its psilocybin from a disreputable source or accidentally administer psilocybin while the patient is on a contraindicating drug. Or a recreational-user patient may feign certain symptoms to be put on a treatment plan involving psilocybin. A religious exemption for Plaintiffs would not necessarily undermine the government's interest any more than the secular exemption does. And Defendants have provided no evidence so far that Plaintiffs' psilocybin use in practice undermines the government's interest. *See Jensen*, 2025 WL 582812, at *14 ("[T]he evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin . . . creates a meaningful risk of compromising the government's . . . interests [in preventing abuse, possible harms from drug use, and drug trafficking]."). Therefore, the Act is not generally applicable.

Defendants resist this conclusion, observing that the medical psilocybin exemption does not differentiate based on religion because it applies to all licensed healthcare providers regardless of their religious beliefs or affiliations. Their observation, although correct, misses the point. The Free Exercise Clause is concerned not just with evenhandedness among religions but also evenhandedness between religion and nonreligion. *McCreary County v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005) (internal quotation marks omitted). A specific, secular exemption for

6

psilocybin without an accompanying religious exemption indicates that the law is not evenhanded as between religion and nonreligion because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. In doctrinal terms, this feature means that the law is not generally applicable.

Defendants also argue that the Utah Controlled Substances Act with its medical exemption for psilocybin mirrors the law at issue in *Smith* and its medical exemption; since *Smith* found that law to be neutral and generally applicable and upheld it on rational-basis review, Defendants urge the court to do the same here. In the court's view, the medical exemption in *Smith* is distinguishable from the medical exemption for psilocybin here because the medical exemption here is specifically directed at psilocybin—indicating a legislative judgment that the restriction on psilocybin can admit of certain exemptions—whereas the medical exemption in *Smith* was merely a general medical exemption.

The plaintiffs in *Smith* sought a religious exemption for peyote, a controlled substance. The Oregon law at issue in *Smith* prohibited the knowing or intentional possession of a controlled substance "unless the substance ha[d] been prescribed by a medical practitioner." *Smith*, 494 U.S. at 874. That state law created a general medical exemption so that controlled substances with legitimate medical uses would not be subject to the law's restrictions; the exemption was not directed toward any particular substance. Accordingly, the law did not by its text create a secular exemption for peyote, the specific drug that the plaintiffs sought to use in their religious practice; the letter of the law prohibited all uses of peyote, secular and religious alike. (It does not appear that peyote was used for medical purposes under the exception.)

The medical exemption Plaintiffs rely on here, by contrast, explicitly creates a secular exemption for psilocybin administered in the context of certain behavioral-health treatment programs. That means that the Utah legislature, unlike the Oregon legislature at the time of *Smith*, specifically considered the risks, harms, and benefits of the drug at issue and decided to legalize certain secular uses of it. And as explained above, the risks and harms resulting from the legal secular use of psilocybin are comparable to the risks and harms that would result from Plaintiffs' religious use of psilocybin. So, under the Free Exercise Clause, the State may not provide the secular exemption without also providing a comparable religious exemption. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (explaining that the government may not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Since the law fails to provide a comparable religious exemption, it triggers strict-scrutiny review.

On strict scrutiny, the government bears the burden of showing that the law accomplishes a compelling interest using the least restrictive means. Whether the government can meet this burden depends on the strength of its evidence, an issue typically ill-suited for resolution on a motion to dismiss. Because Plaintiffs' allegations support a prima facie case under the First Amendment, the court denies Defendants' motion to dismiss the First Amendment claim.[2]

---

[2] As it happens, the court has already held an evidentiary hearing in this case and determined that the government is unlikely to meet its burden on strict scrutiny. *See Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812, at *13–16 (D. Utah Feb. 20, 2025). Although the basis for the court's decision was the Utah RFRA, the strict-scrutiny analysis is identical under the Utah RFRA and the First Amendment. *See* UTAH CODE ANN. § 63G-33-201(3); *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

B.     Federal Constitution Fourth Amendment Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. amend. IV. Plaintiffs' complaint alleges that the officers executing the search warrant on Singularism's spiritual center lacked probable cause to do so because they should have known that Singularism was entitled to a religious exemption for psilocybin. As remedy, Plaintiffs seek damages from Utah County Attorney Jeffrey Gray personally and from the municipalities (Provo City and Utah County). Defendants provide no basis for dismissing these claims.[3] Accordingly, the court denies the motion to dismiss the Fourth Amendment claims.

C.     Utah Constitution Free Exercise Claim

The Utah constitution contains a clause protecting the free exercise of religion similar to that in the Federal Constitution: "The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." UTAH CONST. art. I, § 4. This clause, however, has never been authoritatively interpreted, at least not in the context of a claim for a religious exemption from a criminal law, so it remains unclear how far its protections extend. *See State v. Holm*, 137 P.3d 726, 738 (Utah 2006) ("[O]ur state constitution may well provide greater protection for the free exercise of religion in some respects than the federal constitution . . . ."); *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998) ("We have never determined whether the free

---

[3] Plaintiffs originally sued the individual officers executing the search warrant as well, and Defendants invoked absolute immunity for public officers but provided no basis for dismissing the claims against Mr. Gray or the municipalities. Plaintiffs subsequently removed the individual officers as Defendants.

9

exercise clause . . . of the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution.").

Given the "novel [and] complex issue" that Plaintiffs' state-constitution free-exercise claim raises, Defendants urge the court to decline to exercise supplemental jurisdiction over this claim and remand it to state court. 28 U.S.C. § 1367(c). When considering whether to decline to exercise supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), *superseded on other grounds by* 28 U.S.C. § 1447(c) (1988). "When the balance of these factors indicates that a case properly belongs in state court . . . , the federal court should decline the exercise of jurisdiction . . . ." *Id.* Although Plaintiffs' state free-exercise-clause claim raises novel and complex issues, the court finds that the balance of the factors weighs toward exercising supplemental jurisdiction. That claim "[is] largely identical" to and "require[s] the same evidence" as Plaintiffs' First Amendment claim (which as explained above survives Defendants' motion to dismiss), and Plaintiffs would ordinarily be expected to try both claims in a single proceeding. *Mabey v. Ray*, No. 4:18-cv-00061, 2019 WL 962183, at * 3 (D. Utah Feb. 4, 2019). "Severing and remanding the state law claims would require the parties to litigate nearly identical matters, based on the same operative facts . . . , in two separate forums . . . [,] expend[ing] unnecessary judicial resources." *Id.* The court therefore rejects Defendants' invitation to decline to exercise supplemental jurisdiction.

When as here a federal court is asked to pass on the meaning of a state law that has not yet been authoritatively interpreted, the court "must make an *Erie*-guess as to how the [state s]upreme [c]ourt would rule" based on "all resources available." *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901–02 (10th Cir. 2005) (internal quotation marks omitted). The Utah Supreme Court

has indicated in other areas of constitutional law that when a state constitutional provision mirrors a federal one, the state provision must be analyzed independently with "no presumption that federal construction of similar language is correct." *State v. Tiedemann*, 162 P.3d 1106, 1114–15 (Utah 2007). When analyzing a question of first impression under the Utah constitution, the Utah Supreme Court "exmain[es] the historical background against which [that clause] . . . was drafted," among other things. *West v. Thomson Newspapers*, 872 P.2d 999, 1013 (Utah 1994). Here, the court has received minimal briefing on the historical background against which article I, section 4 was adopted, making an *Erie*-guess especially difficult.

Plaintiffs ask the court to interpret this clause to require strict scrutiny for any laws burdening free exercise.[4] Defendants on the other hand propose that this clause stands for a principle of strict neutrality and therefore does not protect against free-exercise burdens stemming from neutral laws. In essence, the parties propose the following two doctrinal formulations: (1) if a litigant can show a burden on his sincere religious exercise, the government must satisfy strict scrutiny for the challenged law to stand; and (2) if a law is entirely neutral toward religion generally and neutral among religions, then the law stands no matter how great a burden it incidentally imposes on the religious litigant. The former resembles the Supreme Court's jurisprudence before *Employment Division v. Smith* (except that the Court's pre-*Smith* doctrine first required the plaintiff to show a *substantial* burden, *see Smith*, 494 U.S. at 883; *supra* note 1); the latter, the Court's current jurisprudence.

_____

[4] Plaintiffs propose strict scrutiny for any free-exercise violation, but they do not explain what should constitute a free-exercise violation. By violation, they most likely mean burden. So, their proposed interpretation would subject a law to strict scrutiny anytime it burdens a litigant's religious exercise.

In choosing between these proposals for the state free-exercise clause, the court is aware of the lively debate surrounding the interpretation of the Federal Free Exercise Clause. Jurists and commentators of all stripes have long criticized the Court's rule under *Smith* (which echoes Defendants' proposal) as insufficiently protective of religious liberty. *See, e.g.*, *Rader v. Johnston*, 924 F. Supp. 1540, 1549 (D. Neb. 1996) ("[T]he majority opinion in *Smith* has been harshly criticized by virtually every legal scholar and commentator addressing the decision, and various members of the Court have demanded reconsideration of the *Smith* holding at the first opportunity." (citation omitted)). Despite the broad consensus, however, the Court has not overruled *Smith*, in part because it is not obvious what a workable alternative doctrine would be. *See Fulton*, 593 U.S. at 543 (Barrett, J., concurring) ("[W]hat should replace *Smith*? The prevailing assumption seems to be that strict scrutiny would apply whenever a neutral and generally applicable law burdens religious exercise. But I am skeptical about swapping *Smith*'s categorical antidiscrimination approach for an equally categorical strict scrutiny regime, particularly when this Court's resolution of conflicts between generally applicable laws and other First Amendment rights . . . has been much more nuanced."). Plaintiffs' proposal, which closely resembles the leading alternative, would raise all sorts of difficult questions. To name just a couple, "Should there be a distinction between indirect and direct burdens on religious exercise?" *Id.* at 544. Or what threshold showing must the religious claimant make to shift the burden to the government to satisfy strict scrutiny?

The court is also aware that most States, about 35, provide greater free-exercise protections than the Federal Constitution does (often in response to the perceived deficiencies in the *Smith* rule). In about 10 of them, those greater protections have come through judicial interpretation of the state constitutions' counterparts to the Free Exercise Clause. *See, e.g.*, *Coulee Cath. Schs. v.*

*Lab. & Indus. Rev. Comm'n*, 768 N.W.2d 868, 886 (Wis. 2009) (Wisconsin); *Cath. Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006) (New York). By contrast, in the remaining 25 or so (including Utah), those greater protections have come through state RFRAs enacted by the state legislatures. *See, e.g.*, 775 ILL. COMP. STAT. 35/1 et seq. (Illinois); TENN. CODE ANN. § 4-1-407 (Tennessee). Finally, the court considers the reality that in this litigation, any relief the state constitution could provide Plaintiffs would overlap with the relief they are already likely to receive under the Federal Constitution and the Utah RFRA.[5]

These considerations at this procedural juncture counsel that it would be wisest to assume—without deciding—that the Utah constitution's free exercise clause provides protections equal to those of the Federal Constitution's Free Exercise Clause. Doing so adheres to "the general rule that courts should avoid reaching constitutional issues if the case can be decided on other grounds." *West*, 872 P.2d at 1004. And it leaves the state court "free and unfettered . . . in interpreting [its] state constitution[]." *Michigan v. Long*, 463 U.S. 1032, 1041 (1983).

Assuming a lockstep interpretation of Utah's free exercise clause, then, the court's analysis of Plaintiffs' federal Free Exercise Clause claims above also controls the resolution of Plaintiffs' state free-exercise-clause claims. Under that analysis, the Utah Controlled Substances Act's restrictions on psilocybin possession and use, though neutral, are not generally applicable due to the secular exemption for behavioral-health treatment by certain healthcare systems and accordingly trigger strict scrutiny if a plaintiff can show that the restrictions burden its religious exercise. And Plaintiffs' complaint alleges facts sufficient for the court to conclude that Plaintiffs

---

[5] Plaintiffs could potentially obtain a declaratory judgment and injunction under the Federal Constitution and the Utah RFRA, and damages under the Federal Constitution (through § 1983). The Utah constitution would not provide any additional remedies.

have alleged a burden on their free exercise. At this stage, then, the court denies Defendants'
motion to dismiss Plaintiffs' state free-exercise-clause claim.

      D.      Utah Constitution Search and Seizure Claim

Much like its federal counterpart, the Utah constitution protects against "unreasonable
searches and seizures" and provides that "no warrant shall issue but upon probable cause supported
by oath or affirmation." UTAH CONST. art. I, § 14. As with their Fourth Amendment claim,
Plaintiffs allege that the officers who executed the search warrant and seized the mushrooms and
scripture lacked probable cause to do so. Defendants invoke the Utah Governmental Immunity
Act.

Utah's Governmental Immunity Act immunizes governmental entities and their employees
"from suit for any injury that results from the exercise of a governmental function," UTAH CODE
ANN. § 63G-7-201(1), unless immunity is waived, *id.* § 63G-7-301 (setting out various waivers of
immunity). The Act defines governmental function broadly to include "each activity, undertaking,
or operation performed by a department, agency, employee, agent, or officer of a governmental
entity." *Id.* § 63G-7-102(5)(b). However, the Act "does not apply to claims alleging state
constitutional violations." *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 479 (Utah 2011).
Because Plaintiffs' claim is based in the Utah constitution, under binding Utah Supreme Court
law, immunity under the Act does not attach. Accordingly, the court denies Defendants' motion to
dismiss as to this claim.

      E.      Utah RFRA Claim

As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a
government entity may not substantially burden the free exercise of religion of a person, regardless
of whether the burden results from a rule of general applicability," unless "the government

14

entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3).

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024—more than 60 days before Plaintiffs filed an amended complaint on January 22, 2025.[6] Plaintiffs' Utah RFRA claim is therefore properly before the court.

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate not just a burden but a *substantial* burden on sincere religious exercise.[7] This language is nearly identical to that in the federal RFRA on which the Utah RFRA was modeled,

---

[6] Plaintiffs originally filed their amended complaint as an exhibit to the document containing the parties' stipulation concerning the amended complaint. ECF No. 73-1. On February 4, 2025, the court ordered Plaintiffs to file their amended complaint as a separate entry on the docket, which Plaintiffs did the next day. ECF No. 83.

[7] It is unsettled whether the Free Exercise Clause also contains this requirement under recent case law, though the Tenth Circuit appears to have indicated that it does not. *See supra* note 1.

42 U.S.C. § 2000bb–1(a), and the federal RFRA drew this language from pre-*Smith* case law, *see id.* § 2000bb(b). How courts should assess whether a burden on religious exercise is substantial in a principled manner without wading into questions of theology is a subject of ongoing debate. *See, e.g.*, Michael A. Helfand, *Substantial Burdens as Civil Penalties*, 108 IOWA L. REV. 2189 (2023) (encouraging courts to consider the burdens of civil penalties for noncompliance); Sherif Girgis, *Defining "Substantial Burdens" on Religion and Other Liberties*, 108 VA. L. REV. 1759 (2022) (encouraging courts to consider whether a challenged law leaves adequate alternative ways to exercise religious rights). The court need not begin to resolve this issue, however, because by any measure, Plaintiffs' allegations, if proven, would establish that the government has substantially burdened their sincere religious exercise. Plaintiffs allege that they offer a "sacramental psilocybin tea" to their voyagers, who then embark on a spiritual journey by which they "write their own scripture." Complaint at 8. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—not only burdens but substantially burdens the free exercise of Singularism and its adherents.[8] *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants challenge this commonsense conclusion by arguing that Plaintiffs cannot allege a substantial burden as that term is defined in the Utah RFRA. As they see it, Defendants' actions of seeking a criminal penalty, as opposed to assessing a criminal penalty, do not count as a

---

[8] Although it does not matter for deciding the motion to dismiss, this court has also found that Plaintiffs' allegations are supported by evidence. *See Jensen*, 2025 WL 582812, at *9.

substantial burden. *See* UTAH CODE ANN. § 63G-33-101(6)(b)(i)(B) (noting that "substantially burden" includes "*assessing* criminal, civil, or administrative penalties" (emphasis added)).

This challenge entirely misses the mark and borders on the disingenuous. Most fundamentally, Defendants fixate on their criminal prosecution as the source of the burden on Plaintiffs' religious exercise when the root of the burden is the Utah Controlled Substances Act and its direct prohibitions on psilocybin use. If the statute did not prohibit Plaintiffs' psilocybin use, Defendants would have no basis for prosecuting Mr. Jensen. And to state the obvious, a statute can substantially burden religious exercise. *See id.* § 63G-33-101(6)(b)(ii)(A)(I).

Even if the court focused narrowly on Defendants' prosecution as the source of the burden, the prosecution still fits comfortably within the statute's expansive definition of substantially burden. *See id.* (recognizing that an "assertion of governmental authority" can substantially burden religious exercise). In pressing their argument about seeking versus assessing criminal penalties, Defendants grossly misconstrue the text they cite. The subsection Defendants point to says that "'substantially burden' *includes* . . . assessing criminal . . . penalties." *Id.* (emphasis added). The word "includes" indicates that what follows is not an exhaustive list, and nothing in the statute excludes a criminal prosecution from the definition of substantial burden. Rather, the subsection consistently uses very broad language to define substantial burden. *See, e.g.*, § 63G-33-101(6) (recognizing that substantial burdens could be imposed "directly" or "indirectly" and could stem from "law, statute, ordinance, rule, policy, order, or other assertion of governmental authority" or "any other means").

Finally, the implications of Defendants' argument are breathtaking. Suppose the State of Utah decided to give Prohibition another try and passed a law banning the possession, use, or distribution of alcoholic beverages with a limited exception for red wine administered by a

healthcare system for medical reasons. Then suppose that Catholic priests in Provo, believing themselves to be protected by the Utah RFRA, distributed wine during Mass and consequently faced criminal prosecution by Utah County. According to Defendants' theory, as long as no criminal penalties were actually imposed on the priests, their religious exercise would not be substantially burdened, either by the law banning alcoholic beverages or by the criminal prosecution. The ludicrousness of Defendants' argument here needs no explanation. In any event, the court concludes that Plaintiffs have alleged a substantial burden on their free exercise and consequently established their prima facie case. It accordingly denies Defendants' motion to dismiss the state RFRA claim as well.

## II.    Plaintiffs' Motion for Anti-Suit Injunction

After the government filed criminal charges against Mr. Jensen, Plaintiffs also moved for an anti-suit injunction against the state criminal prosecution. In their view, the state-court prosecution—brought by the same government Defendants that removed this civil case to federal court in the first place—subverts the purposes of the removal statute by giving the government a second opportunity to litigate the issues on which the government appears poised to lose in this court. Plaintiffs accordingly urge this court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to enjoin the state-court prosecution pending final judgment in this court. Defendants' opposition invokes abstention and the Anti-Injunction Act, 28 U.S.C. § 2283, to argue that it would be improper for the court, at least at this preliminary stage in the proceedings, to enjoin the prosecution. The court begins by addressing abstention.

In our system of federalism, "when federal courts are asked to enjoin pending proceedings in state court[]," the "normal thing to do . . . is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971). This abstention principle is grounded in comity—a proper respect for state

18

functions—and applies even more powerfully when the state proceeding is criminal in nature because state officers "are charged with the duty of prosecuting offenders against the laws of the state." *Fenner v. Boykin*, 271 U.S. 240, 243 (1926).

The doctrine guiding federal courts in determining whether to proceed in a federal case that would interfere with a pending state case is called *Younger* abstention after the Supreme Court's decision in *Younger v. Harris*. Although *Younger* abstention sometimes applies even when the pending state case is civil in nature, it primarily protects state criminal cases from federal interference. *See Huffman v. Pursue*, 420 U.S. 592, 604 (1975). Under *Younger*, a federal court should abstain from hearing the merits in a federal case challenging a state prosecution when (1) the state proceeding is "ongoing"; (2) the state forum provides an adequate opportunity to raise the relevant federal claims; and (3) the state proceeding implicates an important state interest. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 523 (2023). Because *Younger* abstention is a doctrine based on comity, not jurisdiction, a defense based on *Younger* can be waived. *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986). Moreover, the doctrine recognizes certain narrow exceptions, such as in cases where the state prosecution is brought in bad faith or the plaintiff faces irreparable harm. *Younger*, 401 U.S. at 49.

Defendants urge this court to deny Plaintiffs' motion for anti-suit injunction on the grounds that a state criminal case is now proceeding against Mr. Jensen that allows him a full and fair opportunity to raise his constitutional and statutory claims in defense. The court sees no reason why Mr. Jensen could not raise his various claims in defense in the state criminal case (the second *Younger* condition). And it is beyond debate that the state criminal case implicates the State of Utah's important interests in prosecuting those who violate its controlled-substances laws (the

third *Younger* condition). Whether the state criminal case is "ongoing" within the *Younger* analysis, however, is a more difficult issue.

In assessing whether a state proceeding is ongoing at the time the federal case begins, the federal court may not simply compare the filing dates of the two cases. Rather, the court must examine whether "state criminal proceedings are begun . . . before any proceedings of substance on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Even if the state proceeding commences after the federal case is filed, the federal court must abstain if the federal case was still in in an "embryonic stage and no contested matter had been decided" when the state proceeding began. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975).

What counts as a state proceeding in this analysis is not settled: "[c]ircuits are split on the issue of whether *Younger* abstention applies in the pre-indictment stages of a criminal proceeding." *Pawelsky v. County of Nassau*, 684 F. Supp. 3d 73, 82 (E.D.N.Y. 2023). The Supreme Court has hinted that *Younger* abstention should apply to "about-to-be-pending state criminal action[s]." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 n.1 (1992). And as relevant to the facts here, many courts have determined that a state criminal proceeding for *Younger* purposes begins with the execution of a search warrant. *See, e.g.*, *Kingston v. Utah County*, No. 97-4000, 1998 WL 614462, at *4 (10th Cir. 1998); *Pawelsky*, 684 F. Supp. 3d at 83 ("[J]udicial authorization of a search warrant is part of a criminal proceeding because it occurs in a criminal court and is related to a prospective criminal action or involves a criminal investigation." (internal quotation marks omitted)); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) ("[C]ommon sense dictates that a criminal investigation is an integral part of a criminal proceeding."). *But see Moore v. Garland*, No. CV 19-00290, 2024 WL 4534597, at *3 (D. Ariz. 2024) (implying that the state-

court proceeding was initiated when the indictment was returned, not when the search warrants were executed).

The Tenth Circuit appears not to have published a binding decision on the matter yet. If the execution of a search warrant begins a state criminal proceeding for *Younger* purposes—as the weight of the authority appears to indicate—then the conditions for *Younger* abstention would be satisfied here because the search warrants were executed even before Plaintiffs filed their action in state court seeking declaratory judgment and preliminary relief. (That Plaintiffs filed the action in state court and Defendants subsequently removed it to federal court does not affect the analysis here. The court considers this procedural feature in its discussion of waiver and bad faith below.) Ultimately, however, the court determines that it need not decide whether a state criminal proceeding was ongoing when this federal case began because it can resolve the issue of *Younger* abstention on waiver and the bad-faith and irreparable-harm exceptions.[9]

As noted above, a state can waive a *Younger* abstention defense. The court finds that Defendants have waived their *Younger* defense by removing to federal court the civil action Plaintiffs originally filed in Utah state court. The weight of the case law "support[s] . . . the principle that the *Younger* abstention defense is waived when an action is removed from state court

---

[9] The court also notes that Defendants appear to have taken inconsistent positions on whether state proceedings had begun when the federal case began. At the December 13 hearing on Plaintiffs' motion for a temporary restraining order, Defendants argued that the mere threat of criminal prosecution at the time of the federal case did not constitute government action as part of their attempt to persuade the court that the ongoing-harm exception to the Utah RFRA notice requirement did not apply. *See* ECF No. 53-1 ("TRO Hearing Transcript"), at 233. Now, in their opposition to Plaintiffs' motion for anti-suit injunction, Defendants urge the court to take a broader view of the criminal process and find that a state criminal proceeding was ongoing at the time the federal case began because the government had executed search warrants and threatened prosecution. If nothing else, this shift in position simply underscores the court's finding of bad faith, *infra*.

and federal jurisdiction is thereby invoked by the defendant." *Cummings v. Husted*, 795 F. Supp. 2d 677, 692 (S.D. Ohio 2011); *see also Ryan v. State Bd. of Elections*, 661 F.2d 1130, 1136 (7th Cir. 1981) ("[When a] state defendant affirmatively remove[s a] case from state to federal court[, i]ts submission to a federal forum . . . renders *Younger* abstention inapplicable."). As one district court explained by analogy to Eleventh Amendment immunity, "*Younger* abstention is a doctrine of federal-state comity that limits the extent to which state defendants may be sued in federal court." *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 285 (N.D. Ga. 2003). When state defendants "are in federal court only because of their own decision to remove the case from state court[, i]t would be fundamentally unfair to permit [them] to argue that th[e federal c]ourt must abstain from hearing the case." *Id.* "To do so would permit [state] defendants effectively to prevent [the] plaintiffs from pursuing their federal claims in *any* forum." *Id.*

To avoid the straightforward consequences of their own decision to remove this case, Defendants point to *Dowden v. City of Sacramento*, 40 F. Supp. 2d 1146 (E.D. Cal. 1999), which stated in a footnote that "a state does not waive the comity and federalism interests undergirding *Younger* by invoking the jurisdiction of the federal courts." *Id.* at 1152 n.5. In this court's view, *Dowden* incorrectly interpreted a passage from the Supreme Court's opinion in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, to mean that a state defendant does not waive its *Younger* abstention defense by removing an action to federal court.

In *Ohio Civil Rights Commission*, the plaintiffs, a private school system and various individuals, sued in federal court to enjoin a pending state civil-rights administrative proceeding against the private school system. *Ohio C.R. Comm'n*, 477 U.S. at 622. The state defendant stipulated in the federal district court that the court had jurisdiction of the action but urged the court to abstain under *Younger*. *Id.* at 626. The plaintiffs then argued that the defendants had

22

waived their *Younger* defense by stipulating to the federal court's jurisdiction, but the Supreme Court disagreed: since *Younger* abstention is based in considerations of comity, not jurisdiction, the defendants' stipulation to jurisdiction did not waive their *Younger* defense. *Id.* To waive their *Younger* defense, the defendant would have had to "voluntarily submit to federal jurisdiction." *Id.* The *Dowden* case appears to have conflated stipulating to federal jurisdiction on the one hand with voluntarily submitting to federal jurisdiction on the other.

A state defendant's decision to remove an action to federal court is perhaps the most straightforward way for it to voluntarily submit to federal jurisdiction and thereby waive its *Younger* defense. *See Kenny A.*, 218 F.R.D. at 285; *see also Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system."). A finding of waiver is particularly warranted where, as here, "the [state] defendant seek[s] to manipulate the forum in order to . . . hedge its bet on the merits." *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1111 (N.D. Cal. 2006).

Recall that Plaintiffs filed their civil action in state court on November 19 (eight days after state officers executed a search warrant at Singularism's spiritual center and seized their mushrooms and scripture). Defendants then removed the action to federal court on November 27, and the court held a hearing on Plaintiffs' request for a temporary restraining order on December 13. Only after this court determined that Plaintiffs were likely to prevail on the merits of their state RFRA claim did Defendants institute criminal proceedings against Mr. Jensen and invoke *Younger* abstention. From this sequence of events, the court finds that Defendants commenced the state criminal action (the basis for their abstention argument now) in order to relitigate the RFRA issue on which they appear to be poised to lose in this court—in other words, to get a second bite at the

23

apple. The court will not allow the shield of the *Younger* doctrine to be used as a gamesmanship sword.

Even if Defendants had not waived their *Younger* abstention defense by voluntarily invoking federal jurisdiction, the court finds that the bad-faith and irreparable-injury exceptions apply. In the Supreme Court's formulation, *Younger* does not prevent a federal court from granting injunctive relief against pending state criminal proceedings "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

In assessing whether a state prosecution was commenced in bad faith, courts consider the following factors: "(1) whether it was frivolous or undertaken with no reasonably objective hope of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997). The court finds that the balance of the factors weighs strongly in favor of finding that the state prosecution was commenced in bad faith.[10] The government filed its criminal

---

[10] The court expresses no view on whether the issuance and execution of the search warrants was done in bad faith. The court also recognizes that earlier in this opinion, it declined to settle the issue of when state criminal proceedings began for *Younger* purposes—whether they began with the execution of the search warrants or whether they began with the commencement of the prosecution against Mr. Jensen—but recognized that the weight of the authority suggested the former. One could plausibly argue that if the execution of the search warrant marked the start of the state criminal proceedings and if the search warrant was issued and executed in good faith (as it may well have been here), then the bad-faith exception cannot apply, regardless of the circumstances surrounding the subsequent prosecution. But this argument would potentially allow a state to insulate a bad-faith prosecution from federal-court review by pointing to the initial good-faith issuance and execution of a search warrant. Given that "the issue of *Younger* abstention can

charges five days after this court had already issued a temporary restraining order concluding that Plaintiffs were likely to succeed on the merits of their claim that their use of psilocybin for religious purposes is protected. As explained above, this fact in context suggests that the government, having preliminarily lost in this court, is attempting to get a favorable ruling from a more sympathetic court. Although this court does not find the prosecution to be objectively frivolous (after all, if Plaintiffs' religious-exercise claims do not ultimately succeed, they will have admitted to violating the State's criminal drug laws), the court does find that the prosecution is grounded in the government's refusal to recognize the sincerity of a religion that to it appears foreign, strange, or illogical. And in the context of the intrusive, offensive questioning from Defendants' counsel during the December 13 hearing and the vastly overbroad expedited discovery requests, the court has no hesitation finding that the government pursued the prosecution primarily to harass Plaintiffs into ceasing their sincere religious practices.

Separately, the threat to a plaintiff's federally protected rights is irreparable within the meaning of the *Younger* doctrine "only . . . if it 'cannot be eliminated by his defense against a single criminal prosecution.'" *Id.* (quoting *Younger*, 401 U.S. at 46). Even before the prosecution commenced against Mr. Jensen, Defendants pressured the landlord of Singularism's spiritual center to evict Singularism. Plaintiffs also presented evidence that Singularism was losing adherents due to Defendants' raid, and the very real threat of criminal prosecution against more of Singularism's members and affiliates will only continue to shrink its ranks. Mr. Jensen's defense

---

be addressed by a federal court at any time," not just "at the onset of a case," *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1109 (N.D. Cal. 2006), the court finds it proper to assess whether the subsequent prosecution was brought in bad faith even if the relevant state proceeding triggering *Younger* abstention was the initial execution of the search warrant.

in state court, even if successful, cannot remedy these associational harms to Singularism and its adherents. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[A]bsent preliminary relief [enjoining a state-court prosecution], [the federal plaintiffs] would suffer substantial loss of business and perhaps even bankruptcy.").

In sum, Defendants have waived their defense of *Younger* abstention by removing the action to federal court, but even if removal did not constitute waiver, this case falls into the bad-faith and irreparable-injury exceptions to *Younger* abstention. Having resolved the threshold issue of abstention, the court now considers its authority to issue the injunction Plaintiffs request. To do so, it must examine the All Writs Act and the Anti-Injunction Act.

The All Writs Act, which traces its origins to the Judiciary Act of 1789 organizing the federal judiciary, authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. This authority is limited by the Anti-Injunction Act, adopted just a few years later in 1793, which prohibits federal courts from granting injunctions to stay proceedings in a state court except in three limited situations: "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The purpose of the Anti-Injunction Act is to "forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977). It acts as an "absolute prohibition enjoining state court proceedings, unless the injunction falls within one of the specific[] . . . exceptions." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). Plaintiffs argue that this case falls into both of the first two exceptions and is likely to fall into the third exception as well.

The third exception, known as the relitigation exception, is easy to reject here. This "strict and narrow" exception applies only when "the claims or issues which the federal injunction insulates from litigation in state proceedings *actually have been decided* by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148 (1988) (emphasis added). Since the current action is in a preliminary stage, no claims or issues have been actually decided by this court, and the relitigation exception cannot prevent a parallel state-court action.

The second exception, "in aid of" the federal court's jurisdiction, is also simple to reject here because it applies only to actions in rem—that is, actions concerning ownership of a specific piece of property. In those actions, "the effect of [a parallel state] action would be to defeat or impair the jurisdiction of the federal court" because the federal court deciding the claims must exercise "possession or control, actual or potential, of the res [i.e., piece of property]." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922). But "a controversy over a mere question of personal [or governmental] liability does not involve the possession or control of a thing, and an action brought to enforce such liability does not tend to defeat the jurisdiction of the court in which a prior action for the same cause is pending." *Id.* This case concerns Defendants' alleged liability for violating Plaintiffs' constitutional and statutory free-exercise rights, not a specific piece of property, so the second exception is inapplicable.[11]

---

[11] Plaintiffs point to more recent cases to argue that this second exception should not be construed so narrowly as to apply only to in rem actions; rather, they urge, it also applies to actions removed from state to federal court. *See, e.g.*, *Est. of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011). Even if so, the exception would apply only to the action that is removed, not to a closely related separate action. "[N]ecessity is required to invoke this exception; 'it is not enough that the requested injunction is related to th[e exercise of federal] jurisdiction.'" *Id.* (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)).

The first exception, as "expressly authorized" by Congress, though, does support issuing an anti-suit injunction insofar as it is based on Plaintiffs' First Amendment claims. For this first exception to apply, "an Act of Congress must have created a specific and uniquely federal right or remedy . . . that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 237 (1972).

Initially, Plaintiffs argue that the removal provisions, 28 U.S.C. § 1441, 1446, under which Defendants brought this civil case from state court to federal court, constitute an express authorization from Congress to enjoin the state prosecution here. Under Supreme Court precedent, "[t]he statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings," explicitly authorizing the federal court to enjoin further litigation of the removed action in state court. *Vendo Co.*, 433 U.S. at 640. Whether those provisions also permit the federal court to enjoin a separate state action filed to litigate the same issues between the same parties in state court is the subject of a longstanding circuit split.

Several appellate courts have concluded that "[a]lthough the removal statute . . . commands the state court to stay [only] the case that was actually removed, it [also] . . . authorize[s] courts to enjoin later filed state cases that were filed for the purpose of subverting federal removal jurisdiction." *Kan. Pub. Emps. Retirement Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063 (8th Cir. 1996); *see also Lou v. Belzberg*, 834 F.2d 730, 741 (9th Cir. 1987) ("It would be of little value to enjoin continuance of a state case after removal and then permit the refiling of essentially the same suit in state court."); *Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899, 901 (5th Cir. 1975) ("[W]here a district court finds that a second suit filed in state court is an attempt to subvert the purposes of the removal statute, it is justified and authorized by § 1446(e) in enjoining proceedings in the state court."). *But see Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 252 (4th Cir. 2013)

28

("[Section] 1446(d) invalidates post-removal actions taken in state court in the removed case, but it does not reach (and therefore does not invalidate) actions taken in cases other than the removed case."). These cases followed a similar pattern: a plaintiff filed an action in state court, the defendant removed the action to federal court, then the plaintiff filed a nearly identical action again in state court but without the federal jurisdictional hook (i.e., a federal claim if the defendant's removal was based on federal-question jurisdiction, or complete diversity of parties if the defendant's removal was based on diversity jurisdiction) to preclude removal a second time.

The Tenth Circuit has yet to resolve the question, and the court finds the Fourth Circuit's view more persuasive than that of the other three appellate courts cited above. Crucially, the text of the removal statute appears to cover only the action removed from the state system. 28 U.S.C. § 1446(d) ("[T]he clerk of [the] State court . . . shall effect the removal[,] and the State court shall proceed no further unless and until *the case* is remanded." (emphasis added)). Courts should hesitate to read the removal statute more expansively given the Supreme Court's repeated admonition that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Vendo Co.*, 433 U.S. at 630 (alteration in original) (quoting *Atl. Coast Line*, 398 U.S. at 297)).

But even if this court interpreted the removal statute to permit injunctions against copycat state-court actions, it still would not permit an injunction against the criminal prosecution here. As noted above, "in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 237. That is, this exception

29

may be invoked only to protect a specific federal right created by Congress. The federal removal statute provides the defendant a specific and uniquely federal right to have the claims against it heard in federal court. So, any injunction authorized by the removal statute must be directed toward protecting the defendant's right to be heard in a federal forum (for example, an injunction against the plaintiff's copycat state-court action). An injunction against the state government's own criminal prosecution here, by contrast, would do nothing to protect Defendants' right to be heard in a federal forum because that prosecution does not threaten Defendants' removal rights in the first place. Indeed, it is *Plaintiffs* here, not Defendants, who request the court to enjoin the separate state-court proceeding.

Although the federal removal statute does not expressly authorize the court to enjoin the state prosecution, it is well settled that "§ 1983 is an Act of Congress that [does] fall[] within the 'expressly authorized' exception." *Mitchum*, 407 U.S. at 242–43. Thus, the court may enjoin the state prosecution insofar as the prosecution "subjects . . . [Plaintiffs] to the deprivation of . . . rights . . . secured by the [Federal] Constitution." 42 U.S.C. § 1983. To be sure, an injunction against a state prosecution is an exceptionally extraordinary remedy given the "general rule" that a federal court "has no jurisdiction to enjoin criminal proceedings . . . under the state law." *Ex Parte Young*, 209 U.S. 123, 161 (1908). That rule, however, does not apply in "situation[s] in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965).

Based on a thorough review of the evidence, the court concludes "that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in [the Supreme] Court of any adverse determination." *Id.* at 486. As explained above, Plaintiffs have alleged a prima facie case under the Free Exercise Clause—

that is, the Utah Controlled Substances Act is subject to strict scrutiny insofar as it restricts Plaintiffs' religious use of psilocybin—and this court has already found that the government is unlikely to meet its burden on strict scrutiny. That means that Plaintiffs are likely to succeed on the merits of their Free Exercise Clause claim. And "religious freedom . . . has classically been one of the highest values of our society." *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961). So, the loss of Plaintiffs' religious freedom pending the conclusion of the state criminal prosecution "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (internal quotation marks omitted).

The irreparable injury to Plaintiffs is not merely theoretical. Based on the record in this case, the court notes once again its finding that the prosecution was brought in bad faith as part of a larger effort to harass Plaintiffs for their entheogenic religious practices and in hopes of giving the government a second opportunity to litigate the free-exercise issues presented squarely in this case. The prosecution has already caused Singularism to lose many of its practitioners and affiliates, and forcing Plaintiffs to wait until the conclusion of the criminal proceedings to secure their free-exercise rights would be the equivalent of issuing a death warrant for their nascent religion. For these reasons, the court grants Plaintiffs' motion for an anti-suit injunction pending final judgment in this court enjoining further proceedings in the state criminal case against Mr. Jensen insofar as that case prosecutes him for violating the Utah Controlled Substances Act's prohibitions on psilocybin.[12]

---

[12] The state criminal case, *State v. Jensen*, Case No. 241404407 (4th Dist. Utah), also prosecutes him for possession and use of THC. Mr. Jensen represents that he is a member of the Church of the Native Americans and possesses a membership card indicating that he is qualified to carry, possess, and use Native American Church sacraments like cannabis. However, he has not made

## CONCLUSION AND ORDER

The court **DENIES** Defendants' motion to dismiss and **GRANTS** Plaintiffs' motion for anti-suit injunction restraining the state criminal case against Mr. Jensen. Defendants Utah County and Utah County Attorney Jeffrey Gray are **ORDERED** to cease further proceedings in *State v. Jensen*, Case No. 241404407 (4th Dist. Utah), pending final judgment in this court.

Signed August 4, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

any argument in this court for enjoining the prosecution against him for THC possession and use, so the court does not disturb the prosecution insofar as it concerns THC.